Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com

Steve W. Berman
(*pro hac vice motion to be filed*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 268-9320
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiff*

Nitin Shah (DC Bar No. 156035)
(*pro hac vice motion to be filed*)
Jeffrey B. Dubner (DC Bar No. 1013399)
(*pro hac vice motion to be filed*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
Facsimile: (202) 701-1775
nshah@democracyforward.org
jdubner@democracyforward.org

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA REINVESTMENT COALITION, | No. |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| KATHLEEN L. KRANINGER, Director, Consumer Financial Protection Bureau, In Her Official Capacity and CONSUMER FINANCIAL PROTECTION BUREAU, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   JURISDICTION AND VENUE ..........................................................................2

III.  PARTIES ............................................................................................................3

IV.   FACTUAL ALLEGATIONS ..............................................................................3

     A.    Section 1071 of the Dodd-Frank Act................................................3

     B.    CFPB's Years of "Preliminary" Steps ..............................................4

     C.    CFPB Delays Section 1071 Implementation Even Further ...............7

     D.    Harm to Plaintiff...............................................................................8

V.    CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF ........................11

COUNT ONE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
     5 U.S.C. § 706(1)..............................................................................................11

COUNT TWO VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
     5 U.S.C. § 706(2)(A), (C)..................................................................................11

PRAYER FOR RELIEF .................................................................................................12

Plaintiff the California Reinvestment Coalition ("CRC") brings this action for declaratory and injunctive relief against Kathleen L. Kraninger, in her official capacity as Director of the Consumer Financial Protection Bureau, and the Consumer Financial Protection Bureau (collectively, "CFPB" or "Bureau"), and alleges as follows:

## I.    INTRODUCTION

1.    This lawsuit, brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenges the CFPB's unlawful failure to follow Congress's commands in Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (codified at 15 U.S.C. § 1691c–2), which was enacted to identify community development needs and opportunities for women-owned, minority-owned, and small businesses and to reduce discrimination against such businesses.

2.    As CFPB has recognized, data on lending practices is critical to identifying "credit deserts" where businesses and communities have difficulty accessing credit, and to allow financial institutions, community development organizations, and governmental agencies to identify areas of need and potential solutions.[1] Such data does not currently exist, making it "[im]possible to confidently answer basic questions regarding the state of small business lending."[2]

3.    Section 1071 was designed to fill this gap by requiring financial institutions to maintain records of their actions on loan applications by women-owned, minority-owned, and small businesses. In Section 1071, Congress required the CFPB to collect and publish this data annually, and to issue rules and guidance to carry out Section 1071's requirements.

4.    Despite Section 1071's clear and mandatory terms, CFPB has entirely failed to collect and publish the lending data required by Section 1071, or to issue any implementing regulations, in the nearly nine years since its passage. By failing to implement Congress's explicit, mandatory directive, CFPB has unlawfully withheld and unreasonably delayed agency action, violating the APA.

---

[1] *See* CFPB, *Key Dimensions of the Small Business Lending Landscape* 40 (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf [hereinafter *Key Dimensions*].

[2] *Id.*

5.      CFPB's inaction has harmed women-owned, minority-owned, and small businesses, as well as organizations that seek to support community development efforts, like CRC and its member organizations.

6.      Section 1071's benefits for communities seeking enhanced access to credit is clear. Providing lending data, as Section 1071 requires, would incentivize financial institutions to ensure that all communities have equal access to credit. The data will allow women-owned, minority-owned, and small businesses, and nonprofits like CRC who exist to ensure that these businesses have access to credit, to identify specific problem areas and address these problems through negotiations with financial institutions, advice to economic development initiatives, enhanced enforcement opportunities, and advocacy to local, state, and federal policymakers.

7.      The data that Congress required CFPB to publish would aid Plaintiff in numerous ways. For CRC and its members, it would provide critical, currently unavailable information that would improve CRC's ability to negotiate with lenders to invest and originate responsible loans in businesses in low-income communities and communities of color. It would also enable CRC and others to analyze the data and identify specific areas of concern and work with financial institutions, economic development organizations, and policymakers to address these concerns. Without this data, CRC is significantly hindered in these efforts and is forced to expend substantial additional organizational resources to effectuate its organizational objective of ensuring the availability of lending for small businesses and others who have historically been denied equal access to capital.

