Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com

Steve W. Berman
(*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 268-9320
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs*

Nitin Shah (DC Bar No. 156035)
(*pro hac vice*)
Jeffrey B. Dubner (DC Bar No. 1013399)
(*pro hac vice*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
Facsimile: (202) 701-1775
nshah@democracyforward.org
jdubner@democracyforward.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA REINVESTMENT COALITION, NATIONAL ASSOCIATION FOR LATINO COMMUNITY ASSET BUILDERS, DEBORAH LYNN FIELD, and RESHONDA YOUNG,<br><br>       Plaintiffs,<br><br>  v.<br><br>KATHLEEN L. KRANINGER, Director, Consumer Financial Protection Bureau, In Her Official Capacity and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>       Defendants. | No. 4:19-cv-02572-JSW<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    JURISDICTION AND VENUE ...........................................................................3

III.   PARTIES .............................................................................................................3

IV.   FACTUAL ALLEGATIONS ...............................................................................4

      A.     Section 1071 of the Dodd-Frank Act ......................................................4

      B.     CFPB's Years of "Preliminary" Steps .....................................................6

      C.     CFPB Delays Section 1071 Implementation Even Further ......................8

      D.     Harm to Plaintiffs ....................................................................................9

               a.     Harm to CRC ................................................................................9

               b.     Harm to NALCAB ......................................................................12

               c.     Harm to Ms. Field.......................................................................14

               d.     Harm to Ms. Young .....................................................................15

V.     CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF .........................18

COUNT ONE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
     5 U.S.C. § 706(1)...............................................................................................18

COUNT TWO VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
     5 U.S.C. § 706(2)(A), (C)..................................................................................19

PRAYER FOR RELIEF ...................................................................................................19

Plaintiffs the California Reinvestment Coalition ("CRC"), the National Association for Latino Community Asset Builders ("NALCAB"), Deborah Lynn Field ("Ms. Field"), and ReShonda Young ("Ms. Young"), bring this action for declaratory and injunctive relief against Kathleen L. Kraninger, in her official capacity as Director of the Consumer Financial Protection Bureau, and the Consumer Financial Protection Bureau (collectively, "CFPB" or "Bureau"), and alleges as follows:

## I.      INTRODUCTION

1.      This lawsuit, brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenges the CFPB's unlawful failure to follow Congress's commands in Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (codified at 15 U.S.C. § 1691c–2), which was enacted to identify community development needs and opportunities for women-owned, minority-owned, and small businesses and to reduce discrimination against such businesses.

2.      As CFPB has recognized, data on lending practices is critical to identifying "credit deserts" where businesses and communities have difficulty accessing credit, and to allow financial institutions, community development organizations, and governmental agencies to identify areas of need and potential solutions.[1] Such data does not currently exist, making it "[im]possible to confidently answer basic questions regarding the state of small business lending."[2]

3.      Section 1071 was designed to fill this gap by requiring financial institutions to maintain records of their actions on loan applications by women-owned, minority-owned, and small businesses. In Section 1071, Congress required the CFPB to collect and publish this data annually, and to issue rules and guidance to carry out Section 1071's requirements.

4.      Despite Section 1071's clear and mandatory terms, CFPB has entirely failed to collect and publish the lending data required by Section 1071, or to issue any implementing regulations, in

---

[1] *See* CFPB, *Key Dimensions of the Small Business Lending Landscape* 40 (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf (hereinafter "*Key Dimensions*").

[2] *Id.*

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 1
Case No.: 4:19-cv-02572-JSW

the nearly nine years since its passage. By failing to implement Congress's explicit, mandatory directive, CFPB has unlawfully withheld and unreasonably delayed agency action, violating the APA.

5.      CFPB's inaction has harmed women-owned, minority-owned, and small businesses, like Ms. Field's and Ms. Young's businesses, as well as organizations that seek to support community development efforts, like CRC, NALCAB, and their member organizations.

6.      Section 1071's benefits for communities seeking enhanced access to credit is clear. Providing lending data, as Section 1071 requires, would incentivize financial institutions to ensure that all communities have equal access to credit. The data will enhance access to credit for women-owned, minority-owned, and small businesses like Ms. Field's and Ms. Young's businesses, and allow nonprofits like CRC and NALCAB that exist to ensure that these businesses have access to credit, to identify specific problem areas and address these problems through negotiations with financial institutions, advice to economic development initiatives, enhanced enforcement opportunities, and advocacy to local, state, and federal policymakers.

