Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com

Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 268-9320
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs*

Nitin Shah (DC Bar No. 156035)
(*pro hac vice*)
Jeffrey B. Dubner (DC Bar No. 1013399)
(*pro hac vice*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
Facsimile: (202) 701-1775
nshah@democracyforward.org
jdubner@democracyforward.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA REINVESTMENT COALITION, NATIONAL ASSOCIATION FOR LATINO COMMUNITY ASSET BUILDERS, DEBORAH LYNN FIELD, and RESHONDA YOUNG,<br><br>Plaintiffs,<br><br>v.<br><br>KATHLEEN L. KRANINGER, Director, Consumer Financial Protection Bureau, In Her Official Capacity and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Defendants. | No. 4:19-cv-02572-JSW<br><br>**PLAINTIFFS' NOTICE OF MOTION, MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   January 10, 2020<br>Time:   9:00 a.m.<br>Dept:   Courtroom 5, 2nd Floor<br>Judge:  Hon. Jeffrey S. White |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on January 10, 2020 at 9:00 a.m. or as soon thereafter as the matter may be heard by the Honorable Judge Jeffrey S. White of the United States District Court for the Northern District of California, Oakland Division, located at 1301 Clay Street, Oakland, California 94612, Plaintiffs will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 56 for an order granting summary judgment against Kathleen L. Kraninger, Director, Consumer Financial Protection Bureau, in her official capacity and Consumer Financial Protection Bureau. This Motion is based on this Notice of Motion and Motion for Summary Judgement Against Defendants, the following memorandum of points and authorities, supporting declarations filed herewith, the pleadings and the papers on file in this action and such other matters as the Court may consider.

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ...........................................................................................................1

II.  BACKGROUND ............................................................................................................2

    A.   Statutory Framework .........................................................................................2

    B.   CFPB's Years of "Preliminary" Steps ..............................................................3

    C.   CFPB Delays Section 1071 Implementation Further .........................................5

    D.   Plaintiffs ............................................................................................................6

        1.   California Reinvestment Coalition ...........................................................6

        2.   National Association for Latino Community Asset Builders ....................6

        3.   Deborah Field ..........................................................................................7

        4.   ReShonda Young ......................................................................................8

    E.   This Lawsuit ......................................................................................................8

III. ARGUMENT .................................................................................................................9

    A.   Plaintiffs Have Standing to Pursue Their Claims ..............................................9

        1.   CRC and NALCAB Have Organizational Standing .................................9

        2.   CRC and NALCAB Have Associational Standing .................................11

        3.   Ms. Field and Ms. Young Have Standing ..............................................11

    B.   Summary Judgment is Appropriate on Count I .................................................12

        1.   Legal Framework ....................................................................................13

        2.   CFPB Has a Mandatory Duty to Implement Section 1071 .....................13

        3.   Judicial Relief is Warranted ..................................................................14

            a.   The CFPB's Delay is Excessive. .................................................15

            b.   The Absence of a Deadline Does Not Excuse CFPB's Unreasonable Delay. ...............................................................17

            c.   Section 1071 Serves an Important Anti-Discriminatory Purpose. ....................................................................................17

            d.   CFPB's Alleged Higher Priority Matter Is Entirely Discretionary. ...............................................................................18

e.    Plaintiffs, and the Public at Large, Are Injured by CFPB's Years of Delays.................................................18

f.    CFPB Has Not Provided Adequate Justification for Its Decision to Delay Implementation of Section 1071..........19

IV.    CONCLUSION ...............................................................................20

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

**Page(s)**

3

*In re A Community Voice*,
    878 F.3d 779 (9th Cir. 2017) ................................................................................ 13

4

5

*Allied Pilots Ass'n v. Pension Ben. Guar. Corp.*,
    334 F.3d 93 (D.C. Cir. 2003) ................................................................................ 14

6

*In re Barr Labs, Inc.*,
    930 F.2d 72 (D.C. Cir.) ........................................................................................ 18

7

8

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................................ 14

9

*Biodiversity Legal Found. v. Badgley*,
    309 F.3d 1166 (9th Cir. 2002) .............................................................................. 17

10

11

*Brower v. Evans*,
    257 F.3d 1058 (9th Cir. 2001) .............................................................................. 14

12

13

*In re Calif. Power Exchange*,
    245 F.3d 1110 (9th Cir. 2001) .............................................................................. 16

14

*Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) .............................................................................................. 9

15

16

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .............................................................................................. 9

17

18

*Indep. Mining Co. v. Babbitt*,
    105 F.3d 503 (9th Cir. 1997) ................................................................................ 13

19

20

*Lopez v. Davis*,
    531 U.S. 230 (2001) ............................................................................................ 14

21

*MCI Telecomms. Corp. v. FCC*,
    627 F.2d 322 (D.C. Cir. 1980) .............................................................................. 16

22

23

*Nader v. FCC*,
    520 F.2d 182 (D.C. Cir. 1975) .............................................................................. 16

24

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) .............................................................................................. 13

25

26

*In re Pesticide Action Network of N. Am.*,
    798 F.3d 809 (9th Cir. 2015) .......................................................................... 15, 17

27

28

*Potomac Elec. Power Co. v. ICC*,
    702 F.2d 1026 (D.C. Cir. 1983)..................................................................... 15, 16, 17

*Spokeo, Inc. v. Robins*,
    1136 S. Ct. 1540 (2016) ...................................................................................... 9

*Telecommunications Research and Action Center v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984)............................................................. 13, 15, 17, 19

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ........................................................................................ 9

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ............................................................................ 9

*WildEarth Guardians v. U.S. Dep't of Agric.*,
    795 F.3d 1148 (9th Cir. 2015) ........................................................................ 9, 11

**FEDERAL STATUTES**

5 U.S.C. § 706(1)....................................................................................... *passim*

12 U.S.C. § 5491(a) ........................................................................................... 2

12 U.S.C. § 5511(a) ........................................................................................... 2

15 U.S.C. § 1691c-2 .................................................................................. *passim*

**OTHER AUTHORITES**

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203,
    124 Stat. 1376 (2010) .................................................................................. 1, 2

80 Fed. Reg. 66,128 (Oct. 28, 2015) ................................................................. 18

82 Fed. Reg. 22,319 (May 15, 2017)................................................................. 14

82 Fed. Reg. 32,177 (July 12, 2017) ................................................................... 4

## I.     INTRODUCTION

Many women-owned, minority-owned, and small businesses, and the communities they serve, fall into what is known as a "credit desert"—a sector where, for various reasons including discriminatory lending practices, it is difficult to access the capital needed to expand and flourish.[1] And when these businesses are able to access capital, it is for smaller amounts, and at higher interest rates.[2] Accordingly, for decades, the organizational plaintiffs and other community development organizations have been calling for increased transparency in financial institutions' lending to women-owned, minority-owned, and small businesses, in order to ensure appropriate enforcement of fair lending laws and to identify needs and opportunities for increasing access to capital among those communities.

