Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com

Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 268-9320
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs*

Nitin Shah (DC Bar No. 156035)
(*pro hac vice*)
Jeffrey B. Dubner (DC Bar No. 1013399)
(*pro hac vice*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
Facsimile: (202) 701-1775
nshah@democracyforward.org
jdubner@democracyforward.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| CALIFORNIA REINVESTMENT COALITION, NATIONAL ASSOCIATION FOR LATINO COMMUNITY ASSET BUILDERS, DEBORAH LYNN FIELD, and RESHONDA YOUNG, <br><br> Plaintiffs, <br><br> v. <br><br> KATHLEEN L. KRANINGER, Director, Consumer Financial Protection Bureau, In Her Official Capacity and CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> Defendants. | No. 4:19-cv-02572-JSW <br><br> **DECLARATION OF JEFFREY DUBNER IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date:    January 10, 2020 <br> Time:    9:00 a.m. <br> Dept:    Courtroom 5, 2nd Floor <br> Judge:  Hon. Jeffrey S. White |

1         I, JEFFREY DUBNER, declare as follows:

2         1.    I am an attorney duly licensed to practice before all of the courts of the District of

3    Columbia, and admitted *pro hac vice* in the above-entitled action. I am senior counsel at Democracy

4    Forward, one of the counsel of record for Plaintiffs in the above-entitled action. Based on personal

5    knowledge, if called upon, I could and would competently testify thereto.

6         2.    I provide this declaration in support of Plaintiffs' Motion for Summary Judgment.

7         3.    Attached hereto are true and correct copies of the following Exhibits:

8    Exhibit 1:    CFPB, Key Dimensions of the Small Business Lending Landscape (May
9                   2017), *available at*
               https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-
               Small-Business-Lending-Landscape.pdf (last accessed Oct. 10, 2019).

10
11   Exhibit 2:    Michael S. Barr, The Hamilton Project, Minority and Women Entrepreneurs:
               Building Capital, Networks and Skills (March 2015), *available at*
12                  https://www.brookings.edu/wp-
               content/uploads/2016/07/minority_women_entrepreneurs_building_skills_barr.
               pdf (last accessed Oct. 10, 2019).

13
14   Exhibit 3:    Letter from Leonard Kennedy, General Counsel, CFPB, to Chief Executive
               Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act.
15                  (Apr. 11, 2011), *available at* https://files.consumerfinance.gov/f/2011/04/GC-
               letter-re-1071.pdf (last accessed Oct. 10, 2019).

16   Exhibit 4:    CFPB, Fair Lending Report of the Consumer Financial Protection Bureau
17                  (Dec. 2012), *available at*
               https://files.consumerfinance.gov/f/201212_cfpb_fair-lending-report.pdf (last
               accessed Oct. 10, 2019).

18
19   Exhibit 5:    CFPB, Fair Lending Report of the Consumer Financial Protection Bureau
               (Apr. 2015), *available at*
20                  https://files.consumerfinance.gov/f/201504_cfpb_fair_lending_report.pdf (last
               accessed Oct. 10, 2019).

21   Exhibit 6:    CFPB, Spring 2016 Unified Agenda: Business Lending Data (Regulation B),
22                  *available at*
               https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201604&RIN=3
               170-AA09 (last accessed Oct. 8, 2019).

23
24   Exhibit 7:    Kate Berry, CFPB Advisory Board 2.0: Far Fewer Members, Am. Banker (July
               18, 2018), *available at* https://www.americanbanker.com/news/cfpb-
               consumer-advisory-board-20-far-fewer-members (last accessed Oct. 8, 2019).

25
26   Exhibit 8:    Kelly Cochran, Fall 2018 Rulemaking Agenda, CFPB (Oct. 17, 2018),
               *available at* https://www.consumerfinance.gov/about-us/blog/fall-2018-
               rulemaking-agenda/ (last accessed Oct. 8, 2019).

27

28

1   Exhibit 9:      Diane Thompson, Spring 2019 Rulemaking Agenda, CFPB (May 22, 2019),
2                   *available at* https://www.consumerfinance.gov/about-us/blog/spring-2019-
                    rulemaking-agenda/ (last accessed Oct. 8, 2019).

3   Exhibit 10:     Samuel Stebbins & Evan Comen, "These are the 15 worst cities for black
4                   Americans," USA Today, Nov. 16, 2018, *available at*
                    https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-
5                   worst-metro-areas-black-americans/38460961/ (last accessed Oct. 10, 2019).

6   Exhibit 11:     Richard Cordray, Prepared Remarks at the Small Business Lending Field
                    Hearing (May 10, 2017), *available at*
7                   https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-cfpb-
                    director-richard-cordray-small-business-lending-field-hearing/ (last accessed
8                   Oct. 10, 2019).

9
10          I declare under penalty of perjury under the laws of the United States that the foregoing is
11  true and correct.  Executed this 11th day of October 2019, at Washington, D.C.

12
13                                                          /s/ Jeffrey Dubner
                                                          JEFFREY DUBNER
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

May 2017

# Key dimensions of the small business lending landscape



# Table of contents

**Table of contents**.................................................................................................1

**1.   Introduction**....................................................................................................2

**2.   An introduction to small, women-owned, and minority-owned
      businesses** ..................................................................................................5

    2.1   Sizing the small businesses market .......................................................... 5

    2.2   Economic impact of small businesses ................................................... 10

    2.3   Women-owned small businesses............................................................ 12

    2.4   Minority-owned small businesses .......................................................... 14

**3.   Small business access to financing** ........................................................17

    3.1   Business life cycle and credit access...................................................... 18

    3.2   Financial products available to small businesses................................... 19

    3.3   Financial institutions engaged in lending to small businesses.............. 23

**4.   State of small business lending through the recession and
      recovery**.....................................................................................................33

    4.1   Gaps in available survey data limit our understanding of the small
      business financing market during and after the recession................... 36

**5.   The need for more robust small business lending data**.................................39

**6.   Conclusion** .................................................................................................41

# 1.  Introduction

Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) amended the Equal Credit Opportunity Act (ECOA) to require financial institutions to compile, maintain, and submit to the Bureau certain data on credit applications by women-owned, minority-owned, and small businesses. These data include the census tract of the business and the race, sex, and ethnicity of the principal business owners, in addition to a number of other data points.[1] Congress enacted Section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses. The Bureau has interpreted Section 1071 to mean that obligations for financial institutions to collect and submit data "do not arise until the Bureau issues implementing regulations and those regulations take effect."[2]

The Bureau is in the early stages of considering how best to implement the Section 1071 mandate. As one step in this rulemaking process, the Bureau is learning about the small business lending market, including lending to women-owned and minority-owned small businesses. This paper reflects the initial findings of the Bureau's research, providing a preliminary understanding of the small business lending environment, with a particular emphasis on lending to women-owned and minority-owned small businesses. The Bureau hopes to engage in a dialogue with stakeholders about the small business lending market and the

---

[1] Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), Pub. L. 111-203, section 1071, 124 Stat. 1376 (2010) (section 704B of the Equal Credit Opportunity Act was added by section 1071 of the DFA) (codified at 15 U.S.C. 1691c-2).

[2] *See* Letter from Leonard Kennedy, General Counsel, CFPB, to Chief Executive Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act (April 11, 2011) *available at* https://www.consumerfinance.gov/policy-compliance/guidance/implementation-guidance/general-counsel-letter-regarding-section-1071-dodd-frank-act/

issues that will need to be addressed as the Bureau moves forward to implement Section 1071 of the Dodd-Frank Act.

As an initial step in this process, the Bureau held a field hearing on May 10th, 2017 and subsequently released a Request for Information (RFI) regarding the small business lending market; in reviewing comments, we aim to augment the Bureau's expertise in this space.

Our preliminary research suggests the following conclusions:

- Small businesses play a key role in fostering community development and fueling economic growth both nationally and in their local communities. Women-owned and minority-owned small businesses in particular play an important role in supporting their local communities. To contribute meaningfully to the U.S. economy, small businesses – and especially women-owned and minority-owned small businesses – need access to credit to smooth business cash flows from current operations and to allow entrepreneurs to take advantage of opportunities for growth.

- Data on how small businesses engage with credit markets are incomplete. A number of data sets exist; however their value with respect to understanding credit access, particularly for small women-owned and minority-owned businesses, is limited both by scope and frequency. Definitional inconsistencies and a lack of data granularity result in a limited picture of the relationships between small businesses and financial institutions.

In some cases, existing data are dated and therefore may not be representative of current market dynamics. Nevertheless, we use this data in an attempt to synthesize available metrics in order to better understand the small business lending industry. Where appropriate, we discuss the limitations of existing data sets to describe the small business lending marketplace.

The remainder of this paper is arranged into four additional sections, followed by a brief conclusion. We invite interested parties to either respond to this paper, or use this paper as a means to frame their responses to our small business lending RFI.

Section 2 discusses the importance of small, women-owned, and minority-owned businesses to the U.S. economy while suggesting the complexities of defining this market. This section also provides an overview of the various set of definitions used to classify a business as "small". We

further discuss existing surveys and their limitations with respect to quantifying the contribution of small, women-owned, and minority-owned businesses to the economy.

Section 3 discusses how readily-available financing assists in the development and growth of small businesses. Using available data, we describe the types of lenders and various financing products they offer to small businesses. To aid our research, we rely on survey data to understand how small businesses engage with financial credit markets. In addition, we discuss the two important federal datasets from the Federal Financial Institutions Examination Council (FFIEC), the Consolidated Reports of Condition and Income ("Call Reports") and the Community Reinvestment Act ("CRA") data. Using these data, we analyze statistics on how certain depository financial institutions engage with businesses. Additionally, using available data and estimates provided by industry experts, we present the small business lending product landscape through estimated dimensions of dollar volume and account totals.

Section 4 describes the impact of the recent recession on the ability of small businesses to access credit. We identify the data gaps that limit our ability to fully understand the ramifications of the recession on small businesses.

Section 5 identifies the need for additional data and discusses how implementing the data collection described in Section 1071 of the Dodd-Frank Act may further understanding of the small business lending market.

4

# 2. An introduction to small, women-owned, and minority-owned businesses

## 2.1  Sizing the small businesses market

While it is well understood that small businesses play a pivotal role in the U.S. economy, there is little consistency in how they are defined. Answering the most basic question of "how many small businesses are in the United States" will differ depending on the small business definition employed. Various definitions of a small business have been used across the federal government, each of which was established for a different purpose. While federal definitions may be used to determine eligibility for a number of federal programs, industry definitions are typically used to operationalize lending and manage risks by the private sector. Conversations with a variety of financial institutions suggest there is little consensus on how they classify a business as small. Where data are available, we attempt to quantify the number of small businesses using frequently used sizing dimensions.

The Small Business Administration's (SBA) industry-based size standards are among the most widely used federal definitions of what qualifies as a small business.[3] These size standards

---

[3] *See* 15 U.S.C. 632(a)(2) (authorizing the SBA to establish size standards that meet certain criteria). These size standards are used in addition to a base definition that the small business concern must be independently owned and operated and not dominant in its field of operation. 15 U.S.C. 632(a)(1). Section 1071 defines "small business" as having "the same meaning as the term 'small business concern'" in the Small Business Act.  Please see the Bureau's

provide granular definitions of a small business, with size thresholds differing by the specific industry in which the business operates.[4] Using the North American Industry Classification System (NAICS), the SBA generally establishes either an employee- or revenue-based size standard to define small business within each industry.[5] The following sections quantify the number of small businesses in the United States based on the SBA's more general employee- and revenue-based definitions of a small business.[6]

## 2.1.1   Small businesses defined by number of employees

The number of employees at a business is one metric used by the SBA to qualify a business as small.[7] This size standard approach is generally presented in terms of the average number of employees employed by a business over the prior 12 months.[8] Where the SBA uses an employee-based size standard, it most frequently classifies businesses with fewer than 500 employees as small.[9] However as discussed above, this size standard threshold varies depending on the specific industry. For example, size thresholds measured by number of employees range from 500 to 1,250 in the food manufacturing (NAICS 311) industries, and 100 to 250 in wholesaling industries (NAICS 423).[10]

---

Request for Information for further discussion of Section 1071's definition of small business, available on our website. *See* http://files.consumerfinance.gov/f/documents/201705_cfpb_RFI_Small-Business-Lending-Market.pdf.
[4] 13 CFR 121.201; U.S. Small Bus. Admin., *Table of Small Business Size Standards* (Feb. 26, 2016), *available at* https://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf
[5] 13 CFR 21.201; U.S. Small Bus. Admin., *Table of Small Business Size Standards* (Feb. 26, 2016), *available at* https://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf
[6] Importantly, the SBA's industry-specific standards described above are primarily used by the SBA for federal contract purposes. In addition to SBA's industry-specific size standards, the Small Business Act mandates the SBA also use an alternative size standard to determine small business eligibility for the SBA's 7(a) general small business loan program and 504 asset-based loan program. This simpler alternative size standard defines "small businesses" as those with a tangible net worth of no more than $15 million and average net income of no more than $5 million after federal tax as measured over the two fiscal years prior to the date of application. *See* 15 U.S.C. 632(a)(5). This section was amended in 2010 as part of the Small Business Jobs Act and supersedes the SBA regulatory threshold amounts in 13 CFR 121.301(b).
[7] *See* 13 CFR 121.106 (How does SBA calculate number of employees)
[8] U.S. Small Bus. Admin., *SBA Size Standards Methodology* (Apr. 2009), *available at* http://www.sba.gov/sites/default/files/size_standards_methodology.pdf.
[9] 13 CFR 121.101 (What are SBA size standards). U.S. Small Bus. Admin., *Summary of Size Standards by Industry Sector* (Feb. 26 2016), *available at* https://www.sba.gov/contracting/getting-started-contractor/make-sure-you-meet-sba-size-standards/summary-size-standards-industry-sector (discussing use of the 500-employee threshold).
[10] *See* U.S. Small Bus. Admin, *supra* note 4 at pages 6 and 20.

According to the Census Bureau's 2012 Survey of Business Owners, there were roughly 27.63 million businesses in the United States.[11] Nearly all businesses (about 27.61 million, or 99.9 percent) would be considered small using the SBA's 500 employee threshold. Table 1 provides a more detailed distribution of the number of U.S. firms by the number of employees, including the distributions for women-owned[12] and minority-owned[13] businesses.

---

[11] A 2014 estimate by the SBA suggests there are 28.8 million small businesses in the United States when using the 500 employee threshold. To calculate this statistic, the SBA relies on two data sources: the Statistics of U.S. Business and the Nonemployer Statistics, both by the U.S. Census Bureau. Importantly, these datasets measure the number of establishments, not firms in the United States, and therefore may over represent the number of businesses. From the Bureau of Labor Statistics, "an establishment is a single physical location where one predominant activity occurs. A firm is an establishment or a combination of establishments" and may be defined by its IRS identification number. *See* Bureau of Labor Statistics, *Establishment firm or enterprise: does the unit of analysis matter?*, (Nov. 2016) *available at* https://www.bls.gov/opub/mlr/2016/article/establishment-firm-or-enterprise.htm. For the remainder of the paper we will reference the Census's Bureau's 2012 Survey of Business Owners, which measures firms. The Survey of Business Owners classifies firms as "a business organization or entity consisting of one domestic establishment (location) or more under common ownership or control. All establishments are included as part of the owning or controlling firm." U.S. Census Bureau, *Survey of Business Owners & Self-Employed Persons: Methodology – 2012 Survey of Business Owners*, (last visited Feb. 27, 2017) *available at* https://www.census.gov/programs-surveys/sbo/technical-documentation/methodology/2012-sbo-methodology.html. The Survey of Business Owners is conducted every five years and was last conducted in 2012. For the statistics cited in this paper, *see* U.S. Census Bureau, *Statistics for All U.S. Firms by Industry, Gender, Ethnicity, and Race for the U.S., States, Metro Areas, Counties, and Places: 2012*, American Fact Finder, (last visited Mar. 27, 2017) *available at* https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSA01&prodType=table.

[12] *See infra* Section 2.3 (discussing the definition of women-owned business used by the Census Bureau).

[13] *See infra* Section 2.4 (discussing the definition of minority-owned business used by the Census Bureau).

**TABLE 1:**    U.S. FIRMS BY NUMBER OF EMPLOYEES

| | Number of all firms | Percent of all firms | Number of minority-owned firms | Percent of all minority-owned firms | Number of women-owned firms | Percent of all women-owned firms |
|---|---|---|---|---|---|---|
| Total firms | 27,626,360 | 100.00% | 7,952,386 | 100.00% | 9,878,397 | 100.00% |
| Non-employer* | 22,810,999 | 82.57% | 7,159,461 | 90.03% | 8,976,226 | 90.87% |
| 1-49 employees | 4,598,336 | 16.64% | 775,460 | 9.75% | 880,443 | 8.91% |
| 50-99 employees | 116,988 | 0.42% | 11,457 | 0.14% | 13,324 | 0.13% |
| 100-499 employees | 82,313 | 0.30% | 5,392 | 0.07% | 7,583 | 0.08% |
| 500+ employees | 17,724 | 0.06% | 616 | 0.01% | 820 | 0.01% |

*Source: 2012 Survey of Business Owners, United States Census Bureau.* Importantly, this survey measures firms.[14]
*The Census Bureau compiles statistics on all firms as well as all employer-firms. Non-employer statistics in Table 1 include 609,098 businesses that had no paid employees in the sampling month; however, these businesses may have had paid employees at other points throughout the sampling year.

Of the 27.63 million businesses identified in the 2012 Census of Business, about 82.6 percent are non-employer businesses, or businesses without employees other than the owner.[15]  The overwhelming majority of women-owned and minority-owned businesses, approximately 99.99 percent for each group, have fewer than 500 employees. Further, a significant share of minority-owned (90.0 percent) and women-owned businesses (90.9 percent) are non-employer small businesses.

---

[14] The Survey of Business Owners classifies firms as "a business organization or entity consisting of one domestic establishment (location) or more under common ownership or control.  All establishments are included as part of the owning or controlling firm." U.S. Census Bureau, *Survey of Business Owners & Self-Employed Persons: Methodology – 2012 Survey of Business Owners*, (last visited Feb. 27, 2017) *available at* https://www.census.gov/programs-surveys/sbo/technical-documentation/methodology/2012-sbo-methodology.html.
[15] According to the U.S. Census Bureau, a non-employer business is one that has, "no paid employees and [is] subject to federal income tax."  *See*, U.S. Census Bureau, *Nonemployer statistics*, *available at* https://www.census.gov/econ/nonemployer/.

## 2.1.2   Small businesses defined by average annual receipts

A second approach used by the SBA is to establish the small business size standard by average annual receipts, or revenue.[16] The most common size standard the SBA uses for average annual receipts is $7.5 million; however, similar to the employee-size standards, the SBA adjusts the revenue thresholds based on industry.[17] Again, there is wide variability by industry in this classification approach. For example, for industries within the personal and laundry services subsector (NAICS 812), the annual receipts threshold for businesses to be considered small may range from $5.5 million to $38.5 million.[18]

Table 2 presents statistics on the distribution of U.S. firms by average annual receipts from the 2012 Survey of Business Owners. The Census Survey of Business Owners average annual receipt categories do not allow us to calculate the number of businesses with receipts less than $7.5 million, in accordance with the SBA's most common standard. However, the data do allow segmentation for those businesses with receipts under $1 million as reported in the table below, providing estimates on the number of small businesses based on this threshold.[19] From the 2012 Census Survey of Business, approximately 95 percent of all businesses had less than $1 million in annual revenues.[20] Roughly 97.7 percent of all minority-owned businesses and 98.3 percent of all women-owned businesses were similarly under this $1 million in annual receipts threshold.

---

[16] 13 CFR 121.104 ("Receipts means all revenue in whatever form received or accrued from whatever source, including from the sales of products or services, interest, dividends, rents, royalties, fees, or commissions, reduced by returns and allowances.").

[17] *See* 13 CFR 121.101 (defining SBA size standards). *See* U.S. Small Bus. Admin., *Summary of Size Standards by Industry Sector* (Feb 26, 2016), *available at* https://www.sba.gov/contracting/getting-started-contractor/make-sure-you-meet-sba-size-standards/summary-size-standards-industry-sector (explaining the $7.5 million threshold).

[18] *See* U.S. Small Bus. Admin, *supra* note 4 at page 39.

[19] The Census Bureau data allows for subdividing businesses by their annual receipts.  The largest category "firms with sales/receipts of $1 million or more" does not allow for a nuanced picture of small businesses above this threshold. While the data does include a number of smaller categories for businesses with less than $1 million in receipts, we opted to use the $1 million and less definition to most closely align with the SBA's modal $7.5 million average annual receipts threshold.

[20]  U.S. Census Bureau, *Statistics for All U.S. Firms with Paid Employees by Industry, Gender, and Employment Size of Firm for the U.S. and States: 2012 More Information 2012 Survey of Business Owners*, American Fact Finder, (last visited Feb 27,2017), *available at* http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSA09&prodType=table/

**TABLE 2:**    U.S. FIRMS BY SALES/RECEIPTS

| | Number of all firms | Percent of all firms | Number of minority-owned firms | Percent of all minority-owned firms | Number of women-owned firms | Percent of all women-owned firms |
|---|---|---|---|---|---|---|
| Total firms | 27,626,360 | 100.00% | 7,952,386 | 100.00% | 9,878,397 | 100.00% |
| Firms with sales/receipts up to $99,999 | 20,993,485 | 75.99% | 6,808,014 | 85.61% | 8,729,829 | 88.37% |
| Firms with sales/receipts between $100,000 and $999,999 | 5,236,687 | 18.96% | 960,646 | 12.08% | 976,725 | 9.89% |
| Firms with sales/receipts above $1,000,000 | 1,396,188 | 5.05% | 183,726 | 2.31% | 171,842 | 1.74% |

*Source: 2012 Survey of Business Owners, United States Census Bureau.* Importantly, the Census Bureau defines firms differently from establishments. [21]

# 2.2   Economic impact of small businesses

Small businesses are critical to an innovative and dynamic economy, no matter how they are defined. Small businesses, when defined as having fewer than 500 employees, provide work for

---

[21] The Survey of Business Owners classifies firms as "a business organization or entity consisting of one domestic establishment (location) or more under common ownership or control.  All establishments are included as part of the owning or controlling firm." U.S. Census Bureau, *Survey of Business Owners & Self-Employed Persons: Methodology – 2012 Survey of Business Owners,* (last visited Feb. 27, 2017) *available at* https://www.census.gov/programs-surveys/sbo/technical-documentation/methodology/2012-sbo-methodology.html.

almost half of all employees in the private sector.[22] Estimates suggest these businesses have created two out of every three jobs since 1993.[23]

A number of studies have been conducted on the economic benefits of small businesses to their business owners. In a 2015 Small Business Credit Survey of non-employer firms conducted in 26 states, 64 percent of respondents stated that their small business was their primary source of income.[24] A 2013 study by the Federal Reserve Bank of Atlanta found that counties with a higher percentage of their workforce employed by small local businesses exhibited positive trends with respect to local incomes, employment rates, and poverty rates.[25]

One, more dated study attempted to quantify the community-level benefits of small businesses using data from the 1999 Census Population Survey. This study, conducted in coordination with the Bureau of Labor Statistics and SBA economists, found that small businesses (defined as firms with fewer than 500 employees) are more likely to hire employees with a high school diploma when compared to larger firms.[26] This same study also found that small businesses are more likely to hire individuals that, prior to their small business employment, received some form of financial assistance either from the government or relatives.[27]

As will be discussed in later sections, we have a limited understanding about women-owned and minority-owned small businesses and their contributions to local economies given the scarcity of data.

---

[22] JPMorgan Chase Institute, *The Ups and Downs of Small Business Employment* (Jan. 2017), *available at* https://www.jpmorganchase.com/corporate/institute/report-small-business-payroll.htm.

[23] U.S. Small Bus. Admin., Office of Advocacy, *An Analysis of Small Business and Jobs* (Mar. 2010), *available at* https://www.sba.gov/sites/default/files/files/an%20analysis%20of%20small%20business%20and%20jobs(1).pdf.

[24] Fed. Res. Banks of Cleveland, New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *2015 Small Business Credit Survey: Report on Nonemployer Firms* (2016), *available at* https://www.clevelandfed.org/community-development/small-business/about-the-joint-small-business-credit-survey/2015-joint-small-business-credit-survey.aspx.

[25] This study defined small local businesses as those with less than 100 employees. Anil Rupasingha, *Locally Owned: Do Local Business Ownership and Size Matter for Local Economic Well Being?*, (Fed. Res. Bank of Atlanta, Discussion Paper, No. 01-13, 2013), *available at,* https://www.frbatlanta.org/-/media/documents/community-development/publications/discussion-papers/2013/01-do-local-business-ownership-size-matter-for-local-economic-well-being-2013-08-19.pdf

[26] Headd, Brian. *The Characteristics of Small-Business Employees*. Monthly Lab. Rev., Apr. 2000, *available at* stats.bls.gov/opub/mlr/2000/04/art3full.pdf.

[27] *Id.*

## 2.3   Women-owned small businesses

While not as varied as the definitions for small businesses, there are differences in the ways in which a women-owned small business is defined. [28] The SBA, in regulations, defines a women-owned small business as a firm that is "not less than 51 percent unconditionally and directly owned and controlled by one or more women who are United States citizens," and that meets the definition of small business concern set forth by the SBA.[29] The Census Survey of Business Owners provides a slightly different definition of women-owned or female-owned businesses of any size as those where women own 51 percent or more of the equity, interest or stock of the business.[30]

Using the most recent data available from the 2012 Census Survey of Business Owners, there were approximately 9.9 million women-owned businesses of any size in the United States. In 2012, the number of women-owned businesses had increased 26.8 percent from 2007, when the prior iteration of this survey was conducted.[31] Women-owned businesses account for approximately 36.3 percent of all non-farming, private sector firms. These businesses may be found in a variety of industry sectors, the most numerous being in the health care and social assistance program category, which accounts for about 16 percent of women-owned businesses.[32]

The 2012 Survey of Business Owners data highlight that women-owned firms generated $1.4 trillion in total receipts in 2012, representing a 33 percent increase from 2007.[33] Employer

---

[28] Section 1071 defines women-owned business as "a business—(A) more than 50 percent of the ownership or control of which is held by 1 or more women; and (B) more than 50 percent of the net profit or loss of which accrues to 1 or more women." 15 U.S.C. § 1691c-2(h)(6).

[29] 13 CFR 127.200

[30] U.S. Census Bureau, *Survey of Business Owners & Self-Employed Persons: Methodology – 2012 Survey of Business Owners*, (last visited Feb. 27, 2017) *available at* https://www.census.gov/programs-surveys/sbo/technical-documentation/methodology/2012-sbo-methodology.html.

[31] "Data have been collected every 5 years since 1972, for years ending in "2" and "7" as part of the economic census." U.S. Census Bureau, *Survey of Business Owners* (2012), a *vailable at,* https://www.census.gov/econ/overview/mu0200.html.

[32] Nat'l Women's Bus. Council, *Fact Sheet on Women-owned Businesses* (2012), *available at* https://www.nwbc.gov/facts/fact-sheet-women-owned-businesses.

[33] U.S. Census Bureau, Statistics for All U.S. Firms by Industry, Gender, and Receipts Size for the U.S. and States: 2012 More Information 2012 Survey of Business Owners, American Fact Finder, (last visited Feb 27,2017), *available*

women-owned businesses, defined by the Census Bureau as those women-owned firms with at least one employee, employed over 8.4 million workers and provided $263.7 billion in salary, wages, and benefits to their employees in 2012.[34]

Of the women-owned firms identified in the 2012 Survey of Business Owners, 91 percent were non-employer firms and nearly 100 percent had fewer than 100 employees. Ninety-eight percent had revenue under $1 million; in comparison, 94 percent of male-owned firms[35] had revenue below that level.

The Survey of Small Business Owners is conducted every 5 years, with the most recent iterations being in 2007 and 2012. This limitation does not allow for a more dynamic, current understanding of how women-owned small businesses may react to changing economic conditions.

Given the lack of more recent data, a 2016 report commissioned by American Express attempts to estimate the growth in women-owned businesses since 2012. The report, which relied on statistics from the 2012 Survey of Business Owners supplemented with figures on the U.S. gross domestic product, estimates that there are 11.3 million women-owned businesses. This represents a 45 percent increase in the number of women-owned firms from 2007, as compared with a nine percent growth for all businesses during this time.[36] American Express figures also suggest women-owned firms employ nearly nine million people and are responsible for generating over $1.6 trillion in revenues.

---

*at*
https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSA05&prodType=table
[34] *Id.*
[35] Statistics on male-owned firms were calculated using the male-owned category in the 2012 Census of Business Survey. The male-owned firm category excludes those firms that are either women-owned or are equally owned by males and females.
[36] Womenable & American Express, *The 2016 State of Women-Owned Businesses In The U.S.* (2016), http://www.womenable.com/70/the-state-of-women-owned-businesses-in-the-u.s,:-2016.

## 2.4   Minority-owned small businesses

Definitions of minority-owned businesses, when compared to definitions of women-owned businesses, are slightly more nuanced. [37] With regard to a definition of minority-owned businesses, the SBA incorporates a minority business ownership criterion for purposes of qualifying businesses for their 8(a) business development program; this program is intended to help small, disadvantaged businesses compete in the marketplace.[38] Businesses where at least 51 percent of the firm is owned by Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans or Subcontinent Asian Americans may be certified as socially disadvantaged and may qualify for SBA programs.[39] For purposes of the Survey of Small Business, the Census Bureau defines minority-owned businesses as a business where "Hispanics, Blacks or African Americans, American Indians and Alaska Natives, Asians, Native Hawaiians and Other Pacific Islanders, and/or persons of some other race not classified as 'non-Hispanic White' own 51 percent or more of the equity, interest, or stock of the business."[40]

Data from the 2012 Census Survey of Business Owners suggests there were nearly eight million minority-owned businesses in the United States, representing approximately 29 percent of all businesses.[41] The number of minority-owned businesses in the United States increased by 38 percent from 2007 to 2012, according to the same survey.[42] In contrast, the number of non-minority firms experienced a five percent decrease over this same period.[43]

---

[37] Section 1071 defines minority-owned business as "a business—(A) more than 50 percent of the ownership or controlof which is held by 1 or more minority individuals; and (B) more than 50 percent of the net profit or loss of which accrues to 1 or more minority individuals." 15 U.S.C. § 1691c-2(h)(5).

[38] U.S. Small Bus. Admin., *About the 8(a) Business Development Program, available at* https://www.sba.gov/contracting/government-contracting-programs/8a-business-development-program/about-8a-business-development-program.

[39] Businesses may qualify for the SBAs 8(a) program if they are socially or economically disadvantaged. In addition to the "presumed group" minority categories mentioned above, individuals outside of these categories may petition the SBA for eligibility considerations.  Additionally, the SBA requires businesses to meet certain economic disadvantage requirements, ownership requirements, control and management requirements and character requirements.

[40] *See* U.S. Small Bus. Admin., *Social Disadvantage Eligibility, available at* https://www.sba.gov/contracting/government-contracting-programs/8a-business-development-program/eligibility-requirements/social-disadvantage-eligibility.

[41] As is the case with women-owned businesses, our most recent understanding of minority-owned businesses is based on the 2012 Survey of Small Business Owners.

[42] U.S. Census Bureau, *Statistics for All U.S. Firms by Industry, Gender, Ethnicity, and Race for the U.S., States,*

Figure 1 presents the demographics of business owners in the United States. About 12 percent of firms in the United States are owned by Hispanics, representing almost 41 percent of all minority-owned firms; 9.3 percent of all businesses are black-owned, representing almost one-third of all minority-owned businesses.

**FIGURE 1:**    DEMOGRAPHICS OF U.S. BUSINESS OWNERS



*Source: 2012 Survey of Business Owners, Out of 27.63 million firms*

Although minority-owned businesses are found in many industry sectors, these businesses are primarily concentrated in the service sector, the healthcare and social assistance sector, and the administrative support, waste management and remediation sectors.[44] According to the 2012 Survey of Business Owners, minority-owned businesses collectively employed nearly 7.1 million people and generated $1.4 trillion in annual revenues.[45]

---

*Metro Areas, Counties, and Places: 2012*, American Fact Finder, (last visited Feb. 27, 2017) *available at* https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?scr=bkmk.
[43] U.S. Department of Commerce, Minority Business Development Agency, *Fact Sheet: U.S. Minority Owned Firms* (2016), *available at* http://www.mbda.gov/pressroom/research-library.
[44] Edgcomb, Elaine & Joyce Klein, *Opening Opportunities, Building Ownership: Fulfilling the Promise of Microenterprise in the United States*, (Carol Rugg eds., 2005), *available at* http://fieldus.org/Publications/FulfillingthePromise.pdf
[45] U.S. Census Bureau, *Statistics for All U.S. Firms With Paid Employees by Industry, Race, and Employment Size of*

Of the minority-owned firms identified in the 2012 Survey of Business Owners, 90 percent were non-employer firms and an additional 9.9 percent had fewer than 100 employees. About 97.7 percent of minority-owned firms had revenue under $1 million; in comparison, 94.4 percent of non-minority owned firms had revenue below that level. [46]

---

*Firm for the U.S. and States: 2012*, American Fact Finder, (last visited Feb. 27, 2017) *available at* https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSA11&prodType=table  (number of employees). https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSA07&prodType=table (receipts).

[46] Statistics on non-minority owned firms were calculated using the non-minority category in the 2012 Census of Business Survey.  The non-minority firm category excludes those firms that are either minority-owned or are equally owned by individuals in a minority group and a non-minority group.  *See* U.S. Census Bureau, *2012 Survey of Business Owners*, American Fact Finder, (last visited Feb 27, 2017), *available at* https://www.census.gov/programs-surveys/sbo.html.

# 3. Small business access to financing

Access to financing is vitally important in allowing businesses to grow. For small businesses financing not only provides resources to smooth business cash flows for current operations, but also affords business owners the opportunity to invest in business growth. An analysis by the National Small Business Association (NSBA), which examined data from 1993 through 2016, found a correlation between small business owners' ability to hire and their ability to access credit.[47] This same study found that, while not the sole cause, the inability to secure financing may have led 16 percent of small businesses to reduce the number of employees and approximately 10 percent of small businesses to reduce employee benefits. A further 10 percent of small businesses were unable to increase store inventory in order to meet existing demand.[48] A separate study found that businesses with fewer than 10 employees were three times more likely to create jobs if they received a loan.[49] Together, these studies suggest that the ability to access financing plays an important role in allowing small businesses to grow and contribute to the economy.

---

[47] Nat'l Small Bus. Association, *2016 Year-End Economic Report, available at* http://www.nsba.biz/wp-content/uploads/2017/02/Year-End-Economic-Report-2016.pdf

[48] *Id.*

[49] Luz Gomez & Elaine L. Edgcomb, FIELD at the Aspen Institute, *A Newly Crowded Marketplace: How For Profit Lenders are Serving Microentrepeneurs* (2011), *available at* http://fieldus.org/publications/ForProfitLenders.pdf.

17

According to the National Economic Council, "despite serving as a critical part of the U.S. economy, small businesses generally have limited access to capital and other vital resources that help entrepreneurs grow their businesses."[50]

# 3.1   Business life cycle and credit access

The stage in the life cycle of a business may impact how a business is able to interact with financial markets. While all small businesses need capital to operate, where they turn to for that capital can vary depending on a number of business characteristics, most notably the age or performance history of the business. Many new business owners or startups may first turn to personal funds, including savings and personal credit, as an initial source of business financing.[51]  Young firms may be unable to provide the necessary performance history often required to receive financing from financial institutions.

Recent research suggests that 70 percent of small businesses seek loans of less than $250,000.[52] Securing credit from established financial institutions may be a more viable option for a business once it is able to establish positive financial performance history, however reliable data exploring the dynamics of this relationship remains elusive.

According to data from the 2015 Joint Federal Reserve Small Business Credit Survey, about 21 percent of surveyed employer small businesses[53] that applied for financing and have been in

---

[50] National Economic Council, *A Framework for Fintech*, at 4 (2017), *available at* https://www.scribd.com/document/336627464/A-Framework-for-FinTech-National-Economic-Council-January-2017-White-House.

[51] The use of personal funds and assets is not limited to startups. According to the 2015 Federal Reserve Small Business Credit Survey, about 53 percent of employer small businesses reported using personal funds in support of their business during their first two years of operation. *See* Fed. Res. Bank of N.Y., *2015 Fed Small Business Employer Firms Survey*, *available at* https://www.newyorkfed.org/smallbusiness/small-business-credit-survey-employer-firms-2015   According to the 2016 Joint Federal Reserve Survey, 87 percent of employer firms rely on the owner's personal credit scores to obtain financing. *See* Fed.  Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, Dallas, Kansas City, Minneapolis, San Francisco  *2016 Small Business Credit Survey: Report on Employer Firms*, at iv (April 2017), *available at* https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf.

[52] Karen Mills & Brayden McCarthy, *The State of Small Business Lending: Innovation and Technology and the Implications for Regulation*, (Harvard Business School, Working Paper No 17-042, 2016) at 3, *available at* http://www.hbs.edu/faculty/Publication%20Files/17-042_30393d52-3c61-41cb-a78a-ebbe3e040e55.pdf.

[53] Employer businesses are those with at least one employee beyond the business owner.

operation less than 2 years did not receive any financing, while only 42 percent received the full amount requested.  In comparison, for those firms in business 11 or more years, about 12 percent did not receive any financing while 61 percent received the full amount requested. [54] Notably, this survey of employer businesses was conducted in only 26 states and therefore may not be nationally representative. [55]

# 3.2   Financial products available to small businesses

Financial institutions offer a number of financing products to small businesses.[56] Some of the most common products include lines of credit, which may be used to manage economic fluctuations and short-term purchases; term loans, which may be used for more significant investments including equipment, consolidating debt, or business expansion; or business credit cards, which may be used to make business purchases. Within these broad categories there are a number of discrete subcategories. For example, term loans can be amortizing or structured with a balloon payment, and the interest rates on such loans can be variable or fixed. Loans can be secured by tangible property (e.g., commercial real estate loans or commercial auto loans) or by intangibles (e.g., receivables). Loans can be government-guaranteed (e.g., SBA loans), personally-guaranteed, or made without any guarantee.

In addition to traditional banking institutions, a number of specialized financial institutions provide financing to small businesses. These include, for example, retailers or wholesalers who may offer supplier financing (also known as trade credit) for purchases of goods or services; equipment lessors who may lease equipment in exchange for regular payment; and various non-

---

[54] Fed. Res. Bank of N.Y., *2015 Fed Small Business Employer Firms Survey* at 6, *available at* https://www.newyorkfed.org/smallbusiness/small-business-credit-survey-employer-firms-2015

[55] *Id.*

[56] While equity financing remains an option for businesses, this paper will focus predominately on non-equity, or debt financing. Federal Reserve Banks of Cleveland, New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, 2015 Small Business Credit Survey: Report on Employer Firms, at 6  (2016), *available at* https://www.newyorkfed.org/smallbusiness/small-business-credit-survey-employer-firms-2015.

depository institutions which may engage in factoring or may provide what are denominated as "advances" for a share of future receipts.

According to the SBA, small business non-equity financing of all types amounted to about $1 trillion in 2013.[57] While existing data sources attempt to categorize the small business financing market by financing product, currently there is only a very limited ability to accurately size the small business lending market even by broad product categories, let alone subcategories. This paper aims to provide more recent estimates of the various products provided to small businesses based on conversations with industry and extrapolations of market trends. These estimations remain difficult given the significant definitional inconsistencies across various data sources. Additionally, the diffuse nature of the various product markets, each with a number of players engaged in providing these financing products, leads to a fragmented understanding of the small business financing space at best. Figure 2 describes our best current estimates of the aggregate dollar volume of various financial products used by small businesses, while Figure 3 estimates the number of accounts by product for a subset of these products.

Our estimates in Figure 2 suggest the small business financing market is roughly $1.4 trillion in size.  Term loans, lines of credit and business credit cards are among the most common financing products offered by financial institutions.  In total, when excluding supplier financing these products comprise nearly three-fourths of the non-equity financing market.[58]

---

[57] U.S. Small Bus. Admin., Office of Advocacy, *Small Business Finance: Frequently Asked Questions* (2014), *available at*, https://www.sba.gov/sites/default/files/2014_Finance_FAQ.pdf.

[58] Supplier financing, or trade credit, is not offered by traditional financing institutions but rather is a form of credit that is typically offered by sellers for which payment is not immediately required. *See* Gregory E.  Elliehausen & John D. Wolken, Bd. of Governors Fed. Res. Sys., *The Demand for Trade Credit: An Investigation of Motives for Trade Credit Use by Small Businesses* (FRB1/1-1000-0993), *available at* https://www.researchgate.net/publication/5039966_The_Demand_for_Trade_Credit_An_Investigation_of_Motives_for_Trade_Credit_Use_by_Small_Businesses.



**FIGURE 2:** ESTIMATED MARKET SHARE OF FINANCING PRODUCTS AVAILABLE TO SMALL BUSINESSES



*Source: Bureau estimates supported by available data. The total aggregate amount of debt financing available to small businesses is estimated at $1.4 trillion.* This figure is not meant to represent an exhaustive list of products used by small businesses to finance their business needs. Due to rounding, the statistics may add up to more than 100 percent. *Bank loans, including lines of credit, are measured using the outstanding amounts as presented in the FFIEC Call Reports. Outstanding amounts only describe the amounts that are still owed to the financial institutions by the borrowers. The outstanding amount for lines of credit underrepresents the share of credit actually available to a business as a source of financing. A different measure that might avoid this underrepresentation may be the aggregate committed amounts, or original amounts offered to small businesses as a line of credit.  Further, outstanding amounts for term loans made under the SBA's 7(a), 504 and micro loan programs disaggregated for additional detail. These totals are subtracted from the total term loan and lines of credit amounts to avoid double counting.

**FIGURE 3:**    ESTIMATED NUMBER OF ACCOUNTS BY DEBT FINANCING PRODUCT
(BARS REPRESENT 10 PERCENT MARGIN OF ERROR)



Statistics are based on an estimated 33 – 37 million total

*Source: Bureau estimates made with assumptions supported by conversations with industry and external experts.*
For purposes of Figure 3, SBA program loans are included in term loans. Business credit cards may be seen as a type of line of credit.  While other line of credit accounts may exist, we were unable to estimate their frequency; there may be many instances where an account exists, but it is never drawn upon, and therefore not visible in existing data sources.

As rough as these estimates of the aggregate size and composition of the market are, there are even less data available with respect to the flow of credit to women-owned and minority-owned small businesses. Accordingly, we do not attempt to estimate the extent to which those businesses are able to obtain financing or compare their experience with the experience of other small businesses seeking financing.

# 3.3    Financial institutions engaged in lending to small businesses

There are a number of different financial institutions that supply credit primarily in the form of term loans, lines of credit, or business credit cards to small businesses. These institutions include large banks, small banks, credit unions and alternative lenders.  We rely on a mix of survey data and federal datasets to help explain the extent of small loans to businesses and small business lending from these financial institutions.

## 3.3.1    Survey results on small business engagement with financial institutions

Survey data from the 2015 and 2016 Federal Reserve Small Business Credit Survey provide information on how small businesses engage with financial institutions. We rely on the 2015 Federal Reserve survey focused on non-employer businesses and the 2016 survey focused on employer businesses, defined as those with less than 500 employees. These data are derived from non-random sample and therefore may not represent the national lending landscape.[59] In addition to the Federal Reserve Survey, the National Small Business Association (NSBA) 2016 Year-End Economic Report and the Pepperdine Private Capital Index are two surveys of small businesses that provide additional detail; the NSBA Report surveys 1,426 small businesses while the Pepperdine Index received 1,888 completed responses.[60] These three surveys have

---

[59] For employer firms see Fed.  Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, Dallas, Kansas City, Minneapolis, San Francisco  *2016 Small Business Credit Survey: Report on Employer Firms,* at iv (April 2017), *available at* https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf .For nonemployer firms see Fed.  Res.  Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *2015 Small Business Credit Survey Report on Nonemployer Firms,*  at iv (Mar. 2016), *available at* https://www.clevelandfed.org/~/media/content/community%20development/smallbusiness/sbcs%202015%20nonemployer%20firms%20report.pdf?la=en.

[60] Nat'l Small Bus. Association, 2016 Year-End Economic Report, at 10, available at http://www.nsba.biz/wp-content/uploads/2017/02/Year-End-Economic-Report-2016.pdf. For Pepperdine Private Capital Access Index, see Craig Everett, Ph.D., Pepp. Graziadio Sch. of Bus. & Mgmt., *Pepperdine Private Capital Access Index Third Quarter 2016* at 7, *available at* https://bschool.pepperdine.edu/about/people/faculty/appliedresearch/research/pcmsurvey/content/pca-q3-2016.pdf.

important differences and as a result, their statistics may not be exactly comparable.  We note these differences below.

The Federal Reserve Surveys found that small businesses continue to rely on traditional financial institutions as their primary source of financing, defined for our purposes in the survey as large banks and small banks.[61] From the survey, 50 percent of small employer businesses and 45 percent of surveyed non-employer businesses *that sought* a loan or a line of credit applied at a large bank.[62] A comparable statistic from the Pepperdine index suggests an estimated 27 percent of businesses with revenues less than $5 million stated their primary source of capital was from a large bank.[63] The NSBA report asked respondents to name the types of financing products used in the past 12 months rather than the lending institution. According to the NSBA, 15 percent of firms surveyed by the NSBA relied on financing through a "large bank loan" within the past 12 months.[64] While the survey results are notably different, these results do suggest large financial institutions play an important role as suppliers of small business financing.

The Federal Reserve Survey also suggests small banks play an important role in financing for small businesses. According to the Federal Reserve surveys, 46 percent of surveyed employer firms and 46 percent of non-employer firms that applied for credit did so at a "small bank."[65]

---

[61] Fed. Res. Bank of N.Y., *2015 Fed Small Business Employer Firms Survey* at 6, *available at* https://www.newyorkfed.org/smallbusiness/small-business-credit-survey-employer-firms-2015.
[62] The 2016 Federal Reserve Survey defines a "large bank" as having at least $10 billion in total deposits. Employer firms *See:* Fed.  Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, Dallas, Kansas City, Minneapolis, San Francisco  *2016 Small Business Credit Survey: Report on Employer Firms,* at 14 (April 2017), *available at* https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf. Nonemployer firms *See:* Fed.  Res.  Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *2015 Small Business Credit Survey Report on Nonemployer Firms,*  at 11 (Mar. 2016), *available at* https://www.clevelandfed.org/~/media/content/community%20development/smallbusiness/sbcs%202015%20none mployer%20firms%20report.pdf?la=en.
[63] The Pepperdine Index includes responses from those firms that sought no credit, and reports that 16 percent of respondent businesses with revenues less than $5 million named large banks as their primary source of credit.  The survey also suggests 40 percent of respondent businesses did not seek credit. As a result, the authors of this paper computed an estimated 27 percent of small businesses that sought credit would have done so at a large bank. *See* Craig Everett, Ph.D.**,** Pepp. Graziadio Sch. of Bus. & Mgmt., *Pepperdine Private Capital Access Index Third Quarter 2016* at 22, *available at* https://bschool.pepperdine.edu/about/people/faculty/appliedresearch/research/pcmsurvey/content/pca-q3-2016.pdf.
[64] Nat'l Small Bus. Association, 2016 Year-End Economic Report, at 10, available at http://www.nsba.biz/wp-content/uploads/2017/02/Year-End-Economic-Report-2016.pdf.
[65] For purposes of this study, small bank was defined in survey instrument as "small bank/community bank". *See* Fed. Res. Banks of Cleveland, New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *Small Business*

Of those that applied, 67 percent of employer small businesses and 52 percent of non-employer businesses were approved for financing from a small bank, while larger banks only approved 54 percent of employer small businesses and 32 percent of non-employer small businesses that applied for credit.[66]

According to the Pepperdine Index, a comparable small bank statistic suggests about 22 percent of surveyed businesses with revenues less than $5 million that sought credit listed community banks as their primary source of credit.[67] From the NSBA survey, 14 percent of surveyed businesses relied on "community bank loans".[68]

Credit unions also play a role in small business financing.[69] The Federal Reserve Survey finds that 11 percent of all surveyed employer firms and 13 percent of non-employer firms applied for

*Credit Survey – 2015 Questionnaire, available at*
https://www.newyorkfed.org/medialibrary/media/smallbusiness/2015/Questionnaire-SBCS-2015.pdf. Employer firms *See:* Fed. Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, Dallas, Kansas City, Minneapolis, San Francisco *2016 Small Business Credit Survey: Report on Employer Firms*, at iv (April 2017), at 14, *available at* https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf, Nonemployer firms *See:* Fed. Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *2015 Small Business Credit Survey Report on Nonemployer Firms,* at 11 (Mar. 2016), *available at*
https://www.clevelandfed.org/~/media/content/community%20development/smallbusiness/sbcs%202015%20nonemployer%20firms%20report.pdf?la=en.

[66] For employer firms see Fed. Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, Dallas, Kansas City, Minneapolis, San Francisco *2016 Small Business Credit Survey: Report on Employer Firms*, at 16 (April 2017), *available at* https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf, For statistics on non-employer firms see, Fed. Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *2015 Small Business Credit Survey Report on Nonemployer Firms*, at 11 (Mar. 2016), *available at*
https://www.clevelandfed.org/~/media/content/community%20development/smallbusiness/sbcs%202015%20nonemployer%20firms%20report.pdf?la=en.

[67] The Pepperdine Index includes responses from those firms that sought no credit, and reports that 13 percent of respondent businesses with revenues less than $5 million named small banks as their primary source of credit. The survey also suggests 40 percent of respondent businesses did not seek credit. As a result, the authors of this paper computed an estimated 22 percent of small businesses that sought credit would have done so at a small bank. *See* Craig Everett, Ph.D., Pepp. Graziadio Sch. of Bus. & Mgmt., *Pepperdine Private Capital Access Index Third Quarter 2016* at 22, *available at*
https://bschool.pepperdine.edu/about/people/faculty/appliedresearch/research/pcmsurvey/content/pca-q3-2016.pdf.

[68] *See supra* note 61.

[69] Between 1986 and 2010, the number of credit unions lending to member businesses grew from 5 percent to 30 percent of total credit unions. Due to the Credit Union Membership Access Act of 1998, member business loans over $50,000 may not exceed the lesser of 1.75 percent of a credit union's net worth or 12.25 percent of their total assets. *See* U.S. Small Bus. Admin., Office of Advocacy, *The Increasing Importance of Credit Unions in Small Business Lending* (2011), *available at*, https://www.sba.gov/sites/default/files/2014_Finance_FAQ.pdf. For information on the Credit Union Membership Access Act of 1998, see Credit Union Membership Access Act Pub. L. 105-219, 112 Stat

financing at a credit union.[70] Of those that applied, 46 percent of employer businesses and 33 percent of non-employer businesses were approved for credit from a credit union.[71] A comparable estimate from the Pepperdine Index suggests five percent of businesses with revenues under $5 million relied on credit unions as a primary source of financing.[72] About three percent of businesses surveyed by the NSBA relied on a credit union loan in the past 12 months.[73]

The small business lending marketplace has seen the recent emergence of online alternative lenders as providers of financing for small businesses.[74] The Federal Reserve survey found that 21 percent of surveyed employer businesses and 28 percent of non-employer businesses applied for financing from an online alternative lender, with survey respondents suggesting a 62 and 45 percent approval rate, respectively.[75] About two percent of NSBA surveyed businesses relied on

---

913 (1998) (Amending the Federal Credit Union Act) (codified at 12 U.S.C. 1751 et. seq).

[70] For employer firms see Fed. Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, Dallas, Kansas City, Minneapolis, San Francisco 2016 Small Business Credit Survey: Report on Employer Firms, at 14 (April 2017), available at https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf. For statistics on non-employer firms see, Fed. Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *2015 Small Business Credit Survey Report on Nonemployer Firms*, at 10 (Mar. 2016), *available at* https://www.clevelandfed.org/~/media/content/community%20development/smallbusiness/sbcs%202015%20nonemployer%20firms%20report.pdf?la=en.

[71] For employer firms see Fed. Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, Dallas, Kansas City, Minneapolis, San Francisco 2016 Small Business Credit Survey: Report on Employer Firms, at 16 (April 2017), available at https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf For statistics on non-employer firms see, Fed. Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *2015 Small Business Credit Survey Report on Nonemployer Firms*, at 12 (Mar. 2016), *available at* https://www.clevelandfed.org/~/media/content/community%20development/smallbusiness/sbcs%202015%20nonemployer%20firms%20report.pdf?la=en.

[72] The Pepperdine Index includes responses from those firms that sought no credit, and reports that 3 percent of respondent businesses with revenues less than $5 million named credit unions as their primary source of credit. The survey also suggests 40 percent of respondent businesses did not seek credit. As a result, the authors of this paper computed an estimated 5 percent of small businesses that sought credit would have done so at a credit union. *See* Craig Everett, Ph.D., Pepp. Graziadio Sch. of Bus. & Mgmt., *Pepperdine Private Capital Access Index Third Quarter 2016* at 22, *available at* https://bschool.pepperdine.edu/about/people/faculty/appliedresearch/research/pcmsurvey/content/pca-q3-2016.pdf.

[73] *See supra* note 61.

[74] For purposes of this study, online lenders were defined in survey instrument as "non-bank alternative and marketplace lenders," see Fed. Res. Banks of Cleveland, New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *Small Business Credit Survey – 2015 Questionnaire*, *available at* https://www.newyorkfed.org/medialibrary/media/smallbusiness/2015/Questionnaire-SBCS-2015.pdf.

[75] Employer firms *See:* Fed. Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, Dallas, Kansas City, Minneapolis, San Francisco *2016 Small Business Credit Survey: Report on Employer Firms*, (April 2017), *available at* https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf. Nonemployer firms *See:* Fed. Res. Bank of New York, Atlanta, Boston, Cleveland,

financing from an online or non-bank lender.[76] A comparable estimate from the Pepperdine Index suggests 10 percent of businesses with revenues under $5 million relied on online lenders as a primary source of financing.[77]

Other financial institutions such as leasing and factoring firms provide financing for small businesses.  While existing surveys do not ask explicitly about reliance on these more specialized financial institutions, the Federal Reserve surveys do find 9 percent of employer businesses and 10 percent of non-employer businesses applied for a leasing product.[78]  The NSBA survey finds only 6 percent of surveyed firms relied on leasing in the past 12 months.[79]  While not entirely comparable, the Pepperdine survey found 34 percent of surveyed firms who attempted to raise financing relied on leasing.[80] This disparity may be attributable in part to differences in the survey methodologies.

Regarding factoring firms, the Federal Reserve surveys suggest 7 percent of employer businesses and 3 percent of non-employer businesses reported applying for a factoring product.[81] While the

---

Philadelphia, Richmond, St. Louis, *2015 Small Business Credit Survey Report on Nonemployer Firms*,  (Mar. 2016), *available at*
https://www.clevelandfed.org/~/media/content/community%20development/smallbusiness/sbcs%202015%20nonemployer%20firms%20report.pdf?la=en.

[76] *See supra* note 61.

[77] The Pepperdine Index includes responses from those firms that sought no credit, and reports that 6 percent of respondent businesses with revenues less than $5 million named online lenders as their primary source of credit.  The survey also suggests 40 percent of respondent businesses did not seek credit. As a result, the authors of this paper computed an estimated 10 percent of small businesses that sought credit would have done so at an online lender. *See* Craig Everett, Ph.D., Pepp. Graziadio Sch. of Bus. & Mgmt., *Pepperdine Private Capital Access Index Third Quarter 2016* at 22, *available at*
https://bschool.pepperdine.edu/about/people/faculty/appliedresearch/research/pcmsurvey/content/pca-q3-2016.pdf.

[78] Employer firms *See:* Fed.  Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, Dallas, Kansas City, Minneapolis, San Francisco  *2016 Small Business Credit Survey: Report on Employer Firms*, at 13 (April 2017), *available at* https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf. Nonemployer firms *See:* Fed.  Res.  Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *2015 Small Business Credit Survey Report on Nonemployer Firms*,  at 11 (Mar. 2016), *available at*
https://www.clevelandfed.org/~/media/content/community%20development/smallbusiness/sbcs%202015%20nonemployer%20firms%20report.pdf?la=en.

[79] *See* note 61.

[80] *See* Craig Everett, Ph.D., Pepp. Graziadio Sch. of Bus. & Mgmt., *Pepperdine Private Capital Access Index Third Quarter 2016* at 36, *available at*
https://bschool.pepperdine.edu/about/people/faculty/appliedresearch/research/pcmsurvey/content/pca-q3-2016.pdf.

[81] Employer firms *See:* Fed.  Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis,

NSBA survey did not include statistics on factoring, the Pepperdine survey found 19 percent of surveyed firms who attempted to raise financing relied on factors.[82] Again, this discrepancy may be attributable in part to different survey methodologies.

## 3.3.2   Federal datasets on small loans to businesses and small business lending

In addition to existing survey data, we rely on the FFIEC Consolidated Reports of Condition and Income ("Call Reports") and Community Reinvestment Act (CRA) data to illustrate insights into how depository institutions provide small loans to businesses and engage with small businesses. Whereas the surveys above provided context from the small business perspective, these datasets convey lending totals from the financial institution perspective.  While the Call Reports and CRA datasets provide the most complete perspective on lending from financial institutions, both datasets are limited in their ability to appropriately convey the full extent of lending to small businesses, for reasons discussed below. Importantly, these datasets do not cover non-depository financial institutions.

### FFIEC Consolidated Reports of Condition and Income

The FFIEC, through its annually required reporting of the small business section of the Call Reports, provides insight to the number of loans and aggregate dollar amounts provided to businesses by covered depository financial institutions.[83] The Call Reports define "loans to small businesses" generally as loans with original amounts of $1 million or less, regardless of the size

---

Dallas, Kansas City, Minneapolis, San Francisco  *2016 Small Business Credit Survey: Report on Employer Firms*, at 13 (April 2017), *available at* https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf. For statistics on non-employer firms see, Fed.  Res.  Bank of New York,  Atlanta, Boston, Cleveland, Philadelphia, Richmond, St. Louis, *2015 Small Business Credit Survey Report on Nonemployer Firms*, at 22 (Mar. 2016), *available at* https://www.clevelandfed.org/~/media/content/community%20development/smallbusiness/sbcs%202015%20nonemployer%20firms%20report.pdf?la=en.

[82] *See supra* note 77.

[83] National banks, state member banks, insured state nonmember banks and savings associations are required to file call reports. Call Report guidelines excludes banks with assets under $100 million. The FFIEC Call Report data classifies a small business loan based on the dollar value of the loan originated, regardless of the size of the business to whom the loan was made. *See* Federal Financial Institutions Examination Council, *Call Report Instruction Book Update*, at 7 (2016), *available at* https://www.ffiec.gov/pdf/FFIEC_forms/FFIEC031_FFIEC041_201609_i_updates.pdf.

of the receiving entity.[84] For clarity, we will refer to these as small loans to businesses. Regarding dollar amounts, these institutions are only required to report the total dollar amount of these loans that are *outstanding*, or the amount remaining due. To determine the total amount extended to businesses, the more relevant statistic would involve the total dollar amount of small loans *originated*. [85]

## FFIEC Community Reinvestment Act Data

A second data set that describes the relationship between small businesses and financial institutions is captured as part of the Community Reinvestment Act (CRA). Under CRA reporting requirements, certain regulated financial institutions with asset size above roughly $1.2 billion are required to report data specific to small businesses, annually.[86]  CRA data ascribe to the FFIEC Call Report definition of "loans to small businesses", which are loans with original amounts of $1 million or less, regardless of the size of the receiving entity.[87] Again, for clarity we will refer to these as small loans to businesses.

CRA data made available by the FFIEC include aggregate statistics on small loans to businesses both by the number of loans originated in amounts under $1 million in a particular year, as well as the aggregate *origination* dollar amount of these loans. This latter statistic, which differs from the Call Report *outstanding* amounts, allows some understanding as to the total dollar

---

[84] *See* Federal Financial Institutions Examination Council, *Schedule RC-C, Part II. Loans to Small Businesses and Small Farms*, at RC-C- 30 (last visited Feb. 27, 2017), at 207, *available at* https://www.ffiec.gov/pdf/FFIEC_forms/FFIEC031_FFIEC041_201603_i.pdf.

[85] Interpreting changes in the outstanding amounts as an indicator of the small business credit market poses challenges.  Confounding factors including the number of loans, original dollar amount of these loans, and external economic factors may each play a role in changing the outstanding amounts measured in the Call Reports over time. As a result, outstanding amounts only present a high level understanding of lending to small businesses without an ability to closely examine rationales for the observed trends.

[86] In 2017, all financial institutions regulated by the Office of the Comptroller of Currency, (OCC) Federal Reserve System, and Federal Deposit Insurance Corporation generally with an asset size over $1.226 billion are required to submit CRA data. According to an OCC Fact Sheet, "CRA does not apply to Credit Unions insured by the National Credit Union Share Insurance Fund (NCUSIF) or nonbank entities supervised by the Consumer Financial Protection Bureau." For more information on reporting eligibility, see Federal Financial Institutions Examination Council, Community Reinvestment Act, 2017 *Reporting Criteria*, *available at*  https://www.ffiec.gov/cra/reporter17.htm.  For more information on the OCC Fact Sheet, see Off. of the Comptroller of the Currency, *Community Developments Fact Sheet* at 1, *available at* https://www.occ.treas.gov/topics/community-affairs/publications/fact-sheets/fact-sheet-cra-reinvestment-act.pdf (explaining what institutions are covered by CRA).

[87] CRA data refers to the definition of "loans to small businesses" as defined by the FFIEC Call Reports.  *See* Federal Financial Institutions Examination Council, *A Guide to CRA Data Collection and Reporting*, at 11 (last visited Feb. 27, 2017), *available at* https://www.ffiec.gov/cra/pdf/2015_CRA_Guide.pdf.

volume of small loans extended to businesses. Importantly, however, aggregate origination amounts are only for loans extended by financial institutions with assets greater than roughly $1.2 billion in a particular year.

However, the CRA data do allow a limited understanding of lending to "small" businesses as defined by the revenue of the receiving entity.  Those financial institutions that do collect information on the annual revenue of the business, perhaps as part of their underwriting process, are required to report the number and origination dollar amount of loans made to businesses with revenues of $1 million or less. The FFIEC findings on nationwide CRA data indicate that, in 2015, over 52 percent of the number of loans of $1 million or less (and about 37 percent measured in dollar amount of loans) made by CRA reporters were extended to firms with revenues of $1 million or less.[88] Importantly, as the CRA does not require financial institutions to collect business revenue information and therefore report this statistic, these amounts may be an underrepresentation of lending to "small" businesses.[89]  Coupled with the fact that only financial institutions with assets above roughly $1.2 billion are required to report, this statistic is limited in its ability to reflect national lending to "small" businesses.

---

[88] Federal Financial Institutions Examination Council, Reports - Findings from Analysis of Nationwide Summary Statistics for 2015 Community Reinvestment Act Data Fact Sheet (August 2016), *available at* https://www.ffiec.gov/hmcrpr/cra_fs16.htm

[89] "The regulations do not require institutions to request or consider revenue information when making a loan; however, if institutions do gather this information from their borrowers, they should use the gross annual revenue rather than the adjusted grows annual revenue of their small business or small farm borrowers to report whether the borrower has gross annual revenue of a) more than $1 million dollars; or b) $1 million dollars or less. The purpose of small business and small farm data collection is to enable examiners and the public to judge whether the institution is lending to small businesses and farms or whether it is only making small loans to larger businesses and farms." Federal Financial Institutions Examination Council,  *A Guide to CRA Data Collection and Reporting*, at 13 (last visited Feb. 27, 2017), *available at* https://www.ffiec.gov/cra/pdf/2015_CRA_Guide.pdf.

### 3.3.3   Federal database results on small loans to businesses and small business engagement with financial institutions

According to the most recent 2016 FFIEC Call Report data, large financial institutions (defined as those with more than $10 billion in assets) accounted for about 50 percent of the outstanding loan amounts for loans with original amounts below $1 million.[90]

Data from the Call Reports show banks with less than $10 billion in assets hold the remaining 50 percent of the total outstanding amounts for small loans to businesses; about 27 percent is held by small banks with assets less than $1 billion, while 23 percent is held by mid-sized banks with assets between $1 billion and $10 billion.[91] Figure 4 examines the outstanding amounts held on loans with original values less than $1 million, categorized by the asset size of the financial institution.  Since 2014, it appears the largest and mid-sized banks have increased their lending in this space as shown by an increase in their respective share of outstanding amounts. Small banks, defined as those with assets less than $1 billion, have seen a marginal decrease, again with respect to business loans with original amounts less than $1 million.

---

[90] Federal Financial Institutions Examination Council, Call Reports -- Single Period 2016, Retrieved from https://cdr.ffiec.gov/public/PWS/DownloadBulkData.aspx.
[91] The aggregate nature of CRA data does not allow us to discuss original values of loans subdivided by the asset size of the lending institution.

**FIGURE 4:**   AGGREGATE OUTSTANDING AMOUNTS FOR TERM LOANS AND LINES OF CREDIT WITH ORGINATION AMOUNTS LESS THAN $1 MILLION BY INSTITUTION ASSET SIZE



*Source: FFIEC Call Report data*

# 4. State of small business lending through the recession and recovery

The Great Recession, which began in 2007, had a negative impact on the availability of credit generally, including to small businesses. We again rely on the CRA data and the Call Reports to examine loans to small businesses and loans of $1 million or less to entities of any size. Figure 5 uses CRA data to show both the aggregate dollar volume of loans originated to small businesses and the number of loans originated to businesses with revenues less than $1 million.[92] As mentioned above, CRA only requires reporting from certain institutions with assets above roughly $1.2 billion; the origination amounts therefore underrepresent the total amount originated to small businesses.[93]   Figure 6 uses Call Report data to show the number of loans originated in amounts less than $1 million, categorized by the origination amount of the loan.

---

[92] As noted above, the FFIEC findings on nationwide CRA data indicates that, in 2015, over 52 percent of the number of loans of $1 million or less (and about 37 percent measured in dollar amount of loans) made by CRA reporters were extended to firms with revenues of $1 million or less.  Federal Financial Institutions Examination Council, Reports - Findings from Analysis of Nationwide Summary Statistics for 2015 Community Reinvestment Act Data Fact Sheet (August 2016), available at https://www.ffiec.gov/hmcrpr/cra_fs16.htm.

[93] In 2017, all financial institutions regulated by the Office of the Comptroller of Currency, (OCC) Federal Reserve System, and Federal Deposit Insurance Corporation generally with an asset size over $1.226 billion are required to submit CRA data. According to an OCC Fact Sheet, "CRA does not apply to Credit Unions insured by the National Credit Union Share Insurance Fund (NCUSIF) or nonbank entities supervised by the Consumer Financial Protection Bureau." For more information on reporting eligibility, see Federal Financial Institutions Examination Council, Community Reinvestment Act,  *2017 Reporting Criteria*, *available at*  https://www.ffiec.gov/cra/reporter17.htm. For more information on the OCC Fact Sheet, see Off. of the Comptroller of the Currency, *Community Developments Fact Sheet* at 1, *available at* https://www.occ.treas.gov/topics/community-affairs/publications/fact-sheets/fact-sheet-cra-reinvestment-act.pdf (explaining what institutions are covered by CRA).

The picture painted by these two figures tells a complicated story.  On one hand, Figure 5 suggests we see a marked decline in the dollar amount originated to small businesses and small loans to businesses in the wake of the Great Recession and a modest recovery beginning in 2012. On the other hand, Figure 6 suggests the total number of outstanding loans with original loan amounts under $1 million now exceeds 2007 levels; however, this may be due in part to methodological changes in the Call Report data.[94]

**FIGURE 5:**  AGGREGATE SMALL LOANS TO BUSINESSES AND SMALL BUSINESS ORIGINATIONS OVER TIME BY BANKS WITH GREATER THAN $1 BILLION IN ASSETS



*Source: CRA Reports.*  Small business loans are defined as those with original values less than $ 1 million.  Lenders are also required to report loans to firms with revenues less than $ 1 million in the event they collect information on business revenues.[95] Importantly, as CRA does not require banks to collect information on the revenue of the business, the "Loans to Firms with Less than $1 Million in Revenue" may be understated."

---

[94] Prior to 2012, saving associations supervised by the Office of Thrift Supervision were required to file the Thrift Financial Report (TFR). On March 31, 2012 saving associations converted their filing to the FFIEC Call Report, leading to an increase in the number of institutions now filing the Call Reports. This reporting shift may be one explanation for the dramatic increase in the number of small business loans from 2011 to 2012. Federal Financial Institutions Examination Council, Depository Institution Regulatory Reports, (March 2, 2012), available at https://www.fdic.gov/news/news/inactivefinancial/2012/fil12010.html.
[95] "The regulations do not require institutions to request or consider revenue information when making a loan; however, if institutions do gather this information from their borrowers, they should use the gross annual revenue

**FIGURE 6:**   AGGREGATE NUMBER OF LOANS OVER TIME, CATEGORIZED BY THE ORIGINAL VALUE OF
THE LOAN



*Source: FFIEC Call Report data.* Prior to 2012, saving associations supervised by the Office of Thrift Supervision were required to file the Thrift Financial Report (TFR). On March 31, 2012 saving associations converted their filing to the FFIEC Call Report leading to an increase in the number of institutions now filing the Call Reports. This reporting shift may be one rationale for the dramatic increase in the number of small business loans from 2011 to 2012.[96]

---

rather than the adjusted grows annual revenue of their small business or small farm borrowers to report whether the borrower has gross annual revenue of a) more than $1 million dollars; or b) $1 million dollars or less. The purpose of small business and small farm data collection is to enable examiners and the public to judge whether the institution is lending to small businesses and farms or whether it is only making small loans to larger businesses and farms." Federal Financial Institutions Examination Council,  *A Guide to CRA Data Collection and Reporting,* at 13 (last visited Feb. 27, 2017),  *available at* https://www.ffiec.gov/cra/pdf/2015_CRA_Guide.pdf.
[96] Federal Financial Institutions Examination Council,  Depository Institution Regulatory Reports, (March 2, 2012),  *available at* https://www.fdic.gov/news/news/inactivefinancial/2012/fil12010.html

Federal programs, such as those offered by the SBA and other agencies, provide key assistance to American small businesses. For example, the Small Business Jobs Act of 2010 dedicated over $45 billion dollars to state and federal programs to incentivize small business lending.[97] In particular, the Small Business Jobs Act increased the funds available to the SBA under the loan guarantee programs. As described by the Office of the Comptroller of Currency, these loan guarantee programs, such as the 7(a) loan guarantee program may help "creditworthy small businesses acquire financing when they cannot otherwise obtain credit at reasonable terms."[98] However, given the lack of comprehensive, granular data, it is difficult to measure the degree to which these programs directly address the financial challenges of small business owners and determine whether there are unmet needs.

To the extent there has been a decline in the availability of bank credit for small businesses, the causes are uncertain. In general, it is difficult to identify the causes of a decline in lending in any credit market. We cannot distinguish between the impacts of changes in the demand for credit, changes in the availability of credit, changes in the credit quality of borrowers, and the interactions among these three factors. This is especially challenging given the significant limitations in the publicly-available data, as discussed further below.

## 4.1   Gaps in available survey data limit our understanding of the small business financing market during and after the recession

One way to assess the availability of credit is to survey firms both on their need for credit and their ability to obtain the credit they need. The best available survey data on business lending

---

[97] "U.S. Small Bus. Admin., *Small Business Jobs Act of 2010: Changes to the 504 Loan Program*, SBA Information Notice, *available at* https://webcache.googleusercontent.com/search?q=cache:kdrZ9UHCCUoJ:https://www.sba.gov/sites/default/files/bank_5000-1183.pdf+&cd=4&hl=en&ct=clnk&gl=us.

[98] U.S. Office of the Comptroller of the Currency. Community Affairs. N.p., July 2015. Web. 27 Feb. 2017.

and the availability of credit during and after the recession come from a handful of sources. As has been discussed in this paper, the 2015 Joint Federal Reserve Survey provides the most comprehensive understanding of the business lending market from the perspective of small businesses.  In addition to this Federal Reserve survey, both the National Federation of Independent Businesses Research Foundation (NFIB) and the National Small Business Association (NSBA) survey their members to learn about issues small businesses face, such as access to financing.

There also exist a number of business indices related to small business credit access.  For example, the Experian and Moody's Analytics Small Business Credit index "tracks how businesses are faring over a period of time" by relying on commercial credit data coupled with macroeconomic data.[99] Similarly, the Wells Fargo/ Gallup Small Business Index, which surveys a sample of about 600 business owners with revenues ranging from $50,000 to $20 million, considers ease of accessing credit while computing a business optimism score.[100]  As discussed earlier, Pepperdine University computes a Private Capital Access Index to "gauge the demand of small and medium-sized businesses for financing needs, the level of accessibility of private capital, and the transparency and efficiency of private financing markets."[101]

While these surveys and indices provide important high level trends on small business credit access, these resources have a number of limitations that leave many important questions unanswered. For example, the 2016 iteration of the Federal Reserve Small Business Credit survey was the first to survey businesses in all 50 states. Earlier iterations of this survey were more limited in scope; the 2015 survey looked at businesses in 26 states while the 2014 iteration was run exclusively by the Federal Reserve Bank of New York and only surveyed businesses in

---

[99] The Experian/Moody's Analytics Small Business Credit Index used credit balances, delinquency rates, and other commercial credit data in accordance with macroeconomic data to provide an analysis of business credit trends. Experian and Moody's Analytics, *Economy Shows Signs of Stalling while Small Business Credit Improves*,  Small Business Credit Index,  *available at* https://www.experian.com/business-information/me-smallbusinesscreditindex.html.

[100] Wells Fargo, *How Does the Wells Fargo/ Gallup Small Business Index Work?, available at* http://www.gallup.com/175211/wells-fargo-gallup-small-business-index-methodology.aspx.

[101] See *supra* note 77.

New York, New Jersey, Connecticut and Pennsylvania.[102] This sampling limitation therefore precludes a more thorough comparison of small business lending trends over time.

Several of the indices do allow an understanding of the demand for business credit over time from the perspective of business borrowers. However, these indices and underlying surveys largely rely on aggregated business perception. For example, the Wells Fargo/ Gallup Small Business Index asks respondents to measure their ability to access credit by selecting "very difficult, somewhat difficult, about average, somewhat easy, or very easy." As such, responses to these surveys and resulting indices may be somewhat subjective without an appreciation of the underlying dynamics; the responses may depend on the selection of businesses surveyed for a particular iteration of the index. [103]  Further, these indices provide no understanding of the demographic of business applicants and subsequent approval rates.

---

[102] Fed.Res. Bank of N.Y., *Spring 2014 Small Business Credit Survey, available at* https://www.newyorkfed.org/smallbusiness/Spring2014/index.html (retrieved from the "About the Data" tab).
[103] Gallup & Wells Fargo, *Small Business Survey Topline – Final 2-15-2017*, at 24 *available at* https://wellsfargoworks.com/File/Index/8ilA2k9ftkqUkBjoWIg5Hg.

# 5. The need for more robust small business lending data

Small businesses will continue to play a vital role in driving economic activity and supporting job creation. Governments at all levels are likely to promote an adequate flow of capital to these businesses. But without more robust data it will continue to be difficult to assess how well the market is meeting the needs of small businesses.

The FFIEC Call Reports and Community Reinvestment Act(CRA) reports are two of the best available data sources on loans of $1 million or less and small business lending. However these reports only capture lending by banks and exclude lending by alternative lenders and other non-depository financial institutions. The Call Reports provide data on small loans (i.e. loans under $1 million) but not information on the size of the businesses obtaining those loans, or information about the business owners. While the CRA data does present some information on loans made to businesses with revenues under $1 million, the reporting limitations do not provide a complete picture.[104] Thus, these reports provide only limited information on small business lending generally and no information on lending to women-owned and minority-owned small businesses in particular.

Moreover, neither of the FFIEC Reports nor any other source provides comprehensive information on the extent to which small businesses of various sizes and types are unsuccessful in obtaining financing. Our knowledge on these subjects is limited to occasional surveys

---

[104] *See Infra* Section 3.3.2.

containing incomplete information in addition to Bureau conversations with external stakeholders.

Ultimately, with current data it is not possible to confidently answer basic questions regarding the state of small business lending. For example, it is difficult to determine the extent to which there has been a net decline in small business lending as opposed to a shift in lending from banks to alternative lenders during the recession or simply a decrease in credit extended. To the extent there has been a decline, it is difficult to assess whether that decline has affected certain types of small businesses more than others, including women- and minority-owned small businesses. Nor is it possible to answer basic questions about the degree to which supply and/or demand may have contributed to whatever decline in small business lending has occurred, or whether the relative importance of either supply or demand varies for different types of businesses, including women- and minority-owned small businesses.

In part, the purpose for the data collection mandated by Section 1071 of the Dodd-Frank Act is to enable communities, government entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned and small businesses. To the extent data collected under the Bureau's Section 1071 authority is made public – which Section 1071 requires subject to the Bureau's authority to require deletions or modifications to protect privacy interests – these data can provide a broad range of stakeholders across the United States with an understanding of the small business credit flowing into their local communities, and allow them to identify "credit deserts" or sectors where credit flows may be restricted. This in turn may support localized efforts to increase access to credit in various communities around the United States to address unmet credit needs, thereby spurring economic development.

A second part of the purpose of Section 1071 pertains to facilitating the enforcement of fair lending laws. Data is needed to understand the nature and extent of potential disparities, and to ensure women-owned and minority-owned businesses have non-discriminatory access to capital. Data collected under Section 1071 may allow the Bureau and others to focus resources in an effort to identify potential areas of concern.

40

# 6. Conclusion

The data collection mandated by Section 1071 of the Dodd-Frank Act can provide valuable insights to communities, public sector entities, and financial institutions, as well as to advocates and regulators, given the current lack of comprehensive data in this area. However, this data collection needs to be thoughtfully and pragmatically implemented, especially in light of the various types of lenders and products that potentially fall within its scope. The Bureau looks forward to a productive dialogue with stakeholders as we continue to build a shared knowledge base in this area and define workable solutions to outstanding questions.

# EXHIBIT 2



DISCUSSION PAPER 2015-03 | MARCH 2015

# Minority and Women Entrepreneurs:
# Building Capital, Networks, and Skills

Michael S. Barr



## MISSION STATEMENT

The Hamilton Project seeks to advance America's promise of opportunity, prosperity, and growth.

We believe that today's increasingly competitive global economy demands public policy ideas commensurate with the challenges of the 21st Century. The Project's economic strategy reflects a judgment that long-term prosperity is best achieved by fostering economic growth and broad participation in that growth, by enhancing individual economic security, and by embracing a role for effective government in making needed public investments.

Our strategy calls for combining public investment, a secure social safety net, and fiscal discipline. In that framework, the Project puts forward innovative proposals from leading economic thinkers — based on credible evidence and experience, not ideology or doctrine — to introduce new and effective policy options into the national debate.

The Project is named after Alexander Hamilton, the nation's first Treasury Secretary, who laid the foundation for the modern American economy. Hamilton stood for sound fiscal policy, believed that broad-based opportunity for advancement would drive American economic growth, and recognized that "prudent aids and encouragements on the part of government" are necessary to enhance and guide market forces. The guiding principles of the Project remain consistent with these views.





# Minority and Women Entrepreneurs: Building Capital, Networks, and Skills

Michael S. Barr

*University of Michigan*

**MARCH 2015**

NOTE: This discussion paper is a proposal from the author(s). As emphasized in The Hamilton Project's original strategy paper, the Project was designed in part to provide a forum for leading thinkers across the nation to put forward innovative and potentially important economic policy ideas that share the Project's broad goals of promoting economic growth, broad-based participation in growth, and economic security. The author(s) are invited to express their own ideas in discussion papers, whether or not the Project's staff or advisory council agrees with the specific proposals. This discussion paper is offered in that spirit.

BROOKINGS

# Abstract

The United States has an enviable entrepreneurial culture and a track record of building new companies. Yet new and small business owners often face particular challenges, including lack of access to capital, insufficient business networks for peer support, investment, and business opportunities, and the absence of the full range of essential skills necessary to lead a business to survive and grow. Women and minority entrepreneurs often face even greater obstacles. While business formation is, of course, primarily a matter for the private sector, public policy can and should encourage increased rates of entrepreneurship, and the capital, networks, and skills essential for success, especially among women and minorities. In particular, this discussion paper calls for an expanded State Small Business Credit Initiative and an enlarged and permanent New Markets Tax Credit to encourage private sector investment in new and small businesses. These capital initiatives should be complemented with new federal support for local business networks, and for local skills acquisition initiatives, to make it more likely that small businesses will form, survive, and grow. For the United States to continue to grow, to innovate, and even more importantly to generate jobs, we need to expand our rate of business formation and improve the prospects for survival and growth of young and small businesses. Increasing the rate of minority and female entrepreneurship may help to reduce the race and gender wealth gaps, to reduce income and wealth inequality, and to increase social mobility. With the United States becoming more heterogeneous, increasing business formation by minority and female entrepreneurs is critical to improving the rate of entrepreneurship overall. Thus, if we are to grow as a country, create jobs, and make progress on correcting income and wealth inequality, we need to help minority and female entrepreneurs succeed.

# Table of Contents

ABSTRACT                                                                    2

CHAPTER 1.   INTRODUCTION                                                    5

CHAPTER 2.   THE IMPORTANCE OF INCREASING
             ENTREPRENEURSHIP RATES
             AMONG MINORITIES AND WOMEN                                      7

CHAPTER 3.   THE PROPOSALS                                                   10

CHAPTER 4.   QUESTIONS AND CONCERNS                                          21

CHAPTER 6.   CONCLUSION                                                      22

AUTHOR AND ACKNOWLEDGEMENTS                                                  23

ENDNOTES                                                                     24

REFERENCES                                                                   25

# Chapter 1. Introduction

The United States has an enviable entrepreneurial culture and a track record of building new companies. We also have deep and sophisticated lending and equity markets that facilitate the growth of firms across the size spectrum. New businesses are critical to creating more jobs: 40 percent of net new jobs created in the past two decades were the result of hiring by new businesses (U.S. Small Business Administration [SBA] 2014a).

Increasingly, new businesses—especially small businesses—are being created by women and people from minority backgrounds. From 1997 to 2007 the number of minority-owned small businesses, defined as any business with fewer than 500 employees and in which the majority of owners do not identify as white non-Hispanic, increased by more than 25 percent. Specifically, Asian-, American Indian–, and Pacific Islander–owned small businesses collectively increased by approximately 35 percent, while African American– and Hispanic-owned small businesses grew by 14 and 17 percent, respectively. The number of white-owned businesses, meanwhile, grew by only 6 percent. In addition, there was a near-perfect switch in the composition of firm ownership by gender, with the number of women-owned businesses increasing by 7 percent while male-owned businesses fell by 7 percent (U.S. Census Bureau 2001, 2007, n.d.).

Not only are minority and women business owners a growing segment of the entrepreneur population, but their businesses also tend to be relatively dynamic. From 1997 to 2007 total gross receipts—defined as sales, receipts, and values of shipments—from minority firms grew much faster than the total gross receipts of nonminority firms (U.S. Census Bureau 2001, 2007, n.d.; U.S. Bureau of Economic Analysis 2015). Total gross receipts from women business owners also grew faster than the total gross receipts of male business owners over the same period (U.S. Census Bureau 2001, 2007, n.d.; U.S. Bureau of Economic Analysis 2015). In addition, between 1997 and 2007 minority and women business owners increased their payroll counts by 26 and 6 percent, respectively (U.S. Census Bureau 2001, 2007, n.d.; U.S. Bureau of Economic Analysis 2015). These numbers support the view that helping minority and women business owners will expand employment opportunities and economic growth for these groups as well as others.

> New businesses are critical to creating more jobs: 40 percent of net new jobs created in the past two decades were the result of hiring by new businesses.

Starting a new business can be a challenge. Would-be entrepreneurs may face a number of hurdles, including lack of access to capital, insufficient business networks for peer support, investment, and business opportunities, and the absence of the full range of essential skills necessary to lead a business to survive and grow. There is reason to think that racial and ethnic minorities and women are particularly likely to face such hurdles. For instance, minority- and women-headed households generally have lower levels of household wealth, which in turn can make internal investment and external borrowing more difficult. Other barriers that may reduce rates of business formation among minorities include lower average credit scores and educational attainment; geographic or societal isolation from other communities and

persistent discrimination may also impede entrepreneurship among women and minorities.

While business formation is primarily a matter for the private sector, public policy can encourage higher rates of minority and women entrepreneurship. Recognizing the opportunity for wide benefits to the economy at-large, this paper offers three proposals to address the challenges often faced by both minority- and women-owned businesses.

### ACCESS TO CAPITAL

While U.S. capital markets are robust, small businesses have critical borrowing needs that would not be met absent government assistance. Guaranteed loan programs with the Small Business Administration (SBA) provide an important source of private lending to small businesses. Two additional initiatives should be expanded to help meet the capital needs of small firms, including women- and minority-owned firms. The State Small Business Credit Initiative (SSBCI), authorized by Congress on a bipartisan basis in 2010, provides flexible support to state- and locally run programs that use public funds to leverage private funding for small businesses. The SSBCI should be reauthorized at $3 billion, double its current funding. The New Markets Tax Credit (NMTC), authorized on a bipartisan basis in 2000, over the past fourteen years has helped to attract more than $60 billion in private sector funding to build businesses in economically distressed communities and for minority entrepreneurs across the United States. It should be enlarged to permit $5 billion per year in new tax credit allocation authority and should be made permanent, so that investors, businesses, and communities can count on it over the long term. Several modest changes to the structure of each program will also be proposed.

### ACCESS TO BUSINESS NETWORKS

Business networks can help any firm to build its customer and supplier base, improve access to debt and equity finance, and provide useful advice and support. Such networks can be especially beneficial for new and smaller firms, which because of their size often have a narrower range of contacts. Moreover, peer networks may be particularly valuable for entrepreneurs facing similar problems, or located in the same communities. Women- and minority-owned businesses often cannot effectively access business networks even though they might benefit the most from them. Congress should appropriate an additional $500 million to the SSBCI to permit state and local governments to support regional- and sector-specific business networks. As part of the grants, recipients would agree to rigorous evaluation of different network models.

### ACCESS TO SKILL DEVELOPMENT

Many entrepreneurs and small business owners need access to skills, but often training initiatives are not focused enough on their actual needs and time constraints. There are a range of possible training approaches, from extensive, formal teaching in a classroom, to simply providing a few general guidelines. Training can also be provided in person, online, or in some combination of the two. Some entrepreneurs may seek help in how to hire employees with needed skills, or effectively use consulting services, instead of entrepreneurial training. The question of what kinds of skill acquisition will work best in what circumstances, and for minorities and women in particular, is ripe for research. Congress should appropriate a further $500 million through the SSBCI, on top of the additions mentioned above, to be used to finance skills acquisition initiatives. The funds would also include competitively allocated grants to develop an app for entrepreneurs that uses a mix of professionally developed just-in-time information, and peer-to-peer just-in-time advising.

Together, these proposals can assist individuals who are eager to start new businesses but may lack the financial and knowledge resources to do so. They can help ensure that women and minorities in particular are able to more fully take part in entrepreneurship that supports the creation of new jobs, innovative ideas, and economic growth.

# Chapter 2. The Importance of Increasing Entrepreneurship Rates among Minorities and Women

New businesses, small businesses, and entrepreneurship offer a number of benefits for individual business owners as well as for society. Some small businesses tend to stay small, such as owner-operated service, retail, or hospitality businesses. These firms can still be important generators of jobs and economic security in their local communities. Of the roughly 11 percent of workers who are self-employed, most fall into this group. Other small businesses have greater growth possibilities, and can in some instances help to promote large-scale job creation and expansive economic growth. After all, every large business was once a small business. The policy and research literature does not consistently describe "small businesses," "new businesses," and "entrepreneurship" as separate concepts, and I use the terms somewhat interchangeably in the discussion here. The differing types of entrepreneurs—for example, those who start a new business, run a business that will stay small, or grow a small business into a larger one—may vary in their economic objectives, roles in the economy, and skills and resources (Schoar 2009). This is particularly likely to be the case with minorities and women, whose rates of self-employment lag behind that of white, non-Hispanic men—although those rates have been growing over the past two decades (see figure 1). In addition, with racial and ethnic minorities—and women—a growing

**FIGURE 1.**

## Distribution of Self-Employed Workers by Demographic Group, 1971–2014



Sources: U.S. Census Bureau (2015); and author's calculations based on the Current Population Survey.

Note: NH = non-Hispanic. Starting in 1988, the survey question regarding self-employment separately asked about incorporated and nonincorporated self-employment. Previously, some of the incorporated self-employed reported as wage and salary workers. The term "minority" refers to men and women of African American, Asian, Native American, Alaska Native, Native Hawaiian, and Pacific Islander racial descent, as well as men and women of Hispanic descent. The term also includes multiracial Americans.

The Hamilton Project • Brookings   7

share of the U.S. workforce, fostering business formation among these groups will play an increasingly important role in contributing to the rate of entrepreneurship overall. If our country is to continue to foster economic opportunity, create jobs, and make progress on income and wealth inequality, we ought to help women and individuals from racial and ethnic minority groups start businesses and succeed as entrepreneurs.

## THE STATE OF MINORITY AND WOMEN ENTREPRENEURSHIP

Although the United States has long collected demographic and earnings data on workers, detailed data on business owners and their businesses have become regularly available only relatively recently, and they come with a sizeable time lag. The most recent data available are from 2007, and thus predate the Great Recession. With that caveat, table 1 shows how the size of non-publicly traded firms, in terms of employees, varies by the race, ethnicity, and gender of the owner.[1]

While the vast majority of non-publicly traded businesses consist of a single owner with no employees, as of 2007 minority-owned businesses were nonetheless considerably smaller on average than nonminority-owned businesses in their number of employees, as were businesses owned by women relative to businesses owned by men. These size differences also carry over in terms of revenue. In 2002 average gross receipts for minority-owned businesses were approximately $167,000, compared to $439,000 for nonminority-owned businesses;

receipts were particularly low for African American–owned businesses, at just $74,000 (Fairlie and Robb 2010). A separate and more recent (postrecession) survey of businesses headed by women showed that their annual revenues were approximately $154,000 (American Express 2014), although it is hard to compare this number to those above because the recession disproportionately affected women and minority business owners.[2]

## PERSONAL BENEFITS OF ENTREPRENEURSHIP

Providing assistance to entrepreneurs can potentially provide several sets of social benefits: first, to the business owners themselves, including their income and social mobility, and second, to the workers they employ. Finally, assistance to entrepreneurs provides macroeconomic benefits related to the spread of innovation. However, it is challenging to draw a clear cause-and-effect relationship from being an entrepreneur or running a small business to improved economic outcomes: after all, people with the drive, skills, and organizational ability to run their own business might also have earned more and accumulated more wealth if they had been working as employees. Geographic areas with a greater share of people who have the qualities it takes to be successful entrepreneurs might also have stronger economic outcomes if those people worked inside companies, rather than starting companies of their own. That said, a considerable body of evidence suggests the importance of small and new businesses to individual economic outcomes.

TABLE 1.

## Distribution of Non-Publicly Traded Firms by Size and Demographic Group, 2007

|  | # firms (millions) | By Number of Employees (Percent) | | | | |
|---|---|---|---|---|---|---|
|  |  | Owner only | 1 to 4 | 5 to 19 | 20 to 49 | 50 or More |
| **Race** | | | | | | |
| African American | 1.9 | 95.2 | 3.1 | 1.3 | 0.3 | 0.1 |
| Asian/Other | 1.9 | 79.7 | 12.5 | 6.3 | 1.1 | 0.4 |
| White | 22.6 | 81.7 | 10.5 | 5.8 | 1.3 | 0.7 |
| **Ethnicity** | | | | | | |
| Hispanic | 2.3 | 90.4 | 6.0 | 2.9 | 0.5 | 0.2 |
| Non-Hispanic | 23.8 | 81.7 | 10.5 | 5.8 | 1.3 | 0.6 |
| **Sex** | | | | | | |
| Men | 13.9 | 79.3 | 11.6 | 6.6 | 1.6 | 0.9 |
| Women | 7.8 | 89.7 | 6.4 | 3.0 | 0.6 | 0.2 |
| **All firms** | **26.4** | **82.4** | **10.1** | **5.6** | **1.3** | **0.6** |

Sources: U.S. Census Bureau (2007).

Note: As Hispanic Americans can be of any racial background, their share of business owners is computed separately from the race categories. "Owner only" includes (1) firms with paid employees but that reported no employees were paid during the reference period of the survey, and (2) firms without paid employees. "Asian/Other" includes Asian, American Indian and Alaska Native, Native Hawaiian, and Other Pacific Islander business owners, as well as business owners who identify as Some Other Race. Firms reporting equal minority/nonminority (race) ownership, equal male/female, and equal Hispanic/non-Hispanic are excluded from the demographic categories but show up in the total, so categories will not sum to the total for all firms.

Despite the high risks of business failure, successful entrepreneurship is correlated with wealth, savings, job satisfaction, and economic mobility. Small businesses serve as an important store of wealth for individuals from all income levels. For example, Janet Yellen reports that the Survey of Consumer Finances shows that for households in the bottom half of the wealth distribution the average value of business equity was only $20,000, but that represented 60 percent of those households' net worth (Yellen 2014).

Business ownership can catalyze social mobility. A study using the Panel Study of Income Dynamics and the Survey of Consumer Finances found that families who owned a business at the end of a five-year period but not at the beginning of that period were more likely to have moved into a higher income group than were other families over the same period; in fact, families who did not acquire or start a business over the survey period were more likely to either stay in their income category or to fall into a lower one (Quadrini 2000). Another study using data from the Panel Study of Income Dynamics, this time from 1999 to 2009, showed that, controlling for a host of demographic and economic variables, African American entrepreneurs are both more likely to move into higher income groups than are African American nonentrepreneurs, and as likely to do so as are white entrepreneurs (Bradford 2014). The author of that study argues that a higher level of African American entrepreneurship can help to reduce disparities in wealth between white and African American families (Bradford 2014, p. 255). The gender wealth gap, which actually expanded between 1998 and 2011, could also narrow as women gain access to capital, skills training, and networks for business creation and growth (Chang 2010).

## ENTREPRENEURSHIP'S BENEFITS TO THE U.S. ECONOMY

The SBA (2014a) estimates that small businesses accounted for 63 percent of net new jobs created from 1993 to 2013. However, recent academic literature has emphasized that the size of the firm matters less than the age of the firm, which should not be surprising, as many small businesses do not really seek to expand. Indeed, a well-regarded recent study demonstrates that young firms, which by their nature tend to be small, are responsible for most net new job creation (Haltiwanger, Jarmin, and Miranda 2013). Though start-up firms in their first year of existence account for only 3 percent of employment in the United States, they constitute 20 percent of total hires. Furthermore, though many of these firms fail, surviving firms generate jobs at a significantly higher rate than older firms do.

A variety of studies have pointed out reasons that small businesses can make an outsized contribution to innovation and economic growth. Small businesses often lead the market to embrace new processes, different incentives, and alternative organizational models, which may lead to increased efficiency and subsequent economic growth (Carree and Thurik 2005; Edmiston 2007). An increase in the number of small businesses may also lead to more variety in the supply of products and services, thus offering a greater range of niche products and services, and may produce new methods of research and development. (Priest 2003; Thurik and Wennekers 2004). The opportunity for new firms to break away from existing firms can lead to the spillover and commercialization of knowledge that might otherwise have remained dormant or uncommercialized in the incumbent firm generating that knowledge (Audretsch and Keilbach 2007). Patenting small businesses produce sixteen times as many patents per employee as do large patenting businesses (SBA 2014b).

In short, supporting business growth offers a number of benefits to entrepreneurs themselves and to the economy more broadly. In the remainder of the paper, I recommend three specific policy proposals to assist would-be minority and women business owners seeking to start new businesses and/or to improve their existing business ventures.

# Chapter 3. The Proposals

As part of a comprehensive strategy to help minority and female entrepreneurs receive the support they need to succeed, this paper outlines three complementary proposals: expand access to capital, expand access to business networks, and expand skills development and training programs.

## EXPAND ACCESS TO CAPITAL FOR MINORITY AND FEMALE ENTREPRENEURS

Inadequate access to financial capital is an important constraint on the growth of minority- and women-owned businesses. This paper proposes that Congress extend funding and support for two federal programs in particular: the SSBCI and the NMTC.[3] This section first outlines the extent to which minority and women entrepreneurs and small business owners lag behind in access to capital, and then discusses the proposals in more detail.

### *The Need for Loans and Equity*

Minority-owned businesses rely significantly more on investments of personal and family wealth than on external debt or equity; this source of capital is often constrained relative to nonminority-owned businesses by the low household wealth of the entrepreneur, as well as to the low wealth of her friends and family (Robb 2013). Some minority entrepreneurs can raise capital for their small businesses from family members and the ethnic community; Smith and Tang (2012), for example, document this occurrence in Arab American communities in Detroit. Minority entrepreneurs also tend to rely on social capital, such as advice and assistance, from friends in their communities. Nonetheless, minority-owned businesses as a group have less internal capital—and, as it turns out, less external capital from banks and other lenders as well.

Studies that have analyzed data from a survey conducted by the Ewing Marion Kauffman Foundation, a nationally representative cohort of businesses that began operations in 2004 and were followed until 2010, have found that African Americans, Hispanics, and women all began their businesses with about half the financial capital of white men, with these differences actually widening as their businesses matured. Furthermore, minority- and women-owned start-ups received less in loans and equity capital in their early years (Fairlie and Robb 2010; Robb 2013).

One reason that minority-owned businesses employ less capital may be partly attributed to their owners being less likely to apply for bank loans than nonminority business owners because of their fear of rejection. According to one survey, among minority businesses expressing a need for credit, over half reported not applying for loans because they feared being denied (Bates and Robb 2013). Surveys show that African Americans are 37 percent more likely and Hispanics are 23 percent more likely than nonminorities to avoid applying for credit for fear of rejection. Among women entrepreneurs, data show that between 2007 and 2010 they were slightly more likely than men not to apply for credit for fear that their loan applications would be denied (Bates and Robb 2013).

The fear that minorities have of being turned down is well-founded: when they do seek loans, they are significantly less likely to be approved than nonminorities. Minority business owners are more likely to be located in low- or moderate-income or minority-concentrated urban areas, and to be involved in retail businesses; each of these factors is associated with lower return on investment, which partly limits their ability to raise financial capital (Fairlie and Robb 2010).

The personal wealth of the entrepreneur is also an important factor in whether she can obtain credit (Cavalluzzo and Wolken 2005). Estimates from the U.S. Census Bureau indicate that wealth among nonminorities is between eleven and sixteen times the level among African Americans and Hispanics (Fairlie and Robb 2007). Women similarly suffer from the wealth gap, owning only 36 percent as much wealth as men. Never-married women own only 6 percent of the wealth of never-married men. Furthermore, racial and gender inequalities are intertwined: single African American and Hispanic women own a fraction of a penny for every dollar owned by white men (Chang 2010). Low levels of wealth and liquidity create a substantial barrier to entry for minority entrepreneurs, who cannot use personal wealth as collateral to obtain business loans. A 2006 study found that lower levels of assets among African Americans account for more than 15 percent of the difference between the rates of business creation among African Americans and whites (Fairlie 2006). The lack of personal wealth constrains the ability of minorities to invest directly in their businesses or to acquire other businesses.

Yet even after controlling for business and owner characteristics, researchers using 1998 Survey of Small Business Finances data found that minority-owned businesses are approximately three times as likely to be denied loans as are comparable nonminority businesses (Cavalluzzo and Wolken 2005; Fairlie and Robb 2008). Furthermore, minorities who are approved for loans tend to receive lower loan amounts and pay higher interest rates than nonminorities. Data from the 2003 Survey of Small Business Finances shows that whereas the average loan amount for minority-owned businesses was about $9,300, the nonminority average was more than twice this amount, at $20,500. The same survey found that minority businesses pay, on average, 7.8 percent for loans, compared with 6.4 percent for nonminority businesses (Fairlie and Robb 2010). These differences may be driven in part by lenders' stereotypes about the ability of African American– and Hispanic-owned businesses to succeed under certain circumstances (Blanchard, Zhao, and Yinger 2008).

As a result of these intertwined factors, minority-owned businesses rely less than nonminority-owned businesses on external debt. Among businesses with annual gross receipts under $500,000, 17 percent of minority-owned businesses received loans compared to 23 percent of nonminority-owned businesses. Among businesses with annual gross receipts over $500,000, 41 percent of minority-owned businesses received loans compared to 52 percent of nonminority-owned businesses (Fairlie and Robb 2010).

Minority-owned and women-owned firms have less access to equity financing, too. Fairlie and Robb (2010) found that the average amount of new equity investment in a minority-owned business was about $3,400, which was 43 percent of the average equity investment in a nonminority business. The same limited access to equity capital exists for businesses owned by women as compared to those owned by men. In 2001 women-owned businesses drew only 5 percent of all U.S. venture capital investments— although even this low level was higher than it had been in previous decades (Rubin 2010). Some researchers argue that the lack of external equity is the primary driver of capital disparities by gender, even compared to women's lack of access to external debt (Robb 2013).

Minority entrepreneurs start off with less financial capital than nonminority entrepreneurs, and women entrepreneurs start off with less financial capital than their male counterparts. A lack of access to debt and equity finance perpetuates and worsens these differences. When a segment of the market is underserved by private finance, using some form of publicly subsidized finance can help to fill the gap—and can do so profitably. Two such forms of public subsidy that have been used with some success in the past are the State Small Business Credit Initiative and the New Market Tax Credit. Both of these initiatives use public funds to leverage private capital to support small businesses, but are relatively small in scale. I propose increasing the funding for both programs and targeting them to better serve minority- and women-owned businesses.

### Expanding the State Small Business Credit Initiative

The SSBCI was enacted in 2010 with the goal of strengthening state capital access programs and other initiatives that support lending to small businesses and manufacturers. Under the

> Minority-owned businesses are approximately three times as likely to be denied loans as are comparable nonminority businesses.

SSBCI, the U.S. Department of the Treasury (Treasury) lends federal funds to states for specific programs that leverage private lending and equity markets to help finance small businesses and manufacturers. Funding allocations to each state are determined by a formula, which is based on loss of jobs and employment levels per state, but with each state receiving a minimum allocation of 0.9 percent of the total funding. The SSBCI was expected by its supporters to spur up to $15 billion in new private sector lending to small businesses and manufacturers by leveraging $10 in private capital for every $1 of federal support by SSBCI's end (Treasury 2014c). As of June 30, 2014, Treasury had disbursed over $1 billion overall (Treasury 2014b).

Of course, making loans is not an end in itself and the goal is ultimately to provide businesses with the critical help that

they need to grow and flourish. Business owners reported to Treasury that the expenditure of SSBCI funds will lead to the creation and retention of 95,600 jobs, with 32,600 jobs created and 63,000 jobs retained. A survey based on predictions of those hoping to receive a loan is not a project evaluation, and even projected numbers may duplicate job estimates for loans reported under other federal programs. Moreover, although Treasury released this information in its 2013 *Annual Report*, it does not validate or audit the estimates (Treasury 2013). As discussed below, a critical component of reauthorization should be data collection and rigorous evaluation.

To receive SSBCI funds, states currently must submit a plan to Treasury detailing how their program will expand credit to small businesses, particularly in underserved communities (Lewallen 2014). States choose from five basic types of programs: Loan Participation Programs, Loan Guarantee Programs, Collateral Support Programs, Capital Access Programs, and Venture Capital Programs. See box 1 for details.

A state may use an existing program or develop a new one. If a state does not have an existing program in place, Treasury may provide technical assistance to officials in establishing one (Treasury 2014a). The SSBCI permits states to tailor their programs to local needs (Treasury 2014c), which is one of the strengths of the program. States with existing programs need not upend existing arrangements in order to participate in the SSBCI, and states launching new programs can select the risk-profile, risk-sharing, and administrative approaches that best meet their local needs. While the variation in SSBCI programs is beneficial overall by allowing states and localities to tailor their programs to fit their specific needs, and should be continued, it also created a barrier to large bank participation. Large banks typically design programs that can be implemented consistently throughout the country, and they therefore may be reluctant to tailor processes to each state's program (Harras 2014).

Loan participation programs and venture capital programs accounted for 63 percent of the total allocation of SSBCI funds through 2013. Capital access programs, which accounted for just 8 percent of total SSBCI fund allocations, had the highest ratio of increased private sector lending, supporting more than $25 in private sector lending for every $1 in SSBCI funds. In capital access programs, financial institution lenders and small

---

**BOX 1.**

## Types of Programs in the State Small Business Credit Initiative

To receive SSBCI funds, states can choose from the following program types:

1. **Loan Participation Programs,** including two subtypes that are economically the same but entail different staff skills and administrative costs:

   (a) Direct companion loan, in which the state makes a direct loan that closes at the same time as a larger private sector loan

   (b) Purchased participation, in which the state purchases a portion of a loan after it has been made by the lender

2. **Loan Guarantee Programs,** in which a state guarantees a portion of the loss on a loan

3. **Collateral Support Programs,** in which a state pledges cash collateral to a lender when the borrower's collateral does not meet the lender's requirements

4. **Capital Access Programs,** in which the borrower, bank, and state contribute to a loan loss reserve account held by the lender to cover its losses until the account is depleted

5. **Venture Capital Programs,** with four subtypes:

   (a) Direct investment funds, in which state program managers serve in the role of venture capital fund managers

   (b) Coinvestment funds, in which state venture capital invest alongside private sector investors

   (c) Fund-of-funds, in which state venture capital program managers allocate capital to more than one private venture capital fund

   (d) Third-party managed funds, in which the state contracts with a single external firm that may or may not comingle private funds

Sources: Descriptions of loan programs quoted from Center for Regional Economic Competitiveness (2014). Descriptions of venture capital programs paraphrased from Cromwell Schmisseur LLC (2013).

business borrowers both contribute a small percentage of the loan amount to a reserve account held by the lender, which is matched by participating states. The high leverage ratio is a result of the small state contribution required for each small business loan (Treasury 2014b).

For SSBCI programs as a whole, funds have been dispersed from the federal government to states and then to recipient businesses fairly rapidly. Between 2011 and 2013 participating states reported expending $590 million in SSBCI funds, which, in turn, supported $4.1 billion in private sector lending to more than 8,500 small businesses. Thus, state programs have supported roughly $7 in private sector loans or investments for every $1 in SSBCI funds. At least nine states have already surpassed the SSBCI goal of 10:1 private sector leverage by the end of the program. Deployment of SSBCI funds also increased every quarter between June 2011 and June 2014. As businesses repay their loans, SSBCI funds will be recycled into new loans or investments. SSBCI funds are not loans to states; the funds will continue to recycle, thereby increasing the amount of private sector funding that they have attracted, unless they are dissipated by loan losses (Treasury 2014b).

The distribution of loans or investment is spread across industry sectors. Manufacturing accounted for 27 percent of the total SSBCI-supported loans or investments, but a variety of other industries have received that support, ranging from professional, scientific, and technical services, to construction, accommodation, and food services (Treasury 2014b).

Furthermore, SSBCI funding has been channeled to various entrepreneurial businesses that need access to credit most, including young businesses, very small businesses, and businesses in underserved communities (see box 2). The 2013 *Annual Report* states that more than half of all SSBCI loans or investments went to businesses less than five years old (Treasury 2013). As noted earlier, recent evidence suggests that young firms contributed disproportionately to job creation (Haltiwanger, Jarmin, and Miranda 2013). Research suggests that young businesses may be more likely to create jobs than are more mature businesses. Eighty percent of SSBCI-supported loans or investments went to businesses with ten or fewer full-time employees. Approximately 40 percent of total loans or investments went to businesses operating in low- or moderate-income communities, including 47 percent of loans or

---

**BOX 2.**

## Case Study in Local Implementation of the State Small Business Credit Initiative: Detroit Development Fund and Detroit Microloan Collaborative

The Detroit Microloan Collaborative (the Collaborative) is a private–public partnership that plans to offer small loans to Detroit-area businesses that do not qualify for traditional lending. The Collaborative expects that the majority of its portfolio will comprise loans to minority-owned lifestyle companies—companies that typically do not have significant growth potential, but that provide sufficient annual revenue to support a family and often a small number of employees, including auto shops, beauty parlors, and restaurants. The program's primary source of funding is a $5 million line of credit each from Ohio-based Huntington Bank and Goldman Sachs. The Michigan Economic Development Corporation, a quasipublic agency that works to attract businesses to the state, will provide the program an initial loan-loss reserve account. This account, funded by the SSBCI, can be called on to offset loan losses caused by the default of one or more of the Collaborative's borrowers.

The Collaborative comprises several nonprofits that have a history of successful lending in this space. The program's line of credit is being offered to the Detroit Development Fund, a nonprofit with substantial experience lending to Detroit entrepreneurs.[5] Over the past decade, the Detroit Development Fund has invested over $27 million in Detroit businesses and neighborhoods, 64 percent of it to minority-owned businesses. Its portfolio has suffered a default rate of only 3.9 percent. The Collaborative also comprises the Michigan Women's Foundation and the Detroit Micro-Enterprise Fund, two organizations with experience making smaller loans to women- and minority-owned businesses.

With a grant from the New Economy Initiative, the Collaborative has contracted Detroit-based LifeLine Business Consulting Services (LifeLine) to help prepare and process loan applications. LifeLine will help candidates with business and financial plans, and provide candidates a preliminary assessment of their creditworthiness. If LifeLine believes candidates are not ready, it will attempt to connect them with training programs offered by area nonprofits. During the life of the loan, LifeLine will provide a coach to mentor funded entrepreneurs.

Sources: Haimerl (2014); Office of Governor Rick Snyder (2013). Descriptions of loan programs quoted from Center for Regional Economic Competitiveness (2014). Descriptions of venture capital programs paraphrased from Cromwell Schmisseur LLC (2013).

investments from capital access programs and 30 percent from venture capital programs. Many of the loans and investments made to businesses in these communities were made by Community Development Financial Institutions (CDFIs). CDFIs typically provide financial services to underserved communities with the goal of community development. These institutions made more than 3,660 loans or investments supported by SSBCI funds, totaling $231.3 million, through 2013 (Treasury 2014b).

### State Small Business Credit Initiative Reauthorization

The SSBCI should be reauthorized from its current $1.5 billion in funding and be expanded prior to termination in 2017. In the absence of reauthorization, Treasury would no longer administer the program, and participating states would no longer be obligated to report on their progress in distributing the funds (Treasury 2014a). President Obama's FY 2015 budget proposes extending the program with an additional $1.5 billion in funding (Treasury 2014c). The evidence on the existing SSBCI program—the 10:1 ratio of private to public funds, the focus on underserved markets, and the prospect for job gains—is sufficient to make the case for this program. Additionally, most of the $1.5 billion has already been dispersed, well ahead of the 2017 deadline, indicating strong qualified demand among small businesses. It would also be worthwhile to double the amount of funding for the proposal to $3 billion so that states can reach sufficient scale to implement the programs efficiently and to be able to measure the extent to which the programs have a meaningful economic impact. The additional money should be linked to conditions of program testing and evaluation, however.

In addition to allocating some second wave funding according to formulas based on economic conditions, most second-round funding should be awarded to states operating programs that have: successfully reached out to and served minority and female entrepreneurs; successfully leveraged federal funding with private resources; collected and published data on program metrics; and committed to rigorous evaluation of results. For example, SSBCI-participating programs should continue to work with a network of partner organizations and advocacy groups to reach small minority- and women-owned businesses at the local level. The programs in different states are building up their own track records, and the bulk of funding should go to the programs that have proven most effective. It may also be useful to provide funds to programs that experiment with focusing on certain types of firms—new firms, small firms with low growth potential, or small firms with large growth potential. In addition, priority should be given to programs that link capital provision with appropriate skills acquisition and access to business networks.

However, the two biggest conditions for additional funding of the SSBCI involve information and evaluation. Within the $3 billion appropriation, Congress should set aside funds for

Treasury to improve data collection and for evaluation of the program at both the federal and state levels. Collecting data on demographics of borrowers should be eased significantly once the Consumer Financial Protection Bureau writes new federal regulations requiring providers of business loans to report demographic data. Such data will allow Treasury to determine how well minority and female entrepreneurs are being served. It should be straightforward to collect data on how quickly loans are being made, on how much private funding is being leveraged by public money, and on default rates. Over time, as research demonstrates the relative effectiveness of different states' models, the overall reach and efficiency of the program will likely improve. Treasury should also work with the SBA to make more small business loan and performance data available to the public to increase the efficiency of both SBA-guaranteed as well as private lending markets for small businesses.[6]

These data should be collected with future evaluations of the programs in mind. Treasury, through state programs, should follow up with businesses on several dimensions, including actual future jobs, revenue growth, and firm survival. There should also be data collected on useful comparison groups: for example, if data are kept on firms that were just barely denied funding under the criteria of the program, those firms can be compared to the presumably very similar firms that were just barely granted funding under the program. Of course, this step requires collecting data on firms that were not funded. Another approach is to build up a data set of firms that are comparable in observable ways to those that receive SSBCI funding, but perhaps were in areas not served by the program. This matched group can then serve as a comparison group. There are many reasonable methods of program evaluation, and these should be built into future program design from the start.

### Making the New Markets Tax Credit Permanent

### Early Success of the New Markets Tax Credit

The NMTC was established in 2000 as an investment mechanism to support job creation and bolster living standards in low-income communities (Internal Revenue Service [IRS] 2010). Administered by agencies within Treasury, the NMTC program allows individual or corporate entities to receive tax credits against their federal income tax liability in exchange for making equity investments in community development entities (CDEs), which are private organizations recognized by the IRS as providing investment capital in low-income communities. CDEs, in turn, use the funds to make debt or equity investments in qualified for-profit or nonprofit entities in their community. Investments take the form of term loans, lines of credit, equity investments, grants, donations, or other transactions. The NMTC program allows CDEs to invest in businesses in a variety of sectors, including commercial, industrial, retail, manufacturing, cultural enrichment, child care, and educational services. Investments can be made in

any geographic area, as long as the area meets the program's definition of low-income community. Since its inception, CDEs have made 8,060 investments in 3,849 businesses. Approximately 45 percent of CDE investment dollars went to operating businesses, and slightly more than half of the funds went to real estate development or leasing activities (CDFI Fund 2014).

Studies suggest that these investments have had beneficial outcomes for recipient businesses and their communities. Researchers at the Urban Institute surveyed early-year projects, those that received investments and were initiated before the end of 2007, which meant that sufficient time had passed to evaluate the outcomes of the investments. The study reported that the smallest investment by a CDE, in terms of total project costs, was only $8,000, and the largest was $1.8 billion (Abravenel et al. 2013). Based on data collected through 2007, 13 percent of recipient projects were minority owned or controlled, and 10 percent were women owned or controlled. Furthermore, although investment in start-up enterprises was not a required focus of the NMTC program, 10.2 percent of early NMTC projects financed the start-up of a for-profit or nonprofit entity.

The Urban Institute evaluation concluded that between 30 and 40 percent of investments would likely not have proceeded without NMTCs, and another 10 percent would have proceeded in a different (perhaps less economically distressed) location or on a delayed schedule (Abravenel et al. 2013). The study also found that 76 percent of NMTC projects saw a growth in their annual revenue or operating budget of more than 5 percent between the date of project initiation and 2011. The vast majority of projects that grew did so through natural growth rather than acquisition. Small start-up businesses appear to have been successful under the program. More than 78 percent of recipient start-up businesses experienced revenue growth of greater than 5 percent by 2011, which is comparable to the growth in non-start-ups. Start-up entities also generated 9.1 percent of all new jobs created by the program, although they accounted for only 5.8 percent of project dollars (Abravenel et al. 2013). The strong job performance recorded by start-up firms suggests that CDEs should focus greater investment activity on start-up businesses in future rounds of their funding.

**Permanently Extending the New Markets Tax Credit**

There is a real if still incomplete body of evidence that the NMTC has been working as intended. It should be continued in the future, with the following changes.

The NMTC should be reauthorized, and allocation authority should be expanded to leverage $50 billion over ten years, or $5 billion per year. Given the consistent high demand for CDE investments and their strong performance, Treasury estimates that making the tax credit permanent will cost taxpayers $10.1 billion (Treasury Green Book [FY2016] 2015). Congress should

also pass legislation to make the NMTC permanent, providing stability to the program and its participants, facilitating greater investor interest in the program, and providing ongoing investments to low-income communities.

Second, the IRS should continue to pursue measures that make the NMTC easier to use for small businesses, in part by reducing the complexity of the tax compliance requirements of the program. Going forward, the CDFI Fund, which allocates grants to CDEs, should also refine its application procedures by, for example, experimenting with an approach under which applications supporting equity investments in small businesses receive more-favorable treatment than debt provided to real-estate transactions. Applications that are likely to serve minority and women entrepreneurs and small business owners should receive more-favorable treatment, too.

Finally, the CDFI Fund should continue to refine its data collection, research, and evaluation programs. The CDFI Fund's Community Investment Impact System should be expanded to include annual information describing the demographics of business owners, the types of firms served (new start-up, small firm in usually low-growth sector, small firm in potentially high-growth sector), default rates, and firm revenue and payroll growth. There should also be data collected on comparable groups of firms that did not receive assistance, so that a serious evaluation of benefits is possible.

### Summing Up

The rapid growth in revenues and payrolls at minority-owned firms in the years leading up to 2007 (the most recent data) suggests that this segment of the economy has considerable potential for future growth. State-run capital access programs have had long success in expanding the reach of lending to new, small, minority-owned, and women-owned businesses (Barr 2002, 2008; Treasury 1998, 1999, 2001), and the SSBCI and NMTC are no different. The SSBCI should be expanded to $3 billion, and the NMTC should be permanently expanded to permit $5 billion annually in new tax credit allocations, which Treasury estimates will cost $13.1 billion over ten years.

## EXPAND ACCESS TO BUSINESS NETWORKS FOR MINORITY AND WOMEN ENTREPRENEURS

Business networks can help any firm build its customer and supplier base, improve access to debt and equity finance, and provide useful advice and support. Such networks can be especially beneficial for new and smaller firms that, because of their size, often have a narrower range of contacts. Moreover, peer networks may be particularly valuable for entrepreneurs who face similar problems or are located in the same communities. Women- and minority-owned businesses often are cut off from business networks even though they might benefit the most from access to them. While participants in these networks suggest that they are worthwhile, systematic evidence

is lacking on how best to structure them and what payoffs are likely to result. Congress should appropriate $500 million as an add-on to the SSBCI to permit state and local governments to support regional and sector-specific business networks. As part of the grants, recipients would agree to rigorous evaluation of different network models. SSBCI-funded initiatives would help to build networks of different sizes, memberships, skill distributions, and methods of communicating, with the goal of providing evidence for proven models that could be applied on a larger scale.

Many networking initiatives tend to operate through meetings and seminars based around key issues of common interest, such as particular business techniques or opportunities. When entrepreneurs network, they can often help each other with information and advice that will increase their social capital, knowledge of business, and confidence to overcome business challenges or to take greater advantage of business opportunities (Organisation for Economic Co-operation and Development 2005).

Evidence on the extent and importance of networks is hard to find, but some suggestive evidence appears in studies of venture capital. One likely reason that minorities are disproportionately underserved by institutional sources of venture capital may be an information failure that results from a lack of common networks. This hypothesis is supported by the growth in venture capital investment for women-owned businesses as the number of women-owned businesses has increased (Rubin 2010). Similarly, because angel networks are often built informally between investors with a history of doing business together, minorities may not have as much access to this form of capital. Venture capital networks also tend to be geographically based. To the extent that minority entrepreneurs seek to launch businesses in areas of high minority concentration and not in areas where venture capital investors are concentrated, geographic isolation may reinforce exclusion from these networks (Jones 2007).

While business networks should be based in the business community and led by business people, the federal government can play a role in fostering these networks, especially for minority and female entrepreneurs and for businesses in low-income communities. One example was the BusinessLINC (Learning, Information, Networking, and Collaboration) partnership, which was launched in 1998 by the Clinton administration, and has since operated under several different names and incarnations. The Bush administration bolstered and renamed the program the "Urban Entrepreneurship Partnership" in 2004, under which name it operated until 2012, when it entered into a new partnership with the Center for Transformation and Strategic Initiatives, a program that still operates on a localized level (Ewing Marion Kauffman Foundation 2014). The Urban Entrepreneurship Partnership

finds local start-up champions to lead the coalitions, along the same lines as the original BusinessLINC concept; however, the Urban Entrepreneurship Partnership is much more focused on peer-to-peer entrepreneurial connections, and is less focused on economically distressed communities. The Obama administration reimagined these types of partnerships as part of its Startup America initiative, launched in 2011.

BusinessLINC was initially led by the SBA and Treasury (Office of the Vice President 1998) and was then handed off to private sector leaders. Partnerships such as BusinessLINC are designed to encourage large businesses to work with small business owners and entrepreneurs, and to bolster peer-to-peer entrepreneurial connections at the local and regional levels. Small businesses are able to obtain critical advice, enhance management development, leverage core strengths, assess sources of financing, increase marketplace credibility, and enter subcontracts and joint ventures. At the same time, larger companies are able to leverage relationships with smaller companies to penetrate local markets with untapped buying power, find new strategic market niches, and diversify supplier bases. This multifaceted strategy encourages development of business networks through one-on-one consulting, group training, peer groups and advisory boards, subcontracting and supplier development programs, and sales channel development programs, among other approaches. While networking can be mutually beneficial, setting up and maintaining a network often requires both a local champion and outside resources, if the benefits of the network are to extend to other firms and the broader community as well.

The BusinessLINC approach was flexible enough to assume various forms. The usual structure of a BusinessLINC coalition was to have a CEO of a major corporation serve as chair, while the coalition was hosted by community, civic, or business organizations. One example of a well-functioning local coalition was in Washington, DC. The BusinessLINC coalition partnered with local government and community development organizations to match neighborhood small business owners with a mentor from the Washington Area Board of Trade. As a result of the collaboration, local businesses reported increased revenue. The Washington, DC local coalition also conducted workshops for entrepreneurs on tax incentives (Jones 2002). Other coalitions were formed around the country, including in Atlanta, Boston, Chicago, Cleveland, Dallas, Flint, Houston, the Mississippi River Delta, Nashville, New York City, Richmond, and San Francisco.

### Expanding Business Networks

As part of the SSBCI, Congress should appropriate $500 million that would be used by the states to finance locally based business networks. Each of these would be tailored to local circumstances. Some networks might form around local chambers of commerce, while others might be built around local CDFIs. Still others might be based on Small Business

Development Centers and Women's Business Centers run by the SBA or by the Minority Business Development Agency supported by the Department of Commerce. Networks might be aimed at entrepreneurs at different stages of the process: those just starting a business, those with a small but low-growth business, and those with a small business that has potential for rapid growth. The Marathon Foundation, discussed in box 3, provides an example of a model that might work for some supported networks.

Improving on past programs, the SSBCI should allocate resources to administer data collection and conduct program evaluations of funded networks. Some potential design strategies may, for example, call for funding only a select number of participants in a network; if these participants are randomly chosen from a larger pool of applicants, it may be possible to have a useful comparison group. Other methods of quasi-experimental variation and well-designed control groups are possible, with the goal of developing evidence for proven models of business networking that could be applied on a larger scale.

## EXPAND ACCESS TO SKILLS DEVELOPMENT FOR MINORITY AND WOMEN ENTREPRENEURS

Studies consistently find that the education level of a business owner is positively correlated with entrepreneurship and entrepreneurial success. Businesses with highly educated owners have higher sales, profits, and survival rates, and hire more employees than businesses with less-educated owners (Fairlie and Robb 2010). They also are more likely to apply for credit (Robb 2013). A 2014 study by the National Women's Business Council suggests that education has a greater effect on women entrepreneurs than on their male counterparts (SAG Corporation 2014). The study found that women with postgraduate education were nearly 50 percent more likely to be self-employed than other women, while men with postgraduate education were only about 8 percent more likely to be self-employed relative to other men.

Lower levels of education and experience among racial minorities may be a barrier to entrepreneurship. One report estimated that 6 percent of the gap in self-employment entry rates between African Americans and whites was explained by differences in education levels. Over 30 percent of the

---

**BOX 3.**

### Case Study in Entrepreneurial Networks: The Marathon Foundation

The Marathon Foundation (TMF) is a professional member organization whose mission is to facilitate deal making between TMF's aspiring entrepreneurs and TMF's corporate members. Privately funded and admittedly not a broad-based entrepreneurship network, the organization was originally piloted by the Harvard Business School Alumni Angels of Greater New York, and now counts experienced entrepreneurs, Fortune 500 companies, and leading consumer information service companies among its members. TMF connects minority entrepreneurs to networks of professionals primarily by hosting regional and national networking events, as well as by maintaining a database of deal opportunities for its members. TMF also incorporates networking into its other minority entrepreneur programs, including its access to capital and entrepreneur education programs.

The core of TMF's deal-making program is its networking events and Deal Flow Database. TMF's signature networking event is its annual DealMakers Summit, which provides panels focusing on specific industry and regional issues, networking receptions, and a pitch competition. TMF also sponsors and cosponsors a number of regional networking events throughout the year. Most of TMF's events are organized by industry or geography to increase the likelihood that entrepreneurs participating in these events will interact with corporate members who are either in the same industry or who are geographically nearby.

TMF's entrepreneur education programs are also designed to facilitate deal making. Like TMF's networking events, its education programs are organized around specific industries and geographies so that entrepreneurs participating in these programs interact and learn from professionals in their fields or regions. TMF's case study sessions are particularly helpful examples of such opportunities. During these sessions TMF entrepreneurs present their business proposals to a group of entrepreneurs and corporate professionals who react to the case. In so doing, corporate members share their expertise with entrepreneurs, and entrepreneurs can identify for corporate members the barriers facing their businesses.

Source: TMF (n.d.).

same gap between Hispanics and whites was explained by differences in education levels (Fairlie and Robb 2010). Women business owners tend to have fewer years of industry and start-up experience compared with men. African Americans and Hispanics have slightly lower average industry experience and significantly less start-up experience compared with nonminorities (Robb 2013). Furthermore, one study has found that minority business owners are less likely to use technology than are nonminority business owners, which may be another factor in the skills gap (Fairlie and Robb 2010).

We have a long way to go in understanding the skills required to start and grow a small business, and an even longer way to go in understanding whether (and how) to successfully provide training or other skills acquisition for such entrepreneurs. Perhaps certain core attributes of a successful entrepreneur cannot be taught. However, it seems clear that certain business skills can improve the chance of success for a small business: for example, skills in finance and accounting, business planning, business start-up, general management, marketing, advertising, and pursuing government contracts. Given the need for entrepreneurial and small business skills acquisition—through training, consulting, or hiring—small business initiatives should include a skills component that is flexible enough to meet the needs of a range of entrepreneurs and small businesses.

There is some evidence that training can raise the chances of success for entrepreneurs. In the United States, for example, the SBA offers training in these areas, both through an online module and through its 1,100 Small Business Development Centers across the country (for locations, see SBDCNet.org). There is substantial variation in the length, content, and structure of these training programs, as well as the types of entrepreneurs and businesses that participate. A Kauffman-RAND report reviewed studies of various forms of small business assistance (Gu, Karoly, and Zissimopoulos 2008), and fourteen of these studies considered the benefits of business counselling services offered by the SBA's Small Business Development Centers. The Kauffman-RAND study notes that all fourteen studies find "a positive relationship between SBDC services and business outcomes and several studies claim the services are a cost-efficient way to promote entrepreneurship" (pp. 22–23). Indeed, one of the studies "estimated that the program outcomes generated approximately $2.61 in incremental tax revenue for every dollar spent" (p. 23). Another of the studies found that "clients benefit more from administrative and operating assistance than from strategic assistance [and that assistance with] a comprehensive approach [serves clients the best]" (p. 44). These findings, however, should be taken as suggestive rather than definitive. The Kauffman-RAND report also notes that "none of these studies use a very rigorous methodology to ensure that causal program impacts are measured. Twelve of the fourteen studies use a weaker mean comparison or simple descriptive methodology. Only two use multivariate regression

to control for potential confounders, and in those cases no comparison group is included" (p. 22).

The GATE (Growing America Through Entrepreneurship) Project study of training for self-employment, run by the U.S. Department of Labor, covered a much smaller group, but with a more rigorous methodology. GATE was implemented through One-Stop Career Centers, also called American Job Centers. There are about 3,000 brick-and-mortar centers around the country that provide employment services, particularly for unemployed workers. GATE added services to support people in seeking self-employment—the first stage of starting a business.

In the GATE study potential participants—both employed and unemployed—were offered the chance to attend an informational session, and then if they wished to participate, were asked to provide a business plan. All who submitted a plan in a timely fashion were accepted into the sample—without any evaluation of whether the plan was likely to work. Of the roughly 4,200 individuals who entered the program in this way, half were randomly selected for a program including a session with an advisor, various kinds of classroom training, one-on-one business counseling, and assistance in applying for business financing. The results of the study showed short-term gains in self-employment and wages. Although these gains faded over time, the study concluded that, overall, "the benefits of Project GATE exceed its costs" (Benus et al. 2010, p. ix). The gains were especially substantial for those who were receiving unemployment benefits, because the additional jobs not only benefited participants, but also allowed the government to save money on unemployment benefits it would otherwise have paid.

McKenzie and Woodruff (2014) provide an extensive survey of the range of research on the subject of entrepreneurial training globally. They observe that training has a positive impact on educating entrepreneurs generally, but many entrepreneurs do not appear to implement practices taught in training. Training often seems to improve business practices and help entrepreneurs launch new businesses more quickly; with a few exceptions, however, the effects of training on business profitability and survivorship are often unclear or only modest. (For studies of additional training programs conducted internationally, see box 4.)

One theme that emerges in this research is that the type of training may matter considerably. For example, Drexler, Fischer, and Schoar (2014) suggest that inundating anyone, including entrepreneurs, with a mass of complex information fails to take into account the psychological or behavioral barriers that prevent people from making better decisions. Instead, they argue that policy interventions should concentrate on developing, testing, and disseminating simple but effective rules of thumb. For example, individuals who simply take the basic steps of calculating monthly revenues and separating

**BOX 4.**

## International Experience with Business Training

Some of the more prominent examples of training programs have occurred internationally, and may offer important lessons for training initiatives in the United States:

- The International Labor Organization's Start and Improve Your Business program has trained over 4.5 million people in over 100 countries since its launch in 1977.

- The Competency-Based Economies through the Formation of Enterprises program is a German program that provides training courses to target groups on various aspects of entrepreneurship, including marketing, finance, production, and organizational management.

- Empretec is a United Nations program that provides training workshops to a variety of small- and medium-sized enterprises in member states.

- The International Finance Corporation's SME (Small- and Medium-Sized Enterprise) Toolkit that partners with IBM provides globally relevant free content and local Web sites with information on business topics.

- The Fountain Enterprise Program targets microfinance clients with a curriculum addressing credit administration, savings, financial negotiation, budgeting, and bank services.

- An entrepreneurship training program for unemployed workers in France provides a form of downside insurance for unemployed individuals who are starting new businesses.

Source: Hombert et al. (2014).

their home and business books may be better able to diagnose periods of bad sales and proactively respond to them by adjusting business practices. The question of what kinds of skill acquisition will work best in what circumstances, and for minorities and women in particular, is ripe for research.

### Supporting Skills Acquisition for Business Owners

Congress should appropriate $500 million as part of the SSBCI to finance skills acquisition initiatives. Three components figure prominently in the plan:

- One component would include challenge grants to develop an app for entrepreneurs that uses a mix of professionally developed just-in-time information and peer-to-peer just-in-time advising.

- A second component would run rigorous experiments on the best methods to assist in skills acquisition.

- A third component would support local Small Business Development Centers and Women's Business Centers run by the SBA, Minority Business Development Agency Business Centers supported by the Commerce Department, and community college entrepreneurial training initiatives. The projects would offer various curriculum choices and then follow-up with participants to collect evidence to help

determine which models could be applied on a larger scale. States would receive bonus points in the SSBCI capital program for rigorous program evaluation.

Under this model, several different approaches to skills acquisition would be considered. Some training programs might implement just-in-time consulting services, while others might focus on heuristics or rule-of-thumb training models. Others might compare online and classroom methods of building skills, or in-person versus telephone or Web-based methods. Still others would focus on helping entrepreneurs acquire necessary skills by efficiently hiring employees with the right skill set. Programs might be aimed at entrepreneurs in different stages: those just starting a business, those with a small business already, and those with a small business that has a chance to grow dramatically. Programs should also be aimed at different types of participants, including those with substantial shares of minorities and women. These programs would compete for federal funds, with some preference going to programs that include rigorous research design—laying out either a randomized or a quasi-experimental approach with a clear comparison group. Programs would be required to submit extensive annual program information, so that outcomes in terms of employment, earnings, growth of business receipts, and payroll, as well as user satisfaction with the program, could be successfully tracked.

Evaluations of these programs would be used to establish a workable method that could be replicated in other states and jurisdictions. Furthermore, the exact number of training programs and allocations for each program would be flexible in order to give applicants of varying scales the opportunity to test different skills-building approaches. For example, ideas42, a nonprofit behavioral design firm that collaborated with Drexler, Fischer, and Schoar on their heuristics study in the Dominican Republic, is currently exploring ways to implement the heuristics approach through a mobile platform.[7] In October 2014 the organization was awarded over $1 million by the Development Innovation Ventures at the U.S. Agency for International Development (USAID DIV) and the Consultative Group to Assist the Poor to create a mobile phone push-notifications tool that would deliver heuristics-based training and information to microentrepreneurs in developing countries. ideas42 hopes that the mobile tool will also benefit microfinancers due to its customizability and low cost of use (ideas42 n.d.), and intends to pilot the program in India and the Philippines over the next three years. It will explore how heuristics training can effectively be delivered via mobile phones; the optimal format, length, and frequency of messaging; to what extent heuristics messaging must be adapted across countries; and the scalability of mobile heuristics (Consultative Group to Assist the Poor 2015).

A portion of federal funding should be used for a challenge grant modeled after the USAID DIV (2014) program that funded the ideas42 project. USAID DIV holds a year-round grant competition seeking innovative ideas and then awarding tiered funding to selected projects. Like the ideas42 project, the grant should be used to develop a mobile app that can be used by entrepreneurs to access just-in-time, heuristics-based training and information. The mobile app should then be tested with entrepreneurs across the country, with a particular focus on minority and women entrepreneurs who would benefit most from a narrowing of the skills gap. As mentioned above, this is but one of many examples of innovative approaches that can and should be taken to experiment with skills acquisition for entrepreneurs.

# Chapter 4. Questions and Concerns

**_Are there other programs that could also be useful in improving access to capital for minority and women entrepreneurs?_**

Yes. This proposal is not meant to be an exhaustive list of programs for small businesses. For example, the SBA offers several services to small business owners, including a guaranteed loan program. Additionally, section 1071 of the Dodd-Frank Act amends the Equal Credit Opportunity Act to improve the collection and dissemination of data on small businesses.[8] Specifically, the provision requires commercial loan applicants to report the race, gender, and other details of the business owner, which were previously optional. This is a welcome improvement, as information regarding those communities that have substantial women and minority entrepreneurs and those that do not is lacking. This makes it difficult to target these groups with the limited funding currently available. Section 1071 will help to solve this information problem. Moreover, the government can make these data widely available to advance the ability of the private sector to serve small businesses, along the lines of recent efforts by the Department of Commerce and the SBA. The proposals discussed in this paper are meant to complement and reinforce these initiatives.

**_These proposals seek to promote business creation among women and minorities. What about business success?_**

It is often difficult to know in advance which businesses will succeed and which will fail. Government policies should increase the opportunities for women and minorities to open new businesses and to increase the likelihood of success of these firms. However, their ultimate success or failure, and their ability to generate job growth, is a result of factors far beyond any capital access, networking, or skills programs.

**_Isn't there a worry that these programs will encourage people to start businesses who would be better off working for a company rather than for themselves?_**

Entrepreneurship and small business ownership is not for everyone. But it is still likely the case that even some relatively marginalized, formerly unemployed workers could benefit from opportunities to open a small business (see Hombert et al. 2014), and many wage workers could usefully supplement their income with self-employment or small business ownership. Furthermore, removing barriers for women and minority entrepreneurs to open and grow their businesses is likely to benefit those who have the drive and ambition to become business owners. Even if many new businesses were to fail—as many do now—those that do succeed would benefit our economy as a whole.

# Chapter 5. Conclusion

Minority and women entrepreneurs—and those who would become entrepreneurs—are increasingly important in the United States, but many of them face critical barriers. Access to capital, business expertise, and connections to networks of peers and to market opportunities are essential for entrepreneurs to succeed. In this paper, I have offered specific policy proposals in three areas. First, to build access to capital I propose that Congress expand funding for the SSBCI and increase and make permanent the NMTC. Second, I call for new federal funding for local networking initiatives through the SSBCI. Third, I suggest new federal funding for local skills acquisitions programs, also through the SSBCI. These proposals are based on recognition that increasing access to capital, building business networks, and expanding access to business skills must rely on local, community-based initiatives, but that these can and must be bolstered and supported at the national level.

For the United States to continue to grow and to innovate, and even more importantly to generate jobs, we need to expand our rate of business formation and improve the prospects for survival and growth of young and small businesses. Expanding business formation may help to contribute to reduction of income and wealth inequality and to greater social mobility. Increasing the rate of minority and female entrepreneurship may help to reduce racial and gender wealth gaps. With the U.S. population becoming increasingly diverse, fostering business formation among minority and female entrepreneurs is critical to improve the rate of entrepreneurship overall and to develop employment opportunities in the United States.

# Author

**Michael S. Barr**

*The Roy F. and Jean Humphrey Proffitt Professor of Law, and Professor of Public Policy, University of Michigan; Nonresident Senior Fellow, Brookings Institution*

Michael S. Barr is the Roy F. and Jean Humphrey Proffitt Professor of Law at the University of Michigan Law School, where he teaches domestic and international financial regulation. He is also Professor of Public Policy at the Gerald R. Ford School of Public Policy, Senior Fellow at the Center for American Progress, and Senior Fellow at the Brookings Institution. He served from 2009-2010 as the U.S. Department of the Treasury's Assistant Secretary for Financial Institutions, and was a key architect of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Recent books include *No Slack: The Financial Lives of Low-Income Americans* (Brookings Press 2012); *Insufficient Funds: Savings, Assets, Credit and Banking Among Low- and Moderate-Income Households* (Russell Sage Press 2009, co-edited with Rebecca Blank) and *Building Inclusive Financial Systems: A Framework for Financial Access* (Brookings Press, 2007, co-edited with Anjali Kumar and Robert Litan).

Barr currently serves on the Advisory Board of Lending Club, an online lending marketplace; of ideas42, a behavioral economics research and development lab; of the Financial Solutions Lab, an initiative to seed and scale innovations to build consumer financial security; of the FDIC Committee on Financial Inclusion; of the Washington Center for Equitable Growth; and of the U.S. Financial Diaries Project. He is also a fellow at the Filene Research Institute.

Barr previously served as Special Adviser and Counselor on the Policy Planning Staff of the State Department, Treasury Secretary Robert E. Rubin's Special Assistant, Deputy Assistant Secretary of the Treasury, and Special Adviser to President William J. Clinton. He earned a BA, *summa cum laude*, with Honors in History, from Yale University, an M.Phil. in International Relations from Oxford University, as a Rhodes Scholar, and a JD from Yale Law School. Barr clerked for U.S. District Court Judge Pierre N. Leval in New York, and for Justice David H. Souter of the U.S. Supreme Court.

# Acknowledgements

The author wishes to acknowledge the outstanding contribution of Priyah Kaul to the research and writing of this discussion paper. The author also wishes to thank Josh Strazanac for excellent research assistance. The author acknowledges the generous support of the William W. Cook Endowment of the University of Michigan. The author benefited from valuable comments and suggestions from Janis Bowdler, Lisa Cook, Alicia Davis, Erik Gordon, Don Graves, Brad Hershbein, Melissa Kearney, Robert Litan, Greg Nantz, Antoinette Schoar, Tim Taylor and participants in a Hamilton Project–hosted author's conference.

# Endnotes

1. The U.S. Census Bureau's Survey of Business Owners, performed once every five years, provides the most comprehensive data on the demographics of businesses and business owners by gender, ethnicity, race, and veteran status. It includes all nonfarm businesses with annual receipts of $1,000 or more that file tax forms as individual proprietorships, partnerships, or any type of corporation. Business ownership is defined as a 51 percent or greater stake by one of the demographic categories used in the survey. Though the most recent survey was conducted in 2012, the Census Bureau does not plan to release any findings from the 2012 survey until June 2015. The U.S. Senate Committee on Small Business and Entrepreneurship has called for data on the subject that are more accurate and current (Cantwell 2014), and the Census Bureau announced in February 2015 that it will begin collecting such data annually (Harrison 2015).

2. Minority-owned businesses were disproportionately affected by the Great Recession in a number of ways. The subprime housing crisis severely affected urban minority neighborhoods. To the extent that minority business owners depended on home asset values as collateral for business loans, the crisis put those businesses at risk (Jarmin, Krizan, and Luque 2014). As banks and lending institutions tightened lending standards and increased loan costs during the recession, the literature suggests that banks were reluctant to lend to minority-owned firms because of concerns about their ability to repay loans. Fairlie and Robb (2010) state that business trade organizations and Minority Business Enterprise Centers anecdotally reported lending institutions cutting off credit lines of viable minority-owned businesses.

3. The author helped to lead the development and enactment of both programs, as well as the BusinessLINC (Learning, Information, Networking, and Collaboration)-initiative described later in the text, while serving in the Clinton and Obama Treasury Departments.

4. Municipalities were also able to apply for an allocation if their state did not submit a notice of intent to apply for funds or complete an application prior to June 27, 2011. Treasury awarded allocations to municipalities in Alaska, North Dakota, and Wyoming. All other states are operating SSBCI programs. Treasury has also allocated funds to five territories. For simplicity, we refer to participating states, territories, and municipalities as "states."

5. The author is involved with a foundation effort to expand the Detroit Development Fund's capacity to lend to small, minority-, and women-owned businesses in Detroit.

6. On February 10, 2015, the SBA announced the launch of LINC (Leveraging Information and Networks to access Capital), an online marketplace that will match small businesses with bank lenders across the country. LINC, which will be available on the agency's website, will ask individuals seeking small business loans to complete a short online form that will be distributed to lenders. Within forty-eight hours, interested lenders respond to the prospective borrower at no cost (SBA 2015). LINC is part of a growing industry of digital marketplaces that match borrowers and lenders (Quittner 2015). Later in 2015, the SBA plans to roll out a program that automates its general small business loan application process (GCN 2015).

7. The author is on the advisory board of ideas42.

8. The Dodd-Frank Wall Street Reform and Consumer Protection Act, HR 4173 (2010); Equal Credit Opportunity Act 15 USC (1974).

# References

Abravenel, Martin D., Nancy M. Pindus, Brett Theodos, Kassie Dumlao Bertumen, Rachel Brash, and Zach McDade. 2013, April. "New Markets Tax Credit (NMTC) Program Evaluation: Final Report." Report prepared for U.S. Department of the Treasury and CDFI Fund, Urban Institute, Washington, DC.

American Express. 2014. "2014 State of Women-Owned Businesses." American Express. http://www.womenable.com/content/userfiles/2014_State_of_Women-owned_Businesses_public.pdf.

Audretsch, David, and Max Keilbach. 2007. "The Knowledge Spillover Theory of Entrepreneurship." *Journal of Management Studies* 44 (7): 1242–54.

Barr, Michael S. 2002. "Access to Financial Services in the 21st Century: Five Opportunities for the Bush Administration and the 107th Congress." *Notre Dame Journal of Law, Ethics & Public Policy* 16 (2): 447–73.

———. 2008. "Policies to Expand Minority Entrepreneurship: Closing Comments." In *Entrepreneurship in Emerging Domestic Markets: Barriers and Innovation*, edited by G. Yago, J. R. Barth, and B. Zeidman, 141–50. New York: Springer, 2008.

Bates, Timothy, and Alicia Robb. 2013. "Small-Business Viability in America's Urban Minority Communities." *Urban Studies*. http://usj.sagepub.com/content/51/13/2844.full.pdf+html.

Benus, Jacob, Theodore Shen, Sisi Zhang, Marc Chan, Benjamin Hansen. 2010. *Growing America Through Entrepreneurship: Final Evaluation of Project GATE*. Impaq International.

Blanchard, Lloyd, Bo Zhao, and John Yinger. 2008. "Do Lenders Discriminate against Minority and Woman Entrepreneurs?" *Journal of Urban Economics* 63 (22): 467–97.

Bradford, William D. 2014. "The 'Myth' that Black Entrepreneurship Can Reduce the Gap in Wealth between Black and White Families." *Economic Development Quarterly* 28: 254–55.

Cantwell, Maria. 2014. "21st Century Barriers to Women's Entrepreneurship." U.S. Senate Committee on Small Business and Entrepreneurship, Washington, DC.

Carree, Martin, and Roy Thurik. 2005. "Understanding the Role of Entrepreneurship for Economic Growth." Institute for Development Strategies, Indiana University, Bloomington, IN.

Cavalluzzo, Ken, and John Wolken. 2005. "Small Business Loan Turndowns, Personal Wealth and Discrimination." *Journal of Business* 78: 2153–77.

Center for Regional Economic Competitiveness (CREC). 2014, January. "Filling the Small Business Lending Gap: Lessons from the U.S. Treasury's SSBCI Loan Programs." Center for Regional Economic Competitiveness, Arlington, VA.

Chang, Mariko Lin. 2010. *Shortchanged: Why Women Have Less Wealth and What Can be Done About It*. New York: Oxford University Press.

Community Development Financial Institutions Fund (CDFI Fund). 2014. *New Markets Tax Credit Public Data Release: 2003–2012 Summary Report*. Community Development Financial Institutions Fund, U.S. Department of the Treasury, Washington, DC.

Consultative Group to Assist the Poor (CGAP). 2015, February 12. "Heuristics: A Behavioral Approach to Financial Literacy Training." Consultative Group to Assist the Poor, Washington, DC.

Cromwell Schmisseur LLC. 2013, February. "Information and Observations on State Venture Capital Programs: Report for the U.S. Department of the Treasury and Interested Parties in the State Small Business Credit Initiative (SSBCI)." Cromwell Schmisseur LLC, Nashville, TN.

Drexler, Alejandro, Greg Fischer, and Antoinette Schoar. 2014. "Keeping it Simple: Financial Literacy and Rules of Thumb." *American Economic Journal: Applied Economics* 6 (2): 1–31.

Edmiston, Kelly. 2007. "The Role of Small and Large Businesses in Economic Development." Federal Reserve Bank of Kansas City, Kansas City, MO.

Ewing Marion Kauffman Foundation. 2014. "Urban Entrepreneurship Partnership." Ewing Marion Kauffman Foundation, Kansas City, MO.

Fairlie, Robert. 2006. "Entrepreneurship among Disadvantaged Groups: An Analysis of the Dynamics of Self-Employment by Gender, Race and Education." In *The Life Cycle of Entrepreneurial Ventures, International Handbook Series on Entrepreneurship*, 437–78. New York: Springer.

Fairlie, Robert, and Alicia Robb. 2007. "Why Are Black-Owned Businesses Less Successful Than White-Owned Businesses?: The Role of Families, Inheritances, and Business Human Capital." *Journal of Labor Economics* 25 (2): 289–323.

———. 2008. *Race and Entrepreneurial Success: Black-, Asian-, and White-Owned Businesses in the United States*. Cambridge, MA: MIT Press.

———. 2010. "Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs." Minority Business Development Agency, U.S. Department of Commerce, Washington, DC.

GCN. 2015, February 13. "SBA Opens Online Matchmaking for Small Business Loans." GCN, Vienna, VA.

Gu, Quian, Lynn A. Karoly, and Julie Zissimopoulos. 2008. "Small Business Assistance Programs in the United States: An Analysis of What They Are, How Well They Perform, and How We Can Learn More About Them." Working Paper WR-603-EMKF, Kauffman-RAND Institute for Entrepreneurship Public Policy, Santa Monica, CA.

Haimerl, Amy. 2014, November 12. "Small-Biz Lending Gets $5M Injection." *Crain's Detroit Business.*

Haltiwanger, John, Ron S. Jarmin, and Javier Miranda. 2013. "Who Creates Small Jobs? Small Versus Large Versus Young." *Review of Economics and Statistics* 95 (2): 357.

Harras, Steven. 2014. "Weak Big Bank Effort Hurts Treasury Small Business Lending Program." Congressional Quarterly: CQ Roll Call Washington Banking Briefing.

Harrison, J.D. 2015. "Commerce Dept. Tries to Kickstart U.S.'s Sputtering Entrepreneurial Economy." *Washington Post*, February 11.

Hombert, John, Antoinette Shoar, David Sraer, and David Thesmar. 2014. "Can Unemployment Insurance Spur Entrepreneurial Activity?" Working Paper No. 20717, National Bureau of Economic Research, Cambridge, MA.

ideas42. n.d. "Press Release: Joining with USAID and CGAP to Scale Up Financial Heuristics." ideas42, New York, NY.

Internal Revenue Service (IRS). 2010. "New Markets Tax Credit." LMSB-04-0510-016. Internal Revenue Service, U.S. Department of the Treasury, Washington, DC.

Jarmin, Ron, C.J. Krizan, and Adela Luque. 2014. "Owner Characteristics and Firm Performance During the Great Recession." Paper 14–36, Center for Economic Studies, Washington, DC.

Jones, Susan R. 2002. "Current Issues in the Changing Roles and Practices of Community Economic Development Lawyers." *Wisconsin Law Review* 437.

———. 2007. "Supporting Urban Entrepreneurs: Law Policy, and the Role of Lawyers in Small Business Development." *Western New England Law Review* 30 (1): 71–91.

Lewallen, Daniel. 2014. "Follow the Leader: Why All States Should Remove Minimum Employee Thresholds in Antidiscrimination Statutes." *Indiana Law Review* 47: 838.

McKenzie, David, and Christopher Woodruff. 2014. "What Are We Learning from Business Training and Entrepreneurship Evaluations around the Developing World?" *World Bank Research Observer* 29 (1): 48–82.

National Community Reinvestment Coalition (NCRC). 2014. "Small Business Loan Data: Recommendations to the Consumer Financial Protection Bureau for Implementing Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010." National Community Reinvestment Coalition, Washington, DC.

Office of Governor Rick Snyder. 2013, November. "Michigan launches Public-Private Partnership That Will Provide Micro Loans To State's Small Businesses." Office of Governor Rick Snyder, Lansing, MI.

Office of the Vice President. 1998. "Vice President Gore Announces New Public/Private Partnership to Encourage Entrepreneurial Growth and Economic Development in our Inner Cities." Office of the Vice President, Washington, DC.

Organisation for Economic Co-operation and Development (OECD). 2005. *Local Economic and Employment Development Entrepreneurship: A Catalyst for Urban Regeneration.* Rome: OECD Publishing.

Priest, George L. 2003. "Small Business Economic Growth and the Huffman Conjecture." *Journal of Small and Emerging Businesses* 7 (1): 1–17.

Quadrini, Vincenzo. 2000. "Entrepreneurship, Saving, and Social Mobility." *Review of Economic Dynamics* 3 (1): 3.

Quittner, Jeremy. 2015, February 11. "SBA Launches Online Loan Marketplace. What Took It So Long?" Inc.com.

Robb, Alicia. 2013. "Access to Capital among Young Firms, Minority-Owned Firms, Women-Owned Firms, and High-Tech Firms." Office of Advocacy, U.S. Small Business Administration, Washington, DC.

Rubin, Julia Sass. 2010. "Venture Capital and Underserved Communities." *Urban Affairs Review* 45 (6): 821–35.

SAG Corporation. 2014. "Opportunities for and Barriers to Hiring for Self-Employed and Microbusinesses." Prepared for National Women's Business Council by SAG Corporation, Annandale, VA.

Schoar, Antoinette. 2009. "The Divide between Subsistence and Transformational Entrepreneurship." In *NBER Innovation Policy and the Economy*, edited by Joshua Lerner and Scott Stern. Chicago: University of Chicago Press. Conference held April 14, 2009. http://www.nber.org/chapters/c11765.

Smith, Ola Marie, and Roger Tang. 2012. "Arab American Entrepreneurship in Detroit, Michigan." *American Journal of Business* 27 (1): 58–78.

The Marathon Foundation (TMF). n.d. "About the Marathon Foundation." The Marathon Foundation, Washington, DC.

Thurik, Roy, and Sander Wennekers. 2004. "Entrepreneurship, Small Business and Economic Growth." *Journal of Small Business and Enterprise Development* 11 (1): 140–149.

Treasury Green Book [FY2016]. 2015. "The Greenbook and Tax Expenditures: Table of Revenue Estimates from the Administration's Fiscal Year 2016 Revenue Proposals." Excel spreadsheet. http://www.treasury.gov/resource-center/tax-policy/Pages/general_explanation.aspx.

USAID Development Innovation Ventures (USAID DIV). 2014. "About DIV." U.S. Agency for International Development, Washington, DC.

U.S. Census Bureau. 2001. "1997 Economic Census: Company Statistics Series." U.S. Census Bureau, U.S. Department of Commerce, Washington, DC. http://www2.census.gov/econ/sbo/97/e97cs-1.pdf.

———. 2007. "Survey of Business Owners: 2007 Survey Results." U.S. Census Bureau, U.S. Department of Commerce, Washington, DC.

———. 2015. "Current Population Survey." U.S. Census Bureau, U.S. Department of Commerce, Washington, DC.

———. n.d. "2002 Survey of Business Owners." American FactFinder. U.S. Census Bureau, U.S. Department of Commerce, Washington, DC.

U.S. Bureau of Economic Analysis. 2015. "Implicit Price Deflators for Gross Domestic Product." Washington, DC. http://www.bea.gov/iTable/iTable.cfm?ReqID=9&step=1#reqid=9&step=1&isuri=1.

U.S. Department of the Treasury. 1998. "Capital Access Programs: A Summary of Nationwide Performance." U.S. Department of the Treasury, Washington, DC.

———. 1999. "Capital Access Programs: A Summary of Nationwide Performance." U.S. Department of the Treasury, Washington, DC.

———. 2001. "Capital Access Programs: A Summary of Nationwide Performance." U.S. Department of the Treasury, Washington, DC.

———. 2013. *Annual Report*. U.S. Department of the Treasury, Washington, DC.

———. 2014a. "State Small Business Credit Initiative: Frequently Asked Questions." U.S. Department of the Treasury, Washington, DC.

———. 2014b. "State Small Business Credit Initiative: A Summary of States' 2013 Annual Reports." U.S. Department of the Treasury, Washington, DC. http://www.treasury.gov/resource-center/sb-programs/Pages/ssbci-program-reports.aspx.

———. 2014c. "Treasury's State Small Business Credit Initiative Has Disbursed More than $1 billion to Spur Small Business Lending." U.S. Department of the Treasury, Washington, DC.

U.S. Small Business Administration (SBA). 2014a. "Frequently Asked Questions about Small Business: March 2014." U.S. Small Business Administration, Washington, DC.

———. 2014b. "2013 Small Business State and Territory Profiles." U.S. Small Business Administration, Washington, DC.

———. 2015, February 15. "SBA Announces New Online Tool to Match Lenders to Entrepreneurs." U.S. Small Business Administration, Washington, DC.

Yellen, Janet L. 2014, October 17. "Perspectives on Inequality and Opportunity from the Survey of Consumer Finances." Speech before the Conference on Economic Opportunity and Inequality hosted by the Federal Reserve Bank of Boston, Boston, MA.



## ADVISORY COUNCIL

GEORGE A. AKERLOF
Koshland Professor of Economics
University of California, Berkeley

ROGER C. ALTMAN
Founder & Executive Chairman
Evercore

KAREN ANDERSON
Principal
KLA Strategies

ALAN S. BLINDER
Gordon S. Rentschler Memorial Professor of
Economics & Public Affairs
Princeton University

JONATHAN COSLET
Senior Partner &
Chief Investment Officer
TPG Capital, L.P.

ROBERT CUMBY
Professor of Economics
Georgetown University

JOHN DEUTCH
Institute Professor
Massachusetts Institute of Technology

CHRISTOPHER EDLEY, JR.
The Honorable William H. Orrick, Jr.
Distinguished Professor; Faculty Director,
Chief Justice Earl Warren Institute on
Law & Social Policy
Boalt School of Law, University of California,
Berkeley

BLAIR W. EFFRON
Partner
Centerview Partners LLC

JUDY FEDER
Professor & Former Dean
McCourt School of Public Policy
Georgetown University

ROLAND FRYER
Henry Lee Professor of Economics
Harvard University
CEO, EdLabs

MARK T. GALLOGLY
Cofounder & Managing Principal
Centerbridge Partners

TED GAYER
Vice President &
Director of Economic Studies
The Brookings Institution

TIMOTHY GEITHNER
Former U.S. Treasury Secretary

RICHARD GEPHARDT
President & Chief Executive Officer
Gephardt Group Government Affairs

ROBERT GREENSTEIN
Founder & President
Center on Budget and Policy Priorities

MICHAEL GREENSTONE
The Milton Friedman Professor in Economics
Director, Energy Policy Institute at Chicago
University Of Chicago

GLENN H. HUTCHINS
Co-Founder
Silver Lake

JIM JOHNSON
Chairman
Johnson Capital Partners

LAWRENCE F. KATZ
Elisabeth Allison Professor of Economics
Harvard University

LILI LYNTON
Founding Partner
Boulud Restaurant Group

MARK MCKINNON
Former Advisor to George W. Bush
Co-Founder, No Labels

ERIC MINDICH
Chief Executive Officer & Founder
Eton Park Capital Management

SUZANNE NORA JOHNSON
Former Vice Chairman
Goldman Sachs Group, Inc.

PETER ORSZAG
Vice Chairman of Corporate and
Investment Banking
Citigroup, Inc.

RICHARD PERRY
Managing Partner &
Chief Executive Officer
Perry Capital

MEEGHAN PRUNTY EDELSTEIN
Senior Advisor
The Hamilton Project

ROBERT D. REISCHAUER
Distinguished Institute Fellow
& President Emeritus
The Urban Institute

ALICE M. RIVLIN
Senior Fellow, The Brookings Institution
Professor of Public Policy
Georgetown University

DAVID M. RUBENSTEIN
Co-Founder &
Co-Chief Executive Officer
The Carlyle Group

ROBERT E. RUBIN
Co-Chair, Council on Foreign Relations
Former U.S. Treasury Secretary

LESLIE B. SAMUELS
Senior Counsel
Cleary Gottlieb Steen & Hamilton LLP

SHERYL SANDBERG
Chief Operating Officer
Facebook

RALPH L. SCHLOSSTEIN
President & Chief Executive Officer
Evercore

ERIC SCHMIDT
Executive Chairman
Google Inc.

ERIC SCHWARTZ
76 West Holdings

THOMAS F. STEYER
Investor, Philanthropist, & Advanced Energy
Advocate

LAWRENCE SUMMERS
Charles W. Eliot University Professor
Harvard University

PETER THIEL
Technology Entrepreneur & Investor

LAURA D'ANDREA TYSON
Professor of Business Administration
and Economics; Director, Institute for
Business & Social Impact
Berkeley-Hass School of Business

MELISSA S. KEARNEY
Director

# Highlights

Michael Barr of the University of Michigan offers three proposals to lower the barriers for minority and women entrepreneurs, who represent a dynamic subset of business owners and a growing share of the workforce.

## The Proposal

**Access to Capital.** The federal government would expand two of its vehicles for providing financing to small businesses—the State Small Business Credit Initiative (SSBCI) and the New Markets Tax Credit. Both of these programs would have their application procedures adjusted to focus further on minority- and women-owned small businesses, and both would require rigorous data collection and evaluation as a condition for funding.

**Access to Business Networks.** Congress would allocate an additional $500 million as a part of the SSBCI to create and expand business networks in states and local jurisdictions. These networks would link small business owners with established business leaders, providing opportunities for exchange of knowledge and information about new business opportunities. Funded networks would be subject to rigorous evaluation.

**Access to Skill Development.** Congress would allocate an additional $500 million as a part of the SSBCI to fund locally administered skills-building  programs. These training initiatives would be designed with a focus on the needs and constraints of small business owners and aspiring entrepreneurs. Funded skills-building programs would be subject to rigorous evaluation.

## Benefits

Small businesses provide benefits to their owners and to the economy as a whole. Ownership of a small business can provide financial stability and economic mobility, and can reduce income inequality. Small businesses, especially young businesses, foster job growth and facilitate innovation. By removing obstacles to entrepreneurship, these proposals would unlock all these benefits and promote economic growth.



1775 Massachusetts Ave., NW
Washington, DC 20036

(202) 797-6484

BROOKINGS



# EXHIBIT 3

*The* Consumer Financial Protection *Bureau*

| | |
|---|---|
| To: | Chief Executive Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act |
| Re: | Section 1071 of the Dodd-Frank Act |
| Date: | April 11, 2011 |

This letter is being issued in response to multiple inquiries the Consumer Financial Protection Bureau ("CFPB" or "Bureau") has received regarding the timing of financial institutions' obligations under section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"). Section 1071 amends the Equal Credit Opportunity Act to require that financial institutions collect and report information concerning credit applications made by women- or minority-owned businesses and by small businesses.

As explained below, financial institutions' obligations under section 1071 do not go into effect until the Bureau issues necessary implementing regulations. The Bureau will act expeditiously to develop such rules in recognition that section 1071 is an important tool that will significantly bolster both fair lending oversight and a broader understanding of the credit needs of small businesses. Toward that end, we will gather input from interested parties, including nonprofit organizations, small business groups, and financial institutions. This rulemaking will be subject to notice-and-comment procedures, ensuring that the public will have a full opportunity to comment on the Bureau's proposed regulations.

Developing effective implementing regulations will be crucial to achieving Congress's objectives. Congress intended section 1071 to produce reliable and consistent data that can be analyzed by the Bureau, other government agencies, and members of the public to facilitate enforcement of fair lending laws and identify business and community development needs. Under an analogous regime established by the Home Mortgage Disclosure Act, the Board of Governors of the Federal Reserve System has issued detailed regulations and supporting materials that establish consistent definitions of terms; procedures for requesting information regarding race, ethnicity, and gender; information data fields to be collected; data coding protocols; and procedures for report formatting and transmittal.

Section 1071 becomes effective on the designated transfer date, which is July 21, 2011, and assigns the Bureau the responsibility to issue implementing regulations. In light of inquiries we have received regarding the timing of financial institutions' obligations under section 1071, we have reviewed the statutory text, purpose, and legislative history and conclude that that their obligations, including for information collection and reporting, do not arise until the Bureau issues implementing

regulations and those regulations take effect.  Given the sensitivity of the data at issue, we believe Congress intended that the Bureau first provide guidance regarding appropriate procedures, information safeguards, and privacy protections. Waiting to commence information collection until implementing regulations are in place will also ensure that data is collected in a consistent, standardized fashion that allows for sound analysis by the Bureau and other users of the data.  Moreover, this approach will conserve the resources of both the users of the data and of financial institutions, which would otherwise have to reprogram their systems needlessly.

In closing, this interpretation is dependent on the unique text, purpose, and legislative history of section 1071 and is therefore not necessarily applicable to any other provision of the Dodd-Frank Act or other Federal consumer financial law.

Sincerely,

Leonard J. Kennedy
General Counsel
Consumer Financial Protection Bureau

# EXHIBIT 4

DECEMBER 2012

# Fair Lending Report of the Consumer Financial Protection Bureau



# Message from Richard Cordray

## Director of the CFPB



On July 21, 2011, the Consumer Financial Protection Bureau was launched as the first government agency solely dedicated to consumer financial protection. This report on Fair Lending describes the **Bureau's efforts to build and implement our fair** lending program.

As the past few years have shown, financial products have the potential to wreak havoc on consumers and the wider economy. Far too often, unequal access to responsible credit can be at the root of these trends and problems. When a potential homeowner cannot get a home mortgage or a small business owner cannot obtain a loan for capital improvements, because of the neighborhood where the home or business is located, both the consumer and the community they belong to suffer.

The belief that each of us can better our lot in life **– that our children's future will be brighter than our own –** is deeply ingrained in the fabric of this country. Essential to that belief is the premise that each of us can access equality of opportunity, and that it is not limited only to a certain privileged set of Americans who are especially blessed by fortune or background. Too often, that equality of opportunity is harder to find than any of us would like or want to believe.

The CFPB is committed to making fair, equitable, and nondiscriminatory access to credit for both individuals and communities a reality. Through the leadership of the Office of Fair Lending and Equal Opportunity and the collaboration of various divisions and offices across the Bureau, we strive to make the financial markets work for consumers, honest businesses, and the economy as a whole. We will work to educate consumers about their fair lending rights, and we will warn them

about the costs and risks associated with financial products and services while working to improve the practices of financial institutions.

Dr. Martin Luther King, Jr. once said, "Our lives begin to end the day we become silent about things that matter." The Consumer Financial Protection Bureau is still in its infancy, but we are here today to say plainly that we will not be silent about discriminatory lending practices. Illegal discrimination in all of its forms is wrong, and it violates the fundamental American precept that each individual should have access to equality of opportunity. Our twin goals are to protect consumers and empower them to be able to protect themselves.

We are intent on making the financial markets work better for the people we serve. Consumers deserve to have someone who stands on their side and sees to it that they are treated fairly and equally in the financial marketplace.

Sincerely,

Richard Cordray

# Message from Patrice Alexander Ficklin



## Assistant Director for Fair Lending and Equal Opportunity

In mid-May 2011, I took my oath to serve as Assistant Director and lead the Office of Fair Lending and Equal Opportunity at the Consumer Financial Protection Bureau. Since that day, the Office of Fair Lending and Equal Opportunity has been hard at work to ensure that all consumers, regardless of protected status, have fair and equal access to credit. I am honored to serve as Assistant Director **for Fair Lending and Equal Opportunity and to share with you a progress report on the Bureau's** efforts in this important area, which is at the intersection of consumer financial protection and civil rights.

Having served as counsel to financial services providers and to civil rights and advocacy groups, my role as Assistant Director for Fair Lending at the Bureau is deeply informed by these varied perspectives. Because of my experience, I came to the Bureau well aware of the deep commitment to fair lending that is shared by a broad constituency of consumer advocates, civil rights groups, and many in industry as well. These experiences have also led me to embrace this opportunity as one that will allow a fresh look at ways that a federal agency with fair lending supervisory, enforcement, and rulemaking responsibilities can ensure compliance with the federal fair lending laws, while also promoting access to responsible credit for underserved markets and consumers.

I have the honor of leading a team with diverse expertise and perspectives. These experiences translate into innovative thinking and approaches to questions related to equal access to credit and fair lending that thousands of consumers face every day. In addition to our supervisory,

enforcement, and rulemaking activities, our outreach efforts have deployed CFPB team members across the country, to work with industry and advocacy groups on the promotion of fair lending compliance and education. Our work is informed by these collaborative partnerships and ongoing dialogue, and we remain committed to these efforts as a means to consistently review and reassess our perspectives on the consumer financial marketplace and access to credit.

**The Bureau's fair lending mission is not pursued in a vacuum.** We will continue to collaborate with federal and state partners to achieve efficient and effective outcomes for the benefit of consumers. The Bureau is also an active participant in several interagency fair lending efforts, and works closely with the various federal agencies charged with fair lending supervisory and enforcement responsibilities. As you will see in this Report, the Bureau now has responsibility for preparing the comprehensive fair lending reports to Congress that are prescribed by the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act. These reports are the result of coordination and collaboration with other federal partners.

As a 21st century agency, the Bureau communicates with consumers in varied ways – through **traditional means, including "Outside the Beltway" field hearings that are open to the public, and** also through the latest technologies. I have been enriched by the opportunity to interact with consumers, and I look forward to continued dialogue. We want to hear from consumers about their personal consumer finance stories, and we also want to ensure that they have the latest and best information available to make informed decisions about the financial products that are best suited **for their family's** needs.

I encourage you to visit our website, consumerfinance.gov, where consumers can learn about the next field hearing; understand their fair lending rights; ask the CFPB a question; tell their consumer **finance story through the "Tell Your Story" function; or read a blog entry about a current trend in** the consumer finance marketplace. Consumers can also follow the Bureau via our Twitter feed and tweet their voice on consumer financial issues to us.

I am **proud to present the Bureau's first Report on Fair Lending**.

Sincerely,

Patrice Alexander Ficklin

Patrice Alexander Ficklin

# Table of Contents

**Message from Richard Cordray** ...................................................................2

**Message from Patrice Alexander Ficklin** ......................................................4

**Executive Summary** ....................................................................................8

Fair Lending Mandate...............................................................................8

First Year Accomplishments .....................................................................10

Next Steps ............................................................................................. 11

**1.  Building and Implementing the CFPB's Fair Lending Program** ........12

1.1   Building the Office of Fair Lending  and Equal Opportunity ........... 13

**2.  First Year Accomplishments** ................................................................14

2.1   Using Fair Lending Supervisory Oversight and Enforcement to
Identify and Eliminate Consumer Harm .......................................... 14

2.2   Fair Lending Enforcement Activity ................................................. 16

2.3   Fair Lending Consumer Education and Engagement...................... 17

2.4   A Data-Driven Approach to Fair Lending – Collaboration with
Research, Markets, and Regulations ............................................... 19

2.5   Dodd-Frank Act Report to Congress on Private Student Loans .... 20

2.6   Amending Fair Lending Regulations .............................................25

3.  **Reporting on the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act** ....................................................................**27**

   3.1  Reporting on the Equal Credit Opportunity Act .............................27

   3.2  Reporting on the Home Mortgage Disclosure Act ..........................32

4.  **CFPB Outreach: Working with Private Industry, Fair Lending, Civil Rights, Consumer and Community Advocates**...................................**34**

   4.1  Private Industry Outreach ................................................................34

   4.2  Outreach to Fair Lending, Civil Rights, Consumer and Community Advocates........................................................................................35

5.  **Fair Lending Look Ahead** ....................................................................**38**

# Executive Summary

Endowed by Congress with a unique consumer financial protection mission, the Consumer Financial Protection Bureau (CFPB) brings a new focus to questions of fair lending and equal access to credit in the consumer finance marketplace.

In this inaugural Report on Fair Lending, the CFPB provides a comprehensive overview of our fair lending program and describes our work in this area from July 21, 2011 through July 20, 2012. Additionally, this Report fulfills congressional reporting requirements under the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) (§ 1013(c)(2)(D) of Public Law 111-203), the Equal Credit Opportunity Act (ECOA) (15 U.S.C. § 1691f),[1] and the Home Mortgage Disclosure Act (HMDA) (12 U.S.C. § 2807).

# Fair Lending Mandate

The Dodd-Frank Act vests the CFPB with specified supervisory, enforcement, and rulemaking authority with respect to a number of federal consumer financial laws, including ECOA and HMDA. ECOA has broad coverage, prohibiting discrimination in mortgage lending and a wide array of other types of lending, including auto finance, credit cards, business loans, and unsecured loans. HMDA requires that specified mortgage lenders annually collect and report mortgage lending data in order to determine whether institutions are serving the housing needs of their communities, to aid in targeting public investment, and to identify possible discriminatory lending patterns and enforce fair lending laws.

---

[1] The ECOA Report covers the period from July 21, 2011 through December 31, 2011.

In addition to responsibilities for ECOA and HMDA, Congress also charged the CFPB with addressing a number of fair lending-related areas of interest, set forth in the Dodd-Frank Act. These include:

- *Establishment of the Office of Fair Lending and Equal Opportunity.* Congress required the creation of the Office of Fair Lending and Equal Opportunity within the CFPB, and charged the office with ensuring that the CFPB provides "oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are enforced by the CFPB, including the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act." (Dodd-Frank Act § 1013(c)).

- *Rulemaking.* Congress mandated new rules under:

  - ECOA – to "facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses" (Dodd-Frank Act § 1071);

  - HMDA – to require mortgage lenders to collect and report additional data fields (Dodd-Frank Act § 1094); and

  - The Truth in Lending Act (TILA) (15 U.S.C. § 1602) – to "prohibit . . . abusive or unfair lending practices that promote disparities among consumers of equal credit worthiness but of different race, ethnicity, gender, or age" (Dodd-Frank Act § 1403).

- *Reports to Congress.* Congress mandated CFPB reports on topics that raise fair lending-related issues, including remittances, credit scoring, and reverse mortgages. In addition, Congress directed the CFPB to "examine, at a minimum . . . the underwriting criteria used by private education lenders, including the use of cohort default rate" and to examine whether federal regulators and the public have access to sufficient information to "determine lender compliance with fair lending laws" (Dodd-Frank Act § 1077). Finally, the Dodd-Frank Act transferred to the CFPB annual reporting responsibilities set forth in ECOA and HMDA.

# First Year Accomplishments

The Office of Fair Lending and Equal Opportunity, in conjunction with other CFPB offices, has **spent considerable time during the CFPB's first year addressing t**he priorities established in our mandate, and expects that some will remain priorities in the months and years to come. In addition to our Congressional directives, we have identified a number of other important areas to be addressed as the CFPB executes its fair lending mission. This includes ensuring the appropriate **breadth of the CFPB's fair lending supervision and enforcement activities, and specifically** addressing compliance by a range of financial services providers – including both banks and nonbanks – that offer a variety of loan products such as home mortgages, auto loans, student loans, credit cards, and small-business loans.

Our first-year accomplishments include:

- Establishment of the Office of Fair Lending and Equal Opportunity, and the recruitment of a diverse and highly-qualified fair lending team;

- **Commencement of the CFPB's fair lending supervision program, and completion of** various levels of fair lending reviews at dozens of bank and nonbank institutions offering a variety of lending products;

- **Commencement of the CFPB's fair lending enforcement program, and initiation of** fair lending investigations;

- Ongoing work on amendments to the regulation that implements HMDA, and planning for the amendments to regulations that implement ECOA and TILA;

- Completion of an empirical study and report to Congress on the use of cohort default rates in private education lending;

- Ongoing collaboration and coordination with federal and state partners; and

- Outreach to private industry as well as fair lending, civil rights, and consumer and community advocates through dozens of meetings and events in Washington, DC and across the country.

# Next Steps

The CFPB is committed to ensuring that all consumers and communities have fair and equal access to credit. We are **still in the process of building our fair lending program and expect the CFPB's** contribution to the work of ensuring compliance with fair lending laws and promoting access to credit will grow as our program progresses. We are also developing risk-based approaches to our **fair lending supervision and enforcement work to efficiently allocate the CFPB's resources in a** manner that provides the greatest benefit to consumers. As the CFPB and the Office of Fair Lending and Equal Opportunity mature, we pledge to continue to promote fair, equal, and nondiscriminatory access to credit and fair lending for all consumers and communities.

# 1. Building and Implementing the CFPB's Fair Lending Program

The Office of Fair Lending and Equal Opportunity plays a leading role in the CFPB's efforts to ensure fair, equitable, and nondiscriminatory access to credit for both individuals and communities. Our vision is a consumer finance marketplace where individuals and communities have fair and equal access to financial products and services, product pricing reflects risk and value, and terms and conditions are clear and nondiscriminatory. Because our mission intersects with that of many other offices within the CFPB, we are involved with initiatives in many areas of the CFPB's work.

Congress created the Office of Fair Lending and Equal Opportunity[2] in the Dodd-Frank Act.[3] The Office of Fair Lending is located within the Division of Supervision, Enforcement, and Fair Lending, which is headed by Associate Director Steven Antonakes. Within the Division, the Office of Fair Lending works closely with our supervision and enforcement counterparts to ensure that financial institutions supervised by the CFPB comply with federal fair lending laws and regulations over which the CFPB has jurisdiction. We provide guidance and support to large bank and nonbank examination teams to ensure that financial institutions' fair lending policies and practices are thoroughly examined and that concerns or violations are identified and addressed. We are also active in the CFPB's enforcement process and, together with our enforcement colleagues, lead the CFPB's fair lending enforcement program and priorities.

---

[2] Hereinafter referred to as the Office of Fair Lending.

[3] Pub. L. No. 111-203, tit. X, § 1013(c)(1), 124 Stat. 1376, 1970 (2010) (codified at 12 U.S.C. § 5493(c)(1)).

# 1.1   Building the Office of Fair Lending and Equal Opportunity

**To implement the CFPB's vision for the consume**r financial marketplace, Assistant Director Patrice Alexander Ficklin has assembled a diverse and highly-qualified fair lending team consisting of attorneys, law clerks, risk analysts, operations analysts, and administrative specialists. The team brings to the CFPB a vast array of expertise and experience, from the federal prudential regulators, the United States Department of Justice (DOJ), the United States Department of Housing and Urban Development (HUD), the Federal Trade Commission (FTC), state attorneys general offices, a local human relations commission, civil rights organizations, and financial services providers. This diverse group is unified by one common goal – a commitment to promoting fair lending and equal access to credit.

> *Access to credit is the ticket to a middle-class lifestyle, which typically requires loans to go to college, make everyday consumer purchases, buy a car, own a home, or to cope with temporary financial difficulties. Those who work to promote equal access to credit – whether in government, private practice, or within regulated institutions themselves – are truly advancing the current civil rights cause.*

Counsel, Office of Fair Lending and Equal Opportunity

# 2. First Year Accomplishments

The CFPB has many tools across several divisions – including the Division of Supervision, Enforcement, and Fair Lending; the Division of Research, Markets, and Regulations; and the Division of Consumer Education and Engagement – to fulfill its fair lending mission. Through close collaboration with CFPB partners, the Office of Fair Lending uses all the tools at its disposal, including supervision, enforcement, consumer education and engagement, the study of consumer financial markets, empirical research and analysis, and rulemaking to ensure that the **CFPB's** mission of promoting fair and equal access to credit is a reality for consumers and communities alike.

## 2.1  Using Fair Lending Supervisory Oversight and Enforcement to Identify and Eliminate Consumer Harm

On October 13, 2011, the CFPB released its Supervision and Examination Manual, which was the culmination of months of work by many offices within the CFPB, including the Office of Fair Lending. The Manual is a guide to how the CFPB will supervise and examine consumer financial services institutions under its jurisdiction for compliance with the Federal consumer financial laws. The Manual contains supervisory guidance on ECOA and HMDA. On April 18, 2012, the CFPB

issued a Compliance Bulletin on Fair Lending that addressed lending discrimination.[4]  The Bulletin stated that "[c]onsistent with other federal supervisory and law enforcement agencies, the CFPB reaffirms that the legal doctrine of disparate impact remains applicable as the Bureau exercises its supervision and enforcement authority to enforce compliance with the **ECOA and Regulation B.**"[5]

**The CFPB's supervision program assesses large ba**nk and nonbank compliance with Federal consumer financial laws and regulations. CFPB-supervised entities include banks, thrifts, and credit unions with assets over $10 billion, and their affiliates and service providers, as well as nonbank financial services providers such as mortgage lenders and brokers, payday lenders, private education lenders, and their service providers. **In the CFPB's supervision of large ban**ks and nonbank financial entities, we are committed to conducting examinations that focus on risk to consumers and place the highest importance on identifying any violations of Federal consumer financial laws and eliminating any resulting harm to consumers. We also expect that regulated **entities under the CFPB's jurisdiction will have effective compliance management systems,** including effective *fair lending* compliance management systems, which are adapted to the **institution's business strategy and operation**.

Thus far in fiscal year 2012, the Office of Fair Lending has supported CFPB examiners in activities at dozens of institutions – both bank and nonbank. These activities ranged from assessments of the institutions' fair lending compliance management systems to in-depth reviews of products or activities that may pose heightened fair lending risks to consumers.

The Office of Fair Lending has led efforts to train CFPB examiners on the federal fair lending laws, and developed procedures to assist these examiners in the identification of potential fair lending violations. **As part of the CFPB's new employee orientation program, every examiner joining the** CFPB receives fair lending training, which was developed and is conducted by the Office of Fair Lending. In addition, attorneys from the Office of Fair Lending periodically brief regional examination teams on fair lending topics and provide updates on fair lending trends and issues observed through examinations. In June 2012, the CFPB launched its Fair Lending Examination

---

[4] CFPB Bulletin 2012-04 (Fair Lending) (Apr. 18, 2012), *available at*
http://files.consumerfinance.gov/f/201404_cfpb_bulletin_lending_discrimination.pdf.

[5] CFPB Bulletin, *supra* note 4, at 1.

Techniques training program, a two-week course that was developed through close collaboration among the Offices of Fair Lending, Large Bank and Nonbank Supervision, and others. The course is designed to provide additional in-depth training to CFPB examiners and is a prerequisite to the **CFPB's examiner commissioning process**.



Assistant Director Patrice Alexander Ficklin, CFPB Deputy Director Raj Date, and Nonbank Supervision Assistant Director Peggy Twohig participate in a field hearing on payday lending in Birmingham, AL.

# 2.2  Fair Lending Enforcement Activity

The CFPB has many tools available to promote fair and nondiscriminatory treatment of consumers, including the authority to bring enforcement actions. The CFPB has the ability to conduct investigations, file administrative complaints, and hold hearings and adjudicate claims through the **CFPB's administrative enforcement process**. The CFPB has independent litigating authority and can therefore file cases in federal court alleging violations of **fair lending laws under the CFPB's** jurisdiction. The CFPB will also refer findings of certain ECOA violations to the DOJ. The CFPB coordinates closely not only with the DOJ, but also with other federal enforcement agencies and state regulators, including the FTC, HUD, and state attorneys general, to ensure that fair lending enforcement efforts are consistent, efficient, and effective.

The Offices of Fair Lending and Enforcement work closely and collaboratively on investigations that may involve fair lending issues, in order to leverage the expertise of the respective offices toward the goal of effective enforcement of fair lending laws. **The CFPB's Fair Lending and Enforcement offices have a number of pending fair lending investigations, including matters a**rising from the CFPB's supervisory activity and joint investigations with other federal agencies. While the details of ongoing **investigations are confidential, the CFPB's conclusions will typically be made public if an** enforcement action is filed at the conclusion of an investigation.

The Office of Fair Lending has developed and conducted training courses for enforcement attorneys on fair lending issues as well.

# 2.3   Fair Lending Consumer Education and Engagement

**Central to the CFPB's work is consumer** education and engagement. The Dodd-Frank Act established the Office of Financial Education, which is vested with the responsibility of developing and implementing initiatives intended to educate and empower consumers to make better financial decisions.[6]  The Offices of Fair Lending and Financial Education work together to educate consumers and promote awareness of federal fair lending laws, such as ECOA, with the goal of helping consumers recognize prohibited practices and protect themselves from discriminatory acts. **For example, in a brochure released in May 2012, entitled "Credit Discrimination is Illegal,"** **consumers are advised about ECOA's protections, warning signs of discrimination, and how to** protect themselves by being active, engaged consumers. More information is available at consumerfinance.gov/fair-lending/.

---

[6] Dodd-Frank Act, § 1013(d)(1).

As a 21st century agency, the CFPB uses both traditional resources, such as its "Credit Discrimination is Illegal" brochure; and social media connections, including a post by Assistant Director Ficklin titled "Fair Notice on Fair Lending"[7] and other blog entries, to reach and engage consumers. Because educated consumers are the first line of defense against discriminatory practices, consumer education in fair lending and access to credit matters is and will remain essential to achieving the CFPB's fair lending mission.



---

[7] Patrice Ficklin, Fair Notice on Fair Lending, Consumer Financial Protection Bureau (Apr. 18, 2012), *available at* http://www.consumerfinance.gov/blog/fair-notice-on-fair-lending/.

## 2.4   A Data-Driven Approach to Fair Lending – Collaboration with Research, Markets, and Regulations

The Division of Research, Markets, and Regulations brings together Ph.D. economists, financial industry experts, and experienced attorneys to lead the CFPB's efforts to articulate informed perspectives about current issues in consumer financial markets. Each of these offices plays an integral role in the CFPB's mission of ensuring equal access to credit.

The Office of Research includes dedicated fair lending research staff who conduct empirical fair lending analyses in connection with the CFPB's supervisory and enforcement activities, as well as special projects and initiatives. Together we have developed and continue to develop tools that allow the CFPB to identify areas of heightened fair lending risk and promote efficiency in our supervisory and enforcement efforts.



CFPB Director Richard Cordray and CFPB Deputy Director Raj Date take questions from the audience at the field hearing on payday lending in Birmingham, AL.

The various Markets offices are organized by product area and are charged with providing guidance on, and analysis of, specific consumer financial services markets. The offices also participate in the

development and analysis of consumer protection policy options in a variety of areas that are relevant to fair lending and access to credit matters. These areas are Mortgage and Home Equity Markets; Card and Payment Markets; Installment and Liquidity Lending Markets; and Deposits, Collections, and Credit Information Markets. Information on market trends relating to fair lending is then fed into other aspects of t**he CFPB's work in fair lending**. For example, the Office of Fair Lending worked closely with the Office of Installment and Liquidity Lending Markets and the Office **of Research this year to respond to Congress'**s request that the CFPB examine and report on a series of questions related to private education loans and private educational lenders. A detailed description of this study and our conclusion follows.

# 2.5  Dodd-Frank Act Report to Congress on Private Student Loans

On July 20, 2012, the CFPB and the Department of Education (DOE) submitted a report to Congress on Private Student Loans (PSL),[8] responding to the Dodd-**Frank Act's** mandate that the agencies discuss:

- [T]he underwriting criteria used by private educational lenders, including the use of cohort default rate (as such term is defined in section 435(m) of the Higher Education Act of 1965);

- [W]hether Federal regulators and the public have access to information sufficient to provide them with assurances that private education loans are provided in accord wi**th the Nation's fair lending laws and that allows public officials to determine lender** compliance with fair lending laws; and

- [A]ny statutory or legislative recommendations necessary to improve consumer protections for private education loan borrowers and to better enable Federal

---

[8] Consumer Financial Protection Bureau and the Department of Education, Private Student Loans (2012), *available at* http://files.consumerfinance.gov/f/201207_cfpb_Reports_Private-Student-Loans.pdf.

regulators and the public to ascertain private educational lender compliance with fair lending laws.[9]

In addition to an in-depth discussion of the private student lending market, products, and consumers, the report also considered fair lending compliance in the PSL market. In particular, the report examined the eligibility, underwriting, and pricing criteria used by private educational lenders, with a specific focus on the use of cohort default rate.

## 2.5.1  COHORT DEFAULT RATE

Cohort default rate (CDR) is a measure of the federal student loan repayment history of a particular group or "cohort" of borrowers. The CDR is the percentage of each post-secondary school's borrowers entering repayment on federal student loans in a particular two-year period who default prior to the end of that period.

CDR is one tool used for determining a school's eligibility for federal student loan programs. The DOE removes a school's eligibility for these programs when the institution's three most recent CDRs are above 25%, or where the most recent CDR is greater than 40%. The DOE uses CDR as an eligibility cutoff at these relatively high levels because CDR is intended to be used as a broad measure to evaluate the risk to taxpayers of guaranteeing loans at a particular school. CDR was not specifically intended to assist private lenders in eligibility, underwriting, and pricing decisions,[10] particularly at much lower levels of default (e.g., under 8%). However, CDR has been used by private student lenders as a proxy for a student's likelihood of repaying debt.

## 2.5.2  USE OF CDR BY PRIVATE STUDENT LENDERS

The CFPB received information from nine of the largest private student lenders about how they use CDR and other institution-based criteria to determine a student's eligibility[11] for their loan

---

[9] *See* Dodd-Frank Act, § 1077.

[10] *See* Ass'n of Accredited Cosmetology v. Alexander, 979 F.2d 859, 861 (D.C. Cir. 1992); see also S. Rep. No. 102–58 (1991).

[11] The term "eligibility" refers to whether a lender accepts applications from a particular postsecondary school's students. In other words, if a lender set its eligibility cutoff at a CDR of 8%, then students from those schools with a

programs, as well as underwriting and pricing. We found that the primary use of CDR by the sample lenders is to set school eligibility cutoffs: in fact, a majority reported relying almost exclusively on CDR to set their school eligibility cutoffs,[12] with eligibility cutoffs between 6% and 12%.[13]  A few lenders also reported using CDR as part of, if not the primary consideration in, underwriting and pricing decisions; however, most reported using traditional, individually-applied criteria, such as minimum credit score, debt-to-income ratio, etc.

## 2.5.3  FAIR LENDING IMPLICATIONS OF CDR

The use of CDR at very low default levels is a fair lending concern because racial and ethnic minority students are disproportionately concentrated in schools with higher CDRs.[14]  For instance, we found that African American students attending public four-year institutions were almost four times more likely than students generally to attend schools with a CDR above 8%.

Hispanic students attending private four-year institutions were over seven times more likely than students generally to attend schools with a CDR above 8%.[15,16]  Accordingly, use of CDR to

---

rate at or below 8% would be eligible to be considered for a loan, whereas students from schools with a rate above 8% could not receive a loan, regardless of any particular student's creditworthiness (or that of his or her co-applicant).

[12] Most lenders who provided data also reported reliance on other nominal criteria such as requiring that a school be Title IV eligible, be located in the United States or Canada, and have had no sanctions imposed by the DOE related to financial, administrative, or loan performance reasons. Some lenders reported that they except Historically Black Colleges and Universities.  Additionally, a few lenders reported setting eligibility cutoffs using CDR in conjunction with other factors such as internal portfolio performance, while others have phased out this particular use of CDR and replaced it with a school's graduation rate (which we note may raise similar fair lending concerns).

[13] We note that some lenders had substantially more generous cutoffs.

[14] To analyze the relationship between CDR and schools' racial and ethnic demographics we studied 2007, 2008, and 2009 Integrated Post-Secondary Educational System data on school characteristics and enrollment, including statistics on race and ethnicity, with the DOE's official CDRs from 2007, 2008, and 2009. Due to the two-year nature of the statistic, 2007, 2008, and 2009 are the three most recent CDR datasets available as of the writing of the CFPB's July report.

[15] We carried out a regression analysis with CDR as the dependent variable and various racial and ethnic demographic categories as the explanatory variables. This analysis confirmed the results discussed above as it found that CDR was positively correlated with the percentage of minority students enrolled at postsecondary schools.

determine loan eligibility, underwriting, and pricing may have a disparate impact on minority students by reducing their access to credit and requiring those minority students who do meet the **lenders' eligibility thresholds to pay higher rates than are otherwise available to similarly** creditworthy non-Hispanic White students at schools with lower CDRs.

---

[16] We tested the 8% cutoff because it is the most common CDR cutoff used by the lenders who provided data, not because it has any obvious intrinsic predictive value.

**TABLE 1:** AVERAGE RACIAL AND ETHNIC DEMOGRAPHICS ABOVE AND BELOW 8%, BY SCHOOL TYPE, 2008-2009 ACADEMIC YEAR

| | Demographic Distribution Below 8% | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Male** | **Female** | **White** | **Hispanic** | **Black** | **American Indian** | **Asian** |
| | % | % | % | % | % | % | % |
| All | 44.0% | 56.0% | 60.5% | 9.3% | 10.0% | 0.8% | 6.6% |
| | | | | | | | |
| Public 4-Year | 45.5% | 54.5% | 63.9% | 8.7% | 8.3% | 0.8% | 7.2% |
| Private Not-for-Profit-4-Year | 42.6% | 57.4% | 60.6% | 6.5% | 8.8% | 0.6% | 6.0% |
| Private for-Profit-4-Year | 39.0% | 61.0% | 46.5% | 7.9% | 20.8% | 0.7% | 3.9% |
| Public 2-Year | 43.0% | 57.0% | 51.3% | 15.4% | 16.9% | 1.3% | 6.6% |
| Private Not-for-Profit-2-Year | 28.3% | 71.7% | 63.8% | 16.2% | 10.9% | 0.3% | 3.3% |
| Private for-Profit-2-Year | 37.6% | 62.4% | 47.3% | 23.9% | 15.0% | 0.9% | 4.1% |
| Public Less-than-2-Year | 44.8% | 55.2% | 44.0% | 33.3% | 11.7% | 4.3% | 4.3% |
| Private Not-for-Profit, Less-than-2-Year | 32.5% | 67.5% | 46.3% | 22.5% | 20.3% | 0.5% | 4.0% |
| Private for-Profit, Less-than-2-Year | 20.1% | 79.9% | 40.8% | 26.4% | 19.2% | 0.5% | 3.4% |

| | Demographic Distribution Above 8% | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Male** | **Female** | **White** | **Hispanic** | **Black** | **American Indian** | **Asian** |
| | % | % | % | % | % | % | % |
| All | 41.2% | 58.8% | 49.4% | 17.0% | 16.7% | 1.0% | 4.7% |
| | | | | | | | |
| Public 4-Year | 40.8% | 59.2% | 46.6% | 17.7% | 25.1% | 1.4% | 2.7% |
| Private Not-for-Profit-4-Year | 39.9% | 60.1% | 33.9% | 33.2% | 23.9% | 0.7% | 1.2% |
| Private for-Profit-4-Year | 35.2% | 64.8% | 33.4% | 10.5% | 23.3% | 0.8% | 2.4% |
| Public 2-Year | 43.1% | 56.9% | 55.0% | 15.6% | 12.4% | 1.0% | 5.9% |
| Private Not-for-Profit-2-Year | 37.6% | 62.4% | 41.5% | 17.9% | 22.3% | 0.5% | 4.8% |
| Private for-Profit-2-Year | 36.1% | 63.9% | 37.7% | 20.8% | 24.2% | 0.8% | 3.2% |
| Public Less-than-2-Year | 35.7% | 64.3% | 70.8% | 5.1% | 19.8% | 1.0% | 1.0% |
| Private Not-for-Profit, Less-than-2-Year | 54.8% | 45.2% | 12.8% | 58.9% | 20.7% | 0.3% | 6.9% |
| Private for-Profit, Less-than-2-Year | 28.0% | 72.0% | 30.2% | 31.3% | 26.4% | 0.6% | 2.6% |

Source: IPEDS 2009 and PEPS. Data are reported for the 50 States, D.C., Puerto Rico, and the territories.

While we were mindful that our analysis used aggregate data – and we were therefore prevented **from drawing conclusions about any specific lender's practice –** we were able to generally conclude **that lenders' consideration of CDR in either school eligibility or under**writing and pricing criteria may reduce credit access and increase costs disproportionately for minority borrowers. Accordingly, use of CDR may require further analysis by lenders to ensure compliance with fair lending laws.

Federal student loans are generally a better choice for consumers than PSL. However, the availability of such loans is statutorily limited and they do not cover the full cost of attendance at many schools. Accordingly, PSL can be an important consumer financial product and lenders that offer the product must do so **in accordance with the nation's fair lending laws**.

The CFPB will continue to work with federal partners, industry, and consumer advocates to explore means through which fair lending risk in private student lending can be mitigated, given the unique underwriting challenges presented.

# 2.6   Amending Fair Lending Regulations

The Dodd-Frank Act transferred rulemaking authority under ECOA and HMDA to the CFPB.[17]  The **CFPB published its restatements of ECOA's implementing regulation, Regulation B, and HMDA's** implementing regulation, Regulation C, in interim final rules in December 2011.[18]

Section 1071 of the Dodd-Frank Act amended ECOA to require financial institutions to collect and report to the CFPB data on lending to small, minority-, and women-owned businesses in order to **"facilitate the enforcement of fair lending laws and enable communities, governmental entities, and** creditors to identify business and community development needs and opportunities of women-owned, minority-**owned, and small businesses."**[19]  The Dodd-Frank Act also directed the CFPB to prescribe rules and guidance as necessary to carry out, enforce, and compile data pursuant to that

---

[17] *See* Dodd-Frank Act, §§ 1002(12), (14), and 1022.

[18] Equal Credit Opportunity (Regulation B), 76 Fed. Reg. 79,442 (Dec. 21, 2011) (codified at 12 C.F.R. pt. 1002): Home Mortgage Disclosure Act (Regulation C), 76 Fed. Reg. 78,465 (Dec. 19, 2012) (codified at 12 C.F.R. pt. 1003).

[19] Dodd-Frank Act, § 1071(a).

section. In April 2011, the CFPB issued guidance stating that the data collection and submission obligations arising under these ECOA amendments do not arise until the CFPB issues implementing regulations.[20]

The CFPB has begun the planning process to promulgate rules concerning small, minority-, and women-owned business loan data collection and reporting. We are currently gathering information from stakeholders to better understand the relevant business lending markets, and to determine what data are available and how best to collect those data. The CFPB has also been in dialogue with a number of interested governmental stakeholders about this issue, including the DOJ, the Department of Commerce, the Department of Treasury, the Small Business Administration, and the Board of Governors of the Federal Reserve System (FRB).

Section 1094 of the Dodd-Frank Act amends HMDA to require the collection and submission of additional data fields related to mortgage loans, including certain applicant, loan, and property characteristic**s, as well as "such other information as the Bureau may require."**[21]  The CFPB is examining what changes it may propose to Regulation C. As required under the Dodd-Frank Act, **the CFPB will ensure the protection of mortgage applicants' and mortgagors' privacy** interests in the disclosure of any additional data fields to the public under HMDA.[22]  A discussion of the prescribed amendments to Regulation C follows, in the HMDA Report section of this Report to Congress.

Finally, section 1403 of the Dodd-Frank Act requires that the CFPB prescribe regulations under TILA **to prohibit "abusive or unfair lending practices that promote disparities among consumers of** equal credit worthiness but of different race, ethnicity, gender or age."[23]  The CFPB has begun preliminary planning with regard to this rule.

---

[20] Letter from Leonard Kennedy, CFPB General Counsel, to Chief Executive Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act (Apr. 11, 2011), *available at* http://files.consumerfinance.gov/f/2011/04/GC-letter-re-1071.pdf.

[21] Dodd-Frank Act, § 1094(3).

[22] *See* Dodd-Frank Act, § 1022(C)(8).

[23] Dodd-Frank Act, § 1403.

# 3. Reporting on the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act

## 3.1  Reporting on the Equal Credit Opportunity Act

Prior to the passage of the Dodd-Frank Act, the FRB was required under ECOA to file an annual report to Congress describing the administration of its functions under ECOA, an assessment of the extent to which compliance with ECOA has been achieved, and a summary of enforcement actions taken by other agencies with responsibilities under ECOA. On the CFPB's designated transfer date of July 21, 2011, the FRB's responsibility for this report was transferred to the CFPB.[24] This part of the CFPB's Fair Lending Report will provide the information required by ECOA: first, it will describe the CFPB's and other agencies' enforcement efforts and assessment of the extent of compliance with ECOA; then, it will summarize the outreach efforts of the various agencies charged with responsibility under ECOA. This ECOA report will cover the period between July 21, 2011, and December 31, 2011; future reports will encompass an entire calendar year.

---

[24] *See* 15 U.S.C. § 1691f.

## 3.1.1  ECOA ENFORCEMENT

Several federal government agencies, including the CFPB, have administrative enforcement authority under ECOA. ECOA makes it illegal for a creditor to discriminate in any aspect of a credit transaction against any applicant on the basis of race, color, national origin, religion, sex, marital status, age (so long as the applicant is old enough to enter into a binding contract), receipt of income from any public assistance program, or exercising in good faith a right under the Consumer Credit Protection Act.

As discussed in Part II, the CFPB is committed to ensuring that the institutions under its jurisdiction comply with ECOA. **The CFPB's efforts related to EC**OA, as prescribed by the Dodd-Frank Act, and the enforcement efforts and compliance assessments made by all the agencies assigned enforcement authority under section 704 of ECOA[25] are discussed in this section.

## 3.1.2  PUBLIC ENFORCEMENT ACTIONS

In addition to the CFPB, the agencies charged with enforcement of ECOA under section 704 include: the FRB, the Federal Deposit Insurance Corporation (FDIC), the Office of the Comptroller of the Currency (OCC), and the National Credit Union Administration (NCUA) (collectively the Federal Financial Institutions Examination Council agencies or FFIEC agencies);[26] the FTC, the Farm Credit Administration (FCA), the Department of Transportation (DOT), the Securities and Exchange Commission (SEC), the Small Business Administration (SBA), and the Grain Inspection, Packers and Stockyards Administration of the Department of Agriculture (GIPSA).[27] During the reporting period, from July 21, 2011 through December 31, 2011, the FDIC filed one public ECOA

---

[25] 15 U.S.C. § 1691c.

[26] The FFIEC is a "formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions" by the member agencies listed above and the State Liaison Committee "and to make recommendations to promote uniformity in the supervision of financial institutions." *See* http://www.ffiec.gov/.

[27] 15 U.S.C. § 1691c.

enforcement action.[28]

## 3.1.3  VIOLATIONS CITED DURING ECOA EXAMINATIONS

Of the institutions examined, the FFIEC agencies reported that the most frequently cited Regulation
B violations were:

**TABLE 2:** MOST FREQUENTLY CITED REGULATION B VIOLATIONS BY FFIEC AGENCIES

| FFIEC Agencies Reporting | Regulation B Violations |
|---|---|
| CFPB, FRB, FDIC, OCC, NCUA | 12 C.F.R. § 1002.4 – Discrimination on a prohibited basis in a credit transaction.<br><br>12 C.F.R. § 1002.5(b) – Improperly requesting information about race, color, religion, national origin, or sex.<br><br>12 C.F.R. § 1002.13(a) and (b) – Failure to collect information about applicants seeking credit primarily for the purchase or refinancing of a principal residence, including applicant race, ethnicity, sex, marital status, and age, for monitoring purposes.<br><br>12 C.F.R. § 1002.9 (a)(2) and (b)(2) – Failure to provide sufficient information, including specific reasons for adverse action, in adverse action notification.<br><br>12 C.F.R. § 1002.7(d)(1) – Improperly requiring a borrower to obtain the signature of a spouse or other person in order to be considered for credit approval. |

---

[28] Because the authorities under the Dodd-Frank Act transferred to the CFPB on July 21, 2011, this report's reporting period is July 21, 2011, through December 31, 2011. The FTC reported for the entire calendar year 2011 and reported a public enforcement action in April 2011. This action is not reported here because it is outside of the time period of this report. Similarly, the FRB reported that a referral made to the DOJ prior to the time period covered by this report, led to a public enforcement action by the DOJ in December 2011. For more information about that action, please see http://www.justice.gov/opa/pr/2011/December/11-ag-1694.html.

Of the remaining agencies, only the FCA conducted examinations and reported results. The Regulation B violations most frequently cited by the FCA were:

**TABLE 3:** MOST FREQUENTLY CITED REGULATION B VIOLATIONS BY OTHER ECOA AGENCIES

| Other ECOA Agencies | Regulation B Violations |
|---|---|
| FCA | 12 C.F.R. § 1002.9 – Failure to provide timely adverse action notices, incomplete documentation to support the adverse action taken, or failing to give specific reasons for adverse actions taken.<br><br>12 C.F.R. § 1002.13(b) – Failure to complete voluntary monitoring forms when borrower chose not to provide requested information regarding ethnicity, race, and sex. |

The DOT, GIPSA, the SBA, and the SEC reported that they received no complaints based on ECOA or Regulation B. The FTC is an enforcement agency and does not conduct compliance examinations.

## 3.1.4   REFERRALS TO THE DEPARTMENT OF JUSTICE

Three FFIEC agencies referred a total of 12 matters to the DOJ during the reporting period. These matters alleged discriminatory treatment of persons in credit transactions due to race, national origin, age, or marital status.

## 3.1.5   INTERAGENCY OUTREACH RELATED TO ECOA

The FFIEC agencies all report substantial outreach and interagency activity aimed at ensuring **creditors' compliance with ECOA and Regulation B**, and that fair lending laws are enforced in a consistent and fair manner.

The CFPB, along with the DOJ, HUD, the FRB, and the National Association of Attorneys General serves as co-chair of **the Federal Financial Fraud Enforcement Task Force's Non**-Discrimination Working Group, with Assistant Director Ficklin representing the CFPB. The Financial Fraud Enforcement Task Force was established in November 2009 by an Executive Order to strengthen the efforts of the DOJ **in conjunction with federal, state, and local agencies "to investigate and**

prosecute significant crimes and other violations relating to the . . . financial crisis and economic recovery efforts, recover the proceeds of such financial crimes and violations, and ensure just and **effective punishment of those who perpetuate financial crimes and violations."**[29] The Task Force brings together representatives from law enforcement agencies, regulatory authorities, inspectors general, and state attorneys general in order to combat financial fraud. This interaction fosters high level discussions among relevant stakeholders about policies, procedures, rulemakings, and other major initiatives. **The Task Force's Non**-Discrimination Working Group in particular is dedicated to improving efforts to detect and eliminate discrimination in the lending and financial markets.

**The FRB took a lead role in the Working Group's effort to analyze data on the Department of Treasury's Home Affordable Modification Pro**gram for evidence of potential discrimination by participating servicers. The Working Group sponsored a field hearing in San Francisco in the fall of 2011, providing outreach to local housing organizations, community groups, and financial institutions.  In addition, on November 2, 2011, the FRB hosted an interagency webinar, *Fair Lending Issues and Hot Topics*, along with the CFPB, the OCC, the DOJ, HUD, the NCUA, and the FDIC. Over 6,000 registrants participated in the webinar, which included presentations on redlining, fair lending exams, maternity leave discrimination, broker compensation, and unsecured consumer loans.

The CFPB, HUD, the DOJ, the OCC, the FRB, the FDIC, the Federal Housing Finance Agency, the NCUA, and the FTC participate in the Federal Interagency Task Force on Fair Lending to discuss and coordinate fair lending activities. The Task Force meets bimonthly to share information and views on emerging fair lending issues.

The CFPB also belongs to a working group of federal agencies – with the DOJ, HUD, and the FTC – that regularly meets to discuss fair lending enforcement. These regular discussions are designed to ensure that enforcement efforts are well-coordinated. Additionally, the CFPB is part of the FFIEC Subcommittee on HMDA and the Community Reinvestment Act (CRA). The purpose of this subcommittee is to encourage the discussion of issues pertaining to the collection and processing of HMDA and CRA data, which financial institutions are legally obligated to report.

---

[29] Exec. Order No. 13519, 74 Fed. Reg. 60,123 (Nov. 17, 2009).

In addition, several FFIEC agencies participated in meetings, conferences, and trainings throughout the country. Outreach efforts included meetings with consumer advocates, civil rights groups, supervised institutions, and industry representatives. The **CFPB's fair lending o**utreach is described in detail later in this Report.

# 3.2   Reporting on the Home Mortgage Disclosure Act

**The CFPB's HMDA reporting requirement**[30] calls for the CFPB, in consultation with HUD, to report annually on the utility of itemizing certain mortgage loan data.[31] Like the reporting requirement under ECOA, the HMDA reporting requirement was transferred from the FRB to the CFPB pursuant to the Dodd-Frank Act. **The CFPB's reporting on HMDA, made in consultation with HUD,** is presented here.

Congress enacted HMDA in 1975 in response to Congressional findings indicating that some depository institutions had at times contributed to the decline of certain geographic areas by failing to provide adequate housing financing on reasonable terms and conditions. HMDA and its implementing regulation, Regulation C, require the collection and reporting of loan-level mortgage data by certain financial institutions, including banks, savings associations, credit unions, and other mortgage lending institutions. The data include, for example, the total number and dollar volume of mortgage applications and resulting mortgage loans and, for each application, the action taken by the creditor; the location of the property to be mortgaged; the race, ethnicity, and gender of each applicant; and the income relied on in the application.

Regulation C states three purposes of HMDA served by the collection and reporting of these data. First, these data help in determining whether financial institutions are serving the housing finance needs of their communities.[32] These data are also relevant to reviewing certain ins**titutions'**

---

[30] *See* 12 U.S.C. § 2807.

[31] 12 U.S.C. § 2803(b)(4).

[32] 12 C.F.R. § 1003.1(b)(1)(i).

obligations under the CRA. Second, the data can be used to assist public officials in the distribution of public-sector investment, so as to attract private investment to areas that need it most.[33] Third, the mortgage loan data submitted under HMDA are used to assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes,[34] including ECOA and the Fair Housing Act.[35]

The Dodd-Frank Act transferred HMDA rulemaking authority from the FRB to the CFPB[36] and expanded the scope of the data that must be collected and submitted under HMDA. Section 1094 of the Dodd-Frank Act amended HMDA to require HMDA-reporting entities to collect and report a number of new data elements, including elements related to additional loan, applicant, and property characteristics, as well as to allow the CFPB to require the collection and reporting of "such other information as the Bureau may require."[37]  At present, the CFPB's efforts to implement these changes are in the pre-rule stage.

---

[33] 12 C.F.R. § 1003.1(b)(1)(ii).

[34] 12 C.F.R. § 1003.1(b)(1)(iii).

[35] 42 U.S.C. § 3601 *et seq.*

[36] *See* Dodd-Frank Act, §§ 1061 and 1094.

[37] Dodd-Frank Act, § 1094(3).

# 4. CFPB Outreach: Working with Private Industry, Fair Lending, Civil Rights, Consumer and Community Advocates

## 4.1  Private Industry Outreach

As one of its core functions, the Office of Fair Lending is responsible for "working with private industry . . . on the promotion of fair lending compliance and education."[38] Consequently, the CFPB regularly engages with representatives from private industry – including financial services providers, fair lending compliance specialists, and regulatory attorneys – at conferences, meetings, colloquia, and roundtables throughout the country. The CFPB seeks to engage stakeholders with an interest in fair lending, with the understanding that there is much insight to be gained from varied perspectives that represent many distinct points of view. In this spirit, the CFPB frequently meets with private industry. These interactions have allowed the CFPB to learn about emerging fair lending and regulatory issues, convey the CFPB's regulatory compliance expectations, and promote fair lending compliance and education pursuant to Congress's direction.

---

[38] Dodd-Frank Act., § 1013(c)(2)(C).

Since July 2011, the CFPB has participated in numerous formal events with a fair lending focus; additional engagements with private industry are being planned. The CFPB has addressed trade associations, several leading industry law firms, executives from leading consulting compliance firms, and state banking associations as well as senior officials at banks and nonbanks subject to the **CFPB's jurisdiction**. In addition, Assistant Director Ficklin and senior fair lending staff regularly answer questions from industry counsel, bank representatives, and fair lending specialists about CFPB examinations, enforcement actions, and interagency coordination; similarly, staff attorneys in the Office of Regulations regularly answer questions from the same stakeholders about the correct interpretation of fair lending regulations and application to their business practices.

# 4.2  Outreach to Fair Lending, Civil Rights, Consumer and Community Advocates

As a civil rights-oriented office within the CFPB, the Office of Fair Lending works with "fair lending, civil rights, [and] consumer and community advocates" to promote fair lending compliance and education.[39]  These engagements take place throughout the country in government offices, places of worship, community meeting spaces, at CFPB headquarters, and via teleconference or videoconference. Consumer advocates communicate directly with the CFPB, and the CFPB learns about emerging fair lending issues from these groups that have regular interactions with the consumers they serve.

---

[39] Dodd-Frank Act § 1013(c)(2)(C).



Office of Fair Lending and Equal Opportunity Assistant Director Patrice Alexander Ficklin, along with other members of the CFP**B's leadership, speak at the National Community Reinvestment Coalition's** annual conference.

During the past year, CFPB staff traveled throughout the country to meet with groups focused on fair lending issues; since July 2011, Fair Lending staff members participated in several dozen such events. The Office of Fair Lending regularly meets with civil rights organizations as well as consumer and community advocates.

In April 2012, which the CFPB recognized as Fair Housing and Fair Lending Month, Director Cordr**ay delivered a keynote address announcing the CFPB's release of a Compliance Bulletin** regarding fair lending, discussed in Part II. In support of this focus, the CFPB released an informative brochure and blog post that empower consumers to protect themselves from credit discrimination. This event exemplifies how the CFPB can raise awareness about fair lending education and compliance simultaneously. The Compliance Bulletin provides guidance to regulated entities and their affiliates in industry; the credit discrimination brochure and blog arm consumers with knowledge to navigate the consumer marketplace in a more secure manner.

In addition, senior CFPB leadership participated **in periodic "Outside the Beltway" events at cities** and communities across the country. These field hearings allow CFPB leadership to meet and

participate in roundtables and larger discussions with consumers, consumer advocates, community groups, civil rights groups, and industry representatives. As part of this outreach, Assistant Director Ficklin co-led a hearing panel at the payday lending field hearing held in January 2012 in Birmingham, Alabama.

All of these events provide the CFPB and the Office of Fair Lending with the opportunity to reach out in order to promote fair lending compliance and education, identify emerging issues and new risks, and champion fair and equal access to credit.

# 5. Fair Lending Look Ahead

In this inaugural Fair Lending Report, we have introduced some of **the CFPB's collaborative work in fair lending, both within the CFPB's various divisions and offices and across federal and state** agencies. We have also introduced the Office of Fair Lending and Equal Opportunity – its mission, staff, and work. **The CFPB's work in the area of fair lending is a priority and has only** just begun.

The CFPB will provide its Fair Lending Report annually. In future reports, we look forward to **updating Congress about the CFPB's accomplishments in the areas of fair lending and equal access to credit. We will provide an update on the CFPB's** work to supervise bank and nonbank financial **services institutions and the CFPB's public fair lending enforcement actions, as well as activities and accomplishments across various offices to further the CFPB's fair lending mission**. We will report on ECOA compliance as assessed by the agencies charged with enforcing that statute as well as fulfill the HMDA reporting requirement. Finally, we will describe our efforts to reach consumers and industry to promote fair lending compliance and education. In doing so, we will strive to fulfill **Congress's mandate that the CFPB work to "ensure the fair, equitable, and nondiscriminatory access to credit for individuals and communities" across America.**

# EXHIBIT 5

Bureau of Consumer Financial Protection

 **This material is for reference only.**

On May 21, 2018, the President signed a joint resolution passed by Congress disapproving the Bulletin titled "Indirect Auto Lending and Compliance with the Equal Credit Opportunity Act" (Bulletin), which had provided guidance about the Equal Credit Opportunity Act (ECOA) and its implementing regulation, Regulation B. Consistent with the joint resolution, the Bulletin has no force or effect. The ECOA and Regulation B are unchanged and remain in force and effect. See more information on complying with the ECOA and Regulation B. The materials relating to the Bulletin on the Bureau's website are for reference only.

# Fair Lending Report of the Consumer Financial Protection Bureau



Consumer Financial
Protection Bureau

April 2015



# Message from Richard Cordray

## Director of the CFPB

The Consumer Financial Protection Bureau (the Bureau or CFPB) **is the nation's first Federal** agency dedicated to making financial markets work better for consumers and helping consumers improve their financial lives. Since we opened our doors, we have worked to ensure that markets for consumer financial products and services are fair, transparent, and competitive. The **Bureau's Office of Fair Lending and Equal Opportunity (Office of Fair Lending)** is integral to realizing that mission. Specifically mandated by the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Office of Fair Lending collaborates with divisions and offices across the Bureau to enhance fair, equitable, and nondiscriminatory access to credit for all consumers. The Office of Fair Lending provides oversight and enforcement of Federal fair lending laws; **coordinates the Bureau's fair lending efforts with Federal agencies and State** regulators; works with private industry, fair lending, civil rights, consumer and community advocates to promote fair lending compliance and education; and provides annual reports on these efforts to fulfill its fair lending mandate.

Late last year, I had the honor of speaking at my alma mater, Michigan State University, on the role of the Bureau and civil rights in this country.[1] The event gave me an opportunity to reflect,

---

[1] Richard Cordray, Address at Michigan State University: Economic Rights as Civil Rights: The Case of Fair Lending (Oct. 10, 2014), *available at* http://www.consumerfinance.gov/newsroom/cfpb-director-richard-cordrays-prepared-lecture-on-economic-rights-as-civil-rights-at-michigan-state-university/.

not only on the Bureau's responsibility to enforce Federal consumer financial protection and fair lending laws, but also on the fundamental idea that economic rights are civil rights.

As I noted in my speech, the time-shifting nature of credit is that it enables us to transform the circumstances of the present into our aspirations for the future. With it, we have opportunities; without it, most of us would be locked into narrowed and constrained pathways for our lives. So together with the related rights to obtain money, to hold money, and to deploy money on fair and equal terms, the right to credit or fair lending becomes a basic pillar of the economic rights that are intertwined with civil rights in our society.

As the numbers show us, life still is more difficult and more expensive for many people of color than for others. Despite the pivotal legal changes adopted over the past 60 years, communities of color still face significant social and economic challenges. In the face of difficulties, they are entitled to count on the essential principle of fairness in all of their ordinary economic dealings.

As a nation, we need to deepen our commitment to diversity and inclusion and understand how these principles can improve life for all society. It has always served us well to face hard truths and think carefully about how best to address them. One thing we have learned is that every time we manage to expand opportunity to a broader group of Americans, we make this country better and stronger.

In the years to come, we look forward to continuing to fulfill Congress's vision of an agency dedicated to cultivating a consumer financial marketplace centered on transparency, responsible practices, sound innovation, and excellent customer service.

Sincerely,

Richard Cordray



# Message from Patrice Alexander Ficklin

## Director, Office of Fair Lending and Equal Opportunity

As the CFPB continues its fourth year, the Office of Fair Lending continues to make significant progress in ensuring fair, equitable, and nondiscriminatory access to credit for all Americans. Over the last year, the Office of Fair Lending has continued to work to identify and combat discrimination through research, supervision, enforcement, consumer education, industry guidance and outreach, rulemaking, and interagency engagement.

We maximize our resources by targeting our efforts on practices, products, and institutions that pose the greatest risk to consumers. Data play a critical role in helping to identify areas of risk. The Bureau also has many tools **for overseeing and enforcing our nation's fair lending laws**. Moreover, much of what we do to protect consumers and foster a fair and equitable marketplace is part of our confidential fair lending supervision activities, working with institutions to improve -- and as appropriate, correct -- policies and practices to ensure equal access and protection for all consumers.

**This year marked the Office of Fair Lending's second public enforcement action in the credit** cards market. As the Office of Fair Lending moves forward in this area, we have been encouraged by the thoughtful engagement of industry in addressing fair lending risk and disparities and of consumer representatives and the American people in providing valuable feedback on fair lending priorities. Our non-public supervisory resolutions also impact many consumers, sometimes more promptly than public enforcement actions, and can produce as much in consumer relief (to as many consumers) as public actions. Over the last year, our fair

lending supervisory and public enforcement actions directed institutions to provide approximately $224 million in remediation to about 303,000 consumers.[2]

Helping harmed consumers receive relief is only one way in which we seek to engage with the American people. As part of the release of the summer 2014 edition of *Supervisory Highlights*, I **had the honor of participating in one of the Bureau's many field hearings. Th**at particular field hearing was held in Indianapolis, Indiana, where I and other senior Bureau staff listened to and engaged with industry and consumer representatives as well as members of the public on issues **surrounding auto finance and the Bureau's activities**.[3] These events improve our understanding of, and connection to, the issues that affect all market participants around the country.

Much of the work I have described relates to our efforts to identify areas of fair lending risk and ensure compliance; however, we also endeavor to inform and educate, as well as learn from, the institutions and markets we oversee. When we do identify areas of fair lending risk across a given market or product, the Office of Fair Lending may issue CFPB bulletins to provide guidance to institutions in complying with the Equal Credit Opportunity Act[4] (ECOA) and the Home Mortgage Disclosure Act[5] (HMDA). This year we issued a bulletin to help lenders seeking to verify Social Security disability income comply with ECOA and its implementing regulation, Regulation B.[6]

These actions are a few of the developments you will read about in this, our third, Fair Lending Report. In the years to come, we look forward to advancing our work to ensure a fair, equitable, and nondiscriminatory credit market, with equal opportunity for all.

---

[2] Figures represent estimates of monetary relief for consumers ordered by the Bureau as a result of supervisory or enforcement actions on fair lending matters in 2014.  The Bureau also ordered institutions to provide non-monetary relief to consumers.

[3] *See* Consumer Financial Protection Bureau, *Live from Indianapolis!* (Sept. 18, 2014), *available at* http://www.consumerfinance.gov/blog/live-from-indianapolis.

[4] 15 U.S.C. §§ 1691-1691f.

[5] 12 U.S.C. §§ 2801-2810.

[6] *See* Consumer Financial Protection Bureau, CFPB Bulletin 2014-03, *Social Security Disability Income* (Nov. 18, 2014), *available at* http://files.consumerfinance.gov/f/201411_cfpb_bulletin_disability-income.pdf.

Sincerely,

Patrice Alexander Ficklin

# Table of contents

**Message from Richard Cordray** ...................................................................2

**Message from Patrice Alexander Ficklin** ........................................................4

**Table of contents** .......................................................................................7

**Executive summary** ....................................................................................9

**1. Fair lending prioritization** .......................................................................12

  1.1  Risk-based prioritization: A data-driven approach to prioritizing areas of potential fair lending harm to consumers .......................................... 12

**2. Supervision** ..........................................................................................16

  2.1  *Supervisory Highlights* ..........................................................................17

  2.2  Monitoring of compliance with supervisory resolutions ........................22

**3. Enforcement** ........................................................................................25

  3.1  Public enforcement action ...................................................................25

  3.2  Implementing public consent orders ....................................................27

  3.3  Equal Credit Opportunity Act referrals to Department of Justice ........29

  3.4  Pending fair lending investigations.......................................................29

**4. Rulemaking** .........................................................................................31

  4.1  Home Mortgage Disclosure Act (Regulation C) ................................... 31

  4.2  Small business data collection..............................................................32

5.   **Interagency coordination** ...................................................................**34**

6.   **Outreach: promoting fair lending compliance and education** ........................**36**

   6.1   Field hearing on automobile finance market ......................................... 36

   6.2   CFPB Bulletin: Social Security disability income verification .............. 41

7.   **Interagency reporting** ........................................................................**43**

   7.1   Equal Credit Opportunity Act enforcement ........................................... 44

   7.2   Referrals to Department of Justice ...................................................... 46

   7.3   Reporting on the Home Mortgage Disclosure Act ............................... 47

8.   **Conclusion** ..........................................................................................**48**

**Appendix A:** .................................................................................................**49**

   Defined terms ............................................................................... 49

# Executive summary

The Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank or Dodd-Frank Act)[7] **established the Bureau as the Nation's first federal agency with a mission focus**ed solely on consumer financial protection and making consumer financial markets work for all Americans. Dodd-Frank established the Office of Fair Lending and Equal Opportunity within the CFPB, and **charged it with "providing oversight and enforcement of Fe**deral laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are enforced by the Bureau."[8]

The Bureau and the Office of Fair Lending have taken important strides over the last year in our efforts to protect consumers from credit discrimination and broaden access to credit, as we identify new fair lending risks and monitor institutions for compliance. Over the last year, our fair lending supervisory and public enforcement actions directed institutions to provide approximately $224 million in remediation to about 303,000 consumers.[9]

- **Supervision and enforcement priorities.** The Bureau's risk-based prioritization process allows the Office of Fair Lending to focus our supervisory and enforcement efforts on markets or products that represent the greatest risk for consumers.

  - **Mortgage lending.** To date, the Bureau's Fair Lending supervision program has included ECOA targeted reviews at institutions responsible for approximately 40% of

---

[7] Pub. L. No. 111-203, 124 Stat. 1376 (2010).

[8] 12 U.S.C. § 5493(c)(2)(A).

[9] *See* footnote 2.

the applications and originations reported pursuant to HMDA.[10] Mortgage lending continues to be a key priority for the Office of Fair Lending for both supervision and enforcement, with a focus on HMDA data integrity and potential fair lending risks in the areas of redlining, underwriting, and pricing.

- **Indirect auto lending.** The Bureau continued its work in overseeing and enforcing compliance with ECOA in indirect auto lending through both supervisory and enforcement activity, including monitoring compliance with our previous supervisory and enforcement actions. In addition, we released a *Supervisory Highlights* report specifically dedicated to the Bureau's activity in this area.[11]  This report provided general information about our supervisory experience and offered additional guidance to assist lenders in complying with Federal consumer financial laws and mitigating fair lending risk.

- **Credit cards.** The Bureau also continued our fair lending work in the credit cards market. In June, the Bureau announced a public enforcement action against Synchrony Bank, formerly known as GE Capital, for failing to provide certain debt settlement offers to consumers based on national origin.[12] The company self-identified the violation and fully cooperated with the Bureau's investigation. As a result, the company was given credit for its responsible conduct and the Bureau assessed no civil money penalties for this violation. However, the company provided $169 million in consumer relief to about 108,000 borrowers excluded from debt relief offers.

- **Other product areas.** The Bureau has ongoing supervision and enforcement work in other markets. We remain committed to assessing and evaluating fair lending risk in all credit markets under the Bureau's jurisdiction.

---

[10] Generally, ECOA targeted reviews focus on a specific line of business, such as mortgages, credit cards, or auto finance. ECOA targeted reviews typically include statistical analysis and, in some cases, loan file reviews in order to evaluate an institution's compliance with ECOA and Regulation B within the specific business line selected.

[11] See Consumer Financial Protection Bureau, *Supervisory Highlights: Summer 2014* (Sept. 17, 2014), *available at* http://files.consumerfinance.gov/f/201409_cfpb_supervisory-highlights_auto-lending_summer-2014.pdf.

[12] *See In re. Synchrony Bank, f/k/a GE Capital Retail Bank*, No. 2014-CFPB-0007 (June 19, 2014) (consent order), *available at* http://files.consumerfinance.gov/f/201406_cfpb_consent-order_synchrony-bank.pdf.

- **Rulemaking.** In August 2014, the Bureau published a proposed rule to amend Regulation C, the regulation that implements HMDA, to require covered lenders to report additional data elements, among other changes.[13] The Bureau received several hundred comments on our proposal, which we will carefully consider as we advance the rulemaking process.

- **Guidance.** In November, the Bureau issued a guidance bulletin reminding lenders that requiring unnecessary documentation from consumers who receive Social Security disability income may raise fair lending risk.[14] ECOA prohibits discrimination against an applicant because all or **part of the applicant's income derives from any public assistance** program. The bulletin outlined the standards and guidelines that may help lenders comply with the law and help to ensure that consumers who receive Social Security disability income have fair and equal access to credit. In addition, throughout the year, the Office of Fair Lending collaborates with the Office of Supervision to provide guidance and information on market trends through *Supervisory Highlights*, including the edition of *Supervisory Highlights* mentioned above, which **focused on the Bureau's activity in indirect auto lending**.

- **Outreach to industry, advocates, consumers, and other stakeholders.** The Bureau continues to initiate and encourage industry and consumer engagement opportunities, to discuss fair lending compliance, access to credit issues, and education, including through speeches, presentations, and webinars.

- **Interagency coordination and collaboration.** The Bureau continues to coordinate with the Federal Financial Institutions Examination Council (FFIEC) agencies, as well as the Department of Justice (DOJ) the Federal Trade Commission (FTC), and the Department of Housing and Urban Development (HUD), as we each play a role in **enforcing our nation's fair lending** laws and regulations.

This report covers the Bureau's fair lending work during calendar year 2014.

---

[13] *See* Home Mortgage Disclosure (Regulation C), 79 Fed. Reg. 51,732 (proposed Aug. 29, 2014) (to be codified at 12 C.F.R. pt. 1003).

[14] *See* Consumer Financial Protection Bureau, CFPB Bulletin 2014-03, *Social Security Disability Income* (Nov. 18, 2014), *available at* http://files.consumerfinance.gov/f/201411_cfpb_bulletin_disability-income.pdf.

# 1. Fair lending prioritization

## 1.1   Risk-based prioritization: A data-driven approach to prioritizing areas of potential fair lending harm to consumers

To use the CFPB's fair lending research, supervision, and enforcement resources most efficiently and effectively, the Office of Fair Lending, working with other offices in the Bureau, developed a fair lending risk-based prioritization approach that assesses and determines how best to address fair lending risk in the entities, products, and markets under our jurisdiction.

The Bureau uses its risk-based prioritization approach to consider many qualitative and quantitative factors at the institution, product, and market levels to determine what, where, and how fair lending risks to consumers should be addressed. These factors include: complaints and tips from consumers, advocacy groups, whistleblowers, and government agencies; supervisory and enforcement history; quality of le**nders' compliance management systems; data analysis;** and market insights. We also coordinate with other regulators on prioritization and scheduling so that our focus and efforts may inform their work and vice versa. The Office of Fair Lending integrates all of this information into the fair lending risk-based prioritization process, which is **incorporated into the Bureau's larger risk**-based prioritization process, allowing the Bureau to efficiently allocate its fair lending resources to areas of greatest risk to consumers.

While mortgage lending and auto finance will continue to be a focus for the Bureau and key priorities for the Office of Fair Lending, we are concerned about fair lending risk in other product markets as well, including credit cards and small business lending. We remain **committed to assessing and evaluating fair lending risk in all credit markets under the Bureau's** supervision.

### 1.1.1   Complaints and tips

The CFPB uses input from a variety of external and internal stakeholders to inform its fair lending prioritization process. We consider fair lending complaints and tips received by the **Bureau's Office of Consumer Response or brought to the Office of Fair Lending's attention by** advocacy groups, whistleblowers, and other government agencies (at the local, state, and federal levels). As part of the prioritization process, the Office of Fair Lending also considers public and private fair lending litigation of which we are aware.

### 1.1.2   Supervisory and enforcement history

The Bureau considers information gathered **from the Bureau's and other regulators' prior fair** lending work, including any supervisory or enforcement actions. At the institution level, the Bureau considers results from past reviews, including information the Bureau has gathered about the fair lendi**ng risk(s) presented by a lender's policies, procedures, practices, or business model; the extent and nature of any violations previously cited; and the institution's remediation** efforts. Additionally, the Bureau considers self-identified issues and whether the institution took appropriate corrective action when it identified those issues. We also closely monitor **institutions' compliance with orders arising from previous enforcement actions. Finally, we** coordinate with other regulators to share and consider the results of our respective fair lending efforts.[15]

### 1.1.3   Quality of compliance management systems

One critical piece of information the Bureau obtains through our supervisory work is the quality **of an institution's fair lending** compliance management system, which is a key factor considered in the fair lending prioritization process. The Bureau has previously identified common features of a well-developed fair lending compliance management system,[16] though we recognize that the

---

[15] **Other regulators may take into account the Bureau's fair lending findings in their** evaluations of lender compliance with the Fair Housing Act or performance under the Community Reinvestment Act.

[16] **See** Fair Lending Report of the Consumer Financial Protection Bureau, at 13-14 (Apr. 2014), **available at** http://files.consumerfinance.gov/f/201404_cfpb_report_fair-lending.pdf.

appropriate scope of an institution's fair lending compliance management system will vary based on its size, complexity, and risk profile.

Many CFPB-supervised institutions face similar fair lending risks, but they may differ in how they manage those risks, based on their size, complexity, and risk profile. The key consideration is that the lower the quality of an institution's fair lending compliance management system, the higher the institution's fair lending risk to consumers.

### 1.1.4   Data analysis

The Bureau's fair lending prioritization process is also driven by quantitative data analysis that evaluates developments and trends at the institution and market levels. For example, in the housing finance marketplace, HMDA data allow regulators to assess a specific institution's risk as well as risk across the market in order to identify those institutions or segments that appear to present heightened fair lending risk to consumers. Such analyses can be particularly useful in identifying those lenders that appear to deviate significantly from their peers in, for example, the extent to which they provide access to credit in communities of color.

### 1.1.5   Market insights

The Office of Fair Lending works closely with all of the Bureau's markets offices, which monitor consumer financial markets to identify emerging developments and trends. These offices monitor key consumer financial products and services, including mortgages, credit cards, auto lending, consumer reporting, student lending, and payday lending. The Bureau uses market intelligence and the trends identified by our markets offices to provide insight into the markets we oversee and to identify fair lending risks in a given market that may require further study or attention. For example, our work with Mortgage Markets has assisted in our understanding of different mortgage lenders' business models and pricing policies, particularly in light of the new rules that affect mortgage loan originator compensation. Information on fair lending risks in a market is then incorporated into our risk-based prioritization process to determine the level of attention needed in a market and our focus within that market.

Based on our evaluation of the information and data gathered from the sources above, this year we continued to identify mortgage lending and auto finance as key priorities for our fair lending supervision and enforcement work. Our work in mortgage lending includes a significant focus on HMDA data integrity and validation, as well as more in-depth mortgage lending analyses both in examinations and investigations. Given the tight credit environment of the last few

years, our focus is on underwriting and redlining, though we also consider pricing policies and practices that present fair lending risk. Another priority is indirect auto lending. Lenders need to be aware of and to monitor fair lending risk in their portfolios, particularly in connection with discretionary dealer markup and compensation policies.[17]

---

[17] *See* Consumer Financial Protection Bureau, CFPB Bulletin 2013-02, *Indirect Auto Lending Compliance with the Equal Credit Opportunity Act,* at 4-5 (Mar. 21, 2013), *available at* http://files.consumerfinance.gov/f/201303_cfpb_march_-Auto-Finance-Bulletin.pdf.

# 2. Supervision

The CFPB's Fair Lending Supervision program assesses compliance with Federal consumer financial laws and regulations at banks and nonbanks over which the Bureau has supervisory authority. Supervision activities range from assessments of institutions' fair lending compliance management systems to in-depth reviews of products or activities that may pose heightened fair lending risks to consumers. As part of its Fair Lending Supervision program, the Bureau continues to conduct three types of fair lending reviews at Bureau-supervised institutions: ECOA baseline reviews, ECOA targeted reviews, and HMDA reviews. Our supervisory work has focused in the priority areas of mortgage, auto lending, and credit cards, but has included other product areas as well.

In order to support our mission to ensure fair, equitable, and nondiscriminatory access to credit for American consumers and their communities, the CFPB created, within the Bureau, the National Fair Lending Examination Team (NFLET) in August 2014. The NFLET is made of up examiners from across the Bureau to help to implement the Office of Fair Lending's supervisory strategy and enhances our ability to conduct fair lending examinations. By partnering with the Office of Fair Lending and different CFPB regional offices, the NFLET helps to increase specialization, share knowledge, develop and test examiner tools, and assist in providing fair lending training throughout the CFPB.

When the CFPB identifies situations in which fair lending compliance is inadequate, it directs institutions to establish fair lending compliance programs commensurate with the size and complexity of the institution and its lines of business. When fair lending violations have occurred, the CFPB may direct institutions to provide remediation and restitution to consumers, and may pursue other appropriate relief.

## 2.1    *Supervisory Highlights*

Although the Bureau's supervisory process is confidential, the Bureau publishes regular reports called *Supervisory Highlights*, which provide information on supervisory trends the Bureau observes. In addition, industry participants can use this information to inform and assist in complying with ECOA and HMDA. Throughout the year, the Office of Fair Lending, in coordination with other offices within the Division of Supervision, Enforcement and Fair Lending, provides information on trends from the Bureau's supervisory experience as it relates to fair lending risk.

### 2.1.1   Documenting exceptions to credit standards to mitigate fair lending risk

In the Spring 2014 edition of *Supervisory Highlights,* the Office of Fair Lending described supervisory observations of instances in which financial institutions lacked adequate policies and procedures for managing the fair lending risk that may arise when a lender makes exceptions to its established credit standards.[18] For example, a lender may decide not to apply certain credit standards to a borrower when there is a competing offer from another institution. Such decisions are appropriate when they are based on a legitimate business justification, but it is important to maintain adequate documentation and oversight to avoid increasing fair lending risk under ECOA and Regulation B.

A lender may promote the availability of credit by providing credit to an applicant based on a **lawful exception to the lender's credit standards when exceptions practices are complemented** by an appropriate system of fair lending compliance management. A strong compliance management system can mitigate fair lending risk related to credit exceptions by adequately documenting the basis for the credit exception, monitoring and tracking exceptions activity, and controlling any resulting fair lending risk.

This edition of *Supervisory Highlights* provided institutions with a list of fair lending-related elements which may be integrated into a strong compliance management system, including

---

[18] Consumer Financial Protection Bureau, *Supervisory Highlights*: Spring 2014, at 20 (May 22, 2014), *available at* http://files.consumerfinance.gov/f/201405_cfpb_supervisory-highlights-spring-2014.pdf.

guidance on exceptions to policies and procedures; monitoring, audit, and corrective action; training; and management participation.

The Bureau recognizes that each lender is different and that an effective compliance management system may take different forms depending on many factors, including the size and complexity of the lender's business. However, the successful implementation of the recommendations identified in the *Supervisory Highlights* will assist lenders in mitigating fair lending risk when making exceptions to credit standards, while also furthering the purposes of Regulation B in promoting the availability of credit.

### 2.1.2   *Supervisory Highlights* on indirect automobile lending market

On September 17, 2014, in conjunction with a public field hearing on the automobile finance market, the Bureau released a fifth issue of the *Supervisory Highlights*, focused on the Bureau's fair lending supervisory and enforcement experience in the indirect automobile lending market.[19] The report discussed the Bureau's examination procedures, supervisory observations, the proxy methodology used in our supervisory and enforcement activity, enforcement resolutions, guidance on what lenders can expect if an examination reveals potential violations, and further guidance for lenders on mitigating fair lending risk.

As noted in that edition of *Supervisory Highlights*, the Bureau's examination teams have continued to review indirect auto lenders for ECOA compliance. These targeted ECOA reviews generally have included an examination of three areas: credit approvals and denials, interest rates quoted by the lender to the dealer (the "buy rates"), and any discretionary markup or adjustments to the buy rate.

During the last two years, multiple supervisory reviews have identified indirect auto lenders with discretionary pricing policies that resulted in discrimination against African American, Hispanic, and/or Asian and Pacific Islander borrowers in violation of ECOA. These institutions maintained discretionary pricing policies while not adequately monitoring and controlling the fair lending risk associated with their policies. We have resolved matters with several supervised

---

[19] *See* Consumer Financial Protection Bureau, *Supervisory Highlights*: Summer 2014 (Sept. 17, 2014), *available at* http://files.consumerfinance.gov/f/201409_cfpb_supervisory-highlights_auto-lending_summer-2014.pdf.

institutions, including through one public enforcement action and through several supervisory resolutions.

When addressing discrimination in indirect auto lending, a key component of supervisory resolutions has been to direct the lender to adopt policies and practices that effectively mitigate fair lending risk. Supervisory and enforcement experience has identified three possible methods of mitigating the fair lending risk associated with indirect auto lending policies that allow discretionary pricing adjustments; however, there may be other methods, and examination teams recognize that the appropriate program will vary among financial institutions.

One method for mitigating fair lending risk associated with indirect auto lending policies is to monitor and, if necessary, correct disparities through a strong compliance management system. Prior issues of *Supervisory Highlights* identified common features of strong compliance management systems.[20] In addition, CFPB Bulletin 2013-02 *Indirect Auto Lending Compliance with the Equal Credit Opportunity Act* elaborated on those features to identify additional elements that may be effective in mitigating fair lending risk for indirect auto lenders.[21] In our Summer *Supervisory Highlights,* we provided further guidance, based on supervisory and enforcement experience, on corrective action and strong compliance management systems.[22]

Moreover, examination teams have observed that implementing a compliance management system that includes most of the elements described in the Summer 2014 issue can reduce or help quickly address disparities, thereby significantly mitigating fair lending risk.

Another method for mitigating fair lending risk is to implement policies that limit the maximum discretionary pricing adjustment to an amount that significantly reduces or eliminates disparities and fair lending risk, for example, imposing limits of 100 basis points, rather than

---

[20] *See* Consumer Financial Protection Bureau, *Supervisory Highlights*: Fall 2012, at 6 (Oct. 31, 2012), *available at* http://files.consumerfinance.gov/f/201210_cfpb_supervisory-highlights-fall-2012.pdf.

[21] *See* Consumer Financial Protection Bureau, CFPB Bulletin 2013-02, *Indirect Auto Lending Compliance with the Equal Credit Opportunity Act,* at 4-5 (Mar. 21, 2013), *available at* http://files.consumerfinance.gov/f/201303_cfpb_march_-Auto-Finance-Bulletin.pdf.

[22] *See* Consumer Financial Protection Bureau, *Supervisory Highlights*: Summer 2014, at 19-21 (Sept. 17, 2014), *available at* http://files.consumerfinance.gov/f/201409_cfpb_supervisory-highlights_auto-lending_summer-2014.pdf.

the more common limits of 200 or 250 basis points. This option will significantly reduce but not eliminate the need for lender compliance related to discretionary pricing.

A third method for lenders is to eliminate discretionary adjustments to risk-based buy rates altogether and fairly compensate dealers using a non-discretionary mechanism that does not result in discrimination. By eliminating such discretion, the lender eliminates the need for monitoring of discretionary pricing and compensation policies.

As noted in the **_Supervisory Highlights_**, when the Bureau identifies potential disparities at an institution in the supervisory process, we will continue to share our initial findings with the institu**tion and solicit the institution's response and explanation**. In order to make these discussions as useful as possible, and consistent with the standard practice of other federal supervisory agencies, when the Bureau preliminarily determines in the supervisory process that a supervised institution may have engaged in a pattern or practice of discrimination in violation of ECOA and notifies an institution of that determination, we disclose the customized regression code that supports the preliminary determination. Moreover, we will continue to share our initial findings with the institution **and to solicit the institution's response and explanation**. For example, institutions may suggest additional factors or controls for consideration; where appropriate and justified, we will incorporate these factors or controls into our analysis. This process is an ongoing dialogue between specific institutions and the Bureau.

## 2.1.3 The CFPB's HMDA resubmission schedule & guidelines

The Fall 2014 edition of **_Supervisory Highlights_** included information on the Bureau's supervisory experience in conducting HMDA Data Integrity Reviews (HMDA Reviews) at dozens of bank and nonbank mortgage lenders.[23] In the report, we note that examination teams have found that many lenders have adequate HMDA compliance systems, resulting in HMDA data with no errors or very few errors. At some institutions, however, examination teams have found inadequate compliance management systems and severely compromised mortgage lending data. On October 9, 2013, the Bureau published its HMDA Resubmission Schedule and

---

[23] **_See_** Consumer Financial Protection Bureau, **_Supervisory Highlights_**: Fall 2014, at 18-19 (Oct. 28, 2014), **_available at_** http://files.consumerfinance.gov/f/201410_cfpb_supervisory-highlights_fall-2014.pdf.

Guidelines (HMDA Resubmission Standards)[24] and a bulletin on HMDA Compliance Management, HMDA Resubmission Standards, and HMDA Enforcement.[25] The Bureau released these publications to highlight the importance of accurate HMDA data and effective HMDA compliance management systems, and to provide transparency into how the Bureau enforces HMDA.

For the majority of CFPB-supervised financial institutions that are required to collect and report data pursuant to HMDA and Regulation C, **the CFPB's HMDA Resubmission Standards are generally similar to the Federal Reserve Board's HMDA Resubmission Standards. The Bureau's** October 9, 2013 guidelines and bulletin announced a different resubmission standard for the largest CFPB HMDA reporters, defined as any institution reporting 100,000 (or more) entries on its HMDA Loan Application Register, given the significance of these institutions**' impact on** access to mortgage credit.

**In response to feedback from mortgage lenders subject to HMDA's reporting requirements, in** the Fall 2014 Supervisory Highlights we announced that in **the Bureau's** supervisory work we **will follow the CFPB's HMDA Resubm**ission Standards in reviews of 2014 and subsequent HMDA data, but will continue to follow the previous standards for reviews of 2013 and earlier HMDA data. This distinction will provide CFPB HMDA Reporters with an appropriate opportunity to calibrate their HMDA data collection, reporting, and compliance programs to the **Bureau's HMDA Resubmission Standards. Bureau examination teams will continue conducting** HMDA Reviews using the resubmission thresholds and guidelines that are appropriate to the year of the data being reviewed.

---

[24] The CFPB's HMDA Resubmission Standards are part of the CFPB's Supervision and Examination Manual, *available at* http://files.consumerfinance.gov/f/201310_cfpb_hmda_resubmission-guidelines_fair-lending.pdf.

[25] Consumer Financial Protection Bureau, CFPB Bulletin 2013-11, Home Mortgage Disclosure Act (HMDA) and Regulation C – Compliance Management: CFPB HMDA Resubmission Schedule and Guidelines; and HMDA Enforcement (Oct. 9, 2013), *available at* http://files.consumerfinance.gov/f/201310_cfpb_hmda_compliance-bulletin_fair-lending.pdf.

## 2.2 Monitoring of compliance with supervisory resolutions

Through confidential supervisory resolutions, the Bureau is working to address lender practices that create fair lending risks. When fair lending violations are identified through the Bureau's confidential supervisory process, the CFPB will direct remediation and restitution to consumers, and may pursue other appropriate relief. Non-public supervisory resolutions impact many consumers, sometimes more promptly than a public enforcement action, and can produce as much in consumer relief (to as many consumers) as our public actions.

Importantly, Bureau supervisory action has induced change in the financial industry to more closely consider fair lending risks and prevent future discrimination. After an examination reveals discrimination on a prohibited basis, we have directed institutions to address the aspects of their businesses that give rise to the discrimination and to adopt policies and practices that effectively monitor and mitigate the potential for future discrimination. While the Bureau's supervisory actions are critical to address discriminatory practices, the importance of institutions effectively self-monitoring for fair lending risk cannot be underestimated. When examination teams have returned to many institutions, they have found improved compliance management systems and enhanced consumer protections. In contrast, in those instances where examination teams identify violations during follow-up reviews, the Bureau will consider whether to take enforcement action.

### 2.2.1 Improving business practices

Through supervisory resolutions, the Bureau has directed institutions to take affirmative corrective actions to mitigate fair lending risk. For instance, where there is a risk of discrimination in underwriting or pricing a loan due to lack of exceptions guidance, an institution will be directed to implement and maintain appropriate limits to restrict or eliminate **an individual employee's ability to make decisions** to approve or deny a loan, or to raise or lower **the interest rate on a loan, based on factors unrelated to the borrower's credit qualifications**. Institutions have also been directed to reassess their business relationships with third-party partners and contractors to ensure compliance with ECOA and Regulation B. This may mean directing the institution to send regular communications to third-party partners and contractors explaining fair lending laws **and stating the lender's expectations and the contractor's** obligations with respect to compliance, as well as excluding non-compliant contractors from future consumer lending transactions.

## 2.2.2   Enhancing compliance management

In addition to changing the lending policies themselves, the CFPB has also directed institutions to improve their internal compliance management systems that are used to ensure that day-to-day business practices conform to fair lending laws. **Significant corrections to an institution's** compliance management system should mean that it is doing a better job of identifying and addressing fair lending risks before they become violations.

In supervisory resolutions, institutions have had the choice to adopt compliance mechanisms that suit their particular business size and structure; however, we have identified and shared the best practices of financial institutions with well-developed fair lending compliance systems, which include:

- Policies and procedures to address fair lending risks in each product line, including:

    - An up-to-date fair lending policy statement;

    - Policies and procedures that acknowledge and address areas of heightened fair lending risk; and

    - Policies that do not contain prohibited basis criteria, such as impermissible exclusions of public assistance income, or use of age in credit scoring in a manner that violates ECOA.

- Effective monitoring for fair lending risks and violations. Appropriate measures will vary depending on the size and complexity of the institution. Where appropriate, monitoring should include regular analysis of loan data for potential prohibited disparities in pricing, underwriting, or other aspects of the credit transaction; evaluation of credit scoring models for potential disparate impact; and review of marketing practices for fair lending risks.

- Prompt and full corrective action in response to identified risks and violations, including consumer remuneration when appropriate.

- Regular and up-to-date fair lending training for employees, officers, and Board members.

- Policies and procedures for handling of consumer discrimination complaints.

- A robust fair lending audit function.

- Meaningful Board and management oversight of fair lending compliance.

# 3. Enforcement

The Bureau conducts investigations of potential violations of HMDA and ECOA, and if it believes a violation has occurred, can file a complaint either through its administrative enforcement process or in federal court. Like the other federal bank regulators, the Bureau must refer a matter to the DOJ when it has reason to believe that a creditor has engaged in a pattern or practice of lending discrimination. However, when the Bureau makes a referral to the DOJ, the Bureau can still take its own independent action to address a violation. In 2014, the Bureau announced one fair lending enforcement action, in the context of credit cards. Moreover, the Bureau has a number of ongoing fair lending investigations and has authority to settle or sue in a number of matters.

## 3.1   Public enforcement action

### Synchrony Bank, formerly known as GE Capital Retail Bank

On June 19, 2014, the CFPB, as part of a joint enforcement action with the DOJ, ordered Synchrony Bank, formerly known as GE Capital, to provide $169 million in relief to about 108,000 borrowers excluded from debt relief offers because of their national origin.[26] As part of the Bureau consent order, Synchrony Bank also refunded $56 million to approximately 638,000 consumers who were harmed by deceptive marketing practices.

---

[26] *In re. Synchrony Bank, f/k/a GE Capital Retail Bank*, No. 2014-CFPB-0007 (June 19, 2014) (consent order), *available at* http://files.consumerfinance.gov/f/201406_cfpb_consent-order_synchrony-bank.pdf.

Synchrony Bank had two different promotions that allowed credit card customers with delinquent accounts to address their outstanding balances, one by paying a specific amount to bring their account current in return for a statement credit and another by paying a specific amount in return for waiving the remaining account balance. However, it did not extend these offers to any customers who indicated that they preferred to communicate in Spanish and/or had a mailing address in Puerto Rico, even if the customer met the promotion's qualifications. This practice resulted in Hispanic populations being unfairly denied the opportunity to benefit from these promotions, in direct violation of ECOA. This public enforcement action represented the federal government's largest credit card discrimination settlement in history.

The Bureau did not assess penalties with respect to the illegal discrimination, based on a number of factors, including that the company self-reported the violation, self-initiated remediation for the harm done to affected consumers, and fully cooperated with the Bureau's investigation, in accordance with CFPB Bulletin 2013-06, *Responsible Business Conduct: Self-Policing, Self-Reporting, Remediation, and Cooperation.*[27]

The Bureau is exploring the obstacles consumers with Limited English Proficiency (LEP) face when attempting to access credit, as well as the challenges that creditors face when interacting with LEP consumers and complying with their various legal and regulatory obligations. The Bureau encourages lenders to provide assistance to LEP individuals in order to increase access to credit and to reach out to the Bureau with ideas of how to promote access. In doing so, lenders should take steps to ensure that their actions comply with ECOA.

---

[27] Consumer Financial Protection Bureau, CFPB Bulletin 2013-06, *Responsible Business Conduct: Self-Policing, Self-Reporting, Remediation, and Cooperation* (June 25, 2013), *available at* http://files.consumerfinance.gov/f/201306_cfpb_bulletin_responsible-conduct.pdf. This bulletin serves to inform market participants that they may proactively self-police for potential violations, promptly self-report to the Bureau when they identify potential violations, quickly and completely remediate the harm resulting from violations, and affirmatively cooperate with any Bureau investigation above and beyond what is required. If an entity meaningfully engages in these activities, which this bulletin refers to collectively as "responsible conduct," it may favorably affect the ultimate resolution of a Bureau enforcement investigation.

## 3.2    Implementing public consent orders

When a lawsuit is resolved through a public consent order, the Bureau will take steps to ensure that the defendant complies with the requirements of the order. As appropriate to the specific requirements of individual public consent orders, the Bureau may take steps to ensure that borrowers who are eligible for compensation receive remuneration and that the defendant has implemented a comprehensive fair lending compliance management system. Throughout 2014, the Office of Fair Lending worked to implement and oversee compliance with five separate **consent orders that were issued by federal courts or the Bureau's Director.**

**To carry out the Bureau's and DOJ's** 2013 settlement with PNC, as successor in interest to National City Bank,[28] the Bureau and DOJ have worked closely alongside a settlement administrator and PNC Bank to distribute $35 million to minority borrowers who suffered discrimination. On September 16, 2014, the Bureau published a blog post (available in English[29] and Spanish[30]) announcing the selection of a settlement administrator. Under the supervision of the government agencies, the settlement administrator has contacted over 90,000 borrowers who are eligible for compensation, including direct mailing, electronic mail communication, and phone calls. As of the participation deadline of February 17, 2015, borrowers on 72.4% of the affected loans expressed interest in participating in the settlement. The settlement administrator will begin mailing checks in the second quarter of 2015.

Since the Bureau and DOJ jointly settled allegations of pricing discrimination in automobile lending with Ally Financial Inc. and Ally Bank in December 2013,[31] the government agencies have been working with a settlement administrator and Ally to locate borrowers harmed by the

---

[28] *Consumer Financial Protection Bureau v. National City Bank*, No. 2:13-cv-01817-CB (W.D. Pa. Jan. 9, 2014) (consent order), *available at* http://files.consumerfinance.gov/f/201312_cfpb_consent_national-city-bank.pdf.

[29] Patrice Ficklin, Consumer Financial Protection Bureau, *National City Bank Settlement Administrator will Contact Eligible Borrowers Soon* (Sept. 16, 2014), *available at* http://www.consumerfinance.gov/blog/national-city-bank-settlement-administrator-will-contact-eligible-borrowers-soon/.

[30] Patrice Ficklin, Consumer Financial Protection Bureau, El Administrador de Negociación del National City Bank Pronto Se Pondrá en Contacto con los Prestatarios Elegibles (Sept. 16, 2014), *available at* http://www.consumerfinance.gov/blog/el-administrador-de-negociacion-del-national-city-bank-pronto-se-pondra-en-contacto-con-los-prestatarios-elegibles/.

[31] *In re. Ally Financial Inc.*, No. 2013-CFPB-0010 (Dec. 20, 2013) (consent order), *available at* http://files.consumerfinance.gov/f/201312_cfpb_consent-order_ally.pdf.

alleged discrimination. In addition, Ally has also begun the process of sending refunds to affected borrowers who financed car purchases after December 2013.

Settlements often require that lenders develop strong compliance management systems to **ensure that discrimination does not occur in the future. Since the Bureau's settlement with** Ally **in December 2013, the Bureau and DOJ have been overseeing Ally's adoptio**n of a robust compliance plan that includes monitoring lending by automobile dealers for discrimination, taking corrective action in response to evidence of discrimination, and providing relief to minority borrowers if disparities persist. As noted above, Ally has already begun to compensate borrowers affected after December 2013.

In addition, as part of the settlement with Synchrony Bank, discussed above, approximately 134,000 consumers who have a mailing address in Puerto Rico or who indicated a preference to communicate in Spanish received relief, including payments, credits, interest, and debt forgiveness.[32]

In October 2013, the Bureau reached settlements with Washington Federal Bank[33] and Mortgage Master Inc.[34] over allegations of HMDA violations. Since then, the Bureau has been overseeing the **institutions'** development of comprehensive HMDA compliance management systems, which include the implementation of policies, procedures, training, monitoring, and internal controls. The Bureau has similarly worked with Synchrony Bank to ensure that the Bank continues to enhance its fair lending compliance management system as a fundamental core component of its enterprise-wide compliance program.

---

[32] Since the Consent Order was filed, the number of affected consumers has been updated to reflect additional affected consumers identified by the Bank.

[33] *In re. Washington Federal*, No. 2013-CFPB-0005 (Oct. 9, 2013), *available at* http://files.consumerfinance.gov/f/201310_cfpb_consent-order_washington-federal.pdf.

[34] *In re. Mortgage Master, Inc.*, No. 2013-CFPB-0006 (Oct. 9, 2013), *available at* http://files.consumerfinance.gov/f/201310_cfpb_consent-order_mortgage-master.pdf.

## 3.3 Equal Credit Opportunity Act referrals to Department of Justice

The CFPB must refer a matter to the DOJ when it has reason to believe that a creditor has engaged in a pattern or practice of lending discrimination in violation of ECOA.[35] The CFPB may also refer other potential ECOA violations to the DOJ if it chooses. In 2014, the CFPB referred 15 matters to the DOJ. With respect to five of the 15 matters referred to DOJ, DOJ declined to open an independent investigation **and deferred to the Bureau's handling of the matter.  The CFPB's** referrals to the DOJ covered a variety of practices, including discrimination on the bases of:

- Receipt of public assistance income, sex, marital status, race, national origin, and age in mortgage lending;

- Race and national origin in auto finance;

- Marital status, age, and national origin in unsecured consumer lending and credit cards; and

- Receipt of public assistance income, age, marital status, and sex in student lending.

## 3.4 Pending fair lending investigations

The Bureau had a number of ongoing investigations and authorized lawsuits against institutions that are focused on fair lending. In particular, the Bureau focused its efforts on addressing redlining. Redlining occurs when a lender fails to provide credit based on the racial or ethnic composition of a neighborhood. At the end of 2014, the Bureau had several open investigations of potential redlining.

**The Bureau is also focused on institutions' indirect auto lending, specifically discrimination** resulting from compensation policies that give auto dealers discretion to set loan prices. In 2014

---

[35] 15 U.S.C. § 1691e(g).

the Bureau investigated a number of indirect auto lenders and has a number of authorized lawsuits.

Finally, the Bureau is also investigating other areas for potential discrimination. The Bureau has investigated lenders for discrimination in the pricing and underwriting in mortgage lending.

# 4. Rulemaking

## 4.1   Home Mortgage Disclosure Act (Regulation C)

In August 2014, the Bureau published proposed amendments to Regulation C in the **Federal Register** that would, among other things, require covered lenders to report under HMDA certain new data elements.[36] If the proposal is finalized, this new information would include, for example: property value; the term of the loan; total points and fees; the duration of any introductory interest rate; an**d the applicant's or borrower's age and credit score.** In determining what HMDA information will be available to the public, the Bureau, in consultation with other agencies and after public input, will balance the importance of releasing the data to accomplish **HMDA's public disclosure purposes against the potential harm to applicant or borr**ower privacy interests that may result from the release of the data without modification.

In addition to the new data elements that may be added to the HMDA data collection, the Bureau is exploring ways to modernize and streamline HMDA data collection and reporting, particularly in light of other regulatory and mortgage market initiatives to improve the consistency of data standards and information flows.

Prior to issuing the proposed rule, the Bureau, along with the Small Business Administration Office of Advocacy and the Office of Management and Budget, launched in February 2014 a

---

[36] Home Mortgage Disclosure (Regulation C), 79 Fed. Reg. 51,732 (proposed Aug. 29, 2014) (to be codified at 12 C.F.R. pt. 1003).

small business review panel process to gather input on the rulemaking. The Bureau published the report on the small business review panel process along with the HMDA proposed rule.[37]

The public comment period closed on October 29, 2014. The Bureau received approximately 400 comments and is continuing to review all the comments received and work toward a final rule.

## 4.2   Small business data collection

Section 1071 of the Dodd-Frank Act amended ECOA to require financial institutions to collect and report to the CFPB data on lending to small, minority-, and women-owned businesses in **order to "facilitate e**nforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-**owned, and small businesses."**[38] The Dodd-Frank Act also directed the CFPB to prescribe rules and guidance as necessary to carry out, enforce, and compile data pursuant to that section.[39] In April 2011, the CFPB issued guidance stating that the data collection and submission obligations arising under these ECOA amendments do not go into effect until the CFPB issues necessary implementing regulations.[40]

The CFPB has begun to explore the issues our rulemaking will need to address. In particular, the CFPB is considering how the Bureau might work with other agencies to, in part, gain insight into existing small business data collection efforts and possible ways to cooperate in future efforts. The CFPB is also learning from our work implementing Dodd-Frank Act changes to HMDA, which concerns a similar information collection and reporting regime. In addition, the Bureau

---

[37] Final Report of the Small Business Review Panel on the CFPB's Proposals under Consideration for the Home Mortgage Disclosure Act (HMDA) Rulemaking (Apr. 24, 2014), *available at* http://files.consumerfinance.gov/f/201407_cfpb_report_hmda_sbrefa.pdf.

[38] Dodd-Frank Act § 1071(a) (codified at 15 U.S.C. § 1691c-2(a)).

[39] Dodd-Frank Act § 1071(a) (codified at 15 U.S.C. § 1691c-2(g)(1)).

[40] Letter from Leonard Kennedy, CFPB General Counsel, to Chief Executive Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act (Apr. 11, 2011), *available at* http://files.consumerfinance.gov/f/2011/04/GC-letter-re-1071.pdf.

has begun preliminary planning for supervisory activity in this area. Future small business lending reviews will help expand and enhance our knowledge base in this area, including the credit process; existing data collection processes; and the nature, extent, and management of fair lending risk.

# 5. Interagency coordination

**The Office of Fair Lending regularly coordinates the CFPB's fair lending efforts with those of** other federal agencies and state regulators to promote consistent, efficient, and effective enforcement of federal fair lending laws.[41] Through our interagency engagement, we work to address current and emerging fair lending risks.

## Financial Fraud Enforcement Task Force's Non-Discrimination Working Group

The Financial Fraud Enforcement Task Force was established in November 2009 by an Executive Order aimed at strengthening the efforts of the DOJ and federal, state, and local **agencies "to investigate and prosecute significant** financial crimes and other violations relating to the current financial crisis and economic recovery efforts, recover the proceeds of such financial crimes and violations, and ensure just and effective punishment of those who **perpetuate financial crimes and violations."**[42] The Non-Discrimination Working Group focuses on and monitors financial fraud or other unfair practices and emerging trends in order to proactively address emerging discriminatory practices directed at people or neighborhoods based on race, color, religion, national origin, gender, age, disability, or other bases prohibited by law.

On October 22, 2014, along with federal partners from the Federal Reserve Board of Governors (FRB), the DOJ, the Federal Deposit Insurance Corporation (FDIC), the Office of the Comptroller of the Currency (OCC), HUD, and the National Credit Union Administration

---

[41] *See* 12 U.S.C. 5493(c)(2)(B).

[42] Exec. Order No. 13519, 74 Fed. Reg. 60,123 (Nov. 17, 2009).

(NCUA), the Office of Fair Lending staff participated in and presented at the 2014 Federal Interagency Fair Lending Hot Topics webinar. The webinar covered several fair lending topics, including fair lending risk assessments, mortgage pricing risks, and indirect auto lending supervision and enforcement activities. The webinar was viewed by approximately 2,500 registrants.

## Interagency Task Force on Fair Lending

The CFPB, along with the FTC, DOJ, HUD, FDIC, FRB, NCUA, OCC, and the Federal Housing Finance Agency comprise the Interagency Task Force on Fair Lending. The Task Force meets regularly to share information regarding lending discrimination and fair lending policy issues. The agencies use these meetings to discuss fair lending enforcement efforts, share current methods of conducting supervisory and enforcement fair lending activities, and coordinate fair lending policies.

## Interagency Working Group on Fair Lending Enforcement

The CFPB belongs to a standing working group of Federal agencies – with the DOJ, HUD, and FTC – that regularly meets to discuss issues relating to fair lending enforcement. These regular discussions are designed to ensure that Federal fair lending enforcement efforts are well coordinated. The agencies use these meetings to discuss fair lending developments and trends, methodologies for evaluating fair lending risks and violations, and coordination of fair lending enforcement efforts.

## FFIEC HMDA/Community Reinvestment Act Data Collection Subcommittee

The CFPB takes part in the FFIEC HMDA/Community Reinvestment Act Data Collection Subcommittee, which is a subcommittee of the FFIEC Task Force on Consumer Compliance. The Bureau participates in the Subcommittee as its work relates to the collection and processing of HMDA data, over which the CFPB has supervisory and enforcement jurisdiction.

# 6. Outreach: promoting fair lending compliance and education

The CFPB is committed to communicating directly with industry and fair lending, civil rights, consumer, and community groups on its policies, compliance expectations, and priorities. Outreach is accomplished through issuance of Interagency Statements, *Supervisory Highlights*, Compliance Bulletins, and blog posts, as well as through the delivery of speeches and presentations and the convening of meetings and discussions addressing fair lending and access to credit matters.[43]

## 6.1 Field hearing on automobile finance market

In September 2014, the Bureau hosted an auto finance field hearing in Indianapolis, Indiana to facilitate a dialogue between the Bureau and a wide range of auto market participants, including industry representatives and consumer advocates.[44] The event featured remarks from CFPB Director Cordray, as well as from consumer groups, industry representatives, and members of the public. In connection with the hearing, the Bureau released a proposed rule to provide more

---

[43] *See* 12 U.S.C. 5493(c)(2)(C).

[44] *See* Consumer Financial Protection Bureau, *Live from Indianapolis!* (Sept. 18, 2014), *available at* http://www.consumerfinance.gov/blog/live-from-indianapolis.

complete Federal oversight of the auto finance market by extending **the Bureau's supervision authority to the larger participants in the nonbank auto finance market;**[45] an edition of ***Supervisory Highlights*** exclusively focused on fair lending supervisory and enforcement experience in the indirect auto lending market;[46] and a white paper, ***Using Publicly Available Information to Proxy for Unidentified Race and Ethnicity,*** describing the methodology that the Bureau uses to identify discriminatory practices when self-reported demographic data are unavailable.[47]



CFPB senior leadership and witness participate in field hearing on auto finance in Indianapolis, IN.

---

[45] Defining Larger Participants of the Automobile Financing Market and Defining Certain Automobile Leasing Activity as a Financial Product or Service, 79 Fed. Reg. 60,762 (proposed Oct. 8, 2014) (to be codified at 12 C.F.R. pts. 1001 and 1090).

[46] Consumer Financial Protection Bureau, ***Supervisory Highlights***: Summer 2014 (Sept. 17, 2014), *available at* http://files.consumerfinance.gov/f/201409_cfpb_supervisory-highlights_auto-lending_summer-2014.pdf.

[47] Consumer Financial Protection Bureau, ***Using Publicly Available Information to Proxy for Unidentified Race and Ethnicity: A Methodology and Assessment*** (Summer 2014), *available at* http://files.consumerfinance.gov/f/201409_cfpb_report_proxy-methodology.pdf.

### 6.1.1   Proxy methodology white paper

The Office of Fair Lending collaborates closely with the Office of Research, in the Bureau's Division of Research, Markets and Regulations, to conduct statistical analyses of the data we receive in our fair lending work. **In order to evaluate a lender's compliance with fair lending laws** outside of mortgage lending, the Bureau uses a proxy methodology akin to those developed in the social sciences, as do other federal supervisory agencies, the DOJ, and many researchers and private companies. ECOA and Regulation B generally prohibit a creditor from inquiring about the race, national origin, or sex of an applicant or any other person in connection with a credit transaction with a few exceptions, including for applications for home mortgages covered under HMDA. Information on applicant race and ethnicity, however, is often required to conduct fair lending analysis to identify potential discriminatory practices in underwriting and pricing outcomes. Various techniques exist for addressing this data problem. On September 17, 2014, the Bureau published a white paper, entitled *Using Publicly Available Information to Proxy for Unidentified Race and Ethnicity*, that details the methodology the Bureau uses to calculate the probability that an individual is of a specific race and ethnicity based on his or her last name and **place of residence. The Bureau's analysis demonstrates that its proxy** is generally more accurate at approximating the overall reported distribution of race and ethnicity than other available methods **using publicly available data. The Bureau's proxy** assigns an individual probability of inclusion in a prohibited-basis group based on both geography and surname, whereas other proxies use geography or surname alone in predicting **individual applicants' reported race and** ethnicity.

In connection with the release of the report, the Bureau made available the statistical software code and provided links to the publicly available census data used to build the proxy to enable lenders to replicate the analysis performed by the Bureau. Links to these materials are available on our website.[48]

**The Bureau's white paper prompted interest in the to**pic from stakeholders. Some consumer advocates expressed support for the use of proxy methodology, as proxies are a widely accepted and valid means of predicting race and ethnicity in other fields such as health care, as well as

---

[48] *Available at* http://www.consumerfinance.gov/reports/using-publicly-available-information-to-proxy-for-unidentified-race-and-ethnicity/.

commonly used in fair lending analysis. Some industry representatives expressed concern that the proxy overestimates the number of minority borrowers, particularly African Americans, **when compared to a data set of mortgage borrowers. The Bureau's study** similarly reported this result and explained its likely cause: the racial and ethnic makeup of mortgage applicants is not particularly representative of the general population. When the proxy is applied to data where the applicants are more representative of the general population, such as data on auto loan borrowers, this perceived overestimation may disappear or decrease significantly.

**Industry feedback on the Bureau's white paper also urged the Bureau to incorporate controls** into our analyses of discretionary markup based on broad (and, to our knowledge, untested) assumptions about the auto lending market and lending practices, in order to explain disparities identified when comparing the interest rates paid by similarly-situated minority and non-minority consumers. Because the Bureau takes a data-driven approach to its work that is **tailored to specific lenders' policies**, it would not be appropriate simply to adopt such controls as a wholesale matter and apply them to loan data without particularizing them for context. Given the requirements of the law, we must instead evaluate the relevance of any proposed controls on a lender-by-lender basis to determine whether they are legitimate and are actually incorporated **into the lender's decisions about discretionary markup of interest rates** on auto loans. As the Bureau has previously observed, many of the proposed controls are not appropriate when **analyzing disparities in discretionary markup because the lender's underwriting and pricing** systems may have already considered risk-based factors related to creditworthiness, the characteristics of the collateral, and the terms of the transaction.[49] Taking these factors into consideration again, for a second time, would be generally improper and would have the effect of artificially reducing the appearance of disparities and obscuring potential discrimination.

**Another concern voiced by industry relates to the Bureau's analyses of a lender's entire portfolio,** rather than more disaggregated slices based on a dealer-by-dealer analysis. As explained at length in our March 2013 compliance bulletin, when analyzing whether discrimination has occurred at a particular lender based on the overall composition of the lending program that it

---

[49] *See* Consumer Financial Protection Bureau, *Supervisory Highlights*: Summer 2014, at 10 (Sept. 17, 2014), *available at* http://files.consumerfinance.gov/f/201409_cfpb_supervisory-highlights_auto-lending_summer-2014.pdf.

has established, that lender's entire portfolio is indeed the relevant focus.[50] If a lender's policies are resulting in certain racial or ethnic groups paying more for auto loans from that lender, then the fair lending issue exists across all the loans where that policy applies, and not simply for a disaggregated slice of them. Of course, the Bureau's analysis is tailored to reflect the institution's particular policies, practices, products, and channels that occur in its lending program, and we appropriately adjust our analysis for each institution that is subject to review.

Moreover, the Bureau's examination and investigation process provides ample opportunity for a lender to provide feedback on the fair lending analysis we tailor for that institution. When, during an examination or investigation, we identify potential disparities, we share our initial findings with the institution, and solicit the institution's response. As part of this process, we have considered, on a case-by-case basis, many of the controls and recommendations offered by institutions and, where supported by the facts of a particular case, have incorporated them into our analysis. This process represents an ongoing dialogue between specific institutions and the Bureau that is iterative and where we remain open to making further improvements in our analysis of fair lending issues based on the facts and the data that are presented.

As we stated in our white paper, the Bureau is committed to continuing our dialogue with other federal agencies, lenders, advocates, and researchers regarding the Bureau's methodology, the importance of fair lending compliance, and the use of proxies when self-reported race and ethnicity is unavailable. We expect the methodology will continue to evolve as enhancements are identified that further increase accuracy and performance.

## 6.1.2   Larger Nonbank Participants in the Auto Finance Market

On October 8, 2014, the Bureau published in the *Federal Register* a Proposed Rule defining nonbank "larger participants" of the automobile financing market.[51]  If the Rule is adopted, nonbank entities that meet the requirements to be larger participants, and are not otherwise

---

[50] *See* CFPB Bulletin 2013-02, at 3 ("The disparities triggering liability could arise either within a particular dealer's transactions or across different dealers within the lender's portfolio.").

[51] Defining Larger Participants of the Automobile Financing Market and Defining Certain Automobile Leasing Activity as a Financial Product or Service, 79 Fed. Reg. 60,762 (proposed Oct. 8, 2014) (to be codified at 12 C.F.R. pts. 1001 and 1090).

affiliated with a large bank, would for the first time be subject to CFPB supervision with respect to Federal consumer financial laws, including but not limited to ECOA. The Bureau currently has the authority to supervise and bring enforcement actions against large depository institutions (over $10 billion in assets) or their affiliates that engage in automobile financing activities. The Proposed Rule, if adopted, would allow the Bureau to also supervise nonbank larger participants that engage in these same automobile financing activities, promoting the **Bureau's objective of enforcing Federal consumer financial law**s consistently without regard to whether an entity is a bank or nonbank. It should be noted that the Bureau currently has authority to bring enforcement actions against nonbank auto lenders. Before the comment period closed on December 8, 2014, the Bureau received approximately 30 comments on the proposal and will carefully consider these comments as it finalizes the rule.

## 6.2    CFPB Bulletin: Social Security disability income verification

On November 18, 2014, the Bureau issued a bulletin reminding lenders that requiring unnecessary documentation from consumers who receive Social Security disability income may raise fair lending risk, and calling attention to standards and guidelines that may help lenders comply with the law.[52]

The Social Security Administration provides certain benefits for individuals with serious disabilities but generally will not provide documentation regarding how long benefits will last. Some mortgage applicants have reported being asked for information about their disabilities or **even for doctors' notes about the likely duration of their disabilities**. ECOA and Regulation B prohibit creditors from discriminating against an applicant because some or all of the **applicant's income comes from any public assistance program, which includes Social Security** disability income. While lenders can consider the source of an appli**cant's income for** determining pertinent elements of creditworthiness, the bulletin notes that lenders may face fair lending risk if they require documentation beyond that required by lawful applicable agency or

---

[52] Consumer Financial Protection Bureau, CFPB Bulletin 2014-03, *Social Security Disability Income* (Nov. 18, 2014), *available at* http://files.consumerfinance.gov/f/201411_cfpb_bulletin_disability-income.pdf.

secondary market standards and guidelines in order to demonstrate that Social Security disability income is likely to continue.

The bulletin discusses current standards and guidelines on verification of Social Security **disability income, including under the CFPB's Ability**-to-Repay rule, HUD**'s standar**ds for Federal Housing Administration-insured loans, the Department of Veterans Affairs (VA) standards for VA-guaranteed loans, and guidelines from Fannie Mae and Freddie Mac. The bulletin reminds lenders that following the applicable standards and guidelines may help them avoid policies and practices that violate ECOA and Regulation B.

# 7. Interagency reporting

Pursuant to ECOA, the CFPB is required to file a report to Congress describing the administration of its functions under ECOA, providing an assessment of the extent to which compliance with ECOA has been achieved, and giving a summary of public enforcement actions taken by other agencies with administrative enforcement responsibilities under ECOA.[53] This **section of the CFPB's Fair Lending Report provide**s the following information required by ECOA:

- description of **the CFPB's and other agencies' ECOA enforcement efforts**; and

- assessment of compliance with ECOA.

In addition, the CFPB's annual HMDA reporting requirement calls for the CFPB, in consultation with HUD**, to report annually on the utility of HMDA's requirement that covered lenders itemize** certain mortgage loan data.[54]

---

[53] *See* 15 U.S.C. § 1691f.

[54] *See* 12 U.S.C. § 2807.

# 7.1   Equal Credit Opportunity Act enforcement

The enforcement efforts and compliance assessments made by all the agencies assigned enforcement authority under Section 704 of ECOA are discussed in this section.

## 7.1.1   Public enforcement actions

In addition to the CFPB, the agencies charged with administrative enforcement of ECOA under Section 704 include: the FRB, the FDIC, the OCC, and the NCUA (collectively, the FFIEC agencies);[55] the FTC, the Farm Credit Administration (FCA), the Department of Transportation (DOT), the Securities and Exchange Commission (SEC), the Small Business Administration (SBA), and the Grain Inspection, Packers and Stockyards Administration (GIPSA) of the Department of Agriculture.[56]   In 2014, CFPB had one public enforcement action for violations of ECOA, and the FDIC issued one public enforcement action for violations of ECOA and/or Regulation B.

## 7.1.2   Violations cited during ECOA examinations

Among institutions examined for compliance with ECOA and Regulation B, the FFIEC agencies reported that the most frequently cited violations were:

---

[55] The FFIEC is a "formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions" by the member agencies listed above and the State Liaison Committee "and to make recommendations to promote uniformity in the supervision of financial institutions." Federal Financial Institutions Examination Council, http://www.ffiec.gov (last visited Apr. 2, 2015).

[56] *See* 15 U.S.C. § 1691c.

**TABLE 1:**   MOST FREQUENTLY CITED REGULATION B VIOLATIONS BY FFIEC AGENCIES: 2014

| FFIEC Agencies Reporting | Regulation B Violations: 2014 |
|---|---|
| CFPB, FDIC, FRB, NCUA, OCC | 12 C.F.R. § 1002.4(a): Discrimination on a prohibited basis in a credit transaction.<br><br>12 C.F.R. §§ 1002.5(b), (d): Improperly requesting information about an applicant's race, color, religion, national origin, sex, marital status or source of income.<br><br>12 C.F.R. § 1002.7(d)(1): Improperly requiring the signature of an applicant's spouse or other person.<br><br>12 C.F.R. §§ 1002.9(a)(1), (a)(2), and (b)(2): Failure to timely notify an applicant when an application is denied; failure to provide sufficient information in an adverse action notification, including the specific reasons the application was denied.<br><br>12 C.F.R. §§ 1002.13(a) and (b): Failure to request and collect information about the race, ethnicity, sex, marital status, and age of applicants seeking certain types of mortgage loans. |

Of the remaining agencies, only the FCA conducted examinations and reported results in 2014. The Regulation B violations most frequently cited by the FCA were:

**TABLE 2:**   MOST FREQUENTLY CITED REGULATION B VIOLATIONS BY OTHER ECOA AGENCIES, 2014

| Other ECOA Agencies | Regulation B Violations: 2014 |
|---|---|
| FCA | 12 C.F.R. § 1002.9: Failure to timely notify an applicant when an application is denied; failure to provide sufficient information in an adverse action notification, including the specific reasons the application was denied.<br><br>12 C.F.R. § 1002.12(b): Failure to properly preserve records.<br><br>12 C.F.R. § 1002.13: Failure to request and collect information about the race, ethnicity, sex, marital status, and age of applicants seeking certain types of mortgage loans. |

The GIPSA and the SEC reported that they received no complaints based on ECOA or Regulation B in 2014.  The SBA reported that they received one complaint inquiry about a bank from an SBA guaranty loan recipient in 2014 and they referred the recipient to the bank's relevant prudential regulator. In 2014, the DOT reported that it received a "small number of consumer inquiries or complaints concerning credit matters possibly covered by ECOA," which it "processed informally."  The FTC is an enforcement agency and does not conduct compliance examinations.

## 7.2   Referrals to Department of Justice

In 2014, the FFIEC agencies including CFPB referred a total of 18 matters to the DOJ. The FDIC referred 3 matters to the DOJ. These matters alleged discriminatory treatment of persons in credit transactions due to protected characteristics, including national origin and marital status. CFPB referred 15 matters to the DOJ during 2014, finding discrimination in credit transactions on the following prohibited bases: national origin, sex, race, receipt of public assistance income, age, and marital status.

# 7.3    Reporting on the Home Mortgage Disclosure Act

The **CFPB's annual HMDA reporting requirement** calls for the CFPB, in consultation with the Department of Housing and Urban Development (HUD), to report annually on the utility of **HMDA's** requirement that covered lenders itemize in order to disclose the number and dollar amount of certain mortgage loans and applications, grouped according to various characteristics.[57] The CFPB, in consultation with HUD, finds that itemization and tabulation of these data further the purposes of HMDA. **For more information on the Bureau's proposed amendments to HMDA's implementing regulation, Regulation C, please see the Rulemaking** section of this report.

---

[57] *See* 12 U.S.C. § 2807.

# 8. Conclusion

In this, our third Fair Lending Report to Congress, we **describe the Bureau's efforts** to identify and combat discrimination through our research, supervision, enforcement, guidance and outreach to consumers and industry, rulemaking, and interagency engagement.[58] The Bureau and Office of Fair Lending appreciate the opportunity to report on our efforts to ensure fair, equitable, and nondiscriminatory access to credit. In the years to come, we look forward to maintaining a sharp focus on discrimination and ensuring that markets operate fairly and effectively for all market participants.

---

[58] *See* 12 U.S.C. 5493(c)(2)(D).

# APPENDIX A:

# Defined terms

**DEFINED TERM**

| | |
|---|---|
| Bureau | The Consumer Financial Protection Bureau |
| CFPB | The Consumer Financial Protection Bureau |
| CMS | Compliance Management System |
| Dodd-Frank Act | The Dodd-Frank Wall Street Reform and Consumer Protection Act. |
| DOJ | The U.S. Department of Justice |
| DOT | The U.S. Department of Transportation |
| ECOA | The Equal Credit Opportunity Act |
| FCA | Farm Credit Administration |

| | |
|---|---|
| FDIC | The U.S. Federal Deposit Insurance Corporation |
| Federal Reserve Board | The U.S. Board of Governors of the Federal Reserve System |
| FFIEC | The U.S. Federal Financial Institutions Examination Council |
| FRB | The U.S. Board of Governors of the Federal Reserve System |
| FTC | The U.S. Federal Trade Commission |
| GIPSA | Grain Inspection, Packers and Stockyards Administration (GIPSA) of the Department of Agriculture |
| HMDA | The Home Mortgage Disclosure Act |
| HUD | The U.S. Department of Housing and Urban Development |
| LEP | Limited English Proficiency |
| NCUA | The National Credit Union Administration |
| NFLET | National Fair Lending Examination Team |
| OCC | The U.S. Office of the Comptroller of the Currency |

| SBA | Small Business Administration |
|-----|-------------------------------|
| SEC | U.S. Securities and Exchange Commission |
| Treasury | The U.S. Department of the Treasury |
| VA | U.S. Department of Veterans Affairs |

# EXHIBIT 6

# RIN Data

**CFPB** **RIN:** 3170-AA09 **Publication ID:** Spring 2016

**Title:** Business Lending Data (Regulation B)

**Abstract:**

Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) amends the Equal Credit Opportunity Act (ECOA) to require financial institutions to report information concerning credit applications made by women-owned, minority-owned, and small businesses. The amendments to ECOA made by the Dodd-Frank Act require that certain data be collected and maintained, including the number of the application and date the application was received; the type and purpose of loan or credit applied for; the amount of credit applied for and approved; the type of action taken with regard to each application and the date of such action; the census tract of the principal place of business; the gross annual revenue of the business; and the race, sex, and ethnicity of the principal owners of the business. The Dodd-Frank Act also provides authority for the CFPB to require any additional data that the CFPB determines would aid in fulfilling the purposes of this section. The Bureau will focus on outreach and research to develop its understanding of the players, products, and practices in the small business lending market and of the potential ways to implement section 1071. The CFPB then expects to begin developing proposed regulations concerning the data to be collected and appropriate procedures, information safeguards, and privacy protections for information-gathering under this section.

**Agency:** Consumer Financial Protection Bureau(CFPB) **Priority:** Other Significant

**RIN Status:** Previously published in the Unified Agenda **Agenda Stage of Rulemaking:** Prerule Stage

**Major:** Undetermined **Unfunded Mandates:** No

**EO 13771 Designation:**

**CFR Citation:** 12 CFR 1002

**Legal Authority:** 15 U.S.C. 1691c-2

**Legal Deadline:** None

**Timetable:**

| Action | Date | FR Cite |
|---|---|---|
| Prerule Activities | 12/00/2016 | |

**Regulatory Flexibility Analysis Required:** Yes **Government Levels Affected:** None

**Small Entities Affected:** Businesses **Federalism:** No

**Included in the Regulatory Plan:** No

**RIN Data Printed in the FR:** Yes

**Agency Contact:**
Elena Grigera Babinecz
Office of Regulations
Consumer Financial Protection Bureau
Phone:202 435-7700

# EXHIBIT 7

# CFPB advisory board 2.0: Far fewer members

By **Kate Berry**
Published July 18 2018, 11:11am EDT

More in **Trump administration, Dodd-Frank, Regulatory reform, Mick Mulvaney, CFPB**

Just as Mick Mulvaney fired members of a board that advises the Consumer Financial Protection Bureau on consumer issues last month, the agency's acting director was also taking steps to re-form the panel with less than a quarter of its sitting members.

On June 5, Mulvaney signed an amended charter to reconstitute the consumer advisory board with only six members, according to a copy of the charter obtained by American Banker. A day later, the board's 25 volunteer members were fired along with roughly 35 members of two other advisory boards.

The board's new amended charter states that the board "will have no formal decision-making role and no access to confidential supervisory or other confidential information." The document also indicates that the amended charter was filed on June 20 with the Senate Banking Committee, the House Financial Services Committee, the General Services Administration and the Library of Congress. The advisory board was originally created under the Dodd-Frank Act.



Acting CFPB Director Mick Mulvaney said the advisory boards were fired because they were too big and he wanted meetings held in private because he feared information would leak to the media.
Bloomberg News

All the board members were fired via a conference call by Anthony Welcher, the CFPB's policy adviser for external affairs and one of a dozen political appointees hired by Mulvaney. The firings came after several consumer lawyers and advocates complained in media reports that Mulvaney had refused to meet with them or convene the boards at all this year.

Days later, Mulvaney said the boards were fired because they were too big and he wanted meetings held in private because he feared information would leak to the media.

The board's new amended charter has nearly identical language to the old one with the exception of the smaller number of members.

"The Board shall consist of six members serving one-year terms, appointed upon the recommendation of the regional Federal Reserve Bank Presidents on a rotating basis," the charter states. "All members appointed by the Director shall serve at the pleasure of the Director."

The charter states that the estimated operating cost for the board is roughly $150,000 including staff time.

The charter also states that the board may be composed of "a mixture of representatives and Special Government Employees," which gives board members a special exemption from financial conflicts of interest and impartiality rules.

Six of the consumer advisory board's 25 members who were fired in June had been appointed on the recommendation of regional Fed presidents.

Some CFPB experts consider the agency's boards to be ancillary since they have little power. But the board members — a mix of consumer advocates, attorneys and high-level executives at banks and other fintech companies — viewed the firings as politically motivated.

Last week, 25 Senate Democrats sent a letter to Mulvaney urging him to reinstate the board and asking for more details on the firings.

"By dismissing the [advisory board], the CFPB is deliberately rejecting statutorily required advice from qualified professionals who are volunteering their services to the American public, with no credible explanation as to why the present CAB members are not fulfilling their responsibilities," the letter said.

Like President Trump, who has sought to eliminate rules and regulations put in place by his predecessor, Mulvaney also has made a number of decisions specifically to undo the work of his predecessor, former CFPB Director Richard Cordray, who is running for governor of Ohio.

Most notable has been Mulvaney's decision to officially change the name of the bureau to the Bureau of Financial Consumer Protection, or BFCP. The CFPB's staff has been changing the agency's name and seal on thousands of documents.

It is unclear if Mulvaney has created new charters to reconstitute the CFPB's other boards, the Community Bank Advisory Board and the Credit Union Advisory Board, neither of which is mandated by Dodd-Frank. A fourth board, called the Academic Research Council, provides technical advice and feedback to the CFPB's Office of Research. It has not yet been disbanded and held a meeting in May.





For reprint and licensing requests for this article, **click here**.

# EXHIBIT 8



# Fall 2018 rulemaking agenda

By Kelly Cochran – OCT 17, 2018

The Bureau's general purpose, as specified in section 1021 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), is to implement and enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive. Under the Regulatory Flexibility Act, Federal agencies must publish regulatory agendas twice a year. As an independent regulatory agency, the Bureau has been voluntarily participating in the Unified Agenda ◰, which is led by the Office of Management and Budget (OMB).

The Bureau is under interim leadership pending the confirmation of a permanent director. The Bureau is also in the process of implementing various provisions in the Economic Growth, Regulatory Relief, and Consumer Protection Act (EGRRCPA) ◰, which was signed into law in May 2018, and of conducting its first assessments of the effectiveness of prior "significant" Bureau rulemakings as required by section 1022(d) of the Dodd-Frank Act. In addition, the Bureau is analyzing more than 86,000 comments received in response to its "Call for Evidence" initiative seeking feedback on Bureau operations and regulations. Following consideration of these various initiatives, the Bureau expects to refine its rulemaking priorities no later than the Spring 2019 Agenda and will publish an updated statement of priorities at that time.

## Implementing Statutory Directives

Much of the Bureau's current rulemaking work is focusing on implementing directives mandated in the EGRRCPA, the Dodd-Frank Act, and other statutes.

The Bureau issued two rules to facilitate the implementation of the EGRRCPA. One rule was an interim final rule that adjusts certain model forms under the Fair Credit Reporting Act in light of EGRRCPA amendments to strengthen consumers' ability to protect themselves from identity theft.  The other  rule was an interpretive and procedural rule that provided clarification regarding EGRRCPA amendments to the Home Mortgage Disclosure Act (HMDA).

The Bureau has also added future EGRRCPA projects to this Unified Agenda.  These projects include a rulemaking to exempt certain creditors with assets of $10 billion or less

from certain mortgage escrow requirements under the Dodd-Frank Act, and a rulemaking to develop standards for assessing consumers' ability to repay "Property Assess Clean Energy" financing.

Some provisions of EGRRCPA do not require Bureau rulemaking to take effect (e.g., sections 101, 104, 106, 107, 109(a), 301, 601). Even though Bureau rulemaking is not required for these provisions to take effect, the Bureau has noted in the Unified Agenda that notice-and-comment rulemaking may be helpful to better implement or clarify these provisions.

The Bureau is also engaged in a range of other non-rulemaking activities to facilitate EGRRCPA implementation. For example, the Bureau is reviewing its compliance guides and examination manuals to make appropriate updates, as well as engaging with stakeholders regarding the issuance of guidance to meet the statutory requirements and facilitate compliance. In particular, EGRRCPA calls upon the Bureau to provide clearer, authoritative guidance on certain issues, in connection with regulations that integrate certain mortgage disclosures under the Truth in Lending Act (TILA) and the Real Estate Settlement Procedures Act (RESPA).

The Bureau has also added a new rulemaking to its agenda to facilitate further implementation of a statutory directive in the 2010 Dodd-Frank Act amendments to HMDA that the Bureau modify or require modification of the public HMDA data for the purpose of protecting consumer privacy interests. The Bureau expects to issue final guidance in the next few months to govern public disclosure of 2018 HMDA data in accordance with the standards it set for balancing privacy interests in its 2015 final rule to implement the Dodd-Frank Act amendments. After consideration of stakeholder comments urging that determinations concerning the disclosure of loan-level HMDA data be effectuated through more formal processes, the Bureau also has decided to add a new notice-and-comment rulemaking to govern the disclosure of HMDA data in future years.

In light of the need to focus additional resources on various HMDA initiatives discussed elsewhere in this agenda, the Bureau has adjusted its timeline for implementing the statutory directive contained in section 1071 of the Dodd-Frank Act which amended the Equal Credit Opportunity Act (ECOA) to require financial institutions to collect, report, and make public certain information concerning credit applications made by women-owned, minority-owned, and small businesses. The Bureau has now reclassified the section 1071 project from pre-rule status to longer-term action status.

## Continuation of Existing Rulemaking

The Bureau announced in January 2018 that it intends to engage in a rulemaking to reconsider a 2017 rule titled Payday, Vehicle Title, and Certain High-Cost Installment Loans which has a compliance date in August 2019. The Bureau expects to issue a Notice of Proposed Rulemaking by no later than early 2019 that will address reconsideration of the rule on the merits as well as address changes to its compliance date.

Prior to the enactment of the EGRRCPA, the Bureau had already put a rulemaking on its Spring 2018 Agenda to reconsider aspects of its 2015 rulemaking to implement Dodd-Frank Act amendments to HMDA, including but not limited to the threshold for collecting and reporting HMDA data with respect to open-end lines of credit.  In addition, the Bureau anticipates engaging in notice-and-comment rulemaking to incorporate the EGRRCPA interpretative and procedural rule mentioned above into Regulation C and to further implement ERGGCPA.  The Bureau expects to issue a Notice of Proposed Rulemaking in Spring 2019 to address some or all of the issues related to these HMDA projects.

 Finally, the Bureau has continued to engage in research and pre-rulemaking activities regarding the debt collection market, which remains a top source of complaints to the Bureau.  The Bureau has also received encouragement from industry and consumer groups to engage in rulemaking to address how to apply the 40-year old Fair Debt Collection Practices Act (FDCPA) to modern collection practices. By March 2019, the Bureau expects to issue a Notice of Proposed Rulemaking addressing such issues as communication practices and consumer disclosures.

## Future Planning

As noted above, the Bureau has a number of workstreams underway that could affect planning and prioritization of rulemaking activity, as well as the way in which it conducts rulemakings and related processes.  For example, in addition to completing its first three statutorily-mandated assessments of prior "significant" rulemakings (Remittance Rule, 2013 RESPA Mortgage Servicing Rule, and Ability-to-Repay-Qualified Mortgage Rule) by January 2019, the Bureau expects to begin work in 2019 on its assessment of the TILA-RESPA Integrated Disclosure Rule.

The Bureau is considering future activity with regard to specific areas of consumer financial law of significant public interest.  For example, the Bureau announced in May 2018 that it is reexamining the requirements of the Equal Credit Opportunity Act (ECOA) concerning the disparate impact doctrine in light of recent Supreme Court case law and the Congressional disapproval of a prior Bureau bulletin concerning indirect auto lender compliance with ECOA and its implementing regulations.   The Bureau is also considering how rulemaking may be helpful to further clarify the meaning of "abusiveness" under the section 1031 of the Dodd-Frank Act.

The Bureau expects by no later than the Spring 2019 Agenda to issue a more comprehensive statement of priorities to reflect its ongoing market monitoring and the Bureau's other activities discussed above.

**Topics:**

* RULEMAKING

Join the conversation. Follow CFPB on Twitter 🗗 and Facebook 🗗 .

**FURTHER READING**

🗩 Blog

Spring 2019 rulemaking agenda

MAY 22, 2019

Assessing our rules: Our reports on the Ability to Repay and Qualified Mortgage Rule and the RESPA Mortgage Servicing Rule

JAN 11, 2019

Spring 2018 rulemaking agenda

MAY 10, 2018

🖼 Newsroom

Director Kraninger's Speech at CFPB Symposium on Behavioral Economics

SEP 19, 2019

Deputy Director Johnson's Speech at CFPB Symposium on Behavioral Economics

SEP 19, 2019

CFPB to Host Symposium on September 19

SEP 06, 2019

📅 Events

CFPB Symposium: Behavioral Economics

SEP 19, 2019

CFPB Symposium: Abusive Acts or Practices

JUN 25, 2019

View more

**STAY INFORMED**

Subscribe to our email newsletter. We will update you on new blogs.

**Email address**

mail@example.com

Sign up     See Privacy Act statement

Subscribe to our RSS feed to get the latest content in your reader.

Subscribe to RSS

---

## Contact Us

## Newsroom

## Careers

## Industry Whistleblowers

## CFPB Ombudsman

FOIA

Plain Writing

Privacy

Website Privacy Policy & Legal Notices

Open Government

Information Quality Guidelines

Administrative Adjudication

Accessibility

Office of Civil Rights

No FEAR Act Data

Tribal

USA.gov ⧉

Office of Inspector General ⧉

An official website of the United States government

# EXHIBIT 9



# Spring 2019 rulemaking agenda

By Diane Thompson – MAY 22, 2019

The Bureau is publishing its Spring 2019 Agenda as part of the Spring 2019 Unified Agenda ⤧ of Federal Regulatory and Deregulatory Actions, which is coordinated by the Office of Management and Budget. As an independent regulatory agency, the Bureau voluntarily participates in the Unified Agenda. The agenda lists the regulatory matters that the Bureau reasonably anticipates having under consideration during the period from May 1, 2019, to April 30, 2020, as described further below

A permanent director of the Bureau took office in December 2018. The Director recently completed a listening tour to engage with Bureau stakeholders, employees, and outside experts, building on feedback submitted through more than 88,000 public comments in response to the Bureau's 2018 "Call for Evidence" initiative. The Bureau expects to communicate further information about future planning and priorities in the coming months. In the meantime, this Spring 2019 Agenda reflects ongoing rulemaking activities, including initiatives to implement statutory requirements and to address the potential sunset of statutory and regulatory provisions.

## Implementing Statutory Directives

The Bureau is engaged in a number of rulemakings to implement directives mandated in the Economic Growth, Regulatory Relief, and Consumer Protection Act of 2018 (EGRRCPA) ⤧, the Dodd-Frank Act, and other statutes. As part of these rulemakings, the Bureau is working to achieve the consumer protection objectives of the statutes while minimizing regulatory burden on financial services providers, including facilitating industry compliance with rules.

For example, the Bureau has recently published an Advance Notice of Proposed Rulemaking to seek public comment relating to implementation of section 307 of EGRRCPA, which amends the Truth in Lending Act (TILA) to mandate that the Bureau prescribe certain regulations relating to "Property Assessed Clean Energy" (PACE) financing. The required regulations must carry out the purposes of TILA's ability-to-repay (ATR) requirements, currently in place for residential mortgage loans, with respect to PACE financing, and apply TILA's general civil liability provision for violations of the ATR requirements the Bureau will prescribe for PACE financing.

The Bureau recently issued a Notice of Proposed Rulemaking to follow up on an interpretive and procedural rule that it issued in August 2018 to provide clarification regarding EGRRCPA amendments to the Home Mortgage Disclosure Act (HMDA) which created partial exemptions that allow certain insured depository institutions and insured credit unions not to report certain data points for certain transactions.

The Bureau has been engaged in a range of other activities to support implementation of EGRRCPA. For example, the Bureau updated its small entity compliance guides and other compliance aids to reflect EGRRCPA's statutory changes. The Bureau also has issued written guidance as encouraged by section 109 of the Act to facilitate compliance with certain regulations governing mortgage disclosures. In anticipation of its future rulemaking activity, the Bureau has conducted a preliminary analysis of the number of lenders potentially impacted by implementation of section 108 of EGRRCPA. That preliminary analysis indicates that the section 108 EGRRCPA amendments would affect no more than a few hundred institutions. The Bureau anticipates updating that analysis in conjunction with its release of its HMDA data point article, which it intends to issue later this summer.

Consistent with undertaking rulemaking to implement the EGRRCPA, the Bureau intends to recommence work later this year to develop rules to implement section 1071 of the Dodd-Frank Act. Section 1071 amended the Equal Credit Opportunity Act (ECOA) to require financial institutions to collect, report, and make public certain information concerning credit applications made by women-owned, minority-owned, and small businesses. The Bureau expects that it will be able to resume pre-rulemaking activities on the section 1071 project within this next year.

## Continuation of Other Rulemakings

The Bureau is continuing certain other rulemakings described in its Fall 2018 Agenda to ensure that markets for consumer financial products and services operate transparently and efficiently and to address potential unwarranted regulatory burdens.

For example, the Bureau issued two proposals in February 2019 relating to reconsideration of a 2017 rule titled Payday, Vehicle Title, and Certain High-Cost Installment Loans. The main proposal would rescind portions of the 2017 rule that mandated underwriting requirements for certain short-term and balloon-payment loans. The second proposal would postpone the compliance date for those same provisions for fifteen months. The Bureau expects to issue a final rule concerning the compliance date in summer 2019 and a final determination on reconsideration thereafter.

In addition, prior to the enactment of the EGRRCPA, the Bureau in August 2017 had temporarily increased the threshold for collecting and reporting HMDA data with respect to open-end lines of credit from 100 loans to 500 loans so that the Bureau could assess whether to make a permanent adjustment to the 100 open-end line of credit threshold. The Bureau recently issued a Notice of Proposed Rulemaking to address both the open-end

threshold and the 2015 HMDA rule's 25-loan threshold for closed-end loans, as well as implementation of the EGRRCPA's changes to HMDA as described above. The Bureau concurrently issued an Advance Notice of Proposed Rulemaking concerning certain data points that are reported under the 2015 HMDA rule. The Bureau expects at a later date to issue a Notice of Proposed Rulemaking concerning the public disclosure of HMDA data in light of consumer privacy interests.

Finally, the Bureau issued a Notice of Proposed Rulemaking in May 2019 addressing such issues as communication practices and consumer disclosures in the debt collection market. This proposal builds on research and pre-rulemaking activities regarding the debt collection market, which remains a top source of complaints to the Bureau.

## New Projects and Further Planning

After completing an assessment in October 2018 of its rules to implement Dodd-Frank Act requirements for international remittance transfers, the Bureau issued in April 2019 a request for information to gather information related to the expiration of a statutorily-established exception in the Remittance Rule that permits insured banks and insured credit unions to estimate certain required disclosures and other potential remittance transfer issues and related topics. The Bureau may consider rulemaking based on comments received to that RFI.

The Bureau also recently completed an assessment of rules implementing Dodd-Frank Act provisions that require mortgage lenders to determine consumers' ability to repay loans and define certain "qualified mortgages" that are presumed to comply with the statutory requirements. The Bureau is now focusing its attention on a regulatory provision (the patch) that extends qualified mortgage status to loans that are eligible to be purchased or guaranteed by either Fannie Mae or Freddie Mac (the government sponsored entities or GSEs) while they operate under Federal conservatorship or receivership. After further policy analysis on this issue, the Bureau will determine whether rulemaking or follow up activity is appropriate concerning the patch or other aspects of the ATR/QM rules.

The Bureau is also actively reviewing existing regulations. For example, the Bureau will be conducting an assessment pursuant to section 1022(d) of the Dodd-Frank Act of its regulations to consolidate various mortgage origination disclosures under the Truth in Lending Act and Real Estate Settlement Procedures Act. The Bureau also published in May 2019 its plan for conducting reviews consistent with section 610 of the Regulatory Flexibility Act, of certain regulations which are believed to have a significant impact on a substantial number of small entities, and it issued a request for information on the first such review, concerning the impact of certain regulations concerning overdraft services on small banks and credit unions.

As noted above, Bureau leadership is considering further prioritization and planning of the Bureau's rulemaking activities, both with regard to substantive projects and modifications to

the processes that the Bureau uses to develop and review regulations. While this evaluation is underway, the Bureau has decided not to revise its current list of long-term projects other than the changes described above.

The Bureau expects by no later than the Fall 2019 Agenda to issue a more comprehensive statement of priorities to reflect its ongoing statutorily mandated market monitoring and the Bureau's other activities discussed above.

**Topics:**

✦ RULEMAKING

Join the conversation. Follow CFPB on Twitter ⬚ and Facebook ⬚ .

**FURTHER READING**

🗩 Blog

**Assessing our rules: Our reports on the Ability to Repay and Qualified Mortgage Rule and the RESPA Mortgage Servicing Rule**

JAN 11, 2019

**Fall 2018 rulemaking agenda**

OCT 17, 2018

**Spring 2018 rulemaking agenda**

MAY 10, 2018

▦ Newsroom

**Director Kraninger's Speech at CFPB Symposium on Behavioral Economics**

SEP 19, 2019

**Deputy Director Johnson's Speech at CFPB Symposium on Behavioral Economics**

SEP 19, 2019

**CFPB to Host Symposium on September 19**

SEP 06, 2019

🗓 **Events**

CFPB Symposium: Behavioral Economics

SEP 19, 2019

CFPB Symposium: Abusive Acts or Practices

JUN 25, 2019

View more

**STAY INFORMED**

Subscribe to our email newsletter. We will update you on new blogs.

**Email address**

mail@example.com

Sign up     See Privacy Act statement

Subscribe to our RSS feed to get the latest content in your reader.

Subscribe to RSS

Contact Us

Newsroom

Careers

Industry Whistleblowers

## CFPB Ombudsman

FOIA

Plain Writing

Privacy

Website Privacy Policy & Legal Notices

Open Government

Information Quality Guidelines

Administrative Adjudication

Accessibility

Office of Civil Rights

No FEAR Act Data

Tribal

USA.gov ☑

Office of Inspector General ☑

An official website of the United States government

# EXHIBIT 10

# These are the 15 worst cities for black Americans

*Samuel Stebbins and Evan Comen, 24/7 Wall Street Published 6:00 a.m. ET Nov. 16, 2018 | Updated 10:10 a.m. ET Feb. 27, 2019*

These are some of the worst cities to live in for black Americans according to unemployment rate and median income. USA TODAY



The unemployment rate for black Americans fell below 6 percent for the first time in history earlier this year.(Photo: Darren Hauck / Getty Images)

The unemployment rate for black Americans fell below 6 percent for the first time in history earlier this year.

The historic dip in joblessness was a benchmark of progress in the continued pursuit of racial equality in the United States – and a reminder of the unique challenges black Americans face every day.

The black unemployment rate has hovered above the overall unemployment rate by several percentage points since the Bureau of Labor Statistics began tracking it over 40 years ago. Racial disparities in America do not stop with the labor market.

The median annual income among black households in the United States is just $36,651, about $24,000 shy of the median income among white households. Black

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

Americans are also less likely to own a home, less likely to have a college education, and five times more likely to be incarcerated than white Americans.



In some U.S. cities, everyday comfort and happiness is much harder to attain than in others. Quality of life is subjective, and difficult to measure. Still, there is a wide range of quantifiable factors that can impact quality of life in a given area. Affordability, safety, job market strength, quality of education, infrastructure, average commute times, air quality, and the presence of cultural attractions are just a few examples of factors that can influence overall quality of life. 24/7 Wall Street created an index with measures in eight categories -- crime, economy, education, environment, health, housing, infrastructure, and leisure -- to identify the 50 worst cities to live in. Not confined to a single region, the worst cities span the country. TennesseePhotographer / iStock

50. Fort Smith, Arkansas: By a number of measures assessing economic opportunity, education, crime, and public health, Fort Smith is one of the worst cities to live in. Just 20.0% of adults in the city have a bachelor's degree, far less than the national college attainment rate of 31.3% and the smallest share of any major city in Arkansas. Scott Ward / Shutterstock.com

49. Salt Lake City: One factor detracting from quality of life in Salt Lake City is the area's high violent crime rate. Some 937 violent crimes were reported in 2016 per 100,000 city residents, more than twice the national violent crime rate of 386 incidents per 100,000 Americans and nearly four times the state rate of 243 per 100,000 Utah residents. Housing prices in Salt Lake City also have been rising fast in recent years and have

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

outpaced the area's income growth, making housing unaffordable for many low-income residents. Thinkstock

48. Gainesville, Fla.: Gainesville is the home of the University of Florida, one of the top 50 national universities as ranked by U.S. News & World Report and the country's fifth largest university by undergraduate enrollment. While the presence of a large research university likely has added depth to the area's talent pool -- some 41.7% of Gainesville adults have a bachelor's degree compared to 31.3% of adults nationwide --quality of life in the city is poor overall. Sean Pavone / iStock

47. Atlanta: While Atlanta has experienced substantial economic and population growth in recent years, the city's high violent crime rate continues to hinder the area's quality of life. There were 1,084 violent crimes reported in 2016 per 100,000 Atlanta residents, nearly three times the national violent crime rate of 386 incidents per 100,000 Americans. Thinkstock

46. Tacoma, Wash.: While Tacoma has experienced substantial economic growth in recent years -- the number of employed workers in the city rose by 6.1% from 2014 to 2016, compared to a 3.5% growth nationwide -- the area still struggles with high unemployment and violent crime. Some 6.6% of the Tacoma workforce is currently unemployed, a far higher jobless rate than the 4.9% national rate. Scott Eklund, for USA TODAY

45. Albuquerque, N.M.: While cheap land and low taxes have spurred rapid development in much of the area surrounding Albuquerque, the city's population growth has been relatively limited in recent years. Albuquerque's population growth rate of just 1.2% from 2011 to 2016 is less than one-third the national population growth rate of 3.7% over that time. Thinkstock

44. Jackson, Miss.: By a number of metrics assessing economic opportunity, education, public safety, and infrastructure, Jackson is one of the worst cities to live in in the country. The typical Jackson household earns just $39,742 a year, far less than the national median household income of $57,617. Even adjusted for the area's low cost of living -- goods and services cost 13.9% less in Jackson and the surrounding Hinds County than they do nationwide -- incomes in Jackson are still far below the U.S. median. Jackson is also one of the more dangerous Southern cities. Thinkstock

43. Syracuse, N.Y.: Syracuse is one of two upstate New York cities to rank among the worst cities to live in nationwide. A third, Rochester, nearly made the list as well. A relatively poor city, the typical household in Syracuse earns $33,695 a year, only slightly more than half the median income of $62,909 statewide. Additionally, 32.1% of city residents live below the poverty line, well more than double the state poverty rate of 14.7%. Thinkstock

42. Miami, Fla.: Miami is one of the most expensive cities in the country. Goods and services in Miami-Dade County are about 15% more expensive than they are on

average nationwide. Housing is particularly expensive. The typical home in Miami is worth $277,700 compared to the median home value of $205,000 nationwide. Despite this, the typical household in the Miami area earns $34,901 a year, well below the median income of $57,617 nationwide. Thinkstock

41. North Charleston, S.C.: More than one in every four North Charleston residents live in poverty, compared to 15.3% of South Carolinians and 14.0% of Americans. Poorer cities are often relatively dangerous, and North Charleston is no exception. There were 885 violent crimes in North Charleston for every 100,000 residents in 2016, compared to state's violent crime rate of 502 per 100,000 and the nationwide rate of 386 per 100,000. Thinkstock

40. South Bend, Ind.: South Bend is one of the most dangerous cities in the United States. There were 1,012 violent crimes in South Bend for every 100,000 residents in 2016, more than double both the state and national violent crime rates of 405 incidents and 386 incidents per 100,000 people, respectively. As is often the case in high crime areas, property values in South Bend are depressed. Matt Cashore, Matt Cashore-USA TODAY Sports

39. New Haven, Conn.: New Haven is one of two Connecticut cities to rank among the worst cities to live in nationwide. The city's 6.6% unemployment rate is higher than both the state jobless rate of 5.1% and the national rate of 4.9%. The weak job market likely only increases financial hardship for some city residents as it is not a particularly inexpensive place to live. Goods and services in New Haven County are about 16.5% more expensive than they are on average nationwide. John Moore, Getty Images

38. Tallahassee, Fla.: Tallahassee is one of six cities in the Sunshine State to rank among the least liveable in the country. As is the case with most other Florida cities on this list, Tallahassee has a relatively high poverty rate. More than one in every four city residents live below the poverty line compared to 14% of Americans nationwide. Additionally, both property and violent crimes are more than twice as common in Tallahassee than they are nationwide. Thinkstock

37. Kalamazoo, Mich.: Air quality in Kalamazoo is nearly the worst of any U.S. city. The city's air is considered hazardous for about 15% of days in a given year, a far larger share than the 6% average nationwide. The city is also among the most dangerous nationwide. There were 1,217 violent crimes in 2016 for every 100,000 residents, more than triple the U.S. violent crime rate of 386 per 100,000. Mark Bugnaski, AP

36. Knoxville, Tenn.: About one in every four Knoxville residents live in poverty, well above the 14% share of Americans and the second highest poverty rate of any large city in the state. Poorer areas often struggle with crime, and in Knoxville, both violent and property crimes are more than twice as common as they are nationwide. Thinkstock

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

35. Toledo, Ohio: Toledo, Ohio, is one of the most dangerous cities in the country. There were 1,192 violent crimes for every 100,000 Toledo residents in 2016, more than three times the statewide violent crime rate and nearly triple the U.S. violent crime rate. A high crime rate can depress home values, and real estate in Toledo ranks among the least expensive in the country. The typical home in the city is worth just $79,100 compared to the value of $205,000 of the typical American home. It is also lower than in all but 13 other U.S. cities. Thinkstock

34. Buffalo, N.Y.: Based on a number of socioeconomic indicators, Buffalo is the worst city to live in New York state and one of the worst in the country. Buffalo is one of just a handful of cities nationwide where the typical household earns less than $33,000 a year. The low median income is due in part to the high jobless rate. Some 6.3% of Buffalo's labor force is out of a job, above both the state unemployment rate of 4.8% and the national rate of 4.9%. The jobs market has not improved meaningfully in the western New York city in recent years. Thinkstock

33. Canton, Ohio: Only 15 cities nationwide have a higher poverty rate than Canton, Ohio, where 31.5% of the population lives below the poverty line. The high poverty rate is likely due in part to the bleak jobs picture. The number of people working in the city fell by 1.3% from 2014 to 2016, and the annual unemployment rate stands at 6.4%. In comparison, employment climbed 3.5% nationwide over the same period and the annual U.S. unemployment rate stands at 4.9%. Thinkstock

32. Fresno, Calif.: Fresno is one of half a dozen cities in California to rank among the worst cities to live in nationwide. Like most California cities, Fresno is an expensive place to live. The typical area home is worth $227,500, or about five times the median income of $44,905 in the city. In comparison, the typical American home value of $205,000 is only about 3.6 times the national median income of $57,617. MARK CROSSE, AP

31. Tucson, Ariz.: Tucson is the second most populous city in Arizona and the only city in the state to rank among the worst U.S. cities to live in. The typical Tucson household earns $40,021 a year, only about three-quarters of the median annual household income in Arizona. Additionally, nearly one in every four city residents live in poverty, compared to 14.0% of Americans and 16.4% of people in Arizona. Thinkstock

30. Trenton, N.J.: In Trenton, one of the poorest cities in the country, more than one in four residents live in poverty, and the typical household earns just $31,592 a year. Low-income Trenton residents live with additional financial stress as goods and services in the county around the New Jersey state capital are about 18% more expensive than they are on average nationwide. Thinkstock

29. Dayton, Ohio: The median annual household income in Dayton, Ohio, of $28,894 is the sixth lowest among all large U.S. cities. Low-income areas often also have low property values, and Dayton is no exception. The typical home in the city is worth

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

$66,900, also the sixth lowest median home value of any similarly sized city in the United States. Thinkstock

28. Springfield, Mass.: Springfield is the only city in Massachusetts, and one of only three in the broader New England region, to rank among the worst cities to live in. Springfield's 6.9% unemployment rate is the highest of any Massachusetts city and well above the 4.9% U.S. unemployment rate. The high jobless rate exacerbates financial hardship in the city. About one in every four Springfield residents live below the poverty line, the highest poverty rate of any city in the state. Thinkstock

27. Oakland: Oakland's median household income of $68,060 a year is the highest of any city on this list and higher even than the median income nationwide of $57,617. However, the city's high incomes are largely offset by a high cost of living, as goods and services are about 27% more expensive in Oakland than they are nationwide, on average. Housing is particularly expensive. trekandshoot / iStock

26. Merced, Calif.: Merced is one of several California cities on this list struggling with high unemployment. About one in every 10 workers in the city are out of a job, the sixth highest unemployment rate of any American city. The high jobless rate may contribute to the city's high poverty rate. More than one in every four Merced residents live in poverty, well above the 14.0% U.S. poverty rate. Kurt Hegre, for USA TODAY

25. Miami Beach, Fla.: Miami Beach -- one of three cities on this list in Miami-Dade County -- is one of the least affordable cities in the United States. The median home value is just under half a million dollars, about nine times the median household income in the city of $53,685. In comparison, the typical home nationwide is worth just 3.6 times the median household income. High crime rates often drive down property values, but not in Miami Beach. There were 1,023 violent crimes in the city for every 100,000 residents in 2016, nearly triple the national violent crime rate. Thinkstock

24. Stockton, Calif.: Stockton has one of the highest unemployment rates of any American city. Some 8.7% of the city's workforce is out of a job, far higher than the 4.9% U.S. annual unemployment rate. The high jobless rate contributes to the city's relatively low median income. The typical household in the city earns just $49,271 a year -- less than three-quarters of the median income of $67,739 across the state. Ben Margot, AP

23. Daytona Beach, Fla.: Daytona Beach is one of the poorest cities in the country, with a median annual household income of just $31,273. The city's low median income is likely due in part to a lack of jobs. Some 6.3% of the Daytona Beach workforce is out of a job, well above the 4.9% annual U.S. unemployment rate. JIM TILLER, AP

22. Charleston, W.Va.: Though the median household income in Charleston of $46,720 a year is considerably lower than the national median of $57,617, a dollar goes further in West Virginia's capital city. Goods and services are 17% less expensive in Charleston than they are on average nationwide. Thinkstock

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

21. Shreveport, La.: The violent crime rate in Louisiana of 566 incidents for every 100,000 residents is the fifth highest among states. In Shreveport, violence is even more prevalent. There were 959 violent crimes for every 100,000 residents in 2016, nearly double the corresponding state rate. Violence is often more common in poorer areas, and a large share of Shreveport residents face serious financial hardship. Some 30.8% of the city's population lives below the poverty line compared to the 20.2% of the state's population and 14.0% of the U.S. population. Thinkstock

20. Compton, Calif.: More than one in every four Compton residents live on poverty level income, well above the 14.0% U.S. poverty rate. The high poverty rate is partly attributable to the city's weak job market. Some 8.2% of workers in Compton are unemployed compared to 4.9% of American workers nationwide. The jobs that are available in the city do not likely pay much. High-paying jobs are often only available to those with a college education, and in Compton, just 8.1% of adults have a bachelor's degree or higher, less than a third of the U.S. share of 31.3% of adults. Thinkstock

19. Little Rock, Ark.: Little Rock, the capital of Arkansas, ranks as the worst city to live in in the state and one of the worst in the country. One of the most dangerous cities in the country, Little Rock's violent crime rate of 1,533 incidents per 100,000 residents is nearly quadruple the national violent crime rate of 386 incidents per 100,000. The high violent crime rate may discourage some from relocating to or starting a family in the city. In the last decade, Little Rock's population increased by only 0.2%, even as the U.S. population grew by 7.1%. Thinkstock

18. Gary, Ind.: Gary, Indiana, is one of the most economically depressed cities in the country. One in every three city residents live below the poverty line, more than double the national poverty rate of 14.0%. Gary is also one of only a handful of cities nationwide where most households earn less than $30,000 per year. The low incomes are reflected in the area's depressed real estate values. Alyssa L Schukar, for USA TODAY

17. Pueblo, Colo.: Pueblo is the only Colorado city to rank among the worst cities to live in. The typical household earns just $38,380 a year, by far the lowest median income of any city in the state. Pueblo is also home to many residents struggling with financial hardship. Nearly one in every four residents live below the poverty line, the highest poverty rate of any city in Colorado. Bloomberg, Bloomberg via Getty Images

16. Rockford, Ill.: The city of Rockford, Illinois, has an unemployment rate of 7.7%, the highest of any city in the state and well above the 4.9% annual U.S. jobless rate. The city also ranks as the most dangerous in the state, with a violent crime rate of 1,658 incidents per 100,000 residents in 2016 -- which is more than four times the U.S. violent crime rate. Thinkstock

15. Youngstown, Ohio: Youngstown, Ohio, is one of the poorest cities in the United States. Some 38.0% of the population lives below the poverty line, the third highest poverty rate among U.S. cities. Youngstown is also the only U.S. city where more than

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

half of all households earn less than $25,000 a year. The low incomes are reflected in the city's low property values. The typical home in Youngstown is worth just $43,300, less than a quarter of the national median home value of $205,000. Amy Sancetta, AP

14. San Bernardino, Calif.: San Bernardino is the second worst city to live in in California and one of the worst in the country. San Bernardino's 29.4% poverty is the third highest in the state and more than double the U.S. poverty rate. Widespread financial hardship is likely tied to the lack of available jobs in the city. Some 7.3% of workers are out of a job, well above the 5.4% statewide unemployment rate. Thinkstock

13. Florence-Graham, Calif.: The typical household in Florence-Graham earns just $34,738 a year, almost half the $67,739 the typical California household earns. The city's lower-income residents face additional financial strain with a high cost of living. Goods and services in Florence-Graham are about 37% more expensive than they are on average nationwide. Google Maps Street View

12. Homestead, Fla.: One of three cities in Miami-Dade County to rank among the worst places in the country to live, Homestead is the worst city in Florida and 14th worst nationwide. The typical household in Homestead earns just $32,001 a year compared to the national median income of $57,617. Residents' financial strain is compounded by the city's a high cost of living. Goods and services are 15% more expensive in Homestead than they are on average nationwide. Joe Raedle, Getty Images

11. Hartford, Conn.: Hartford is the worst city to live in in both Connecticut and the broader New England region. The typical Hartford household earns $36,637 a year, less than half the median income in Connecticut of $73,433. Low-income individuals in the city are put under additional financial strain as goods and services are 17.3% more expensive in the city than they are on average nationwide. A bleak jobs picture in the city is partially to blame for the low median income. Thinkstock

10. Milwaukee: More than one in every four Milwaukee residents live in poverty, more than double the 11.8% state poverty rate. Poor cities often have higher crime rates than more affluent cities, and Milwaukee is no exception. There were 1,546 violent crimes for every 100,000 Milwaukee residents, more than five times the statewide violent crime rate of 306 per 100,000. Thinkstock

9. Baltimore: Baltimore's median annual household income of $47,350 is the lowest of any city in Maryland. The city's poor households face additional strain because of the high cost of living. Goods and services are about 12% more expensive in Baltimore than they are nationwide on average. Thinkstock

8. Springfield, Mo.: Along with St. Louis, Springfield is one of two Missouri cities to rank among the worst cities to live in. As is also the case in St. Louis, crime detracts considerably from overall quality of life in Springfield. There were 1,345 violent crimes for every 100,000 city residents in 2016, more than triple the U.S. violent crime rate.

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

Additionally, there were 8,518 property crimes in the city for every 100,000 people in 2016, the third highest property crime rate in the United States. Thinkstock

7. Albany, Ga.: The populations of several cities on this list are shrinking, but few are losing residents as fast as Albany, Georgia. In the last five years, Albany's population declined by 4.8%, even as the U.S. population expanded by 3.7%. The falling population is likely attributable in part to bleak economic conditions. Some 32.5% of city residents live in poverty, more than double the state poverty rate of 16.0% and the U.S. rate of 14.0%. Thinkstock

6. Wilmington, Del.: Low incomes and a high cost of living likely detract from overall quality of life for many in Wilmington, Delaware. The typical household in the city earns just $36,435 a year -- well below the median income of $57,617 nationwide -- and 27.7% of the city's population lives below the poverty line, nearly double the U.S. poverty rate. Meanwhile, goods and services in Wilmington are about 17% more expensive than they are on average nationwide. Thinkstock

5. Cleveland: One of the poorest cities in the country, Cleveland's 35% poverty rate is more than double the U.S. poverty rate and higher than that of all but one other city in the state. Cleveland's 6.9% jobless rate is also the second highest of any city in the state. The city is also dangerous. There were 1,633 violent crimes in the city for every 100,000 residents in 2016, more than in all but eight other U.S. cities and quadruple the national violent crime rate. Thinkstock

4. Memphis: In Memphis, serious financial hardship and high crime rate detract from the overall quality of life of many residents. Some 26.9% of area residents live in poverty, the largest share of any city in the state and well above the 14.0% U.S. poverty rate. Poorer cities often struggle more with crime, and Memphis is no exception. Thinkstock

3. St. Louis: St. Louis is the worst city to live in in Missouri and third worst nationwide. A concentration of violence in parts of the city makes St. Louis a particularly difficult place to live. There were 1,932 violent crimes for every 100,000 city residents in 2016, the third highest violent crime rate of any U.S. city and five times the comparable U.S. rate. Crime rates are often higher in economically depressed areas, and St. Louis is a relatively poor city. Some 23.8% of residents live below the poverty line, a higher poverty rate than in the majority of U.S. cities and nearly 10 percentage points above both the U.S. and statewide poverty rates of 14.0%. Thinkstock

2. Flint, Mich.: Flint is second-worst city to live in in both Michigan and the United States as a whole. Some 44.5% of Flint's population lives below the poverty line, the highest poverty rate of any city in the country. Financial hardship in the city is precipitated in part by a lagging job market. The city's 9.8% unemployment rate is double the annual U.S. unemployment rate of 4.9%. Carlos Osorio, AP

1. Detroit: The poster child of American post-industrial urban decline, Detroit, Michigan, ranks as the worst city in the country to live in. Once home to 1.8 million residents at the

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

peak of U.S. auto manufacturing in the 1950s, the city is now home to fewer than 700,000 after decades of decline. A poor, economically depressed city, more than one in every three Detroit residents live below the poverty line. The city also has one of the highest unemployment rates in the United States, with 10.9% of the workforce out of a job. Thinkstock

Disparities in socioeconomic measures exist to some degree nationwide. However, in certain cities, gaps in outcomes along racial lines are chasmic. 24/7 Wall St. created an index based on racial disparities in eight socioeconomic measures in U.S. metro areas to identify the worst cities for black Americans.

In an interview with 24/7 Wall St., Camille M. Busette, a senior fellow at the Brookings Institution, laid out some of the causal factors behind these disparities in the cities on this list. "Looking historically, these are cities where there is a tremendous amount of residential segregation," Busette said.

The cities on this list are largely concentrated in the Midwest and have long histories of systemic racial segregation. Though about half a century has passed since the Fair Housing Act legally banned discriminatory lending, zoning, and renting practices, such practices persist in much of the country in less overt ways.

Busette described the day-to-day implications of segregation. "People are not walking around, working together, going to school together, taking the same metro together, et cetera. So there isn't a lot of familiarity."

This kind of segregation can have profound consequences for labor markets. "People tend to hire people like themselves, so when you get residential segregation, you tend to also get employment segregation," Busette said.

Segregation serves to perpetuate inequality in other ways as well. "Where you have residential segregation and where you have large percentages of poor black populations, the schools that service those neighborhoods tend to be substandard relative to white neighborhoods," Busette said.

Second-rate schools in black neighborhoods in many of the cities on this list result in lower educational attainment rates – which in turn contribute to disparities in other measures like income, unemployment, and incarceration.

## Methodology

To determine the 15 worst cities for black Americans, 24/7 Wall St. created an index consisting of eight measures to assess race-based gaps in socioeconomic outcomes in each of the nation's metropolitan areas. Creating the index in this way ensured that cities were ranked on the differences between black and white residents and not on absolute levels of socioeconomic development. For each measure, we constructed an index from the gaps between black and white Americans. The index was standardized using interdecile normalization so outliers in the data did not skew results. We excluded

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

metro areas where black residents comprised less than 5 percent of the population or where data limitations made comparisons between racial groups impossible.

Within the index, we considered 2016 data from the U.S. Census Bureau's American Community Survey on median household income, poverty, adult high school and bachelor's degree attainment, homeownership, and unemployment rates. All ACS data are five-year estimates. Data on incarceration rates came from The Sentencing Project, a nonprofit dedicated to criminal justice reform, and are for the most recent available year. Because states, rather than metro areas, are responsible for the prison population, incarceration rates are for the state where the metro area is located. If a metro area spans more than one state, we used the state in which the metro area's principal city is located. From the Centers for Disease Control and Prevention, we used age-adjusted mortality rates by race for each U.S. county from 2012-2016 to calculate mortality rates at the metro level using a variation on the indirect standardization method. Incarceration and mortality rates are per 100,000 residents.



Chicago (Photo: Thinkstock)

15. Chicago, Naperville and Elgin, Illinois

• Black population: 1.6 million (16.9 percent)
• Black median income: $36,017 (47.3 percent of white income)
• Unemployment: 18.7 percent black; 5.8 percent white
• Homeownership rate: 39.9 percent black; 74.6 percent white

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

A history of exclusionary zoning, redlining, and discriminatory lending practices in Chicago throughout the 20th century has led to deeply entrenched segregation in the Midwestern metropolis and contributed to some of the largest racial disparities in income, education, and health of any U.S. metro area. While nationwide the typical black household earns 60.1 percent of the income the typical white household earns, in Chicago the typical black household earns just 47.3 percent of the typical white household's income. Just 21.3 percent of black adults in Chicago have a college degree, less than half the 43.7 percent of white adults with a degree. Additionally, the black unemployment rate is more than three times the white unemployment rate.

14. Rochester, New York

• Black population: 124,911 (11.5 percent)
• Black median income: $28,681 (48.7 percent of white income)
• Unemployment: 16.3 percent black; 5.4 percent white
• Homeownership rate: 32.3 percent black; 73.9 percent white

A recent report by the Civil Rights Project of the University of California, Los Angeles, found that segregation persists de facto in the Rochester metro area's schools. From 1990 to 2010, white enrollment in Rochester's inner-city public schools fell from more than 34 percent to just 15 percent. As white families relocated to the suburbs, the share of black students in urban Rochester schools climbed from 49 percent to 60 percent.

Segregated schools can perpetuate economic and social inequality. In Rochester just 78.8 percent of black adults have a high school diploma compared to 93.1 percent of white adults – nearly double the nationwide attainment gap. The median income for black area households of $28,681 a year is less than half the white median household income of $58,885 a year.

13. Danville, Illinois

• Black population: 10,946 (13.7 percent)
• Black median income: $24,504 (52.1 percent of white income)
• Unemployment: 22.5 percent black; 8.1 percent white
• Homeownership rate: 31.0 percent black; 75.0 percent white

Danville is one of several metro areas in Illinois in which the gaps in income, education, and health between white and black residents are among the widest in the country. The typical black household earns $24,504 a year, about half the income the typical white household earns of $47,054 a year. Just 31.0 percent of black heads of household own their homes, compared to the white homeownership rate of 75.0 percent.

One factor contributing to the large disparities in income and homeownership in Danville may be the high unemployment rate among black workers in the area. According to recent Census figures, 22.5 percent of the black workforce in Danville is unemployed, the sixth highest share of any U.S. metro area and nearly three times the area's 8.1 percent white unemployment rate.

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/



Trenton, N.J. (Photo: Thinkstock)

12. Trenton, New Jersey

• Black population: 75,905 (20.5 percent)
• Black median income: $43,393 (47.7 percent of white income)
• Unemployment: 15.6 percent black; 6.2 percent white
• Homeownership rate: 40.6 percent black; 76.3 percent white

In the Trenton metro area, gaps in socioeconomic measures such as income and poverty are partially rooted in disparities in educational attainment. While the 48.0 percent white college attainment rate in Trenton is far greater than the 33.8 percent national figure, the 18.2 percent black college attainment rate is below the 20.0 percent national figure. Those with lower educational attainment have lower earnings potential and are less likely to accumulate wealth over their lifetimes. The typical black household in Trenton earns $43,393 a year, less than half the median income for white households of $91,008 a year.

Trenton is the capital of the state with the largest black-white disparity in incarceration in the country. According to data from the Sentencing Project, a criminal justice reform advocacy group, black Americans are incarcerated at approximately five times the rate of white Americans nationwide. In New Jersey, the black incarceration rate is more than 12 times the rate for whites in the state.

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

## 11. Springfield, Illinois

• Black population: 25,242 (12.0 percent)
• Black median income: $27,197 (43.9 percent of white income)
• Unemployment: 18.8 percent black; 5.8 percent white
• Homeownership rate: 30.6 percent black; 75.8 percent white

Across Illinois, black residents are nine times more likely than white residents to be incarcerated. A high incarceration rate can reduce the earning potential of affected families, and may be one of the many factors contributing to economic and social inequality in Illinois' capital. The typical black household in Springfield earns $27,197 a year, less than half the median annual income of $61,976 for white households. A criminal record can also reduce the likelihood of finding employment, and the unemployment rate among black workers in Springfield stands at 18.8 percent, more than triple the white unemployment rate of 5.8 percent.

## 10. Fresno, California

• Black population: 48,434 (5.0 percent)
• Black median income: $25,895 (42.2 percent of white income)
• Unemployment: 22.3 percent black; 8.9 percent white
• Homeownership rate: 25.1 percent black; 66.5 percent white

Fresno is the only West Coast metro area to rank among the worst cities for black Americans. In Fresno, like many U.S. cities, much of the overt housing segregation of the 20th century is evident today. Many of the city's black and minority residents live in west Fresno, while the wealthier, largely white population lives in northern and eastern sections of the metro area. The construction of Highway 99 through Central Valley in the 1950s created a physical barrier between east and west Fresno, further concentrating poverty in minority neighborhoods. Today, 41.2 percent of black residents live in poverty, one of the largest shares of any city and more than three times the 13.0 percent white poverty rate.

According to a recent study by the California Environmental Protection Agency, life expectancy in Fresno varies by as much as 20 years between the city's richest and poorest neighborhoods. With socioeconomic disparities largely divided along racial lines, so are health inequities. The black mortality rate of 908 deaths per 100,000 residents is nearly 20 percent greater than the white mortality rate of 750 deaths per 100,000 residents.

## 9. Kankakee, Illinois

• Black population: 16,908 (15.2 percent)
• Black median income: $28,816 (47.5 percent of white income)
• Unemployment: 19.8 percent black; 6.2 percent white
• Homeownership rate: 34.5 percent black; 76.6 percent white

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

More than two in every five black residents of Kankakee, Illinois, live below the poverty line, compared to fewer than one in every 10 white residents. Disparities in poverty rates along racial lines tend to be higher in highly segregated areas, and Kankakee has some of the most racially segregated neighborhoods in Illinois.

While segregated schools were outlawed as the result of the Brown v. Board of Education Supreme Court decision in 1954, the concentration of minorities in poor neighborhoods and inequitable distribution of resources can result in predominantly black and underfunded schools that put their students at a substantial disadvantage. In Kankakee, fewer than 80 percent of black adults have a high school diploma compared to more than 90 percent of white adults.



Niles-Benton Harbor, Michigan (Photo: coophil / Getty Images)

8. Niles-Benton Harbor, Michigan

• Black population: 22,985 (14.8 percent)
• Black median income: $22,757 (44.2 percent of white income)
• Unemployment: 17.4 percent black; 6.2 percent white
• Homeownership rate: 34.6 percent black; 76.8 percent white

Niles-Benton Harbor is the only metro area in Michigan to rank among the worst places for black Americans. Segregation can significantly deepen socioeconomic gaps along racial lines, and Niles-Benton Harbor is one of the most segregated cities in the country.

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

Nearly half of all black metro area residents in Niles-Benton Harbor live in predominantly black neighborhoods, more than twice the national share.

Nearly 42 percent of the city's black population lives below the poverty line, a higher black poverty rate than in all but 11 other metro areas nationwide. Meanwhile, 12.4 percent of white area residents live below the poverty line. The white-black poverty gap in Niles-Benton Harbor may be exacerbated in part by the metro area's wide unemployment disparity. The area's black unemployment rate stands at 17.4 percent, well more than double the 6.2 percent white unemployment rate.

7. Decatur, Illinois

• Black population: 15,319 (14.1 percent)
• Black median income: $21,871 (42.3 percent of white income)
• Unemployment: 21.7 percent black; 7.4 percent white
• Homeownership rate: 36.4 percent black; 75.9 percent white

Decatur is one of several Illinois metro areas to rank among the worst cities for black Americans. Just 77.6 percent of black adults in Decatur have a high school diploma, far less than the 91.8 percent of white adults who have a high school diploma. Individuals with less educational attainment tend to have lower earning potential, leading to similar disparities in income, unemployment, and other socioeconomic measures.

The 21.7 percent black unemployment rate in Decatur is nearly triple the 7.4 percent white unemployment rate. The typical black household in Decatur earns just $21,871 a year, less than half the white median household income of $51,662 a year. Black Decatur residents are also less likely to have as much in the way of material assets that white residents do. For example, the black homeownership rate in Decatur of 36.4 percent is less than half the white homeownership rate of 75.9 percent.

6. Elmira, New York

• Black population: 5,143 (5.9 percent)
• Black median income: $21,767 (42.6 percent of white income)
• Unemployment: 15.9 percent black; 5.0 percent white
• Homeownership rate: 22.4 percent black; 71.7 percent white

Elmira, New York, has a relatively small black population. Just 5.9 percent of the nearly 88,000 area residents are black. For reference, 12.6 percent of the U.S. population is black. The gaps in some socioeconomic outcomes between white and black Elmira residents are among the largest in the country.

The typical black household in Elmira earns just $21,767 a year, less than half the income of the typical white household of $51,101 a year. Black Elmira residents are also less likely to have as much in the way of material assets that white residents do. For example, the homeownership rate among black Elmira residents is just 22.4 percent compared to 71.7 percent among white residents.

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/



Peoria, Illinois (Photo: Thinkstock)

5. Peoria, Illinois

• Black population: 34,462 (9.1 percent)
• Black median income: $27,085 (45.6 percent of white income)
• Unemployment: 17.9 percent black; 5.6 percent white
• Homeownership rate: 31.4 percent black; 76.1 percent white

Peoria, Illinois, is one of many cities on this list with a long history of segregation, the effects of which linger today. Black Peoria residents are much more likely to struggle financially and far more likely to face difficulty finding employment than white Peoria residents. The metro area's black poverty rate is 37.0 percent – higher than the national black poverty rate of 26.2 percent and well above the metro area's white poverty rate of 9.2 percent. Additionally, 17.9 percent of the metro area's black labor force is out of a job compared to a white unemployment rate of just 5.6 percent.

While segregated housing has been illegal nationwide since the passage of the Fair Housing Act of the Civil Rights Act of 1968, a recent federal lawsuit alleges that there are still housing codes in place in Peoria being used to unlawfully target African Americans. Filed in August 2017 by the Illinois-based nonprofit HOPE Fair Housing Center, the lawsuit claims that Peoria's chronic nuisance ordinance, which requires landlords to evict tenants from homes that have been the subject of multiple police contacts, is being selectively enforced in predominantly black neighborhoods.

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

4. Minneapolis-St. Paul, Bloomington, Minnesota

• Black population: 270,924 (7.8 percent)
• Black median income: $31,653 (41.5 percent of white income)
• Unemployment: 12.3 percent black; 3.9 percent white
• Homeownership rate: 24.6 percent black; 75.8 percent white

The Minneapolis-St. Paul-Bloomington metro area is one of several Midwestern cities that enacted restrictive housing covenants and exclusionary zoning policies in the 20th century. These policies still impact residential patterns today. The city is highly segregated by race and has some of the largest disparities in poverty, income, and homeownership between black and white residents of any U.S. metro area.

While the 6.0 percent white poverty rate in Minneapolis is far lower than the comparable 10.6 percent national figure, the 32.0 percent black poverty rate is above the 26.2 percent national figure. Additionally, the typical black household in the area earns $31,653 a year, just 41.5 percent of the white median household income of $76,208. Disparity in homeownership is even more stark. The 24.6 percent black homeownership rate in the Twin Cities metro area is less than a third of the 75.8 percent white homeownership rate.

3. Racine, Wisconsin

• Black population: 21,450 (11.0 percent)
• Black median income: $26,888 (42.3 percent of white income)
• Unemployment: 16.6 percent black; 6.1 percent white
• Homeownership rate: 31.4 percent black; 77.1 percent white

Racine, Wisconsin, is one of several Rust Belt cities where social and economic outcomes for black residents fall well behind those of white area residents. For example, the typical black household in the Racine metro area earns just $26,888 a year, less than half the $63,507 annual income the typical white household in the area earns.

Racial disparities in the metro area may be made worse by disproportionate incarceration rates. In Wisconsin, black residents are nearly 12 times more likely to be imprisoned than white residents. For reference, the black incarceration rate is five times the white incarceration rate nationwide. The effects of incarceration are far reaching, as adults with a criminal record are less likely to find employment, and households with a family member in jail have one less potential income earner.

2. Milwaukee-Waukesha-West Allis, Wisconsin

• Black population: 260,776 (16.6 percent)
• Black median income: $27,834 (42.5 percent of white income)
• Unemployment: 16.1 percent black; 4.2 percent white
• Homeownership rate: 28.2 percent black; 69.5 percent white

https://www.usatoday.com/story/money/2018/11/16/racial-disparity-cities-worst-metro-areas-black-americans/38460961/

Like many Midwestern cities with similar history, Milwaukee's discriminatory housing policies from the mid-20th century still largely define residential patterns today. According to research published by the University of Wisconsin-Madison, 16 of the 18 suburbs of Milwaukee County enacted restrictive housing covenants in the 1940s, many of which remained in effect into the 1960s and 1970s. Segregation can contribute to income inequality, and today, the typical black household in Milwaukee earns just $27,834 a year – 42.5 percent of the $65,568 white median household income. While the white poverty rate in Milwaukee of 7.6 percent is one of the lowest in the country, the black poverty rate of 36.4 percent is among the highest.

Milwaukee is the largest city in Wisconsin, a state with one of the largest racial disparities in incarceration nationwide. Black Americans in Wisconsin are nearly 11 times more like to be incarcerated than white state residents. In Milwaukee County, more than half of all black adults in their 30s and early 40s have served time in a state correctional facility.

1. Waterloo-Cedar Falls, Iowa

• Black population: 12,085 (7.1 percent)
• Black median income: $25,897 (46.8 percent of white income)
• Unemployment: 23.9 percent black; 4.4 percent white
• Homeownership rate: 32.8 percent black; 73.2 percent white

No U.S. metro area has larger social and economic disparities along racial lines than Waterloo-Cedar Falls, Iowa. Black metro area residents earn just 46.8 percent of what white area residents earn, and are far more likely to be unemployed than white workers in the city. The city's black unemployment rate is 23.9 percent, well above the 13.3 percent nationwide black unemployment rate and the second highest such figure of any U.S. metro. Meanwhile, the area's white unemployment rate stands at 4.4 percent, below the 5.9 percent national white unemployment rate and among the least of any city nationwide.

Like many U.S. cities with high economic and social inequality, Waterloo residents have struggled with several major incidents that have sparked racial tension in the area in recent years. In 2012, for example, a white police officer shot and killed a fleeing black suspect, and was later exonerated by a grand jury.

*24/7 Wall Street is a USA TODAY content partner offering financial news and commentary. Its content is produced independently of USA TODAY.*

# EXHIBIT 11

Case 4:19-cv-02572-JSW   Document 42-2   Filed 10/11/19   Page 217 of 222

10/10/2019     Prepared Remarks of CFPB Director Richard Cordray at the Small Business Lending Field Hearing | Consumer Financial Protection Bur…


Consumer Financial
Protection Bureau

# Prepared Remarks of CFPB Director Richard Cordray at the Small Business Lending Field Hearing

Los Angeles, Calif.

**By Richard Cordray** – MAY 10, 2017

Thank you all for coming. It is good to be here again in Los Angeles. Today, the Consumer Financial Protection Bureau is announcing an inquiry into ways to collect and publish information about the financing and credit needs of small businesses, especially those owned by women and minorities. We are well aware of the key role they play in our lives. Small businesses help drive America's economic engine by creating jobs and nurturing local communities. It is estimated that they have created two out of every three jobs since 1993 and now provide work for almost half of all employees in the private sector. Yet we perceive large gaps in the public's understanding of how well the financing and credit needs of these entrepreneurs are being served.

As you probably know, Congress provided the Consumer Bureau with certain responsibilities in the area of small business lending. And there is a strong logic behind this. When I served as the Ohio Attorney General, we recognized the need to protect small businesses and nonprofit organizations by accepting and handling complaints on their behalf, just as we did for individual consumers – an approach that proved to be very productive. In addition, the line between consumer finance and small business finance is quite blurred. More than 22 million Americans are small business owners and have no employees. And, according to data from the Federal Reserve, almost two-thirds of them rely on their business as their primary source of income.

Congress specifically has charged the Consumer Bureau with the responsibility to administer and enforce various laws, including the Equal Credit Opportunity Act. Unlike other consumer financial laws, the ECOA governs not only personal lending, but some commercial lending as well. In fact, we have now conducted a number of ECOA supervisory examinations of small business lending programs. Through that work, we are learning about the challenges financial institutions face in identifying areas where fair lending risk may exist, and we are assisting them in developing the proper tools to manage that risk.

In the Dodd-Frank Wall Street Reform and Consumer Protection Act, Congress took a further step to learn more about how to encourage and promote small businesses. To help determine how well the market is functioning and to facilitate enforcement of the fair lending laws, Congress directed the Consumer Bureau to develop regulations for financial

institutions that lend to small businesses to collect certain information and report it to the Bureau. The Request for Information we are releasing today asks for public feedback to help us better understand how to carry out this directive in a way that is careful, thoughtful, and cost-effective.

***

We have considerable enthusiasm for this project. In my own case, I have seen firsthand how small business financing can have a big economic impact. When I served as the Treasurer of Ohio, we had a reduced-interest loan program to support job creation and retention by small businesses. The way the program worked was that the state could put money on deposit with banks at a below-market rate of interest, and this deposit was then linked to a same-sized loan to a small business at a correspondingly below-market rate. This so-called "Linked Deposit" program had been authorized more than twenty years earlier, but had gradually fallen into disuse.

At its core, however, the program made good sense. Small businesses are often in desperate need of financing to update and expand their operations, and if they can get inexpensive financing, they often can fertilize their ideas for growth and be even more successful. So we diagnosed the program and found that after its initial success, it had become too bureaucratic. We heard from both banks and businesses that the program, which was still paper-based, was so slow and cumbersome that nobody wanted to use it.

So we changed all that. We put the process online, rebranded it as the "Grow Now" program, and made specific commitments to those who wanted to participate in it. We told them they could fill out a typical application in 30-60 minutes, and we promised them they would have a yes-or-no answer on their application within 72 hours. That was not easy, and it required very close coordination with the banks that took part in the program. But we did it, and the "Grow Now" program really took off. Only about $20 million had been allocated when we started, but in less than two years we deployed more than $350 million, helping about 1,500 small businesses create or retain approximately 15,000 jobs across the State.

It was also exciting and interesting to see how the businesses were able to use the loan funds. I can recall a construction business in northeast Ohio that needed a loan to buy a large piece of equipment so the company could compete for new and different jobs. They got the money, they got the equipment, and they thrived. I recall a manufacturer in northern Ohio that needed money to turn their factory sideways on their property so they could utilize more space and employ more people. We funded the build-out, they executed on it, and they met their goals for growth of output, revenue, and jobs. And I recall a company in western Ohio that started out as a caterer, began making their own tents for events, recognized that they might be able to succeed as tentmakers, and needed financing to be able to bid on a major project with the U.S. Department of Defense. We got them the loan, they got the bid, and *Inc.* magazine named them one of its 500 fastest-growing businesses of that year!

***

The moral of this story is that business opportunity – especially opportunities for small businesses – often hinges on the availability of financing. People have immense reserves of energy and imagination. Human ingenuity is the overwhelming power that allows human beings to reinvent the future and make it so. These forces unleash what Joseph Schumpeter called the "gales of creative destruction" that constantly mold and reshape the patterns of our economic life. Innovation has sharpened our nation's economic edge for generation after generation, but when credit is unavailable, creativity is stifled.

To make the kind of meaningful contributions they are capable of making to the American economy, small businesses – particularly women-owned and minority-owned businesses – need access to credit. Without it, they cannot take advantage of opportunities to grow. And with small businesses so deeply woven into the nation's economic fabric, it is essential that the public – along with small business owners themselves – can have a more complete picture of the financing available to this key sector.

Some things we do know. We are releasing a white paper today that lays out the limited information we currently have about key dimensions of the small business lending landscape. According to Census data, and depending on the definition used, there are an estimated 27.6 million small businesses in the United States. We estimate that together they access about $1.4 trillion in credit. Businesses owned by women and minorities play an especially important role in this space. Women-owned businesses account for over one-third (36 percent) of all non-farming, private sector firms. The 2012 Survey of Business Owners, the most recent such information available, indicates that women-owned firms employed more than 8.4 million people, and minority-owned firms employed more than 7 million people. Those are huge numbers: by comparison, in 2014 fewer than 8 million people were employed in the entire financial services sector.

When small businesses succeed, they send constant ripples of energy across the economy and throughout our communities. For example, a  2013 study by the Federal Reserve Bank of Atlanta found that counties with higher percentages of their workforce employed by small businesses showed higher local income, higher employment rates, and lower poverty rates. In order to succeed, businesses need access to financing to smooth their cash flows for current operations, meet unexpected contingencies, and invest in their enterprises to take advantage of opportunities as they arise. Another study found that the inability to obtain financing may have prompted one-in-three small businesses to trim their workforces and one-in-five to cut benefits.

Unfortunately, much of the available data on small business lending is too dated or too spotty to paint a full picture of the current state of access to credit for small businesses, especially those owned by women and minorities. For example, we do not know whether certain types of businesses, or those in particular places, may have more or less access to credit. We do not know the extent to which small business lending is shifting from banks to alternative lenders. Nor do we know the extent to which the credit constraints that resulted from the Great Recession persist and to what extent. The *Beige Book* produced by the Federal Reserve on a regular basis is a survey of economic conditions that contains a huge

amount of anecdotal information about business activity around the country. But it has no systematic data on how small businesses are faring and whether or how much they are being held back by financing constraints.

Given the importance of small businesses to our economy and their critical need to access financing if they are to prosper and grow, it is vitally important to fill in the blanks on how small businesses are able to engage with the credit markets. That is why Congress required financial institutions to report information about their applications for credit from small businesses in accordance with regulations to be issued by the Consumer Bureau. And that is why we are here today for this field hearing.

***

The inquiry we are launching today is a first step toward crafting this mandated rule to collect and report on small business lending data. To prepare for the project, we have been building an outstanding team of experts in small business lending. We are enhancing our knowledge and understanding based on our Equal Credit Opportunity Act compliance work with small business lenders, which is helping us learn more about the credit application process; existing data collection processes; and the nature, extent, and management of fair lending risk. We also have learned much from our work on the reporting of home loans under the Home Mortgage Disclosure Act, which has evolved and improved considerably over the past forty years.

At the same time, we recognize that the small business lending market is much different from the mortgage market. It is even more diverse in its range of products and providers, which range from large banks and community banks to marketplace lenders and other emerging players in the fintech space. Community banks play an outsized role in making credit available to small businesses in their local communities. And unlike the mortgage market, many small business lenders have no standard underwriting criteria or widely accepted scoring models. For these reasons and more, we will proceed carefully as we work toward meeting our statutory responsibilities. And we will seek to do so in ways that minimize the burdens on industry. Our Request for Information released today focuses on several issues.

First, we want to determine how best to define "small business" for these purposes. Despite the great importance of these firms to our economy, there is surprisingly little consensus on what constitutes a small business. For example, the Small Business Administration, in overseeing federal contracting, sometimes looks at the number of employees, sometimes looks at the annual receipts, and applies different thresholds for different industries. For our part, the Consumer Bureau is thinking about how to develop a definition that is consistent with the Small Business Act, but can be tailored to the purposes of collecting business lending data. So we are looking at how the lending industry defines small businesses and how that affects their credit application processes. Having this information will help us develop a practical definition that advances our goals and aligns with the common practices of those who lend to small businesses.

Second, we want to learn more about where small businesses seek financing and the kinds of loan products that are made available to them. Our initial research tells us that term loans, lines of credit, and credit cards are the all-purpose products used most often by our small businesses. In fact, they make up an estimated three-fourths of the debt in the small business financing market, excluding the financing that merchants or service providers extend to their small business customers to finance purchases of the sellers' own goods and services. But we want to find out if other important financing sources are also being tapped by small businesses. Currently, we have limited ability to measure accurately the prevalence of lenders and the products they offer. We also want to learn more about the roles that marketplace lenders, brokers, dealers, and other third parties may play in the application process for these loans. At the same time, we are exploring whether specific types of institutions should be exempted from the requirement to collect and submit data on small business lending.

Third, we are seeking comment about the categories of data on small business lending that are currently used, maintained, and reported by financial institutions. In the statute, Congress identified specific pieces of information that should be collected and reported. They include the amount and type of financing applied for; the size and location of the business; the action taken on the application; and the race, ethnicity, and gender of the principal owners. Congress determined that the reporting and disclosure of this information would provide a major boost in understanding small business lending. At the same time, we are sensitive to the fact that various financial institutions may not currently be collecting and reporting all of this information in the context of other regulatory requirements. And we understand that the changes imposed by this rule will create implementation and operational challenges.

So we will look into clarifying the precise meaning of some of these required data elements to make sure they are understood and consistently reported. We will be considering whether to add a small number of additional data points to reduce the possibility of misinterpretations or incorrect conclusions when working with more limited information. To this end, we are seeking input on the kinds of data different types of lenders are currently considering in their application processes, as well as any technical challenges posed by collecting and reporting this data. We will put all of this information to work in thinking carefully about how to fashion the regulation mandated by Congress under Section 1071 of the Dodd-Frank Act.

Finally, the Request for Information seeks input on the privacy implications that may arise from disclosure of the information that is reported on small business lending. The law requires the Consumer Bureau to provide the public with information that will enable communities, government entities, and creditors to identify community development needs and opportunities for small businesses, especially those owned by women and minorities. But we also are authorized to limit the data that is made public to advance privacy interests. So we will be exploring options that protect the privacy of applicants and borrowers, as well as the confidentiality interests of financial institutions that are engaged in the lending process.

\*\*\*

The announcement we are making today, and the work we are doing here, reflect central tenets of the Consumer Financial Protection Bureau. We are committed to evidence-based decision-making. We aim to develop rules that meet our objectives without creating unintended consequences or undue burdens. We want to see a financial marketplace that offers fairness and opportunity not just to some, but to all. A marketplace that does so without regard to race, ethnicity, gender, or any of the other elements of our fabulous American mosaic. We all know that small businesses are powerful economic engines. They supply jobs that lift people out of poverty or dependence, teach essential skills, and serve as backbones of our communities. So we mean to meet our obligation to develop data that will shed light on their ability to access much-needed financing. It is essential to their future growth and prosperity, and therefore to the growth and prosperity of us all. Because what Cicero observed in ancient Rome still holds true today. He said, "Nothing so cements and holds together all the parts of a society as faith or credit." Our communities depend on both of those precious things just as much today.

As we launch this inquiry, I want to remind all of you that we value the feedback we get. We take it seriously, consider it carefully, and integrate it into our thinking and our approach as we figure out how best to go forward with this work. So we ask you to share your thoughts and experiences to help us get there. And we thank you again for joining us today.

### ###

*The Consumer Financial Protection Bureau is a 21st century agency that helps consumer finance markets work by making rules more effective, by consistently and fairly enforcing those rules, and by empowering consumers to take more control over their economic lives. For more information, visit consumerfinance.gov.*

**Topics:**

* ACCESS TO CREDIT

* BUSINESS LOANS

## PRESS INFORMATION

If you want to republish the article or have questions about the content, please contact the press office.

**Go to press resources page**