1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA REINVESTMENT COALITION, NATIONAL ASSOCIATION FOR LATINO COMMUNITY ASSET BUILDERS, DEBORAH LYNN FIELD, and RESHONDA YOUNG,<br><br>Plaintiffs,<br><br>v.<br><br>KATHLEEN L. KRANINGER, Director, Consumer Financial Protection Bureau, In Her Official Capacity and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Defendants. | No. 4:19-cv-02572-JSW<br><br>**DECLARATION OF PAULINA GONZALEZ-BRITO** |

DECLARATION OF PAULINA GONZALEZ-BRITO - 1
Case No.: 4:19-cv-02572-JSW

**DECLARATION OF PAULINA GONZALEZ-BRITO**

I, Paulina Gonzalez-Brito, declare as follows:

1. The facts in this declaration are based on my personal knowledge.

2. I am the Executive Director of California Reinvestment Coalition ("CRC"), a 501(c)(3) nonprofit organization based in San Francisco, California.

3. CRC was founded in 1986 to aid low-income communities and communities of color in accessing credit, financial services, and investments. CRC is a membership organization comprising more than 300 nonprofit community-based organizations and public agencies, including small business lenders, community development financial institutions, and technical assistance providers that work directly with small businesses to ensure equal access to capital.

4. CRC pursues this mission through numerous routes. Among other things, it negotiates agreements with lenders to increase lending to and investments in women-owned, minority-owned, and small businesses; publishes evidence-based reports to educate its members, policymakers, and the public about areas of need and ways to promote credit access; works with state and local governments to enact policies to improve lending practices and increase the availability of credit and capital in low-income communities and communities of color; and files complaints with CFPB to ensure appropriate enforcement of fair lending laws and implementation of the Community Reinvestment Act ("CRA").

**I.      Harm to CRC from the Failure to Implement Section 1071**

5. CRC makes extensive use of small business–related data, such as the data collected and published by the Federal Financial Institutions Examinations Council ("FFIEC"), the Small Business Administration ("SBA"), and similar sources. But these datasets provide little if any geographic, institution-specific, or loan applicant demographic data.

DECLARATION OF PAULINA GONZALEZ-BRITO - 2
Case No.: 4:19-cv-02572-JSW

6. CRC advocated for passage of Section 1071 (or a similar requirement) for decades to fill this gap in the currently available data. Section 1071 requires collection and publication of lending data at the level of individual census tracts, loan applicants, and financial institutions.

7. CRC would use this information to advance each of the efforts described above. But CFPB's continuing failure to implement Section 1071 has impaired each of these critical components of CRC's mission.

8. First, the absence of Section 1071 data requires us to devote greater resources to negotiating agreements with lenders to support the credit needs of minority-owned and small businesses. CRC expends substantial time, resources, and money seeking commitments from financial institutions to provide loans, investments, and financial services in communities that have historically faced barriers to accessing credit. With Section 1071 data, we could identify the communities most in need and the services that would be most beneficial, which would both allow us to more finely target our efforts and make a more compelling case to our potential partners. Additionally, we would be better able to identify which institutions were good actors in certain geographic markets and could expand their efforts elsewhere—or which institutions were not contributing to the communities around them and might be convinced to improve their practices. CFPB's failure to implement Section 1071 increases the difficulty and resource-intensiveness of each of these negotiations, thereby reducing the number of agreements CRC can pursue and restricting CRC's ability to address unequal credit access issues in such agreements.

9. For example, we are currently working with some of our members to negotiate with CIT Bank to seek a community benefit agreement as it acquires Mutual of Omaha Bank. If we had Section 1071 data on CIT, Mutual of Omaha, and their competitors, we would be in a far stronger position to make targeted, data-driven proposals to CIT and, if necessary, propose conditions to regulators to ensure that the merger will provide a public benefit.

DECLARATION OF PAULINA GONZALEZ-BRITO - 3
Case No.: 4:19-cv-02572-JSW

10. Second, CRC regularly publishes analyses of access to credit for women-owned, minority-owned, and small businesses. To date, our reports have largely relied on data collected by FFIEC, SBA and similar sources, as well as our own attempts to survey California banks on their lending practices.[1] But the publicly available datasets do not provide the geographic, loan applicant, and institution-specific data that Section 1071 requires, and we lack any ability to compel banks to respond to our surveys or provide the level of detail that Section 1071 requires. As a result, we have extremely limited visibility into which particular cities or neighborhoods are the most credit-starved or show troubling disparities along demographic lines. With the data mandated by Section 1071, we would produce targeted, data-driven analyses and reports about the credit needs of particular communities (and, in particular, women-owned, minority-owned, and small businesses). CFPB's failure renders this impossible, limiting CRC's ability to produce informed analyses and increasing the costs of obtaining necessary information.