8.      Accordingly, the Court should declare Defendants in violation of the APA and the Act, and require the CFPB to promptly issue a Proposed and Final Rule implementing Section 1071 and begin collecting and publishing the required data.

## II.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

10.     Venue is proper under 28 U.S.C. § 1391(e) because Plaintiff CRC has its principal place of business in San Francisco, California, which is within the Northern District of California.

11.     Intradistrict Assignment: Pursuant to Civil L.R. 3-2(c), intradistrict assignment is proper in the San Francisco or Oakland Division, as this action arises in the County of San Francisco, where Plaintiff has its principal place of business.

### III.     PARTIES

12.     Plaintiff California Reinvestment Coalition, founded in 1986, is a nonprofit organization operating under Section 501(c)(3) of the Internal Revenue Code. CRC is based in San Francisco, California. CRC was founded to aid low-income communities and communities of color in accessing credit, financial services, and investments. Its membership comprises more than 300 nonprofit community-based organizations and public agencies, including small business lenders, community development financial institutions, and technical assistance providers that work directly with small businesses to ensure equal access to capital. Of particular relevance here, CRC seeks to accomplish its mission by negotiating agreements with lenders to increase lending to and investments in women-owned, minority-owned, and small businesses, and by publishing evidence-based reports to educate its members, policymakers, and the public about areas of need and ways to promote credit access.

13.     Defendant Kathleen L. Kraninger is Director of the Consumer Financial Protection Bureau.

14.     Defendant Consumer Financial Protection Bureau is a federal agency headquartered in Washington, D.C.

### IV.     FACTUAL ALLEGATIONS

**A.     Section 1071 of the Dodd-Frank Act**

15.     For decades, CRC and its member organizations have been calling for changes to federal law to require collection and publication of data documenting lending to women-owned, minority-owned, and small businesses, and lending in neighborhoods of color, in order to identify needs and opportunities for increasing access to capital among those communities.

16.     The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act" or "Act") enacted a series of reforms designed to prevent a recurrence of the 2008

financial crisis and to protect consumers from harmful and predatory practices by financial institutions.

17.     The Act established the CFPB with the purpose of "ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). The Act gave the CFPB broad regulatory authority with which to accomplish this mission, and also established several mandatory duties consistent with its mission.

18.     Among these, in order to address an identified problem with the inability of women-owned, minority-owned, and small businesses to access credit on the same terms and conditions as other loan applicants, Congress established requirements for CFPB to collect and publish data regarding lending to these communities.

19.     These requirements are codified in Section 1071 of the Dodd-Frank Act. *See* 15 U.S.C. § 1691c–2.

20.     Section 1071's purpose is "to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." 15 U.S.C. § 1691c–2(a).

21.     In furtherance of this purpose, Section 1071 provides that "[e]ach financial institution shall compile and maintain, in accordance with regulations of the Bureau," data describing loan applications submitted by women-owned, minority-owned, and small businesses, and the action taken on those applications. *See* 15 U.S.C. § 1691c–2(e).

22.     Such data "shall be submitted annually to the Bureau," and "shall be … annually made available to the public by the Bureau, in such form and in such manner as is determined by the Bureau, by regulation." 15 U.S.C. 1691c–2(f). CFPB must also make it "available to any member of the public, upon request, in the form required under regulations prescribed by the Bureau." *Id.*

**B.     CFPB's Years of "Preliminary" Steps**

23.     Despite the clear and mandatory duty imposed by the Act, CFPB has never published regulations prescribing requirements for financial institutions' collections, nor for CFPB's

publication of data regarding lending to women-owned, minority-owned, and small businesses. To the contrary, the only substantive action CFPB has taken is to issue guidance instructing financial institutions not to collect or submit data, the mandatory nature of Section 1071 notwithstanding.[3]

24.    Beginning at least as early as December 2012, CFPB reported that it had "begun the planning process to promulgate rules" concerning Section 1071, and was "currently gathering information from stakeholders to better understand the relevant business lending markets, and to determine what data are available and how best to collect those data."[4]

25.    This "planning process" stretched on for years. In April 2015, for example, CFPB reported again that it had "begun preliminary planning" for implementing Section 1071.[5]

26.    In the spring of 2016, CFPB similarly said that it planned to "focus on outreach and research to develop its understanding of the players, products, and practices in the small business lending market and of the potential ways to implement section 1071."[6]

27.    By the spring of 2017, these preliminary steps finally seemed to be bearing fruit. CFPB held a field hearing and roundtable on May 10, 2017, in which CRC and its members participated. One week later, CRC and its members and partners convened a panel of small business owners to discuss with CFPB and other banking regulators the challenges small business owners face in accessing bank credit and being relegated to high-cost merchant cash advance and other online lenders, and the need for small business lending data to address these problems.