7.      The data that Congress required CFPB to publish would aid Plaintiffs in numerous ways. For Ms. Field and Ms. Young, it will enhance their access to the capital they need to grow their businesses and fulfill their personal and professional aspirations. For CRC and its members, it would provide critical, currently unavailable information that would improve CRC's ability to negotiate with lenders to invest and originate responsible loans in businesses in low-income communities and communities of color. For NALCAB and its members, it would improve their ability to identify underserved areas most in need of capital opportunities. It would also enable CRC, NALCAB, and others to analyze the data and identify specific areas of concern and work with financial institutions, economic development organizations, and policymakers to address these concerns. Without this data, CRC and NALCAB are significantly hindered in these efforts and are forced to expend substantial additional organizational resources to effectuate their organizational objective of ensuring the availability of lending for small businesses and others who have historically been denied equal access to capital.

8.      Accordingly, the Court should declare Defendants in violation of the APA and the Act, and require the CFPB to promptly issue a Proposed and Final Rule implementing Section 1071 and begin collecting and publishing the required data.

## II.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

10.     Venue is proper under 28 U.S.C. § 1391(e) because Plaintiff CRC has its principal place of business in San Francisco, California, which is within the Northern District of California.

## III.      PARTIES

11.     Plaintiff California Reinvestment Coalition, founded in 1986, is a nonprofit organization operating under Section 501(c)(3) of the Internal Revenue Code. CRC is based in San Francisco, California. CRC was founded to aid low-income communities and communities of color in accessing credit, financial services, and investments. Its membership comprises more than 300 nonprofit community-based organizations and public agencies, including small business lenders, community development financial institutions, and technical assistance providers that work directly with small businesses to ensure equal access to capital. Of particular relevance here, CRC seeks to accomplish its mission by negotiating agreements with lenders to increase lending to and investments in women-owned, minority-owned, and small businesses, and by publishing evidence-based reports to educate its members, policymakers, and the public about areas of need and ways to promote credit access.

12.     Plaintiff National Association for Latino Community Asset Builders is a nonprofit organization operating under Section 501(c)(3) of the Internal Revenue Code. Based in San Antonio, Texas, NALCAB's mission is to strengthen the economy by advancing economic mobility in Latino communities. NALCAB has worked for more than 15 years to bring together community and economic development leaders to help rural and urban Latino communities overcome barriers to accessing capital and building assets. NALCAB has a member network of more than 100 non-profit community development, asset-building, and lending organizations, and itself lends to small business lenders for the purpose of improving access to capital in underserved areas. NALCAB has assisted

its members to secure more than $75 million in capital for small businesses investment and local economic development projects. NALCAB also conducts research into business credit needs in local markets, producing reports that are used by business owners, lenders, and policymakers to identify and implement strategies for improving access to capital and strengthen economic development.

13.    Plaintiff Deborah Lynn Field is a resident of Portland, Oregon, and co-owner, with her husband, of Take Notice Card Company, doing business as Paperjam Press, a small business based in the Fremont neighborhood of Portland. Paperjam Press serves the printing needs of the local community. Ms. Field and her husband have co-owned Paperjam Press and its predecessor printing businesses since approximately 1990. Paperjam Press currently has four full-time employees (including Ms. Field and her husband) and revenues of approximately $250,000 per year. Ms. Field has struggled to grow her business because of financial institutions' unwillingness to provide capital, despite her strong credit rating and track record.

14.    Plaintiff ReShonda Young is a resident of Waterloo, Iowa, and owner of Popcorn Heaven, a small business based in Waterloo. Popcorn Heaven is a retail gourmet popcorn business focused in the Midwest United States but with licensed locations nationwide from Charlotte, North Carolina to Pasadena, California. Ms. Young was forced to sell her own Popcorn Heaven retail store and move to a licensing-based model in part because of her inability to obtain adequate operating capital, despite her strong credit rating and ability to provide collateral.

15.    Defendant Kathleen L. Kraninger is Director of the Consumer Financial Protection Bureau.

16.    Defendant Consumer Financial Protection Bureau is a federal agency headquartered in Washington, D.C.

## IV.    FACTUAL ALLEGATIONS

### A.    Section 1071 of the Dodd-Frank Act

17.    For decades, CRC and its member organizations have been calling for changes to federal law to require collection and publication of data documenting lending to women-owned, minority-owned, and small businesses, and lending in neighborhoods of color, in order to identify needs and opportunities for increasing access to capital among those communities.

18.     The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act" or "Act") enacted a series of reforms designed to prevent a recurrence of the 2008 financial crisis and to protect consumers from harmful and predatory practices by financial institutions.

19.     The Act established the CFPB with the purpose of "ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). The Act gave the CFPB broad regulatory authority with which to accomplish this mission and established several mandatory duties consistent with its mission.