In 2010 Congress enacted a statutory provision designed to address this problem as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act" or "Act"). This provision, which was enacted as Section 1071 of the Act, requires financial institutions to submit to the Consumer Financial Protection Bureau ("CFPB" or "Bureau") data regarding their lending decisions on applications submitted by women-owned, minority-owned, and small businesses. In turn, it requires the CFPB to compile that data and publish it annually. CFPB has acknowledged its mandatory duty to prescribe rules implementing Section 1071, and it has recognized the importance of increasing data transparency to address credit deserts. Yet for more than eight years, it has taken hardly any meaningful steps forward, has actively instructed financial institutions not to comply, and recently, has officially placed fulfilling its mandatory statutory duty to implement Section 1071 on the backburner.

Plaintiffs the California Reinvestment Coalition ("CRC"), the National Association for Latino Community Asset Builders ("NALCAB"), Deborah Field ("Ms. Field"), and ReShonda Young ("Ms. Young") brought this action under the Administrative Procedure Act to compel CFPB

---

[1] *See* Declaration of Jeffrey Dubner in Support of Plaintiffs' Motion for Summary Judgment (Dubner Decl.), Ex. 1 CFPB, *Key Dimensions of the Small Business Lending Landscape*, at 40 (May 2017) (hereinafter *Key Dimensions*), filed concurrently herewith.

[2] *See* Dubner Decl. Ex. 2, *Minority and Women Entrepreneurs: Building Capital, Networks and Skills,* at 10-11 (March 2015).

1 to carry out its nondiscretionary duty to fulfill Congress's mandate. For the reasons discussed herein,

2 summary judgment is appropriate for Plaintiffs on Count I of their First Amended Complaint.

## II.    BACKGROUND

### A.    Statutory Framework

Enacted in the wake of the financial crisis, the Dodd-Frank Act's purposes include "promot[ing] the financial stability of the United States by improving accountability and transparency in the financial system" and "protect[ing] consumers from abusive financial services practices." 124 Stat. at 1376. In furtherance of that statutory purpose, the Act established the CFPB and charged it with "implement[ing] and enforc[ing] Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). Accordingly, the CFPB is equipped with broad authority to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a).

As part of this overarching mission, and specifically to "facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses," Congress included Section 1071, 15 U.S.C. § 1691c–2, in the Act. Section 1071 requires all financial institutions to collect and submit to CFPB data regarding lending to women-owned, minority-owned, and small businesses. *Id.* § 1691c–2(b), (e), (f)(1). It further requires the institutions and CFPB to make that data available to the public. *Id.* § 1691c–2(f)(2)(B) & (C).

Specifically, Section 1071 provides that each financial institution receiving "any application for credit for women-owned, minority-owned, or small business … shall … inquire whether the business is a women-owned, minority-owned, or small business" and "maintain a record of the responses to such inquiry." *Id.* § 1691c–2(b). Financial institutions must "compile and maintain, in accordance with the regulations of the Bureau," this data, including several specifically itemized pieces of information. *Id.* § 1691c–2(e). Such data "shall be submitted annually to the Bureau"; shall be "made available" by the institutions "to any member of the public, upon request, in the form

required under regulations prescribed by the Bureau"; and "shall be … annually made available to the public by the Bureau, in such form and in such manner as is determined by the Bureau, by regulation." *Id.* § 1691c–2(f). And CFPB must also make the data "available to any member of the public, upon request, in the form required under regulations prescribed by the Bureau." *Id.*

**B.   CFPB's Years of "Preliminary" Steps**

Despite these clear and mandatory terms, CFPB has never published regulations implementing Section 1071. To the contrary, CFPB has issued guidance instructing financial institutions they may disregard the statute altogether and need not collect or submit such data.

On April 11, 2011, then–General Counsel Leonard J. Kennedy sent a letter to "Chief Executive Officers of Financial Institutions" advising such institutions that their "obligations under section 1071 do not go into effect until the Bureau issues necessary implementing regulations."[3] The letter acknowledged that "Section 1071 becomes effective on the designated transfer date, which is July 21, 2011." *Id.* Nonetheless, in response to financial institutions' inquiries, the letter stated that a review of "the statutory text, purpose, and legislative history" led CFPB to "conclude that that [sic] their obligations, including for information collection and reporting, do not arise until the Bureau issues implementing regulations and those regulations take effect." *Id.* at 1-2. The letter did not explain what it found in "statutory text, purpose, and legislative history" that conceivably justified this conclusion. *Id.* Instead, it merely stated that "[g]iven the sensitivity of the data at issue, we believe Congress intended that the Bureau first provide guidance regarding appropriate procedures, information safeguards, and privacy protections." *Id.* at 2. It also offered two additional sentences of policy rationales regarding data consistency and "conserv[ing] the resources of both the users of the data and of financial institutions." *Id.*

The Kennedy letter stated that CFPB would "act expeditiously" to implement the statute.[4] The course of action that followed, however, was anything but expeditious. Beginning at least as

---

[3] *See* Dubner Decl., Ex. 3, Letter from Leonard Kennedy, General Counsel, CFPB, to Chief Executive Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act. (Apr. 11, 2011) (Kennedy Letter), at 1.

[4] *See id.* at 1.