11. Third, CRC works with state and local governments to enact policies to improve lending practices. For example, I recently finished serving on San Francisco's Task Force on Public Banking, which evaluated the costs and benefits of creating a municipal bank—including the benefits it would bring small businesses. Because we had limited data on the lending practices of banks operating in San Francisco and on the availability of credit by demographic and neighborhood, we were limited in the precision with which we could estimate the benefits of creating a municipal bank and our ability to recommend specific geographic considerations. Such challenges take on heightened significance with the recent passage of AB 857, which authorizes local governments to

---

[1] *See, e.g.*, CRC, "Harnessing the Power of Banks: The Community Reinvestment Act and Building an Inclusive Economy" (Mar. 2018), available at http://calreinvest.org/wp-content/uploads/2018/07/Harnessing20the20Power20of20Banks20report20FINAL20version.pdf; CRC, "Small Business Access to Credit—The Little Engine That Could: If Banks Helped" (Dec. 2013), available at http://calreinvest.org/wp-content/uploads/2018/09/CRC-Small-Business-Report-2013.pdf.

DECLARATION OF PAULINA GONZALEZ-BRITO - 4
Case No.: 4:19-cv-02572-JSW

establish public banks. With Section 1071 data, we could craft these and other proposals to track the areas and types of lenders where the data showed the greatest problems. Due to CFPB's failure to implement Section 1071, our proposals to and work with local governments are necessarily less targeted and more expensive, making them less effective and less politically feasible. We thus must expend more resources justifying and lobbing for our proposals than we would if Section 1071 had been implemented.

12.     Fourth, CRC works with bank regulators and CFPB to ensure appropriate enforcement of federal fair lending laws and implementation of the Community Reinvestment Act. With Section 1071 data, we could more powerfully connect individual incidents to industry-wide shortcomings or patterns of institutional misconduct, increasing our ability to highlight poor lending performance or file actionable complaints—and increasing bank regulators and CFPB's ability to investigate our complaints and oversee compliance by violators.

**II.     Harm to CRC's Members from the Failure to Implement Section 1071**

13.     CRC has more than 300 members, including small business lenders, community development financial institutions, technical assistance providers, and organizations that work directly to ensure equal access to capital. Among other things, these organizations pay annual membership dues; nominate board members and serve on our board; attend annular member meetings; receive regular updates from CRC on banking practices, regulatory issues, and legislation; respond to CRC surveys, and participate in or even spearhead our advocacy efforts.

14.     Just like CFPB's failure to implement Section 1071 has inhibited CRC's mission, it has harmed many of our members' operations and impaired their ability to carry out their individual missions.

15.     For example, many of our members provide free assistance to women, people of color, and members of other disadvantaged groups seeking loans. CFPB's failure to implement

DECLARATION OF PAULINA GONZALEZ-BRITO - 5
Case No.: 4:19-cv-02572-JSW

Section 1071 hinders these efforts in numerous ways. Our members can only determine where to focus their resources—where they should assign their staff, where they should locate offices, which institutions to contact when seeking credit for their clients—based on anecdotal evidence. The specific, census tract–level that Section 1071 would provide would be immeasurably valuable to these efforts.

16. Similarly, our members negotiate individually with banks or participate with CRC in negotiations with banks to improve their small business lending. But for the vast majority of banks, our members lack any data about the bank's treatment of small, women-owned, and minority-owned businesses. For example, as discussed above, some of our members are working closely with CRC to negotiate with CIT, and are hampered in their efforts for all the same reasons.

17. For all these reasons, my experience and observations lead me to believe that CFPB's failure to implement Section 1071 has harmed CRC and its members, and will continue to do so as long as it persists. After nearly a decade of waiting, CRC brought this lawsuit because it appeared to be the only way to ensure that CFPB ever implements Section 1071.

### III. CFPB's Termination of the Consumer Advisory Board

18. On a final note, I served on CFPB's Consumer Advisory Board from 2016 to 2018, as part of CRC's support for Section 1071 and the economic development of low-income communities and communities of color more generally.

19. In June 2017, I gave a presentation to CFPB and the Consumer Advisory Board on small-business needs, focusing particularly on the need for implementation of Section 1071. Soon thereafter, CFPB stopped holding Consumer Advisory Board meetings at all—and then fired the entire Board the following year.

DECLARATION OF PAULINA GONZALEZ-BRITO - 6
Case No.: 4:19-cv-02572-JSW

1  20. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct to the best of my knowledge, information, and belief.

Dated: October 11, 2019

DocuSigned by:

Paulina Gonzalez-Brito
California Reinvestment Coalition

DECLARATION OF PAULINA GONZALEZ-BRITO - 7
Case No.: 4:19-cv-02572-JSW

MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 1
Case No.: 4:19-cv-02572-JSW