---

[3] *See* Letter from Leonard Kennedy, Gen. Couns., CFPB, to Chief Exec. Officers of Fin. Instits. under Section 1071 of the Dodd-Frank Act (Apr. 11, 2011), https://files.consumerfinance.gov/f/2011/04/GC-letter-re-1071.pdf.

[4] CFPB, *Fair Lending Report of the Consumer Financial Protection Bureau* 25-26, (Dec. 2012), https://files.consumerfinance.gov/f/201212_cfpb_fair-lending-report.pdf.

[5] CFPB, *Fair Lending Report of the Consumer Financial Protection Bureau* 32-33 (Apr. 2015), https://files.consumerfinance.gov/f/201504_cfpb_fair_lending_report.pdf.

[6] CFPB, Spring 2016 Unified Agenda: Business Lending Data (Regulation B), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201604&RIN=3170-AA09.

28.     CFPB thereafter published a "Request for Information" soliciting comments "to enhance our understanding of the small business lending market in order to prioritize and guide research and policy development work for implementation of section 1071."[7]

29.     The RFI sought comments regarding, among other things, (i) the definition of "small business" as used in Section 1071, (ii) how to define the data points required to be provided, (iii) who is a "financial institution" engaged in activity covered by the statute, and whether any otherwise qualifying institutions should be exempted, (iv) the financial products offered to small businesses and the challenges faced by small businesses in accessing credit, and (v) what privacy related concerns exist with regard to the Section 1071 data collection, and how those concerns can best be mitigated.[8]

30.     CFPB held the comment period open for four months. Over this time, it received some 2,709 comments.[9]

31.     Many of the comments were submitted by women-owned, minority-owned, and small businesses, nonprofit organizations (such as CRC) focused on ensuring access to capital, and community development-oriented financial institutions, and urged CFPB to move expeditiously to implement Section 1071's commands.

32.     Plaintiff CRC filed comments urging swift implementation and offering suggestions on the content of implementing regulations. They also participated in a working group that produced a 45-page white paper addressing the data collection questions asked in the RFI.

33.     Soon after issuing the RFI, CFPB issued a May 2017 report summarizing its research to date on the small business lending landscape. The report recognized that "[s]mall businesses play a key role in fostering community development and fueling economic growth both nationally and in their local communities," with "[w]omen-owned and minority-owned small businesses" playing a

---

[7] Request for Information Regarding the Small Business Lending Market, 82 Fed. Reg. 22,318, 22,319 (May 15, 2017) [hereinafter RFI].

[8] *Id.* at 22, 319-22, 322.

[9] *See* Request for Information Regarding the Small Business Lending Market; Extension, 82 Fed. Reg. 32,177 (July 12, 2017).

particularly important role in supporting local communities.[10] It also concluded that "the ability to access financing plays an important role in allowing small businesses to grow and contribute to the economy."[11] Yet, the CFPB acknowledged, "[d]ata on how small businesses engage with credit markets are incomplete," and "without more robust data it will continue to be difficult to assess how well the market is meeting the needs of small businesses."[12]

**C.      CFPB Delays Section 1071 Implementation Even Further**

34.     Despite taking these encouraging steps in 2017, CFPB failed to implement Section 1071 even at that belated time. Rather, it appears to have moved backward since CFPB's then-Director was replaced in November 2017 by Acting Director Mick Mulvaney and subsequently Defendant Kraninger.

35.     Since Acting Director Mulvaney took over, CFPB has actively disengaged from constructive discussions about the importance of Section 1071 implementation.

36.     In June 2018, Acting Director Mulvaney fired all 25 members of the CFPB's Consumer Advisory Board, many of whom, including the Executive Director of CRC, had advocated in the Consumer Advisory Board and to CFPB for implementation of Section 1071. In particular, the Executive Director of CRC had, prior to being fired, presented on small business needs, and in particular the need for implementation of Section 1071, at a meeting of the Consumer Advisory Board.