20.     Among these, in order to address an identified problem with the inability of women-owned, minority-owned, and small businesses to access credit on the same terms and conditions as other loan applicants, Congress established requirements for CFPB to collect and publish data regarding lending to these communities.

21.     These requirements are codified in Section 1071 of the Dodd-Frank Act. *See* 15 U.S.C. § 1691c–2.

22.     Section 1071's purpose is "to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." 15 U.S.C. § 1691c–2(a).

23.     In furtherance of this purpose, Section 1071 provides that "[e]ach financial institution shall compile and maintain, in accordance with regulations of the Bureau," data describing loan applications submitted by women-owned, minority-owned, and small businesses, and the action taken on those applications. *See* 15 U.S.C. § 1691c–2(e).

24.     Such data "shall be submitted annually to the Bureau," and "shall be … annually made available to the public by the Bureau, in such form and in such manner as is determined by the Bureau, by regulation." 15 U.S.C. 1691c–2(f). CFPB must also make it "available to any member of the public, upon request, in the form required under regulations prescribed by the Bureau." *Id.*

1

## B.     CFPB's Years of "Preliminary" Steps

2

25.     Despite the clear and mandatory duty imposed by the Act, CFPB has never published

3

regulations prescribing requirements for financial institutions' collections, nor for CFPB's

4

publication of data regarding lending to women-owned, minority-owned, and small businesses. To

5

the contrary, the only substantive action CFPB has taken is to issue guidance instructing financial

6

institutions not to collect or submit data, the mandatory nature of Section 1071 notwithstanding.[3]

7

26.     Beginning at least as early as December 2012, CFPB reported that it had "begun the

8

planning process to promulgate rules" concerning Section 1071, and was "currently gathering

9

information from stakeholders to better understand the relevant business lending markets, and to

10

determine what data are available and how best to collect those data."[4]

11

27.     This "planning process" stretched on for years. In April 2015, for example, CFPB

12

reported again that it had "begun preliminary planning" for implementing Section 1071.[5]

13

28.     In the spring of 2016, CFPB similarly said that it planned to "focus on outreach and

14

research to develop its understanding of the players, products, and practices in the small business

15

lending market and of the potential ways to implement section 1071."[6]

16

29.     By the spring of 2017, these preliminary steps finally seemed to be bearing fruit.

17

CFPB held a field hearing and roundtable on May 10, 2017, in which CRC and its members

18

participated. One week later, CRC and its members and partners convened a panel of small business

19

owners to discuss with CFPB and other banking regulators the challenges small business owners face

20

in accessing bank credit and being relegated to high-cost merchant cash advance and other online

21

lenders, and the need for small business lending data to address these problems.

22

23

---

[3] *See* Letter from Leonard Kennedy, Gen. Couns., CFPB, to Chief Exec. Officers of Fin. Instits. under Section 1071 of the Dodd-Frank Act (Apr. 11, 2011), https://files.consumerfinance.gov/f/2011/04/GC-letter-re-1071.pdf.

24

25

[4] CFPB, *Fair Lending Report of the Consumer Financial Protection Bureau* 25-26, (Dec. 2012), https://files.consumerfinance.gov/f/201212_cfpb_fair-lending-report.pdf.

26

[5] CFPB, *Fair Lending Report of the Consumer Financial Protection Bureau* 32-33 (Apr. 2015), https://files.consumerfinance.gov/f/201504_cfpb_fair_lending_report.pdf.

27

[6] CFPB, Spring 2016 Unified Agenda: Business Lending Data (Regulation B), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201604&RIN=3170-AA09.

28

30.     CFPB thereafter published a "Request for Information" soliciting comments "to enhance our understanding of the small business lending market in order to prioritize and guide research and policy development work for implementation of section 1071."[7]

31.     The RFI sought comments regarding, among other things, (i) the definition of "small business" as used in Section 1071, (ii) how to define the data points required to be provided, (iii) who is a "financial institution" engaged in activity covered by the statute, and whether any otherwise qualifying institutions should be exempted, (iv) the financial products offered to small businesses and the challenges faced by small businesses in accessing credit, and (v) what privacy related concerns exist with regard to the Section 1071 data collection, and how those concerns can best be mitigated.[8]

32.     CFPB held the comment period open for four months. Over this time, it received some 2,709 comments.[9]

33.     Many of the comments were submitted by women-owned, minority-owned, and small businesses, nonprofit organizations (such as CRC) focused on ensuring access to capital, and community development-oriented financial institutions, and urged CFPB to move expeditiously to implement Section 1071's commands.

34.     Plaintiff CRC filed comments urging swift implementation and offering suggestions on the content of implementing regulations. CRC also participated in a working group that produced a 45-page white paper addressing the data collection questions asked in the RFI.