1    early as December 2012, CFPB reported that it had "begun the planning process to promulgate rules"

2    implementing Section 1071, and was "currently gathering information from stakeholders to better

3    understand the relevant business lending markets, and to determine what data are available and how

4    best to collect those data."[5] Yet two and a half years later, in April 2015, CFPB had made no

5    apparent progress, still reporting that it had only "begun preliminary planning" for implementing

6    Section 1071.[6] So too the following year, where CFPB reported that it still had "outreach and

7    research" to perform.[7]

8         Finally, by spring 2017, progress appeared to be on the horizon. CFPB held a field hearing

9    and roundtable on May 10, 2017, in which CRC and its members participated. Compl. ¶ 29. One

10   week later, CRC and its members and partners convened a panel of small business owners to discuss

11   with CFPB and other banking regulators the challenges small business owners face in accessing bank

12   credit and being relegated to high-cost merchant cash advance and other online lenders, and the need

13   for small business lending data to address these problems. *Id.* Thereafter, CFPB published a

14   "Request for Information" soliciting comments to "enhance our understanding of the small business

15   lending market in order to prioritize and guide research and policy development work for

16   implementation of section 1071."[8]

17        CFPB held the comment period open for four months and received some 2,709 comments.[9]

18   Many comments, including CRC's, urged CFPB to move expeditiously to implement Section 1071,

19   given the ongoing harm to women-owned, minority-owned, and small businesses, and the

20   communities they serve. It appeared that CFPB had received the message, recognizing in a report the

21   important role that women-owned, minority-owned, and small businesses play in supporting local

22

23        [5] Dubner Decl., Ex. 4, CFPB, *Fair Lending Report of the Consumer Financial Protection Bureau* (Dec. 2012) at 25-26.

24        [6] Dubner Decl., Ex. 5, CFPB, *Fair Lending Report of the Consumer Financial Protection Bureau* (Apr. 2015) at 32-33.

25
     [7] Dubner Decl., Ex. 6, CFPB, *Spring 2016 Unified Agenda: Business Lending Data (Regulation B)*.
26

27        [8] *Id.*

         [9] *See* Request for Information Regarding the Small Business Lending Market; Extension, 82 Fed.
28   Reg. 32,177 (July 12, 2017).

1   communities, acknowledging that access to capital is a critical issue for these businesses, and that

2   more robust data is needed to "assess how well the market is meeting the needs of small

3   businesses."[10]

4   **C.    CFPB Delays Section 1071 Implementation Further**

5        Despite these encouraging signs, any progress was halted—and reversed—after CFPB's then-

6   Director was replaced in November 2017 by Acting Director Mick Mulvaney and then by Defendant

7   Kraninger. Rather than moving forward with rulemaking, CFPB in its Spring 2018 Regulatory

8   Agenda pushed back its prerule activities by ten months, from May 2018 to March 2019. Compl.

9   ¶ 39. The Fall 2018 Regulatory Agenda then effectively took Section 1071 off the table altogether,

10  moving it to the "Long-Term Agenda" for items on which no activity would happen for at least a

11  year. *Id.*

12       Rather than engage in further discussions regarding Section 1071, Acting Director Mulvaney

13  fired all 25 members of the CFPB's Consumer Advisory Board,[11] shortly after CRC's Executive

14  Director, who served on the Board, had advocated for CFPB to fulfill its statutory duty to implement

15  the statute.[12]

16       CFPB asserted that instead of complying with its mandatory duty to implement Section 1071,

17  it would prioritize its own discretionary Home Mortgage Disclosure Act initiatives.[13] And only after

18  this lawsuit was filed, CFPB announced, vaguely, that it would "recommence work later this year"

19  on "pre-rulemaking activities on the section 1071 project," without committing to any timeframe for

20  even proposing a rule, much less issuing a final rule.[14] To date, nearly five months later, CFPB has

21  not issued a proposed rule or even explained why the pre-rulemaking activities conducted in 2017

22  are insufficient to issue a proposed rule.

23

24       [10] *Key Dimensions* at 3, 17, 39.

25       [11] *See* Dubner Decl., Ex. 7, *CFPB Advisory Board 2.0: Far Fewer Members*, Am. Banker (July 18, 2018) at 1.

26       [12] Declaration of Paulina Gonzalez-Brito (Gonzalez-Brito Decl.), ¶¶ 18-19, filed concurrently herewith.

27       [13] Dubner Decl., Ex. 8, CFPB, *Fall 2018 Rulemaking Agenda* (Oct. 17, 2018).

28       [14] Dubner Decl., Ex. 9, CFPB, *Spring 2019 Rulemaking Agenda* (May 22, 2019).

1    **D.      Plaintiffs**

2           **1.      California Reinvestment Coalition**

3           CRC is a non-profit organization based in San Francisco, California. Gonzalez-Brito Decl.,

4    ¶ 2. CRC's mission is to aid low-income communities and communities of color in accessing credit,

5    financial services, and investments. *Id.*, ¶ 3. To pursue this mission, CRC negotiates agreements with

6    lenders to increase lending to and investments in women-owned, minority-owned, and small

7    businesses; publishes evidence-based reports about credit access; works with state and local

8    governments to enact policies increasing the availability of credit; and files complaints with CFPB to

9    ensure appropriate enforcement of fair lending laws and implementation of the Community

10   Reinvestment Act. *Id.*, ¶ 4. CRC makes extensive use of small business–related data in these efforts,

11   and would use the geographic, demographic, and institution-specific information required by Section

12   1071 to target its resources, improve its negotiating ability with lenders, and add critical evidence to

13   its reports and policymaking participation. *Id.*, ¶¶ 5-12. CFPB's failure to implement Section 1071

14   has thus increased the cost of CRC's activities and reduced their effectiveness. *Id.*

15          CRC also has more than 300 members including public agencies, small business lenders,

16   community development financial institutions ("CDFIs"), and technical assistance providers. *Id.*,

17   ¶¶ 3, 13. The failure to implement Section 1071 has similarly harmed these members, as they lack

18   data to use in determining where and how to focus their resources. *Id.*, ¶¶ 14-15.

19          **2.      National Association for Latino Community Asset Builders**

20          NALCAB is a non-profit organization based in San Antonio, Texas.[15] NALCAB's mission is

21   to strengthen the economy by advancing economic mobility in Latino communities, primarily

22   through helping overcome barriers to accessing capital and building assets. Poyo Decl., ¶ 3. To fulfill

23   this mission, NALCAB lends to small-business lenders for the purpose of improving access to

24   capital in underserved areas. *Id.*, ¶ 5. It has assisted its members to secure more than $350 million in

25   capital for small business investment and local economic development projects, including more than

26   $75 million dedicated specifically for small business investment and local economic development

27

28          [15] Declaration of Noel Poyo (Poyo Decl.), ¶ 2, filed concurrently herewith.