37.     As of the Fall 2017 Unified Agenda, CFPB intended to take its next "Prerule Activities" in May 2018. Without explanation, its Spring 2018 Unified Agenda pushed this date back by nearly a year, to March 2019. The Fall 2018 Unified Agenda then delayed implementation of Section 1071 even further, moving it to the "Long-Term Agenda" for rules on which they did not expect near-term activity.

---

[10] *Key Dimensions* at 3.

[11] *Id.* at 17.

[12] *Id.* at 3, 39.

38.     Defendants justified pushing back Section 1071 implementation even further because of a desire to "focus additional resources on various HMDA [Home Mortgage Disclosure Act] initiatives."[13]

39.     Unlike Section 1071, CFPB's current HMDA activities were not mandated by Congress. The Dodd-Frank Act amended HMDA, necessitating amendments to CFPB's implementing regulation—and CFPB issued a final rule making those amendments in 2015.[14] CFPB's current activities are directed at discretionary amendments to the 2015 final rule. Moreover, any claim by CFPB that it lacks resources to implement Section 1071 is inconsistent with Acting Director Mulvaney's statement that CFPB has all the resources it needs when he requested $0 in funding.[15]

40.     In other words, CFPB has chosen to prioritize its discretionary policy preferences over an explicit congressional mandate that it has now failed to implement for more than eight years.

**D.     Harm to Plaintiff**

41.     CFPB's nearly decade-long failure has harmed and continues to harm Plaintiff, as well as the small businesses and communities that it serves. It inhibits Plaintiff's ability to advocate, educate, and issue reports about access to credit; to advise economic development organizations working with women-owned, minority-owned, and small businesses on getting loans; and to work with lenders to arrange investment in low-income communities and communities of color.

42.     For example, CRC regularly publishes analyses of access to credit for women-owned, minority-owned, and small businesses. Its previous reports have been based on data collected from the Federal Financial Institutions Examinations Council ("FFIEC"), the Small Business Administration, and similar sources. But as CFPB has recognized, the FFIEC's datasets "are limited

---

[13] Kelly Cochran, *Fall 2018 Rulemaking Agenda*, CFPB (Oct. 17, 2018), https://www.consumerfinance.gov/about-us/blog/fall-2018-rulemaking-agenda/.

[14] *See* Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,128 (Oct. 28, 2015).

[15] Jim Puzzanghera, Mulvaney Requests Zero Funding for the Consumer Financial Protection Bureau, L.A. Times, Jan. 18, 2018, https://www.latimes.com/business/la-fi-cfpb-mulvaney-funding-20180118-story.html.

in their ability to appropriately convey the full extent of lending to small businesses."[16] As a result, "with current data it is not possible to confidently answer basic questions regarding the state of small business lending."[17]

43.     A 2017 survey of CRC's members who work with small businesses on lending found that 95 percent believed that implementing Section 1071 was critical to ensuring equal access to capital.[18]

44.     This is the exact reason Congress enacted Section 1071: to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." 15 U.S.C. § 1691c–2(a). With the data mandated by Section 1071, CRC would produce targeted, data-driven analyses and reports about the credit needs of communities and, in particular, women-owned, minority-owned, and small businesses. CFPB's failure renders this impossible, limiting CRC's ability to produce informed analyses and increasing the costs of obtaining necessary information.

45.     CRC also devotes substantial resources to negotiating agreements with lenders to support the credit needs of minority-owned and small businesses. Through these agreements, CRC obtains commitments to provide loans, investments, and financial services in communities that have historically faced barriers to accessing credit. CFPB's failure impairs these efforts by making it far harder for CRC to identify the communities most in need and the services that could be most beneficial. This increases the difficulty and resource-intensiveness of each effort CRC undertakes, reducing the number of agreements CRC can pursue; restricting CRC's ability to address unequal credit access issues in such agreements; and preventing CRC from being able to address these issues adequately in meetings with financial institutions with whom they do not have formal agreements.

---

[16] *Key Dimensions* at 28.

[17] *Id.* at 40.

[18] CRC, *Displacement, Discrimination, and Determination: Small Business Owners Struggle to Access Affordable Credit* 3 (Sept. 2017), http://calreinvest.org/wp-content/uploads/2018/08/CRC20Small20Business20Report.pdf.

46.     The absence of data transparency also disincentivizes lenders from improving their lending practices. This, in turn, harms not only the affected businesses, but also the communities in which they operate or would operate, as without capital access businesses are unable to hire local workers and serve their communities.