35.     Soon after issuing the RFI, CFPB issued a May 2017 report summarizing its research to date on the small business lending landscape. The report recognized that "[s]mall businesses play a key role in fostering community development and fueling economic growth both nationally and in their local communities," with "[w]omen-owned and minority-owned small businesses" playing a

---

[7] Request for Information Regarding the Small Business Lending Market, 82 Fed. Reg. 22,318, 22,319 (May 15, 2017) ("RFI").

[8] *Id.* at 22, 319-22, 322.

[9] *See* Request for Information Regarding the Small Business Lending Market; Extension, 82 Fed. Reg. 32,177 (July 12, 2017).

particularly important role in supporting local communities.[10] It also concluded that "the ability to access financing plays an important role in allowing small businesses to grow and contribute to the economy."[11] Yet, the CFPB acknowledged, "[d]ata on how small businesses engage with credit markets are incomplete," and "without more robust data it will continue to be difficult to assess how well the market is meeting the needs of small businesses."[12]

**C.      CFPB Delays Section 1071 Implementation Even Further**

36.      Despite taking these encouraging steps in 2017, CFPB failed to implement Section 1071 even at that belated time. Rather, it appears to have moved backward since CFPB's then-Director was replaced in November 2017 by Acting Director Mick Mulvaney and subsequently Defendant Kraninger.

37.      Since Acting Director Mulvaney took over, CFPB has actively disengaged from constructive discussions about the importance of Section 1071 implementation.

38.      In June 2018, Acting Director Mulvaney fired all 25 members of the CFPB's Consumer Advisory Board, many of whom, including the Executive Director of CRC, had advocated in the Consumer Advisory Board and to CFPB for implementation of Section 1071. In particular, the Executive Director of CRC had, prior to being fired, presented on small business needs, and in particular the need for implementation of Section 1071, at a meeting of the Consumer Advisory Board.

39.      As of the Fall 2017 Unified Agenda, CFPB intended to take its next "Prerule Activities" in May 2018. Without explanation, its Spring 2018 Unified Agenda pushed this date back by nearly a year, to March 2019. The Fall 2018 Unified Agenda then delayed implementation of Section 1071 even further, moving it to the "Long-Term Agenda" for rules on which they did not expect near-term activity.

---

[10] *Key Dimensions* at 3.

[11] *Id.* at 17.

[12] *Id.* at 3, 39.

40.     Defendants justified pushing back Section 1071 implementation even further because of a desire to "focus additional resources on various HMDA [Home Mortgage Disclosure Act] initiatives."[13]

41.     Unlike Section 1071, CFPB's current HMDA activities were not mandated by Congress. The Dodd-Frank Act amended HMDA, necessitating amendments to CFPB's implementing regulation—and CFPB issued a final rule making those amendments in 2015.[14] CFPB's current activities are directed at discretionary amendments to the 2015 final rule. Moreover, any claim by CFPB that it lacks resources to implement Section 1071 is inconsistent with Acting Director Mulvaney's statement that CFPB has all the resources it needs when he requested $0 in funding.[15]

42.     In other words, CFPB has chosen to prioritize its discretionary policy preferences over an explicit congressional mandate that it has now failed to implement for more than eight years.

43.     After this lawsuit was filed, CFPB announced that it would "recommence work later this year" to develop rules implementing Section 1071. CFPB's statement—that it "expects that it will be able to resume pre-rulemaking activities on the section 1071 project within this next year"— contains no commitment whatsoever as to a timeline for implementation of Section 1071, despite the many years of delay that have already occurred, nor any explanation of why further "pre-rulemaking activities" are needed after the 2017 efforts.[16]

**D.     Harm to Plaintiffs**

        **a.     Harm to CRC**

44.     CFPB's nearly decade-long failure has harmed and continues to harm CRC, as well as the small businesses and communities that it serves. It inhibits CRC's ability to advocate, educate,

---

[13] Kelly Cochran, *Fall 2018 Rulemaking Agenda*, CFPB (Oct. 17, 2018), https://www.consumerfinance.gov/about-us/blog/fall-2018-rulemaking-agenda/.

[14] *See* Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,128 (Oct. 28, 2015).

[15] Jim Puzzanghera, Mulvaney Requests Zero Funding for the Consumer Financial Protection Bureau, L.A. Times, Jan. 18, 2018, https://www.latimes.com/business/la-fi-cfpb-mulvaney-funding-20180118-story.html.

[16] Diane Thompson, *Spring 2019 Rulemaking Agenda*, CFPB (May 22, 2019), https://www.consumerfinance.gov/about-us/blog/spring-2019-rulemaking-agenda/.

and issue reports about access to credit; to advise economic development organizations working with women-owned, minority-owned, and small businesses on getting loans; and to work with lenders to arrange investment in low-income communities and communities of color.