1   programs. *Id.* It also works with local and state governments to develop economic and small business

2   investment programs. *Id.*, ¶ 11.

3          These activities rely critically on lending data, which NALCAB analyzes to determine where

4   its resources are best dedicated. *Id.*, ¶¶ 7-8. Because Section 1071 has not been implemented and

5   current data does not provide geographic information, NALCAB has spent more than $100,000

6   conducting research into business credit needs in local markets. *Id.*, ¶¶ 7-10. NALCAB expects to

7   spend hundreds of thousands more dollars on this research as long as Section 1071 continues to be

8   unimplemented. *Id.*, ¶ 10.

9          NALCAB also has more than 120 members including community development, asset-

10  building, and lending organizations, nearly all of whom are non-profits. *Id.*, ¶ 4. The failure to

11  implement Section 1071 has similarly harmed these members, as they lack data that could help them

12  identify particular areas of need and potential capital sources. *Id.*, ¶ 13. Without Section 1071 data,

13  their grant applications and funding proposals are more likely to be rejected and their resources must

14  be spread more thinly, to less effect. *Id.*

15         3.   **Deborah Field**

16         Deborah Field is the founder, president, and co-owner of Paperjam Press, a small family-

17  owned corporation in Portland, Oregon.[16] Ms. Field's efforts to grow her business have been

18  hampered by the difficulty of finding banks willing to lend to small businesses. *Id.*, ¶¶ 5-12. In 2017,

19  a local community bank rejected a loan application because they do not lend to small businesses,

20  delaying her ability to obtain funding for several months and thus delaying the implementation of

21  Paperjam Press's growth plan. *Id.* She is now in the process of seeking refinancing from another

22  bank based on anecdotal reports that it is willing to provide small business loans to women, but

23  cannot compare offers to other banks' because she lacks any data to determine which banks consider

24  such loans. *Id.*, ¶¶ 17-19.

25         Additionally, she serves on the Small Business Council for the Portland Business Alliance.

26  *Id.*, ¶ 14. Her efforts to advocate for banks, business leaders, and state officials to commit more

27

28         ———————————
           [16] Declaration of Deborah Lynn Field (Field Decl.), ¶ 2, filed concurrently herewith.

resources to her community are impaired by the absence of data she can use to show the

demographics and other characteristics of which small businesses obtain loans and which are denied.

*Id.*, ¶¶ 14-15.

### 4. ReShonda Young

ReShonda Young is the founder of Popcorn Heaven LLC, a small business launched in

Waterloo, Iowa in 2013.[17] Waterloo was recently found to be the worst city in America for African-

Americans, with vastly unequal economic opportunities. *Id.*, ¶ 14.[18] Despite having excellent

credentials, credit, and income qualifications when she founded Popcorn Heaven in 2013, her loan

application was rejected by one lender after it learned that she was African-American, and by a

second bank because it did not lend money to new small businesses. *Id.*, ¶¶ 6-7. When she ultimately

obtained a loan from a regional bank, she received $56,000 with a five-year repayment period; after

she sold this location to a white buyer with lesser credentials, the buyer received a $130,000 loan

with a 20-year repayment period from the same bank. *Id.*, ¶¶ 8, 12.

These difficulties prevented Ms. Young from fully executing her business plan and required

her to draw into her savings and retirement, and would have made it impossible to start the business

at all had she not had her own finances to draw from. *Id.*, ¶ 9. Popcorn Heaven's growth has further

been slowed by the difficulty her first several licensees, all of whom were African-American, have

experienced obtaining credit. *Id.*, ¶ 11. Given the difficulty of finding lenders who provide loans to

minority-owned small businesses, Ms. Young will need to finance future expansions from her own

profits and savings. *Id.*, ¶ 16. If CFPB implemented Section 1071, she would be able to identify

banks that might be receptive to her application and would seek outside capital that would allow her

to expand the business more rapidly and profitably. *Id.*

### E. This Lawsuit

Plaintiff CRC brought this lawsuit on May 14, 2019. *See* ECF No. 1. The complaint was

subsequently amended on June 27, 2019, to add plaintiffs NALCAB, Ms. Young, and Ms. Field. *See*

---

[17] Declaration of ReShonda Young (Young Decl.), ¶¶ 2-3, filed concurrently herewith.

[18] *See* Dubner Decl., Ex. 10, Samuel Stebbins & Evan Comen, "These are the 15 worst cities for black Americans," *USA Today* (Nov. 16, 2018).

1   ECF No. 24. In Count I, Plaintiffs challenge CFPB's unlawful eight-year-plus failure to fulfill its

2   mandatory duty to prescribe rules implementing Section 1071.[19]

### III.   ARGUMENT

### A.   Plaintiffs Have Standing to Pursue Their Claims

To demonstrate Article III standing a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 1136 S. Ct. 1540, 1547 (2016).

An organization has standing to sue in its own right when "it show[s] a drain on its resources from both a diversion of its resources and frustration of its mission." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (internal citations omitted); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). A membership organization may also sue on behalf of its members if "its members would otherwise have standing to sue in their own right; the interests at stake are germane to the organization's purpose; and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015).

Although only one plaintiff need have standing, *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017), each Plaintiff here has standing.

### 1.   CRC and NALCAB Have Organizational Standing

As outlined above and shown in the declarations of Paulina Gonzalez-Brito and Noel Poyo, both CRC and NALCAB have been frustrated in their missions and have had to expend organizational resources as a result of CFPB's failure to implement Section 1071. NALCAB lends money to small-business lenders for the purpose of improving access to capital in underserved communities, while CRC negotiates with lenders to ensure commitments to provide capital to small, women-owned, and minority-owned businesses. Poyo Decl., ¶ 5; Gonzalez-Brito Decl., ¶¶ 4, 8-9.

---

[19] Plaintiffs do not seek summary judgment on Count II of the First Amended Complaint and hereby withdraw that claim.