47.     CFPB's failure to implement Section 1071 has also impaired the ability of CRC and its members to work with state and local governments to enact policies to improve lending practices. The failure has deprived CRC and its members of data they would use in developing and advocating for effective regulatory measures on multiple fronts, such as regulation of merchant cash advance lenders and high-cost online lenders.

48.     CFPB's failure to implement Section 1071 has similarly adversely affected the ability of CRC and its members to work with CFPB to ensure appropriate enforcement of federal fair lending laws and implementation of the Community Reinvestment Act. Without lending data, CRC and its members' ability to identify areas of concern and file actionable complaints with CFPB is limited, as is CFPB's ability to investigate and oversee compliance with the Equal Credit Opportunity Act.

49.     For these reasons, CRC and its members have for decades called for implementation of a data collection requirement for lending to the affected communities, a call that Congress heeded in enacting Section 1071. Since its enactment, CRC and its members have called on CFPB repeatedly to fulfill its statutory duty to implement Section 1071. These calls have been consistently ignored.

50.     In addition, CRC's members—which include small business lenders, community development financial institutions, and organizations that work directly to ensure equal access to capital—are directly harmed by Defendants' failure to implement Section 1071. These members are hindered in their efforts to provide and secure loans for members of the impacted communities because without the data mandated by Section 1071, they have to expend additional organizational resources—and in some respects are entirely unable—to identify particular needs and opportunities. Thus, without implementation of Section 1071, CRC's members are prevented from effectuating

their missions by focusing their efforts on the individuals and communities with the greatest need for their services.

## V.    CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF

### COUNT ONE
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
### 5 U.S.C. § 706(1)

51.     Plaintiff re-alleges and reincorporates the paragraphs above as fully set forth herein.

52.     The APA provides a remedy to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

53.     Section 1071 requires Defendants to collect, maintain, and publish data about credit applications by women-owned, minority-owned, and small businesses. *See* 15 U.S.C. § 1691c-2(e)-(f). It further requires the Bureau to prescribe rules and guidance to carry out these requirements. *Id.* § 1691c-2(g)(1).

54.     By failing to prescribe rules and guidance or otherwise implement Section 1071 in the more than eight years since Congress mandated that action, Defendants have unlawfully withheld and unreasonably delayed agency action.

### COUNT TWO
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
### 5 U.S.C. § 706(2)(A), (C)

55.     Plaintiff re-alleges and reincorporates the paragraphs above as fully set forth herein.

56.     The APA provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

57.     Section 1071 requires financial institutions to inquire whether businesses applying for loans are women-owned, minority-owned, or small businesses, and maintain a record of the responses. 15 U.S.C. § 1691c-2(b). It further requires financial institutions to compile and maintain specifically enumerated data regarding loan applications. *Id.* § 1691c-2(e). It requires financial institutions to submit this data to the CFPB, which must retain it for three years and make it public annually and on request. *Id.* § 1691c-2(f)(1)-(2).

58.     CFPB has consistently countermanded Congress's requirements by informing financial institutions not to make these inquiries, nor compile, maintain, and submit this data.

59.     CFPB lacked any statutory authority to set aside the explicit requirements that Congress directly imposed on financial institutions in Section 1071.

60.     Accordingly, Defendants have acted arbitrarily and capriciously, not in accordance with law, and in excess of statutory authority.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

(1)     Declare Defendants in violation of the APA and the Dodd-Frank Act;

(2)     Issue an order or writ of mandamus compelling Defendants to act promptly to issue a Final Rule implementing Section 1071, within a reasonable time as determined by the Court;

(3)     Declare invalid and vacate Defendants' countermanding of Section 1071's requirements on financial institutions;

(4)     Award Plaintiff its attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

(5)     Grant such other and further relief as this Court deems proper.

DATED: May 14, 2019                          Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:   */s/ Shana E. Scarlett*
        Shana E. Scarlett (SBN 217895)

Benjamin J. Siegel (SBN 256260)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com

Steve W. Berman (*pro hac vice motion to be filed*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Nitin Shah (DC Bar No. 156035)
(*pro hac vice motion to be filed*)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 12
Case No.:

Jeffrey B. Dubner (DC Bar No. 1013399)
(*pro hac vice motion to be filed*)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
Facsimile: (202) 701-1775
nshah@democracyforward.org
jdubner@democracyforward.org

*Counsel for Plaintiff*