45.     For example, CRC regularly publishes analyses of access to credit for women-owned, minority-owned, and small businesses. Its previous reports have been based on data collected from the Federal Financial Institutions Examinations Council ("FFIEC"), the Small Business Administration, and similar sources. But as CFPB has recognized, the FFIEC's datasets "are limited in their ability to appropriately convey the full extent of lending to small businesses."[17] As a result, "with current data it is not possible to confidently answer basic questions regarding the state of small business lending."[18]

46.     A 2017 survey of CRC's members who work with small businesses on lending found that 95 percent believed that implementing Section 1071 was critical to ensuring equal access to capital.[19]

47.     This is the exact reason Congress enacted Section 1071: to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." 15 U.S.C. § 1691c–2(a). With the data mandated by Section 1071, CRC would produce targeted, data-driven analyses and reports about the credit needs of communities and, in particular, women-owned, minority-owned, and small businesses. CFPB's failure renders this impossible, limiting CRC's ability to produce informed analyses and increasing the costs of obtaining necessary information.

48.     CRC also devotes substantial resources to negotiating agreements with lenders to support the credit needs of minority-owned and small businesses. Through these agreements, CRC obtains commitments to provide loans, investments, and financial services in communities that have

---

[17] *Key Dimensions* at 28.

[18] *Id.* at 40.

[19] CRC, *Displacement, Discrimination, and Determination: Small Business Owners Struggle to Access Affordable Credit* 3 (Sept. 2017), http://calreinvest.org/wp-content/uploads/2018/08/CRC20Small20Business20Report.pdf.

historically faced barriers to accessing credit. CFPB's failure impairs these efforts by making it far harder for CRC to identify the communities most in need and the services that could be most beneficial. This increases the difficulty and resource-intensiveness of each effort CRC undertakes, reducing the number of agreements CRC can pursue; restricting CRC's ability to address unequal credit access issues in such agreements; and preventing CRC from being able to address these issues adequately in meetings with financial institutions with whom they do not have formal agreements.

49. The absence of data transparency also disincentivizes lenders from improving their lending practices. This, in turn, harms not only the affected businesses, but also the communities in which they operate or would operate, as without capital access businesses are unable to hire local workers and serve their communities.

50. CFPB's failure to implement Section 1071 has also impaired the ability of CRC and its members to work with state and local governments to enact policies to improve lending practices. The failure has deprived CRC and its members of data they would use in developing and advocating for effective regulatory measures on multiple fronts, such as regulation of merchant cash advance lenders and high-cost online lenders.

51. CFPB's failure to implement Section 1071 has similarly adversely affected the ability of CRC and its members to work with CFPB to ensure appropriate enforcement of federal fair lending laws and implementation of the Community Reinvestment Act. Without lending data, CRC and its members' ability to identify areas of concern and file actionable complaints with CFPB is limited, as is CFPB's ability to investigate and oversee compliance with the Equal Credit Opportunity Act.

52. For these reasons, CRC and its members have for decades called for implementation of a data collection requirement for lending to the affected communities, a call that Congress heeded in enacting Section 1071. Since its enactment, CRC and its members have called on CFPB repeatedly to fulfill its statutory duty to implement Section 1071. These calls have been consistently ignored.

53. In addition, CRC's members—which include small business lenders, community development financial institutions, and organizations that work directly to ensure equal access to

capital—are directly harmed by Defendants' failure to implement Section 1071. These members are hindered in their efforts to provide and secure loans for members of the impacted communities because without the data mandated by Section 1071, they must expend additional organizational resources—and in some respects are entirely unable—to identify particular needs and opportunities. Thus, without implementation of Section 1071, CRC's members are prevented from effectuating their missions by focusing their efforts on the individuals and communities with the greatest need for their services.

**b.     Harm to NALCAB**

54.     Like CRC, NALCAB seeks to improve access to capital for small business owners, particularly focusing on business owners in Latino and immigrant communities. It has assisted local non-profit organizations to secure more than $75 million in capital for small business investment and local economic development projects, and performs costly surveys to understand geographic and demographic patterns of capital availability. CFPB's prolonged failure to implement Section 1071 directly impairs these efforts, impeding NALCAB's ability to target its efforts and forcing it to spend considerable sums to replicate pieces of the data CFPB is required to provide.

55.     NALCAB provides capital to local community development financial institutions ("CDFIs") to invest in their local markets, including by lending to businesses that have limited access to small business lending. These activities rely critically on data. Access to capital, and lenders' willingness to lend to small (and, particularly, Latino- and immigrant-owned) businesses, varies considerably from market to market. For NALCAB to understand where capital is needed, how to capitalize their loan funds, and what local CDFIs to support, it requires data on the demographics and geography of small business lending.