1    Both of these efforts rely critically on data. NALCAB needs to understand the demographics and

2    geography of small business lending in order to know how to capitalize its loan funds, where to

3    direct its resources, and what local CDFIs to support. Poyo Decl., ¶ 7. Similarly, CRC needs to

4    identify which communities are most in need and what an institution's existing practices are to

5    convince financial institutions to agree to provide additional investment in communities that face

6    barriers to accessing credit. Gonzalez-Brito Decl., ¶ 8.

7           However, as CFPB itself has acknowledged, publicly available data has "a number of

8    limitations that leave many important questions unanswered," and "without more robust data it will

9    continue to be difficult to assess how well the market is meeting the needs of small businesses." *Key*

10   *Dimensions* at 37, 39; *see also* Poyo Decl., ¶ 8; Gonzalez-Brito Decl., ¶¶ 5-7. In particular, existing

11   data does not provide the kind of geographic and institution-specific data that Section 1071 requires.

12   *Key Dimensions* at 37-40; Poyo Decl., ¶¶ 7-8; Gonzalez-Brito Decl., ¶¶ 5-10. As CFPB explained,

13              To the extent data collected under the Bureau's Section 1071 authority
14              is made public—which Section 1071 requires subject to the Bureau's
                authority to require deletions or modifications to protect privacy
15              interests—these data can provide a broad range of stakeholders across
                the United States with an understanding of the small business credit
16              flowing into their local communities, and allow them to identify
                "credit deserts" or sectors where credit flows may be restricted. This in
17              turn may support localized efforts to increase access to credit in
                various communities around the United States to address unmet credit
18              needs, thereby spurring economic development.

19   *Key Dimensions* at 40.

20          In the absence of this data, NALCAB has conducted expensive research into lending

21   practices and barriers to accessing credit in specific, targeted markets. Poyo Decl., ¶¶ 9-10.

22   NALCAB has spent roughly $100,000 in recent years, and expects to spend hundreds of thousands

23   more in the coming years if CFPB continues to withhold Section 1071 data. *Id.*, ¶ 10.

24          Additionally, both NALCAB and CRC publish reports analyzing access to credit to inform

25   their members, business owners, lenders, and policymakers. Poyo Decl., ¶ 11; Gonzalez-Brito Decl.,

26   ¶ 10. These reports are more difficult to create, and less useful, due to the absence of Section 1071

27   data. Poyo Decl., ¶ 12; Gonzalez-Brito Decl., ¶ 10. Similarly, NALCAB's and CRC's efforts to work

28   with state and local governments to design policies improving access to credit—for example, CRC's

1    work helping San Francisco evaluate the creation of a municipal bank—are impaired by the lack of

2    data, because they cannot tailor programs to the actual facts on the ground in a given area. Gonzalez-

3    Brito Decl., ¶ 11; *see also* Poyo Decl., ¶ 11.

4        2.    **CRC and NALCAB Have Associational Standing**

5        CRC and NALCAB are both membership organizations, consisting of dues-paying CDFIs,

6    small business lenders, asset-building organizations, and the like. Poyo Decl., ¶ 4; Gonzalez-Brito

7    Decl., ¶¶ 3, 12. Many of these members devote substantial resources to assisting women, people of

8    color, and members of other underserved communities seeking loans. Poyo Decl., ¶ 13; Gonzalez-

9    Brito Decl., ¶¶ 13-15. These activities similarly rely heavily on data. Many members obtain their

10   funding from government grants and private investors; without the geographic data required by

11   Section 1071, their applications are less targeted and more likely to be rejected. Poyo Decl., ¶ 13.

12   They are hamstrung in negotiations with financial institutions to increase lending to small, women-

13   owned, and minority-owned businesses. Gonzales-Brito Decl., ¶ 16. And they must rely on anecdotal

14   evidence to determine where to assign staff, where to locate offices, and which institutions to contact

15   when seeking credit for their clients. *Id.*, ¶ 15.

16       Thus, CFPB's failure to implement Section 1071 injures CRC's and NALCAB's members

17   much as it does CRC and NALCAB themselves. Because the members' interests are germane to

18   CRC's and NALCAB's purpose, *see* Poyo Decl., ¶ 3; Gonzalez-Brito Decl., ¶ 3, and nothing about

19   Plaintiffs' claims require individual members' participation, CRC and NALCAB have standing to

20   sue on behalf of their members. *See WildEarth Guardians*, 795 F.3d at 1154.

21       3.    **Ms. Field and Ms. Young Have Standing**

22       The individual Plaintiffs, Ms. Field and Ms. Young, are also injured by CFPB's failure to

23   collect and publish Section 1071 data. Both women are small business owners who have recently

24   sought loans for their businesses, and expect to invest more capital in their businesses in the near

25   future. Field Decl., ¶¶ 5-12, 18-19; Young Decl., ¶¶ 5-10, 16. Ms. Field was rejected by a bank that

26   held itself out as serving small businesses, and only informed her after multiple post-rejection

27   inquiries that they no longer lent to small businesses at all. Field Decl., ¶¶ 10-11. Ms. Young, who is

28   African-American, was rejected by multiple lenders, and ultimately received just two-thirds of the

1   funds she required; when she sold her store a few years later to a buyer who is white, with less

2   business experience, the same bank provided more than twice as much in principal and with a

3   substantially longer repayment period. Young Decl., ¶¶ 5-12.

4        Because of CFPB's failure to implement Section 1071, both Ms. Field and Ms. Young lack

5   any ability to determine what institutions have a track record of refusing to lend to small businesses

6   (and, in particular, women and African-American small business owners). Field Decl., ¶¶ 16, 18;

7   Young Decl., ¶ 16. Without that data, Ms. Field is limited to applying to a single bank based on the

8   anecdotal experience of two other business owners, while Ms. Young has resorted to investing her

9   own savings because she cannot determine which banks are worth approaching. Field Decl., ¶ 18;

10   Young Decl., ¶¶ 9, 16. With this data, they would determine which lenders are worth consulting,

11   allowing them to compare offers without sending time-consuming applications to lenders who would

12   not even consider their requests. Field Decl., ¶ 18; Young Decl., ¶ 16.