56.     As already explained, this data does not currently exist. NALCAB relies on the Federal Reserve's Small Business Credit Survey, but that provides only high-level information about business owners' locations and access to capital.

57.     NALCAB also makes use of periodic reports from the Stanford Business School's Latino Entrepreneurship Initiative and the U.S. Hispanic Chamber of Commerce, but none of those provide anything close to the scale of the information that Section 1071 requires.

58.     In order to pursue its mission in the face of this dearth of information, NALCAB has had no choice but to perform its own surveys of credit needs for small businesses in local markets. It conducted a statewide study in California examining the demographic and economic characteristics of Latino-owned small businesses and their access to capital, as well as similar surveys in particular local markets.

59.     NALCAB has spent roughly $100,000 on these surveys in recent years, and expects to spend hundreds of thousands more in the coming years if CFPB continues to withhold Section 1071 data. And even with NALCAB's considerable investments, the data it has generated are but a sliver of the data required by Section 1071.

60.     CFPB's failure to implement Section 1071 harms not only NALCAB's investment activities but its ability to publish reports informing its members, the public, and policymakers of the credit needs of Latino small business owners.

61.     NALCAB has published several reports based on public information and the proprietary research described above. These reports help its member lending institutions identify where to direct their resources, help small business owners identify ways to address their needs for capital, and help policymakers understand credit needs and advocate for policies that address them.

62.     The utility of these reports is significantly compromised by the absence of the data required by Section 1071. These deficits substantially impede NALCAB from carrying out its mission.

63.     For example, NALCAB has assisted local and state governments to develop economic and small business investment programs. Loan loss reserve programs are particularly effective tools for stimulating lending to underserved small businesses—but require significant funding to establish. Without the information that Congress required in Section 1071, NALCAB is often unable to identify the communities where loan loss reserves would have the greatest effect and is thus hampered in its ability to provide the information that states need to determine how and where to concentrate their resources.

64.     In addition, NALCAB's members—which include an array of non-profit, community development and asset-building organizations—are directly harmed by Defendants' failure to

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 13
Case No.: 4:19-cv-02572-JSW

implement Section 1071. These members are hindered in their efforts to provide and secure loans for members of the affected communities because without the data mandated by Section 1071, they must expend additional organizational resources—and in some respects are entirely unable—to identify particular needs and opportunities. Thus, without implementation of Section 1071, CRC's members are prevented from effectuating their missions by focusing their efforts on the individuals and communities with the greatest need for their services.

      **c.**      **Harm to Ms. Field**

65.      Ms. Field and her husband own Paperjam Press, a small printing company that serves the printing needs of local customers from a single storefront in the Fremont neighborhood of Portland.

66.      Paperjam Press began with sales of $0 in 2009 and has gradually grown to a business with four total employees (including Ms. Field and her husband) and revenues of approximately $250,000 per year.

67.      Eager to grow the business further, Ms. Field took an entrepreneurship course in 2016 and developed a growth plan that involved targeted marketing expenditures, development of a social media presence, and improving Paperjam Press's physical facilities.

68.      To implement this plan and grow their business, Ms. Field sought a $30,000 loan in 2017 from a regional bank with which Ms. Field had an established relationship. Ms. Field sought less money than Paperjam Press actually needed because she was concerned—based on conversations with others in the small business community—that the bank would be unwilling to extend more capital than that to a woman-owned small business such as hers.

69.      Despite Ms. Field's long track record of successful businesses and a strong credit score, the bank denied her loan application "due to insufficient cash flow." After Ms. Field requested additional explanation for the denial, a bank executive informed her that the bank simply does not lend to small businesses anymore, but that she would keep Ms. Field "posted on changes here."

70.      Based on her experiences and discussions with many others in the small business community, Ms. Field believes that Paperjam Press operates in a "credit desert," in which

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 14
Case No.: 4:19-cv-02572-JSW

businesses—especially women-owned businesses like hers—struggle to obtain operating capital needed to sustain and grow.

71.     Although Ms. Field was able to receive a loan from a Portland economic development entity after the regional bank turned her down in 2017, she anticipates continuing to need access to operating capital in order to be able to sustain and grow her business. Her experiences have led her to have grave concerns about her ability to obtain the required capital, and therefore to be able to continue operating, let alone grow, Paperjam Press.