13        Additionally, Ms. Field serves on the Small Business Council for the Portland Business

14   Alliance, where she seeks to advance access to capital for small businesses. Field Decl., ¶ 14. The

15   lack of data hamstrings her ability to advocate for banks, business leaders, and state officials to

16   commit more resources to her area. *Id.*, ¶¶ 14-15. Thus, much like CRC and NALCAB, Ms. Field is

17   hampered in her efforts to improve access to capital in her community. *Id.*

18   **B.**    **Summary Judgment is Appropriate on Count I**

19        Summary judgment for Plaintiffs is appropriate with respect to Count I of the complaint.

20   Pursuant to the Administrative Procedure Act ("APA"), "the reviewing court shall [] compel agency

21   action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). There is no question that

22   Section 1071 imposes a mandatory duty to issue implementing regulations providing for the

23   collection and publication of lending data. And CFPB has itself acknowledged the importance of

24   improving available data on access to capital in order to ensure that women-owned, minority- owned,

25   and small businesses, and the communities they serve, have adequate access to capital and are not

26   discriminated against in violation of the fair lending laws. Nevertheless, CFPB has delayed its

27   implementation of Section 1071 for more than eight years to date, with no firm commitment or even

28

1  estimated timetable to issue a proposed rule at any time in the future. CFPB's extended delay,

2  lacking in any adequate justification, is unreasonable and warrants judicial relief.

3       **1.**    **Legal Framework**

4       In assessing a claim of unlawfully withheld agency action, courts first determine whether the

5  agency is under a mandatory duty to act. *See In re A Community Voice*, 878 F.3d 779, 784 (9th Cir.

6  2017) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 n.1 (2004)). If such a duty exists,

7  courts within this Circuit next apply factors first announced by the D.C. Circuit in

8  *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984)

9  ("*TRAC*"), to determine whether relief is appropriate. *See Indep. Mining Co. v. Babbitt*, 105 F.3d

10  503, 507 (9th Cir. 1997).

11       **2.**    **CFPB Has a Mandatory Duty to Implement Section 1071**

12       Section 706(1) of the APA provides a remedy where the "agency failed to take a *discrete*

13  agency action that it is *required to take*," *S. Utah Wilderness All.*, 542 U.S. at 64. Accordingly, the

14  initial inquiry is whether Section 1071 imposes a mandatory duty on CFPB to issue implementing

15  regulations. In this case, the statute is clear and nondiscretionary. Specifically, Section 1071 provides

16  that "[t]he Bureau *shall* prescribe such rules and issue such guidance as may be necessary to carry

17  out, enforce, and compile data pursuant to this section." 15 U.S.C. § 1691c–2(g)(1) (emphasis

18  added). The statute further provides that "[t]he Bureau *shall* issue guidance designed to facilitate

19  compliance with the requirements of this section, including assisting financial institutions in working

20  with applicants to determine whether the applicants are women-owned, minority-owned, or small

21  businesses for purposes of this section." *Id.*, § 1691c–2(g)(3) (emphasis added). Similarly, the statute

22  provides that information compiled and maintained "shall be" (1) retained for at least three years;

23  (2) "made available to any member of the public, upon request, in the form required under

24  regulations prescribed by the Bureau"; and (3) "annually made available to the public generally by

25  the Bureau, in such form and in such manner as is determined by the Bureau, by regulation." *Id.*,

26  § 1691c–2(f)(2).

27       It is well settled that the use of the imperative "shall" establishes a mandatory duty. *See, e.g.*,

28  *Bennett v. Spear*, 520 U.S. 154, 172 (1997) (statutory terms providing that Secretary "shall" take

1    action "are plainly those of obligation rather than discretion"); *Allied Pilots Ass'n v. Pension Ben.*

2    *Guar. Corp.*, 334 F.3d 93, 98 (D.C. Cir. 2003) (quoting *Anderon v. Yungkau*, 329 U.S. 482, 485

3    (1947)). In other words, "'Shall' means shall." *Brower v. Evans*, 257 F.3d 1058, 1067 n.10 (9th Cir.

4    2001) (citations and internal quotation marks omitted). And this understanding is further buttressed

5    by the statute's use of the optional "may" in other provisions. *See* 15 U.S.C. § 1691c–2(e)(4), (g)(2);

6    *see Lopez v. Davis*, 531 U.S. 230, 231 (2001) (interpreting use of permissive "may" in contrast with

7    use of mandatory "shall" elsewhere in statute). Thus, by the statute's plain terms, CFPB is required

8    to issue rules implementing Section 1071's data collection requirements.

9        Indeed, CFPB has itself acknowledged its mandatory duty to implement Section 1071. Its

10   2011 letter to financial institutions stated that the Bureau would "act expeditiously" to develop and

11   issue "necessary implementing regulations."[20] Its 2017 Request for Information characterized its

12   rulemaking as fulfilling a "Congressional Mandate To Enact Section 1071." 82 Fed. Reg. 22,319

13   (May 15, 2017). Then–CFPB Director Richard Cordray characterized the rule as "the regulation

14   mandated by Congress under Section 1071" in prepared remarks,[21] and the current Director,

15   Defendant Kraninger, has stated that the rulemaking "is something that Congress directed the Bureau

16   to do."[22] Any argument CFPB may now mount that it does not have a mandatory duty to implement

17   Section 1071 is a post-hoc litigating argument that flatly contradicts the statute and the agency's own

18   years-long, oft-repeated position.

19        3.    **Judicial Relief is Warranted**

20        The Court should grant relief under Section 706(1) of the APA. The eight-plus years that

21   have elapsed with little or no progress since the CFPB was charged with implementing Section 1071

22   defy any rule of reason. CFPB has provided no legitimate rationale for its interminable delay. And as

23   Plaintiffs have demonstrated, and as CFPB itself has acknowledged, each week, month, and year that

---

[20] *See* Dubner Decl., Ex. 3, at 1.

[21] Dubner Decl., Ex. 11, *Prepared Remarks of CFPB Director Richard Cordray at the Small Business Lending Field Hearing* (May 10, 2017).

[22] Bipartisan Policy Center, *The Next Phase for CFPB: A Keynote Address from Director Kathy Kraninger* (Apr. 17, 2019), *available at* https://www.youtube.com/watch?v=avyf3ZleSAM&feature=youtu.be&t=3138 (at 52:19).

1    passes without implementation of Section 1071's mandate allows discriminatory practices to go

2    undetected and inhibits community organizations and government agencies from addressing the

3    neglected credit needs of the women-owned, minority-owned, and small businesses the statute was

4    designed to protect.