72.     Section 1071 was enacted for the very purpose of identifying and fixing these "credit deserts."

73.     Section 1071 requires publication of data regarding lending to applicants like Ms. Field. It would therefore deter financial institutions from discriminating against applicants like Ms. Field, and would allow policymakers and the public to locate patterns of capital unavailability and work to eliminate them. It would also aid applicants like Ms. Field in identifying sources of capital that might be more inclined to lend to small businesses.

74.     CFPB's failure to implement Section 1071 therefore impairs Ms. Field's ability to obtain the working capital she needs to maintain her business.

**d.     Harm to Ms. Young**

75.     Ms. Young is a black female small business owner and a lifelong resident of Waterloo, Iowa.

76.     Black residents of Waterloo have historically suffered substantial levels of discrimination, and these problems are manifested today, among other ways, through significant social and economic disparities.

77.     A study published on USA Today's website in 2018 concluded that Waterloo is the single worst city for black Americans in the country among cities with black populations of five percent or more, based largely on findings of vastly unequal economic opportunities. The study cited

a large disparity in black versus white unemployment rates (23.9 percent versus 4.4 percent) and in black residents' income as a percentage of white residents' (46.8 percent).[20]

78.     The study did not, however, include data regarding minority-owned businesses' access to capital in Waterloo. Such data do not exist because CFPB has failed to implement Section 1071.

79.     Ms. Young has had to overcome significant obstacles to become a successful black female small business owner. She has been significantly harmed by business lending discrimination, which Section 1071 was enacted to address.

80.     Ms. Young comes from an entrepreneurial family, and has seen firsthand the effects of business lending discrimination for decades. Her father ran a successful transportation and maintenance contracting company. Despite his financial success, Ms. Young observed that her father always struggled to obtain capital. The first van he secured for his company had to be purchased by an employee of his, a white woman, because he could not locate a bank willing to offer a small business loan to a black person. Even later, once the business was earning revenue in the millions of dollars and its success was undeniable, Ms. Young's father had to secure loans with his personal residence and other non-business property.

81.     Ms. Young has experienced similar problems in her own time as an entrepreneur. Since 2013, Ms. Young has been the sole owner of Popcorn Heaven, a gourmet popcorn retail business based in Waterloo.

82.     Upon establishing Popcorn Heaven in 2013, Ms. Young sought an $80,000 loan to get the business off the ground and establish operating capital. At the time, Ms. Young had a credit rating of over 700 and significant income and assets with which to secure the loan, if needed.

83.     She first applied to a regional bank with whom she had a preexisting business banking relationship. Despite her strong qualifications, the bank denied Ms. Young's loan application

---

[20] Samuel Stebbins & Evan Comen, *These Are the 15 Worst Cities for Black Americans*, 24/7 Wall Street, USA Today (Nov. 16, 2018; updated Feb. 27, 2019), https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/.

1   outright, informing her, in effect, that it would not extend her the funds until *after* her business was

2   successful.

3       84.     Ms. Young believes, based in part on her experiences with this bank, that the bank's

4   denial of her loan application was based, at least in part, on her race and gender.

5       85.     Ms. Young next applied for a loan with a regional credit union with whom she had

6   banked for 17 years. After initially offering promising indications, the banker at the regional credit

7   union simply stopped responding to phone calls and emails from Ms. Young. Despite following up

8   repeatedly, Ms. Young never received a decision on her loan application from the regional credit

9   union.

10      86.     Ms. Young next applied for a loan with another regional bank. Despite her excellent

11  qualifications, this bank too declined to loan her the requested $80,000, but did offer her a $56,000

12  loan secured by her business equipment. Desperate to get her business off the ground, Ms. Young

13  accepted the loan offer even though it was only two-thirds of the funds she needed to have adequate

14  working capital to operate the business.

15      87.     Despite these setbacks, the Waterloo Popcorn Heaven store opened in early 2014 and

16  was immediately popular. Between 2014 and 2017, sales were stable in the $240,000-$290,000

17  range.

18      88.     However, because she had not been able to secure a loan in an amount and on terms

19  that she needed, Ms. Young was always struggling to stay far enough ahead to be able to grow the

20  business.

21      89.     In part because of her lack of access to capital needed to grow the business, Ms.

22  Young sold the Waterloo store in 2017. The woman to whom Ms. Young sold the Waterloo store,

23  who is white, was able to obtain $130,000 in loans upon her purchase of the store from Ms. Young—

24  an amount far in excess of what Ms. Young herself was able to obtain. Ms. Young has licensed

25  Popcorn Heaven's intellectual property to other individuals for the purpose of operating Popcorn

26  Heaven stores in seven other cities around the country.

27      90.     The owner of the Des Moines store, a black woman, fell behind on her royalty

28  payments to Ms. Young because she, like Ms. Young, was unable to obtain the capital needed to

operate and grow her business. The Des Moines store owner ultimately closed her store without ever paying Ms. Young the $15,000 she owed her. This shortfall in turn created substantial indebtedness on Ms. Young's part, and ultimately forced her to file for personal bankruptcy in March 2018, leading to substantial personal financial hardship from which she has yet to fully recover.