5           Under the D.C. Circuit's *TRAC* analysis, which the Ninth Circuit has adopted, the Court

6    considers these factors in determining whether relief is warranted:

7                      (1) the time agencies take to make decisions must be governed by a
                       rule of reason; (2) where Congress has provided a timetable or other
8                      indication of the speed with which it expects the agency to proceed in
                       the enabling statute, that statutory scheme may supply content for this
9                      rule of reason; (3) delays that might be reasonable in the sphere of
                       economic regulation are less tolerable when human health and welfare
10                     are at stake; (4) the court should consider the effect of expediting
                       delayed action on agency activities of a higher or competing priority;
11                     (5) the court should also take into account the nature and extent of the
                       interests prejudiced by delay; and (6) the court need not find any
12                     impropriety lurking behind agency lassitude in order to hold that
                       agency action is unreasonably delayed.
13

14   750 F.2d at 80 (citations and internal quotation marks omitted). The first factor, the rule of reason, is

15   the "most important," although courts must consider them all. *In re A Community Voice*, 878 F.3d at

16   786. For the reasons discussed below, these factors weigh strongly in favor of granting relief.

17                  **a.      The CFPB's Delay is Excessive**

18          A delay exceeds a rule of reason if, as here, it "saps the public confidence in an agency's

19   ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate

20   the potential effects of possible agency decisionmaking into future plans." *Potomac Elec. Power Co.

21   v. ICC*, 702 F.2d 1026, 1034 (D.C. Cir. 1983). The Ninth Circuit itself has at least twice found an

22   eight-year delay—the delay at issue here—to be excessive. *In re A Community Voice*, 878 F.3d at

23   787; *In re Pesticide Action Network of N. Am.*, 798 F.3d 809, 814 (9th Cir. 2015). In a line of cases

24   endorsed by the Ninth Circuit, the D.C. Circuit has consistently found agency delays of a similar

25   length or even shorter to be unreasonable. *See, e.g.*, *Potomac Elec. Power Co.*, 702 F.2d at 1035

26   (eight-year delay was unreasonable); *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322, 324-24 (D.C.

27   Cir. 1980) (four-year delay was unreasonable); *Nader v. FCC*, 520 F.2d 182, 206 (D.C. Cir. 1975)

28

1    (ten-year delay was unreasonable); *cf. In re Calif. Power Exchange*, 245 F.3d 1110, 1125 (9th Cir.

2    2001) (citing above D.C. Circuit cases and finding four-month delay reasonable).

3          Plaintiffs have waited for more than eight years for CFPB to prescribe rules implementing

4    Section 1071—something the agency promised in 2011 that it would "act expeditiously" to

5    accomplish.[23] For their patience, they have been rewarded with delay after delay. After some

6    progress was finally made under CFPB's previous leadership, the Bureau last year backtracked from

7    those forward steps, firing its advisory council and removing Section 1071 implementation

8    altogether from its near-term agenda, despite the Bureau's acknowledgment of its mandatory duty to

9    implement the statute. This failure is exacerbated by CFPB's unlawful decision to excuse all

10   financial institutions from complying with their obligations under the statute while it "act[ed]

11   expeditiously" to implement the statute—meaning that Section 1071 essentially is a dead letter as

12   long as CFPB continues to delay. And although, after the initiation of this lawsuit, CFPB restored

13   pre-rule activities to its plans, it has still provided no indication—much less a firm commitment—as

14   to when it will issue a proposed or final rule.

15         A delay of more than eight years is unreasonable in these circumstances. CFPB already

16   conducted substantial pre-rule activities in 2017 and has provided no explanation that would justify

17   its continued lack of progress—let alone its apparent rollback of the progress that has been made. At

18   this point, Plaintiffs—whose businesses and missions are directly affected by CFPB's failure to

19   implement the statute—have no confidence that CFPB will do so, and must resort to second-best

20   solutions in lieu of incorporating Section 1071 data into their future plans. Poyo Decl., ¶¶ 9-10;

21   Gonzalez-Brito Decl., ¶ 9; Field Decl., ¶ 18; Young Decl., ¶ 16. In short, the CFPB's intransigence

22   with regard to its statutory duty has entirely "sap[ped] the public confidence in [its] ability to

23   discharge its responsibilities." *Potomac Elec. Power Co.*, 702 F.2d at 1034. Thus, the first factor

24   weighs strongly in plaintiffs' favor.

25

26

27

28         [23] Dubner Decl., Ex. 3, at 1.

1

2

**b.      The Absence of a Deadline Does Not Excuse CFPB's Unreasonable Delay**

3       The Ninth and D.C. Circuits have reiterated that the lack of a specific deadline does not

4   render a statutory mandate unenforceable. Rather, a specific deadline would at most "supply content

5   for [the] rule of reason" courts are to apply. *See In re Pesticide Action Network of N. Am.*, 798 F.3d

6   at 814 (quoting *TRAC*, 750 F.2d at 79-80). Accordingly, courts have applied the *TRAC* analysis in

7   concluding that an agency's delay was unreasonable even in the absence of a congressionally

8   supplied deadline. *See, e.g.*, *In re A Community Voice*, 878 F.3d at 786; *In re Pesticide Action

9   Network of N. Am.*, 798 F.3d at 81; *see also Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166,

10  1177 n.11 (9th Cir. 2002) (noting that Ninth Circuit applies *TRAC* factors "in the absence of a firm

11  [congressionally mandated] deadline"). And the Ninth Circuit has granted relief twice where the

12  agency delayed action for eight years, despite the lack of a specific deadline. *See In re A Community

13  Voice*, 878 F.3d at 786; *In re Pesticide Action Network of N. Am.*, 798 F.3d at 81. The same result

14  holds here.

**c.      Section 1071 Serves an Important Anti-Discriminatory Purpose**

15       Congress enacted Section 1071 in recognition of the need to enhance "enforcement of fair

16  lending laws and enable communities, governmental entities, and creditors to identify business and

17  community development needs and opportunities of women-owned, minority-owned, and small

18  businesses." 15 U.S.C. § 1691c–2(a). Although it falls within the economic sphere under *TRAC*'s

19  dichotomy between regulations affecting economic matters as opposed to health and welfare, the

20  effects of CFPB's failure to implement Section 1071 are far-reaching, undermining the viability of

21  women-owned, minority-owned, and small businesses, as well as the communities they serve, around

22  the country. CFPB has effectively acknowledged as much. *See Key Dimensions* at 17, 37, 39 (small

23  businesses "play a vital role in driving economic activity and supporting job creation"; moreover,

24  their "ability to access financing plays an important role in allowing small businesses to grow and

25  contribute to the economy"; however, "without more robust data it will continue to be difficult to

26  assess how well the market is meeting the needs of small businesses").