91.     Ms. Young retains the intellectual property rights to Popcorn Heaven and is likely to require additional capital in the future to continue to grow her business.

92.     Banks are able to discriminate against black female small business owners like Ms. Young and her licensee without fear that their discriminatory lending patterns will be exposed and remedied because CFPB has failed to implement Section 1071. CFPB's delay also harms the ability of Ms. Young and other small business owners to identify potential sources of capital.

93.     Accordingly, CFPB's failure to implement Section 1071 threatens the ability of Ms. Young (like Ms. Field and countless others) to obtain the capital needed to sustain and grow her businesses and fulfill her aspirations.

## V.     CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF

### COUNT ONE
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
### 5 U.S.C. § 706(1)

94.     Plaintiffs re-allege and reincorporate the paragraphs above as fully set forth herein.

95.     The APA provides a remedy to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

96.     Section 1071 requires Defendants to collect, maintain, and publish data about credit applications by women-owned, minority-owned, and small businesses. *See* 15 U.S.C. § 1691c-2(e)-(f). It further requires the Bureau to prescribe rules and guidance to carry out these requirements. *Id.* § 1691c-2(g)(1).

97.     By failing to prescribe rules and guidance or otherwise implement Section 1071 in the more than eight years since Congress mandated that action, Defendants have unlawfully withheld and unreasonably delayed agency action.

**COUNT TWO**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,**
**5 U.S.C. § 706(2)(A), (C)**

98.     Plaintiffs re-allege and reincorporate the paragraphs above as fully set forth herein.

99.     The APA provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

100.     Section 1071 requires financial institutions to inquire whether businesses applying for loans are women-owned, minority-owned, or small businesses, and maintain a record of the responses. 15 U.S.C. § 1691c-2(b). It further requires financial institutions to compile and maintain specifically enumerated data regarding loan applications. *Id.* § 1691c-2(e). It requires financial institutions to submit this data to the CFPB, which must retain it for three years and make it public annually and on request. *Id.* § 1691c-2(f)(1)-(2).

101.     CFPB has consistently countermanded Congress's requirements by informing financial institutions not to make these inquiries, nor compile, maintain, and submit this data.

102.     CFPB lacked any statutory authority to set aside the explicit requirements that Congress directly imposed on financial institutions in Section 1071.

103.     Accordingly, Defendants have acted arbitrarily and capriciously, not in accordance with law, and in excess of statutory authority.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(1)     Declare Defendants in violation of the APA and the Dodd-Frank Act;

(2)     Issue an order or writ of mandamus compelling Defendants to act promptly to issue a Final Rule implementing Section 1071, within a reasonable time as determined by the Court;

(3)     Declare invalid and vacate Defendants' countermanding of Section 1071's requirements on financial institutions;

(4)     Award Plaintiffs their attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

1    (5)    Grant such other and further relief as this Court deems proper.

2  DATED: June 27, 2019                          Respectfully submitted,

3                                                DEMOCRACY FORWARD FOUNDATION

4                                                By:_____*/s/ Nitin Shah*_____

5                                                   Nitin Shah (DC Bar No. 156035)
                                                    (*pro hac vice*)

6
7                                                Jeffrey B. Dubner (DC Bar No. 1013399)
                                                 (*pro hac vice*)
8                                                P.O. Box 34553
                                                 Washington, DC 20043
9                                                Telephone: (202) 448-9090
                                                 Facsimile: (202) 701-1775
10                                               nshah@democracyforward.org
                                                 jdubner@democracyforward.org
11
                                                 Shana E. Scarlett (SBN 217895)
12                                               Benjamin J. Siegel (SBN 256260)
                                                 715 Hearst Avenue, Suite 202
13                                               Berkeley, CA 94710
                                                 Telephone: (510) 725-3000
14                                               Facsimile: (510) 725-3001
                                                 shanas@hbsslaw.com
15                                               bens@hbsslaw.com

16                                               Steve W. Berman (*pro hac vice*)
                                                 1301 Second Avenue, Suite 2000
17                                               Seattle, WA 98101
                                                 Telephone: (206) 623-7292
18                                               Facsimile: (206) 623-0594
                                                 steve@hbsslaw.com
19
                                                 HAGENS BERMAN SOBOL SHAPIRO LLP
20
                                                 *Counsel for Plaintiffs*
21

22

23

24

25

26

27

28