27

28

### d.   CFPB's Alleged Higher Priority Matter Is Entirely Discretionary

CFPB asserts that it put Section 1071 implementation on the backburner in order to prioritize changes to its Home Mortgage Disclosure Act ("HMDA") regulations over its implementation of Section 1071.[24] However, the rules required by HMDA have been in place since 2015.[25] CFPB's current activities pertain to consideration of entirely discretionary amendments to the 2015 regulations. Although there is no question that agencies may balance competing priorities, CFPB's decision to direct its resources to an entirely discretionary matter while putting Section 1071 implementation on the backburner countermands Congress's clear mandate. *Cf. In re Barr Labs, Inc.*, 930 F.2d 72, 76 (D.C. Cir.), *cert. denied*, 502 U.S. 906 (1991) (where agency "assert[s] utter indifference to a congressional deadline, the agency will have a hard time claiming legitimacy for its priorities").

### e.   Plaintiffs, and the Public at Large, Are Injured by CFPB's Years of Delays

CFPB itself claims to fully appreciate the importance of implementing Section 1071. CFPB acknowledges the "vital role" women-owned, minority-owned, and small businesses play "in driving economic activity and supporting job creation." *Key Dimensions* at 39. CFPB recognizes that the available data on lending to these businesses "provide an incomplete picture" and that there is a "need for more robust small business lending data"; indeed, CFPB goes as far as to say that "with current data it is not possible to confidently answer basic questions regarding the state of small business lending." *Id.* at 40. And CFPB acknowledges that Section 1071 would fill that need to a great extent:

> [T]hese data can provide a broad range of stakeholders across the United States with an understanding of the small business credit flowing into their local communities, and allow them to identify 'credit deserts' or sectors where credit flows may be restricted. This in turn may support localized efforts to increase access to credit in various communities around the United States to address unmet credit needs, thereby spurring economic development. [In addition, d]ata is needed to understand the nature and extent of potential disparities, and to ensure women-owned and minority-owned businesses have non-

[24] Dubner Decl., Ex. 8.

[25] *See* Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,128 (Oct. 28, 2015); Compl. ¶ 41.

> discriminatory access to capital. Data collected under Section 1071 may allow the Bureau and others to focus resources in an effort to identify potential areas of concern.

*Id.* at 40.

CFPB has therefore acknowledged the very harm that Section 1071 is designed to remedy, and has recognized that fulfilling its mandatory duty to implement the statute would in fact meaningfully address these problems. Yet despite this, CFPB has consistently delayed and backburnered its implementation of the statute. The harm of CFPB's delay is further exacerbated by its decision to issue a letter exempting all financial institutions from complying with the statute until its implementing regulations take effect. This letter—which is unsupported by the mandatory language of Section 1071, which only allows CFPB to issue exceptions and exemptions "by rule or order," 15 U.S.C. § 1691c–2(g)(2)—has freed financial institutions from even *collecting* data, which means that even after implementation it will take at least a year for data to become available, and longer still before Plaintiffs can review a multi-year sample. In other words, CFPB has rendered Section 1071 a dead letter for more than eight years, with no relief on the horizon.

### f.  CFPB Has Not Provided Adequate Justification for Its Decision to Delay Implementation of Section 1071

Although *TRAC* and its progeny are clear that there need not be any showing of bad faith for a Section § 706(1) remedy to be warranted, CFPB's explanations and justifications for its continued delay certainly raise more questions than answers. In 2011, CFPB—in the course of excusing financial institutions' compliance with the statute's mandates—stated that it would "act expeditiously" to implement Section 1071.[26] Yet rather than doing so, for more than five years after that, CFPB took virtually no action, stating repeatedly that it intended to gather stakeholder viewpoints soon. The 2017 RFI, and its associated outreach effort, constituted the first discernible step toward implementation of the statute, some six years after the CFPB was charged with its execution.

---

[26] Dubner Decl., Ex. 3, at 1.

Then, after a change in leadership, CFPB suddenly decided to place fulfilling its statutory mandate on the backburner, stating that yet more pre-rule activities were needed before a proposed rule could issue and providing no timeframe whatsoever for issuing such a proposal. CFPB's only explanation, as discussed above, is its desire to engage in some revisions to the rules implementing a different law, the Home Mortgage Disclosure Act, even though it had completed all mandatory rulemakings for that law in 2015. Why it is suddenly urgent to do so, and why doing so excludes the possibility of issuing a proposed rule on Section 1071 at any point in the near future, has not been explained. Without adequate justifications, it is difficult to understand why CFPB continues to kick the can on fulfilling its statutory duty, while also excusing financial institutions from fulfilling their duties, either.

*                              *                              *

In summary, despite its acknowledged mandatory duty to implement Section 1071, CFPB has failed for more than eight years to move definitively toward issuing a final rule. And its most recent actions raise serious questions about their commitment to doing so. In the meantime, the important statutory objectives Congress sought to effectuate—facilitating enforcement of the federal fair lending laws and identifying capital access needs and opportunities for women-owned, minority-owned, and small businesses—remain unfilled. In these circumstances, relief is appropriate under Section 706(1). The Court should therefore grant summary judgment for Plaintiffs on this count and issue an order directing CFPB to propose and finalize a rule implementing Section 1071 by dates certain.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment on Count I of the First Amended Complaint.

DATED: October 11, 2019

Respectfully submitted,

DEMOCRACY FORWARD FOUNDATION

By:_____/s/ Nitin Shah_____
    Nitin Shah (DC Bar No. 156035)
    (*pro hac vice*)

Jeffrey B. Dubner (DC Bar No. 1013399)
(*pro hac vice*)
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
Facsimile:  (202) 701-1775
nshah@democracyforward.org
jdubner@democracyforward.org

HAGENS BERMAN SOBOL SHAPIRO LLP

Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 256260)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com

Steve W. Berman (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs*