MARY McLEOD
General Counsel
JOHN R. COLEMAN
Deputy General Counsel
LAURA M. HUSSAIN
Assistant General Counsel
LAWRENCE DeMILLE-WAGMAN
Senior Litigation Counsel
DC Bar No. 929950
Email: lawrence.wagman@cfpb.gov
CHRISTOPHER J. DEAL
Senior Litigation Counsel
DC Bar No. 990573
Email: christopher.deal@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, N.W.
Washington, D.C. 20552
Telephone: (202) 435-9582
Facsimile: (202) 435-7024

Counsel for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA REINVESTMENT COALITION, NATIONAL ASSOCIATION FOR LATINO COMMUNITY ASSET BUILDERS, DEBORAH LYNN FIELD, and RESHONDA YOUNG,<br><br>Plaintiffs,<br><br>v.<br><br>KATHLEEN L. KRANINGER, Director, Consumer Financial Protection Bureau, In Her Official Capacity, and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Defendants. | Case No. 4:19-cv-02572-JSW<br><br>**DEFENDANTS' NOTICE OF MOTION, MOTION, AND MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     January 10, 2010<br>Time:     9:00 a.m.<br>Dept:     Courtroom 5, 2nd Floor<br>Judge:    Hon. Jeffrey S. White |

1

**NOTICE OF MOTION AND MOTION**

2

PLEASE TAKE NOTICE that on January 10, 2020 at 9:00 a.m. or as soon thereafter as

3

the matter may be heard by the Honorable Judge Jeffrey S. White of the United States District

4

Court for the Northern District of California, Oakland Division, located at 1301 Clay Street,

5

Oakland, California 94612, Defendants will and hereby do move the Court pursuant to Federal

6

Rule of Civil Procedure 56 for an order granting their cross-motion for summary judgment

7

against Plaintiffs California Reinvestment Coalition, National Association for Latino Community

8

Asset Builders, Deborah Field, and ReShonda Young. Defendants' cross-motion is based on this

9

Notice of Motion and Motion, the following memorandum of points and authorities, supporting

10

declarations filed herewith, the pleadings and the papers on file in this action, and such other

11

matters as the Court may consider.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    A.   The Bureau and Its Regulatory Responsibilities................................................. 2

    B.   Section 1071......................................................................................................... 4

    C.   The Bureau's Interpretation of Section 1071...................................................... 4

    D.   The Bureau Commences Implementation of Section 1071 ................................. 5

    E.   The Bureau's Plan for the Section 1071 Rulemaking.......................................... 9

    F.   This Lawsuit....................................................................................................... 11

ARGUMENT ........................................................................................................................ 11

I.    Plaintiffs are not entitled to the extraordinary remedy of mandamus. ...................... 11

    A.   The first two *TRAC* factors do not support mandamus..................................... 13

        1.   The Bureau has a reasonable plan to ensure the prompt completion of the Section 1071 rulemaking. ....................................................... 13

        2.   Congress chose not to set a deadline for the newly established Bureau to issue a rule implementing Section 1071. ................................................ 15

    B.   The third and fifth *TRAC* factors do not support mandamus. .......................... 17

        1.   While the Section 1071 rulemaking serves important interests, human health is not at risk. ............................................................................... 18

        2.   Rushing to issue a poorly designed rule would harm the very businesses that Section 1071 was meant to help. ......................................... 18

    C.   The fourth and sixth TRAC factors do not support mandamus. ......................... 19

        1.   Expediting the Section 1071 rulemaking further would interfere with other important regulatory projects........................................................ 19

        2.   The Bureau's past decisions to prioritize other rulemaking projects were made in good faith. ................................................................................ 21

II.   Even if mandamus were warranted, this Court should decline to enter an order setting a fixed schedule for the completion of the rulemaking. ......................................... 22

CONCLUSION...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Grand Canyon Air Tour Coal. v. FAA*,
   154 F.3d 455 (D.C. Cir. 1998) ..................................................................... 2, 13, 23

*In re A Community Voice*,
   878 F.3d 779 (9th Cir. 2017) ............................................................................ passim

*In re Barr Labs. Inc.*,
   930 F.2d 72 (D.C. Cir. 1991) ............................................................................ 21, 23

*In re Bluewater Network*,
   234 F.3d 1305 (D.C. Cir. 2000) ................................................................................. 22

*In re Core Commc'ns, Inc.*,
   531 F.3d 849 (D.C. Cir. 2008) ........................................................................... 23, 24

*In re Int'l Chem. Workers Union*,
   958 F.2d 1144 (D.C. Cir. 1992) ................................................................................ 17

*In re Pesticide Action Network N. Am.* (*In re PANNA I*),
   532 F. Appx. 649 (9th Cir. 2013) .............................................................................. 13

*In re Pesticide Action Network N. Am.* (*In re PANNA II*),
   798 F.3d 809 (9th Cir. 2015) ............................................................................ passim

*In re United Mine Workers of Am. Int'l Union*,
   190 F.3d 545 (D.C. Cir. 1999) .............................................................................. 2, 24

*Independence Min. Co., Inc. v. Babbitt*,
   105 F.3d 502 (9th Cir. 1997) ..................................................................................... 12

*Islam v. Heinauer*,
   32 F. Supp. 3d 1063 (N.D. Cal. 2014) ..................................................................... 13

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
   336 F.3d 1094 (D.C. Cir. 2003) ......................................................................... 13, 21

*MCI Telecomms. Corp. v. FCC*,
   627 F.2d 322 (D.C. Cir. 1980) ................................................................................. 24

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015) ................................................................................. 23

*Nader v. FCC*,
    520 F.2d 182 (D.C. Cir. 1975) .................................................................................. 24

*Oil, Chem. & Atomic Workers Int'l Union v. Zegeer*,
    768 F.2d 1480 (D.C. Cir. 1985) ................................................................................ 14

*Potomac Elec. Power Co. v. ICC*,
    702 F.2d 1026 (D.C. Cir. 1983) ................................................................................ 24

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) .................................................................................. 14

*Telecomms. Research & Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) .................................................................................... 12

*United Steelworkers of Am., AFL-CIO-CLC v. Rubber Mfrs. Ass'n*,
    783 F.2d 1117 (D.C. Cir. 1986) .................................................................. 14, 19, 23

**STATUTES**

5 U.S.C. § 609 .................................................................................................................. 3

5 U.S.C. § 706 ........................................................................................................... 11, 12

12 U.S.C. § 2603 ............................................................................................................ 16

12 U.S.C. § 2803 .............................................................................................................. 6

12 U.S.C. § 5481 .............................................................................................................. 2

12 U.S.C. § 5493 ...................................................................................................... 15, 16

12 U.S.C. § 5496 ............................................................................................................ 16

12 U.S.C. § 5511 .................................................................................................. 2, 21, 22

12 U.S.C. § 5512 .................................................................................................... 3, 19

12 U.S.C. § 5514 .............................................................................................. 5, 16, 17

12 U.S.C. § 5515 ............................................................................................................ 16

12 U.S.C. § 5518 ............................................................................................................ 16

12 U.S.C. § 5531 ............................................................................................................ 16

12 U.S.C. § 5532 .............................................................................................................. 5

12 U.S.C. § 5536 ............................................................................................................ 16

12 U.S.C. § 5581 ................................................................................................................ 2

12 U.S.C. § 5582 ................................................................................................................ 2

12 U.S.C. § 5602 .............................................................................................................. 16

15 U.S.C. § 1601 .......................................................................................................... 3, 17

15 U.S.C. § 1604 .............................................................................................................. 16

15 U.S.C. § 1639c ............................................................................................................ 20

15 U.S.C. § 1691c-2 ........................................................................................................... 4

15 U.S.C. § 1693*o*-1 ......................................................................................... 5, 16, 17, 20

Pub. L. No. 111-203, 124 Stat. 1376 (2010) ..................................................................... 2

Pub. L. No. 115-174, 132 Stat. 1296 (2018) ..................................................................... 7

**REGULATIONS**

75 Fed. Reg. 57252 (Sept. 20, 2010) ................................................................................ 2

77 Fed. Reg. 6194 (Feb. 7, 2012) ................................................................................ 5, 17

77 Fed. Reg. 39058 (June 29, 2012) ............................................................................... 16

77 Fed. Reg. 39101 (June 29, 2012) ............................................................................... 16

77 Fed. Reg. 42873 (July 20, 2012) ............................................................................ 5, 16

77 Fed. Reg. 51116 (Aug. 23, 2012) ................................................................................. 5

78 Fed. Reg. 4726 (Jan. 22, 2013) .................................................................................... 5

78 Fed. Reg. 6408 (Jan. 30, 2103) .................................................................................... 5

78 Fed. Reg. 6856 (Jan. 31, 2013) .................................................................................... 5

78 Fed. Reg. 7216 (Jan. 31, 2013) .................................................................................... 5

78 Fed. Reg. 10368 (Feb. 13, 2013) ................................................................................. 5

78 Fed. Reg. 10696 (Feb. 14, 2013) ................................................................................. 5

78 Fed. Reg. 10901 (Feb. 14, 2013) ................................................................................. 6

78 Fed. Reg. 11280 (Feb. 15, 2013) ................................................................................. 6

78 Fed. Reg. 26489 (May 7, 2013) ................................................................................. 16

78 Fed. Reg. 79730 (Dec. 31, 2013) .............................................................................. 16

80 Fed. Reg. 66128 (Oct. 28, 2015) ................................................................................. 6

83 Fed. Reg. 45325 (Sept. 7, 2018) .................................................................................. 8

83 Fed. Reg. 58118 (Nov. 16, 2018) ................................................................................ 8

84 Fed. Reg. 20049 (May 8, 2019) ................................................................................... 7

84 Fed. Reg. 20972 (May 13, 2019) ................................................................................. 8

84 Fed. Reg. 29730 (June 24, 2019) ................................................................................ 8

84 Fed. Reg. 57946 (Oct. 29, 2019) ................................................................................. 8

**INTRODUCTION**

This case is about whether this Court should exercise the "extraordinary remedy of mandamus" to interfere with an ongoing agency rulemaking process. *In re Pesticide Action Network N. Am.* (*In re PANNA II*), 798 F.3d 809, 813 (9th Cir. 2015). Plaintiffs seek an order directing the Consumer Financial Protection Bureau and its Director in her official capacity (the Bureau) to propose and finalize a rule implementing Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) by a date certain—specifically, within six months. While the Bureau does not dispute that Section 1071 requires the Bureau to issue implementing regulations, Plaintiffs are not entitled to the extraordinary relief they seek.

Mandamus is not warranted here because the Bureau—a new agency created by the Dodd-Frank Act—has reasonably balanced its duty to implement Section 1071 with its many other pressing obligations. Moreover, the Bureau has a plan to ensure that the complex rulemaking mandated by Section 1071 is completed promptly, thoughtfully, and lawfully. Under that plan and consistent with the Bureau's special statutory obligations, the Bureau intends to release a detailed outline of the proposals it is considering by November 2020. Allowing the Bureau to proceed with its proposed plan will ensure not only that Section 1071 can be implemented in a way that helps (rather than hurts) the businesses it was meant to benefit, but also that the Bureau can meet its other statutory and regulatory obligations.

Even if the extraordinary remedy of mandamus were appropriate (and it is not), setting a deadline for the issuance of a final rule is not warranted here. Courts generally require agencies to complete rulemakings by a specified date only where (1) there is a "clear threat to human welfare," *In re A Community Voice*, 878 F.3d 779, 787 (9th Cir. 2017), and/or (2) the agency has ignored prior court directions to expedite decision-making, *see In re PANNA II*, 798 F.3d at 814. Neither condition is present here. While the Bureau agrees that requiring financial institutions to collect information about small-business loans is important, the absence of the data-collection rule contemplated by Section 1071 poses no threat to human health and welfare. Likewise, there have been no prior cases involving the Bureau's implementation of Section 1071.

Absent one of these conditions, courts regularly decline to require the agency to complete a rulemaking by a specified date even where substantial time has passed. *See, e.g.*, *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 556 (D.C. Cir. 1999) (retaining jurisdiction and requiring status updates despite eight-year delay); *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477-78 (D.C. Cir. 1998) (declining to order agency action notwithstanding passage of ten years). The same result follows here. This Court should deny Plaintiffs the relief they request and award summary judgment to the Bureau.

## BACKGROUND

### A.  The Bureau and Its Regulatory Responsibilities

Congress enacted the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376, on July 21, 2010. Title X of that Act, known as the Consumer Financial Protection Act (CFPA), established a new agency, the Consumer Financial Protection Bureau. The CFPA gave the Bureau substantial new powers, as well as substantial responsibilities—among others, to bring enforcement actions, conduct supervisory examinations, issue regulations, research and monitor markets, and educate consumers. *See generally* 12 U.S.C. § 5511.

The CFPA also transferred to the Bureau much of the authority to regulate consumer financial products and services that had been vested in other federal agencies, including the authority to enforce and prescribe regulations implementing laws such as the Equal Credit Opportunity Act (ECOA), the Home Mortgage Disclosure Act of 1975 (HMDA), the Truth in Lending Act (TILA), and the Real Estate Settlement Procedures Act of 1974 (RESPA). *See* 12 U.S.C. §§ 5481(12) and (14), 5581. But the CFPA did not transfer that authority to the Bureau right away. Instead, Congress specified that other regulators' authorities would not be transferred to the Bureau until a designated transfer date, July 21, 2011. *See* 12 U.S.C. §§ 5581, 5582; 75 Fed. Reg. 57252 (Sept. 20, 2010). With the transfer of authorities came significant regulatory responsibility. For example, Congress had responded to a breakdown in the consumer mortgage market during the Great Recession with sweeping changes to TILA and RESPA, and the Bureau was required to issue rules implementing those changes. *See generally* Dodd-Frank Act, Title

XIV, § 1401 *et seq.*, 124 Stat. at 2136-212. Even more, many of these new rules had to be issued within eighteen months of the designated transfer date. *See* 15 U.S.C. § 1601 note.

Along with these significant regulatory responsibilities, Congress also imposed substantial procedural requirements on the Bureau's rulemaking efforts—above and beyond the notice-and-comment procedures already required by the Administrative Procedure Act (APA). Among other things, the Bureau must consider the potential benefits and costs to consumers and covered persons, including whether a rule will reduce access by consumers to consumer financial products or services. 12 U.S.C. § 5512(b)(2)(A)(i). And unlike nearly every other federal agency, the Bureau must conduct a small business consultation process pursuant to the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) *before* it issues a notice of proposed rulemaking. *See* 5 U.S.C. § 609(b).[1] When the Bureau conducts this process, it must convene a small business review panel including representatives of the Bureau, the Office of Management and Budget's Office of Information and Regulatory Affairs, and the Small Business Administration's Office of Advocacy. *See id.* § 609(b)(3). The panel then collects advice and recommendations from representatives of affected small entities and prepares a report that becomes part of the rulemaking record. *See id.* § 609(b)(4)-(5). The Bureau then considers that report in issuing a proposed rule. To obtain useful feedback from the panel and the small entity representatives, the Bureau's practice is to prepare a detailed outline of the rulemaking proposals it has under consideration, as well as a summary of any analysis the Bureau has done on the proposals' expected impacts. Declaration of Thomas Pahl (Pahl Decl.) ¶ 41. In addition to sharing the detailed outline with the panel and the small entity representatives, the Bureau also publishes the outline on its website. *Id.* After the Bureau has satisfied its obligations under SBREFA, it can then proceed to issue a notice of proposed rulemaking, consider the comments

---

[1] The Bureau is required to complete this process unless it can certify that its rulemaking will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. § 609. The Bureau does not expect to make such a certification with respect to the Section 1071 rulemaking. Pahl Decl. ¶ 38.

1    received in response to the notice, and issue a final rule consistent with the Dodd-Frank Act and

2    the APA. *See* Pahl Decl. ¶¶ 46-55 (describing the Bureau's rulemaking process).

3        **B.  Section 1071**

4        One of the new powers and responsibilities that Congress gave the Bureau was implementing

5    Section 1071 of the Dodd-Frank Act. Section 1071 established a new data collection regime for

6    small business loans, akin to the longstanding requirements for mortgage loans under HMDA. In

7    particular, Section 1071 amended ECOA to require financial institutions to collect, report, and

8    make public certain information concerning credit applications made "for women-owned,

9    minority-owned, and small business[es]." *See* 15 U.S.C. § 1691c-2. Under Section 1071,

10   financial institutions must inquire whether an application is for one of those types of businesses,

11   and must "compile and maintain, in accordance with regulations of the Bureau, a record of the

12   information provided," itemized to disclose specified data points. Section 1071 also gives the

13   Bureau authority to require financial institutions to collect "any additional data that the Bureau

14   determines would aid in fulfilling the purposes of [Section 1071]." *Id.* § 1691c-2(e)(1)-(2).

15       Section 1071 mandates that the "Bureau shall prescribe such rules and issue such guidance as

16   may be necessary to carry out, enforce, and compile data pursuant to this section," and specifies

17   that the Bureau "may adopt exceptions to any requirement of this section and may, conditionally

18   or unconditionally, exempt any financial institution or class of financial institutions from the

19   requirements of this section, as the Bureau deems necessary or appropriate to carry out the

20   purposes of this section." *Id.* § 1691c-2(g)(1)-(2). Congress did not provide a specific date by

21   which the Bureau was required to issue rules to implement Section 1071.

22       **C.  The Bureau's Interpretation of Section 1071**

23       In April 2011, the Bureau's General Counsel issued a public letter addressed to the chief

24   executive officers of financial institutions regarding Section 1071 (Letter). *See* Declaration of

25   Jeffrey Dubner, ECF No. 42-2, Ex. 3. In the Letter, the General Counsel opined that "financial

26   institutions' obligations under section 1071 do not go into effect until the Bureau issues

27   necessary implementing regulations." *Id.* at 1. The Letter explained that "[g]iven the sensitivity

28   of the data at issue, we believe Congress intended that the Bureau first provide guidance

1  regarding appropriate procedures, information safeguards, and privacy protections." *Id.* at 2. The

2  Letter further observed that this approach would "ensure that data is collected in a consistent,

3  standardized fashion" and would "conserve the resources of both the users of the data and of

4  financial institutions, which would otherwise have to reprogram their systems needlessly." *Id.* at

5  2. No party has previously challenged the Bureau's understanding that financial institutions'

6  obligations to collect and report information under Section 1071 only go into effect after the

7  Bureau has issued rules specifying how that information should be collected, reported, and

8  protected.

9  **D.  The Bureau Commences Implementation of Section 1071**

10  Given the breadth of the directives that Congress imposed on the Bureau, the agency has

11  proceeded in a reasonable and appropriate manner to implement Section 1071. After the

12  designated transfer date, the Bureau principally and appropriately focused its rule-writing

13  resources on a series of mandatory rulemakings that had explicit statutory deadlines. *See*

14  Declaration of David Silberman (Silberman Decl.) ¶ 10. For instance, in January 2012, the

15  Bureau issued a final rule regulating remittance transfers, consistent with Congress's direction

16  that the Bureau issue such a rule by January 21, 2012. *See* 15 U.S.C. § 1693*o*-1(d)(2)-(3); 77

17  Fed. Reg. 6194 (Feb. 7, 2012). In July 2012, in accordance with a deadline set by the CFPA, 12

18  U.S.C. § 5532(f), the Bureau issued a proposal to consolidate disclosures required to be given by

19  mortgage creditors under TILA and RESPA, *see* 77 Fed. Reg. 51116 (Aug. 23, 2012). Likewise,

20  in July 2012, the Bureau issued its first rule defining larger non-depository participants in a

21  market for consumer financial products or services consistent with Congress's direction that the

22  Bureau issue a rule of this kind. *See* 12 U.S.C. 5514(a)(2); 77 Fed. Reg. 42873 (July 20, 2012).

23  And, in January 2013, the Bureau issued a series of very significant final rules regulating

24  mortgage lending, consistent with Congress's direction that the Bureau issue such rules by

25  January 21, 2013. *See* 78 Fed. Reg. 4726 (Jan. 22, 2013) (escrows rule); 78 Fed. Reg. 6408 (Jan.

26  30, 2103) (ability to repay and qualified mortgage rule); 78 Fed. Reg. 6856 (Jan. 31, 2013) (high-

27  cost mortgage loans rule); 78 Fed. Reg. 7216 (Jan. 31, 2013) (ECOA appraisals rule); 78 Fed.

28  Reg. 10368 (Feb. 13, 2013) (interagency appraisals rule); 78 Fed. Reg. 10696 (Feb. 14, 2013)

(RESPA mortgage servicing rule); 78 Fed. Reg. 10901 (Feb. 14, 2013) (TILA mortgage servicing rule); 78 Fed. Reg. 11280 (Feb. 15, 2013) (loan originator compensation rule). And in many cases, the Bureau determined that it was appropriate to amend these rules before they became effective. *See* Silberman Decl. ¶¶ 12, 14.

The Bureau focused its efforts next on a series of significant rulemakings to implement other provisions of the Dodd-Frank Act and the enumerated consumer laws. *Id.* ¶ 15. As most relevant to Section 1071, the Bureau devoted significant rulemaking resources to implement the Dodd-Frank Act's amendments to HMDA. *Id.* ¶ 16. In addition to transferring authority to administer HMDA to the Bureau, the Dodd-Frank Act also amended HMDA to, among other things, add new data points and authorize the Bureau to require that additional information be collected. *See* 12 U.S.C. § 2803(b), (h), (n). The Act directed the Bureau to engage in rulemaking to implement these provisions. *See id.* § 2803(e), (h), (n). In determining to address HMDA before turning to Section 1071, the Bureau took into account both that financial institutions and regulators already had years of experience with HMDA reporting, and that the Bureau had substantial market expertise as the primary federal regulator of consumer mortgage lending. Silberman Decl. ¶ 20. And because the rulemakings presented parallel operational and regulatory challenges, the Bureau believed that the Section 1071 rulemaking would benefit if it followed the completion of the HMDA rulemaking. *Id.* The Bureau accordingly proceeded with the regulatory and operational efforts to implement the HMDA amendments before turning its attention to Section 1071. *Id.* ¶ 21.

After the Bureau issued a final rule implementing the HMDA amendments in October 2015, *see* 80 Fed. Reg. 66128 (Oct. 28, 2015), it began working on the Section 1071 rulemaking. It conducted outreach and research to develop its understanding of the players, products, and practices in the small business lending market. Silberman Decl. ¶¶ 2-3. This preliminary outreach was particularly critical because the Bureau's comparatively limited authority over business lending meant that the Bureau began the process with much less of the pre-existing expertise that the Bureau has with consumer lending or other consumer financial products and services. *Id.* ¶ 20. To ensure that a similar level of expertise could be brought to bear on the

Section 1071 rulemaking, the Bureau established an Office of Small Business Lending Markets and hired experts in small business lending. *Id.* ¶ 22. The Bureau also began conducting supervisory examinations of small business lending programs. *Id.* ¶ 20.

In May 2017, the Bureau published a request for information (RFI) to inform the Section 1071 rulemaking project. *Id.* ¶ 25. Among other matters, the RFI asked for comment on the definition of small business, the data points to be collected, the financial institutions that engage in business lending, small businesses' access to credit and the financial products that are offered to small businesses, and the privacy and confidentiality interests of applicants, borrowers, and financial institutions. *Id.* The Bureau received more than 700 unique responses. *Id.* ¶ 27. In connection with its release of the RFI, the Bureau also released a white paper summarizing the results of the Bureau's preliminary research. *Id.* ¶ 24. The Bureau held a field hearing in May 2017 to publicize these efforts and obtain stakeholder input. *Id.* ¶ 26.

Meanwhile, in November 2017, the Bureau had its first formal leadership transition. Director Richard Cordray resigned and President Trump selected Mick Mulvaney to serve as the Bureau's Acting Director. Pahl Decl. ¶ 3. As a part of this transition, Acting Director Mulvaney conducted a substantial review of the Bureau's activities, including its rulemaking work. *Id.* ¶ 4. Pursuant to this review, Acting Director Mulvaney determined that it was appropriate for the Bureau to revisit certain elements of the Bureau's required rulemaking implementing the Dodd-Frank Act's HMDA amendments. *See id.* ¶ 5. As the Bureau later explained in an advanced notice of proposed rulemaking, the Bureau had heard various concerns about the burdens associated with the Bureau's implementation of the HMDA amendments. *See* 84 Fed. Reg. 20049 (May 8, 2019).

Additionally, in May 2018, Congress enacted the Economic Growth, Regulatory Relief, and Consumer Protection Act of 2018 (EGRRCPA), Pub. L. No. 115-174, 132 Stat. 1296 (2018), which among other things amended HMDA to add certain partial exemptions from HMDA's requirements. The Bureau determined that while these changes to HMDA took effect immediately, further clarification would be beneficial. *See* Pahl Decl. ¶ 6. The Bureau quickly issued an interpretive and procedural rule and announced that it was planning to initiate a notice-

and-comment rulemaking to further implement the EGRRCPA. *See* 83 Fed. Reg. 45325, 45325-26 (Sept. 7, 2018). The Bureau has now proposed and finalized a rule implementing EGRRCPA's HMDA amendments. *See* 84 Fed. Reg. 20972 (May 13, 2019); 84 Fed. Reg. 57946 (Oct. 29, 2019).

In light of the Bureau's reconsideration of certain aspects of its mandated HMDA rulemaking, as well as its rulemaking to implement EGRRCPA's HMDA amendments, Acting Director Mulvaney decided in August 2018 that it was appropriate to temporarily pause the Bureau's Section 1071 rulemaking project. Pahl Decl. ¶¶ 7-8. Accordingly, in its Fall 2018 semi-annual regulatory agenda, the Bureau reported that it had "adjusted its timeline for implementing" Section 1071 "[i]n light of current resource constraints and priority accorded to HMDA implementation." 83 Fed. Reg. 58118, 58119 (Nov. 16, 2018). The Bureau therefore reclassified the Section 1071 project from pre-rule status to longer-term action status, and noted that "despite this rulemaking pause," it intended "to continue certain market monitoring and research activities to facilitate resumption of the rulemaking." *Id.*

In December 2018, the Bureau had another leadership transition—the Senate confirmed Kathleen Kraninger to a five-year term as Director of the Bureau. *See* Pahl Decl. ¶ 10. After evaluating the Bureau's ongoing rulemaking activities, Director Kraninger determined that it would be appropriate for the Bureau to resume pre-rulemaking activities with respect to Section 1071. *Id.* ¶ 11. So, as part of the Bureau's next semi-annual regulatory agenda, the Bureau announced that it intended "to recommence work later this year" on the Section 1071 rulemaking. 84 Fed. Reg. 29730, 29731 (June 24, 2019). The Bureau therefore reclassified the Section 1071 project from longer-term action status back into pre-rule status. Pahl Decl. ¶ 12. This decision was made (and communicated to the General Services Administration) as of March 6, 2019, *i.e.*, before the complaint was filed in this case. *Id.* ¶¶ 8, 13. On November 6, 2019, the Bureau held a symposium with leading experts in small business lending to discuss the current state of, and future outlook for, the small business lending marketplace as well as the issues surrounding Section 1071 implementation, including ways to address or mitigate concerns that were raised in response to the Bureau's RFI. *Id.* ¶ 14. At the symposium, Director Kraninger

highlighted Section 1071's role in increasing public data about the critical small business market and emphasized the need for the Bureau to proceed with care so that the Section 1071 rule does not impede the ability of small businesses—including minority and women-owned small businesses—to access the credit they need. *See id.* ¶ 15.

### E.  The Bureau's Plan for the Section 1071 Rulemaking

As explained in more detail in the attached declaration of Thomas Pahl, the Bureau's Policy Associate Director for Research, Markets, and Regulations, the Bureau has a plan to ensure that it can promptly promulgate a workable rule implementing Section 1071. The Bureau's plan focuses on the next year of rulemaking activity. Building on the outreach and research the Bureau has already conducted, the Bureau anticipates that it can complete its policy decisionmaking process over the next six months. *See id.* ¶ 58.

Section 1071 presents several complex regulatory issues that must be resolved, including:

- what counts as an "application for credit" across various financial products that generally do not utilize more standardized application forms (unlike mortgages);

- whether Section 1071's default definition of "small business" should be used to determine which businesses' credit applications trigger collection and reporting by financial institutions, notwithstanding stakeholder concerns that adopting that definition may impose significant compliance burdens on applicants and institutions;

- which financial institutions should be required to collect and report information, including whether and how the Bureau should exempt any particular classes of financial institutions from the collecting and reporting obligations;

- what specific information financial institutions should be required to collect and report and how they should be required to collect and report it;

- which of the myriad financial products utilized by small businesses should be treated as "credit" for purposes of the Section 1071 rulemaking and therefore are the ones as to which financial institutions are required to collect and report application information; and

1

2

3

- what information should be made public consistent with the privacy and confidentiality interests of businesses and financial institutions. See Pahl Decl. ¶¶ 16-36.

Although Bureau staff have researched these issues and solicited valuable stakeholder feedback (including through the recent symposium), the rulemaking team still needs to brief the Bureau's Director on each of the major legal, policy, and economic issues the agency will need to address in the rulemaking. The Bureau believes that it can complete its recommendation and briefing process within the next six months. *Id.* ¶ 58. Completing this initial policy formulation process will allow the Bureau to initiate the legally required SBREFA process in coordination with the Small Business Administration (SBA) and the Office of Information and Regulatory Affairs (OIRA) within the Office of Management and Budget (OMB). *See id.* ¶¶ 38-45. During this period, the Bureau also plans to seek OMB approval to conduct a survey to obtain estimates of the one-time costs lenders would incur to collect and report application data. *Id.* ¶ 57.

Based on its experience with similar rulemakings, the Bureau believes that it will then take another six months for it to prepare and publicly release a detailed outline of the rulemaking proposals it is considering. *Id.* ¶ 59. The outline will describe how the Bureau is considering implementing Section 1071, discuss other alternatives the Bureau has considered, and identify the potential impact that the proposals under consideration might have on small entities. *Id.* ¶¶ 41, 45, 59. (An example of a past outline is attached as Exhibit 3 to the Pahl Declaration.) After preparing a draft of the SBREFA outline, the Bureau will share it with SBA and OIRA, and incorporate any feedback as appropriate. *Id.* ¶¶ 41, 44. While the Bureau is preparing the outline, the Bureau will work with SBA to select and engage the small entity representatives with whom the SBREFA panel will consult. *Id.* ¶¶ 40, 44. The Bureau will then publicly release the SBREFA outline in. *Id.* ¶ 41. Based on its experience in prior rulemakings, the Bureau believes that six months is a realistic estimate for this step, and thus the Bureau anticipates publicly releasing the SBREFA outline by next November. *Id.* ¶ 59. The SBREFA panel will then issue a report within two months after the panel is officially convened. *Id.* ¶¶ 43-44.

1    Once the SBREFA process concludes, the Bureau intends to move expeditiously to issue a

2    proposed rule in accordance with APA procedures. *Id.* ¶ 60. At that time, the Bureau will be

3    better able to identify a target date for the issuance of a proposed rule. *Id.* In the Bureau's

4    experience, the length of time needed to prepare and issue a proposed rule can vary significantly.

5    *Id.* It depends on the nature of the comments received and the information obtained through the

6    SBREFA process, as well as feedback that the Bureau obtains from other stakeholders who may

7    provide information to the Bureau once the detailed outline of proposals is released. *Id.* In some

8    instances, the Bureau has been able to issue a proposed rule approximately three months after

9    completing the SBREFA process. *Id.* In other instances, the process can take closer to a year. *Id.*

10   Similarly, the time the Bureau will need to issue a final rule once the comment period on the

11   proposal closes depends on the number of comments the Bureau receives as well as the nature

12   and complexity of the issues raised in those comments. *Id.* ¶ 61. While the Bureau generally

13   assumes for planning purposes that it takes at least nine months after the close of the comment

14   period before a final rule will be ready for release, in complex rules, such as the Section 1071

15   rulemaking, this process has taken longer. *Id.*

16       **F.  This Lawsuit**

17   Plaintiff CRC filed a complaint on May 14, 2019, and amended that complaint on June 27,

18   2019, to add plaintiffs National Association for Latino Community Asset Builders, Deborah

19   Field, and ReShonda Young. The amended complaint alleges two claims: first, that the Bureau

20   unreasonably delayed completion of the Section 1071 rulemaking in violation of the

21   Administrative Procedure Act, and second, that, when it issued the Letter, the Bureau

22   countermanded Section 1071 by opining that lenders do not need to comply with Section 1071

23   until after the Bureau issues implementing rules. *See* Am. Compl. ¶¶ 94-103. In their motion for

24   summary judgment, Plaintiffs withdrew the second claim. *See* Mem. at 9 n.19.

25                              **ARGUMENT**

26   **I.  Plaintiffs are not entitled to the extraordinary remedy of mandamus.**

27   Under the Administrative Procedure Act, a court may compel "agency action …

28   unreasonably delayed." 5 U.S.C. § 706(1). As the Ninth Circuit has explained, such an order

DEFS.' NOTICE OF MOT., MOT., & MEM. OPP. PLS.' MSJ & ISO DEFS.' MSJ

requiring an agency to act under 5 U.S.C. § 706(1) is form of mandamus. *Independence Min. Co., Inc. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997). "Issuing a writ of mandamus directing a federal agency to act … is an extraordinary remedy justified only in exceptional circumstances." *In re PANNA II*, 798 F.3d at 813 (quotation marks omitted). Plaintiffs have failed to demonstrate that those exceptional circumstances exist here.

In this circuit, unreasonable delay is evaluated using the so-called *TRAC* factors set out by the D.C. Circuit in *Telecommunications Research & Action Center v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984).[2] *See In re A Community Voice*, 878 F.3d at 786. There are six *TRAC* factors:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Id.* Although the first factor is generally the most important, no one factor is "determinative"— this Court must "consider them all." *Id.* In deciding whether "exceptional circumstances" are present to justify mandamus, *In re PANNA II*, 798 F.3d at 813, this Court should "look to the relevant statutory provisions, the controlling law of this circuit and the more developed law of the District of Columbia Circuit." *In re A Community Voice*, 878 F.3d at 781-82. It is appropriate for this Court to decide whether mandamus should issue as a matter of law on cross-motions for

---

[2] Of course, "the first step before applying the *TRAC* factors is necessarily to determine whether the agency is required to act, that is whether it is under a duty to act." *In re A Community Voice*, 878 F.3d at 784. The Bureau does not dispute that this first step is satisfied here: Consistent with its longstanding interpretation of Section 1071, the Bureau believes that it is obligated to issue a rule implementing Section 1071.

summary judgment. *See, e.g.*, *Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1066 (N.D. Cal. 2014) (resolving unreasonable delay claim as a matter of law on cross-motions for summary judgment).

### A.  The first two *TRAC* factors do not support mandamus.

Mandamus is not warranted under the first two *TRAC* factors for two principal reasons. First, the Bureau has already made considerable progress in undertaking the information-gathering necessary to support an informed rulemaking on a complex mandate and has put forward a reasonable plan to ensure the responsible and prompt completion of that rulemaking. Second, in the context of a new agency assigned multiple mandatory rulemakings at the same time, Congress's decision to impose statutory deadlines for many rulemakings—but *not* for the Section 1071 rulemaking—provides a strong signal that Congress did not expect the Bureau to begin work on the Section 1071 rulemaking right away. The first two *TRAC* factors therefore weigh against mandamus. *See Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003) (explaining that whether time an agency takes to act satisfies the "rule of reason" "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed unlawful" and reversing district court's conclusion that five-year delay was unreasonable); *Grand Canyon Air Tour Coal.*, 154 F.3d at 477-78 (declining to order agency action notwithstanding a 10-year delay in issuing a rule and a 20-year delay in achieving the rule's statutory objective).

### 1.  The Bureau has a reasonable plan to ensure the prompt completion of the Section 1071 rulemaking.

As explained above, the Bureau has a plan to ensure that it can promptly issue a thoughtful and effective rule to implement Section 1071. That plan leverages the substantial research and outreach that the Bureau has already completed in support of the Section 1071 rulemaking. *See In re Pesticide Action Network N. Am.* (*In re PANNA I*), 532 F. Appx. 649, 651 (9th Cir. 2013) (finding that the six years that agency had taken to consider an administrative petition was not unreasonable in light of the complexity of the issues involved, the agency's plan for resolving the petition, and the "concrete steps" agency had already taken). The Bureau's plan focuses on the next year of its rulemaking work. Under its plan, the Bureau intends to complete its internal

1    policymaking process in the next six months. *See* Pahl Decl. ¶ 58. Then, within six months of

2    completing its internal decisionmaking process, the Bureau expects to release a detailed outline

3    of the proposals under consideration. *Id.* ¶ 59. The SBREFA panel will issue a report within two

4    months of being officially convened. *Id.* ¶ 44.

5         In the Bureau's experience, this period of preliminary policy formulation and drafting is

6    critical to the ultimate success of the overall rulemaking process. In addition, the Bureau believes

7    that allowing sufficient time for this step now will help ensure that Section 1071 is implemented

8    sooner rather than later. *See Sierra Club v. Thomas*, 828 F.2d 783, 798-99 (D.C. Cir. 1987)

9    ("Indeed, by decreasing the risk of later judicial invalidation and remand to the agency,

10   additional time spent reviewing a rulemaking proposal before it is adopted may well ensure

11   earlier, not later, implementation of any eventual regulatory scheme."), *abrogated in part by*,

12   Pub. L. No. 101-549, § 707(f), 104 Stat. 2239, 2683 (1990).

13        At this point, the Bureau cannot predict the nature and extent of the comments that it will

14   receive in connection with the SBREFA process, or that it will receive in response to a notice of

15   proposed rulemaking. *See* Pahl Decl. ¶ 60. As a result, the Bureau's plan does not yet include

16   intended dates for the issuance of the proposed or final rule. *Cf. United Steelworkers of Am.,*

17   *AFL-CIO-CLC v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) ("OSHA obviously

18   cannot know at present how many comments it will receive or the nature of those comments.").

19   However, the Bureau can report that for completed rulemakings that went through the SBREFA

20   process in recent years, the Bureau took from roughly three to eleven months to issue a notice of

21   proposed rulemaking after completing the SBREFA process, and approximately eleven months

22   to issue a final rule after the end of the proposal's comment period. *See* Pahl Decl. ¶¶ 60-61.

23        Because the Bureau is "now proceeding toward completion of its rulemaking within a

24   reasonable time[,] there is … no need, at this juncture, for a court order compelling agency

25   action unreasonably delayed." *Oil, Chem. & Atomic Workers Int'l Union v. Zegeer*, 768 F.2d

26   1480, 1488 (D.C. Cir. 1985).

27

28

1
2

      **2.**   **Congress chose not to set a deadline for the newly established Bureau to issue a rule implementing Section 1071.**

3
4
5
6
7
8
9
10
11
12
13
14
15
16

     In considering the reasonableness of the Bureau's timetable for implementing Section 1071, this Court should also consider the Bureau's unique status as a newly created agency and Congress's deliberate choice not to set a deadline for the Bureau to issue rules implementing Section 1071. Unlike the cases on which Plaintiffs rely, Pls.' Mem. at 17, the Bureau was not a fully staffed agency with decades of regulatory experience when Congress gave it the task of implementing Section 1071. Instead, at the same time and in the same act (the CFPA) that Congress imposed the obligation to promulgate the Section 1071 rule, it also established the Bureau. Section 1071 became effective and the Bureau gained the bulk of its authorities in July 2011. During its early years, the Bureau devoted a substantial portion of its budget and efforts to building the agency, including hiring staff, developing information technology, and moving into office space. *See* Silberman Decl. ¶ 8. At the end of fiscal year 2011, the Bureau had about 660 employees. *Id.* ¶ 9 By the end of fiscal year 2015, that number had increased to 1500 employees, about the same number as today. *Id.* So the time period for the Section 1071 rule coincides with the Bureau's initial process of standing itself up.

17
18
19
20
21
22
23
24
25
26
27
28

     In addition, the Section 1071 rulemaking was but one among a wide variety of tasks that confronted the Bureau in July 2011, and the Bureau needed to set up multiple capabilities before it could feasibly and responsibly undertake the Section 1071 rulemaking. In particular, the CFPA required the Bureau to establish: a unit that conducted research regarding, among other things, developments in the markets for consumer financial products or services, 12 U.S.C. § 5493(b)(1); a unit devoted to collecting and tracking consumer complaints, *id.* § 5493(b)(3); an office of fair lending and equal opportunity to coordinate fair lending efforts, *id.* § 5493(c); an office of financial education to educate consumers to make better financial decisions, *id.* § 5493(d); an office of service member affairs to educate service members regarding consumer financial products or services, *id.* § 5493(e); and an office of financial protection for older Americans, *id.* § 5493(g). Some of these functions, particularly its research function and its fair lending office, provide necessary expertise and resources to support its Section 1071 effort.

And the Bureau had other obligations that it had to initiate and undertake as well. The Bureau had to create an enforcement program, because Congress charged it with enforcing the CFPA's prohibition of unfair, deceptive, or abusive acts or practices, as well as 18 other consumer financial protection laws. *See id.* §§ 5531, 5536. The Bureau also had to create a supervision program to conduct supervisory examinations of very large banks, savings associations, and credit unions, *id.* § 5515, as well other larger participants in markets for other consumer financial products or services, *id.* § 5514. The Bureau was required to issue a set of research reports covering a diverse range of topics, including arbitration agreements, reverse mortgages, remittances as evidence of creditworthiness, financial literacy, as well as annual or semi-annual reports on various of its activities. *See id.* §§ 5493, 5496, 5518, 5602; 15 U.S.C. § 1693*o*-1(e). And the Bureau had to engage in several rulemakings so that the Bureau could operate as a stand-alone agency. For example, the Bureau had to implement rules regarding the conduct of investigations, 77 Fed. Reg. 39101 (June 29, 2012); procedural rules for its administrative adjudications, 77 Fed. Reg. 39058 (June 29, 2012); and rules regarding the operation of its civil penalty fund, 78 Fed. Reg. 26489 (May 7, 2013).

In addition to the rules that were necessary to create the procedural structure of the Bureau, the Bureau had other significant substantive rulemaking obligations that were necessary to implement both the Dodd-Frank Act and other consumer financial protection laws. For instance, Congress mandated that the Bureau issue a rule integrating TILA's and RESPA's mortgage disclosure requirements. *See* 12 U.S.C. § 2603(a); 15 U.S.C. § 1604(b); *see also* 78 Fed. Reg. 79730 (Dec. 31, 2013) (integrated mortgage disclosures rule). And, as explained more fully above, Congress also required the Bureau to issue rules implementing the Dodd-Frank Act's amendments to HMDA.

In many instances, Congress set an express deadline for the Bureau to issue rules. Congress specified that the Bureau would have supervisory authority over nondepository institutions defined by the Bureau to be larger participants in markets for consumer financial services; Congress mandated that the Bureau issue its first rule defining such entities within one year of the designated transfer date. *See* 12 U.S.C. § 5514(a)(2); *see also* 77 Fed. Reg. 42873 (July 20,

2012). Likewise, Congress set January 21, 2012, as the deadline for the Bureau to issue certain rules for international remittance transfers. *See* 15 U.S.C. § 1693*o*-1(d)(2)-(3); *see also* 77 Fed. Reg. 6194 (Feb. 7, 2012) (initial remittance rule). And most significantly, Congress set a deadline of eighteen months from the designated transfer date for the Bureau to issue rules implementing several of the Dodd-Frank Act's most significant amendments to the mortgage laws. *See* 15 U.S.C. § 1601 note.

As the D.C. Circuit has explained, when applying the *TRAC* factors, "the reasonableness of the delay must be judged in the context of the statute which authorizes the agency's action." *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992). Here, the statute is the CFPA, and through that statute, Congress created an entirely new agency, gave it a wide variety of new responsibilities, and decided to establish deadlines for some of the mandatory rules it charged the newly created Bureau with implementing, but not to set a deadline for the Section 1071 rulemaking. That deliberate choice provides a strong indication that Congress did not intend to require the Bureau to even begin to address Section 1071 until *after* the Bureau completed the rulemakings with statutory deadlines.

Given this context, it is not unreasonable that the Bureau has not yet issued the Section 1071 rule.

## B.  The third and fifth *TRAC* factors do not support mandamus.

The third and fifth *TRAC* factors, which require consideration of the interests impacted by delay, do not support mandamus with respect to the financial data collection rule at issue here. To be sure, the Bureau believes that a properly executed rule under Section 1071 will result in the collection of data that may be useful in identifying unlawful discrimination and potential development opportunities without imposing undue or unnecessary costs on lenders or overly deterring small business lending. But a delay in the public's ability to enjoy the potential downstream benefits of better data from the Section 1071 rulemaking is a far cry from the threats to human health and well-being that have led the Ninth Circuit to find mandamus relief appropriate.

1. **While the Section 1071 rulemaking serves important interests, human health is not at risk.**

Unlike *In re A Community Voice*, *In re PANNA II*, and many of the other cases on which Plaintiffs rely, this is not a case in which human health is at risk. And while the Bureau agrees that Section 1071 was enacted to achieve important objectives, the Ninth Circuit has made clear that regulatory delays that threaten human health are different. *In re A Community Voice*, for instance, involved a rulemaking to address the dangers posed to children by lead-based paint. The Ninth Circuit distinguished cases involving economic harms, finding that, with respect to the third *TRAC* factor, there was a "clear threat to human welfare; indeed EPA itself has acknowledged that lead poisoning is the number one environmental health threat in the U.S. for children ages 6 and younger." 878 F.3d at 787 (cleaned up). This threat also weighed heavily on the court's assessment of the fifth *TRAC* factor: "The children exposed to lead poisoning due to the failure of EPA to act are severely prejudiced by EPA's delay." *Id. In re PANNA II* involved a similar finding of a threat to human health, this time from a chemical used in pesticides. By the time of the Ninth Circuit's decision, EPA had reported that the chemical "poses such a significant threat to water supplies that a nationwide ban on the pesticide may be justified." 798 F.3d at 814.

No such threats are present here. Instead what is at issue is a financial data collection regime that, if appropriately implemented, can help identify (already unlawful) discriminatory conduct, and can enhance awareness of development and business opportunities without imposing undue or unnecessary costs on lenders or overly deterring small business lending. While such a rule would be in the public interest, it does not implicate the kinds of human health interests involved in *In re A Community Voice* and *In re PANNA II*.

2. **Rushing to issue a poorly designed rule would harm the very businesses that Section 1071 was meant to help.**

While Plaintiffs, along with the rest of the public, stand to benefit from Section 1071's implementation, their interests will be ill-served by a poorly designed rule. *See In re A Community Voice*, 878 F.3d at 788 ("We are mindful of the need for EPA to issue a well-

conceived rule, and not merely a rule ….").  Indeed, if the Section 1071 rule is not properly structured, it could have the perverse impact of harming the very businesses it was meant to help. Section 1071 imposes a data reporting obligation in connection with applications for loans for small businesses, including women-owned and minority-owned small businesses. If the burdens associated with collecting, maintaining, and reporting this data are too high, some financial institutions—especially smaller ones serving underserved parts of the country—may be disincentivized from serving the credit needs of these businesses, thereby reducing the supply of credit and competition among creditors. Other creditors may be forced to increase the cost of credit and thereby price some small business borrowers out of the market for loans. And absent careful rulemaking, Section 1071 could lead creditors to adopt more rigid underwriting processes to the detriment of would-be borrowers. The public interest will be best served through a thoughtful rule that minimizes unnecessary burdens on financial institutions while facilitating the accurate and uniform collection of usable data. The Bureau's approach is designed to achieve this result. The unduly hasty schedule proposed by Plaintiffs would preclude it. *See Rubber Mfrs. Ass'n*, 783 F.2d at 1120 ("[J]udicial imposition of an overly hasty timetable at this stage would ill serve the public interest.").

### C.  The fourth and sixth TRAC factors do not support mandamus.

#### 1.  Expediting the Section 1071 rulemaking further would interfere with other important regulatory projects.

As discussed above, the Bureau has a plan to ensure the prompt and responsible implementation of Section 1071. Expediting the rulemaking further would risk interfering with several important regulatory projects. Pahl Decl. ¶ 62. Many of those initiatives were expressly required by Congress. For example, the Bureau is working to implement Sections 108 and 307 of EGRRCPA, which mandate Bureau mortgage rulemakings related to escrows and "Property Assessed Clean Energy" (PACE) financing, respectively. *See* Pahl Decl. ¶¶ 64-65. The Bureau is also conducting a required retrospective assessment under 12 U.S.C. § 5512(d) of the regulations that consolidated various mortgage origination disclosures under TILA and RESPA. *Id.* ¶ 71.

Many of the Bureau's other regulatory projects are compelled by practical or regulatory necessity, and could, therefore, have significant negative impacts on consumer financial markets if not addressed. For instance, the Bureau is focusing substantial attention on a regulatory provision the Bureau adopted when it implemented the Dodd-Frank Act's mortgage amendments. Pahl Decl. ¶ 68. As background, the Dodd-Frank Act requires mortgage lenders to make a reasonable and good faith determination that consumers have a reasonable ability to repay certain mortgage loans. *See* 15 U.S.C. § 1639c(a). It also established a category of mortgages, known as "qualified mortgages," that a lender may presume comply with the statutory ability-to-repay requirement. *Id.* § 1639c(b). When the Bureau originally implemented these requirements, it established a temporary provision to extend qualified mortgage status to loans that are eligible to be purchased or guaranteed by either Fannie Mae or Freddie Mac. Pahl Decl. ¶ 68. But this provision is set to expire in January 2021. *Id.* This temporary provision currently plays a very significant role in the mortgage market—more than half of the approximately six million closed-end first-lien mortgages made in 2018 were purchased or guaranteed by Fannie Mae or Freddie Mac. *Id.* The Bureau will need to decide whether regulatory action is necessary and appropriate in connection with the expiration of the temporary provision in advance of the January 2021 deadline. *See id.*

The Bureau is presented with a similar deadline in the context of its remittance rule. As authorized by the Dodd-Frank Act, the remittance rule contains a temporary exception that permits insured institutions (principally banks and credit unions) to provide estimated rather than exact disclosures of certain fees and foreign exchange rates. *Id.* ¶ 66. By statute the exception expires in July 2020 and cannot be extended further. *See* 15 U.S.C. § 1693*o*-1(a)(4)(B). The Bureau is concerned, however, that absent Bureau action, the expiration of the temporary exception could disrupt the ability of consumers to send remittances from the bank accounts to certain destinations. Pahl Decl. ¶ 66. The Bureau expects to issue a proposal to address this problem shortly and anticipates finalizing any changes before July 2020. *Id.*

An unduly compressed schedule for the Section 1071 rulemaking risks undermining each of these important projects (among others). *See id.* ¶¶ 62-70. While Plaintiffs appear inclined to

second-guess the Bureau's prioritization of its obligations, Pls. Mem. at 18, the D.C. Circuit has repeatedly reminded that "[t]he agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1101 (quoting *In re Barr Labs. Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991)). And to the extent that Plaintiffs believe that the Bureau countermands congressional intent when it pursues rulemaking projects that Congress did not expressly require alongside mandatory rulemakings (like the Section 1071 rule), Pls.' Mem. at 18, they are mistaken. Congress charged the Bureau not just with a discrete set of rulemaking tasks, but also with a broader mandate to implement federal consumer financial law with the purpose of "ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). And Congress gave the Bureau a series of objectives to guide the Bureau's exercise of its authorities, including ensuring that "consumers are protected from unfair, deceptive, or abusive acts and practices and from discrimination," that "outdated, unnecessary, or unduly burdensome regulations are regularly identified and addressed in order to reduce unwarranted regulatory burdens," and that "markets for consumer financial products and services operate transparently and efficiently to facilitate access and innovation." *Id.* § 5511(b)(2), (3), (5).

In short, the fourth *TRAC* factor does not support mandamus.

> **2.   The Bureau's past decisions to prioritize other rulemaking projects were made in good faith.**

Because Plaintiffs do not claim that the Bureau has acted in bad faith, *see* Mem. at 19, they have conceded that the sixth *TRAC* factor does not support mandamus. But even if Plaintiffs had not conceded the point, the public record demonstrates that the Bureau has made good faith judgments about how to balance its many statutory obligations. The Bureau first prioritized rulemakings with express statutory deadlines, including rules Congress mandated in response to the financial crisis of the last decade. Silberman Decl. ¶¶ 10-14. From there, the Bureau turned its focus to a series of significant rulemakings to implement the Dodd-Frank Act and the

enumerated consumer laws. *Id.* ¶¶ 15-16. In doing so, the Bureau determined that it made sense to issue a required rule implementing the Dodd-Frank Act's HMDA amendments before turning to the Section 1071 project. *Id.* ¶ 20. As then-Director Cordray testified to Congress, the Bureau believed that the Bureau could leverage what it learned from the HMDA rulemaking to facilitate the effort to launch a parallel data collection regime under Section 1071. *Id.* Plaintiffs do not seriously contest this reasonable determination.

After the Bureau issued a final HMDA rule, it allocated staff and resources to Section 1071. *Id.* ¶¶ 22-23. By the spring of 2017, the Bureau had published a research paper, released an RFI, and held a field hearing. *Id.* ¶¶ 24-26. After the Bureau's first leadership transition, the Bureau's new Acting Director determined that it was appropriate to reconsider the Bureau's HMDA rules and to issue rules implementing Congress's 2018 HMDA revisions, and that these efforts—involving rules that were already in effect—took precedence over Section 1071. Pahl Decl. ¶¶ 5-8. While Plaintiffs evidently disagree with this judgment, Mem. at 18, 20, it was entirely within the discretion Congress gave the Bureau to decide to temporarily prioritize the Bureau's statutory objective to ensure that "outdated, unnecessary, or unduly burdensome regulations are regularly identified and addressed in order to reduce unwarranted regulatory burdens." 12 U.S.C. § 5511(b)(3). In any event, the Bureau's current Director has now decided to end the temporary pause in the Bureau's Section 1071 rulemaking activities with the goal of releasing a detailed outline of proposals to implement Section 1071 within 12 months. Pahl Decl. ¶¶ 59-60.

\* \* \*

Because none of the *TRAC* factors support mandamus, this Court should deny Plaintiffs' motion for summary judgment and award summary judgment to the Bureau on Count I.

## II. Even if mandamus were warranted, this Court should decline to enter an order setting a fixed schedule for the completion of the rulemaking.

Plaintiffs do not merely seek mandamus directing the Bureau to "undertake prompt … rulemaking." *In re Bluewater Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000). Rather, Plaintiffs ask this Court to enter an order requiring the Bureau to issue a final rule by a date certain. (They suggest six months in their proposed order.) But Ninth and D.C. Circuit decisions reveal that

where, as here, Congress has declined to impose a statutory deadline, courts generally only impose their own deadlines for agency rulemakings when either (1) there is a "clear threat to human welfare," *In re A Community Voice*, 878 F.3d at 787, or (2) the agency has ignored prior court directions to expedite decision-making, *see, e.g.*, *In re PANNA II*, 798 F.3d at 814-15 ("EPA's unreasonable delay in responding to the administrative petition has already been the subject of three non-frivolous lawsuits. There should not be a fourth."); *In re Core Commc'ns, Inc.*, 531 F.3d 849, 856 (D.C. Cir. 2008) ("In this case, we are faced with the agency's failure— for six years—to respond to our own remand."); *cf Grand Canyon Air Tour Coal.*, 154 F.3d at 477 (declining to order agency to act and noting that "this is not a case where an agency has been contumacious in ignoring court directions to expedite decision-making"). In other words, imposing a mandatory deadline for an agency to complete a rulemaking is appropriate only where it is necessary—whether to protect human health or to deal with an agency that has ignored prior judicial interventions—and not as a "punishment" for an agency's prior failure to act. *See, e.g.*, *Rubber Mfr. Ass'n*, 783 F.2d at 1120 ("[W]e decline the invitation to 'punish' OSHA for its past delay by imposing a mandatory, accelerated timetable.").

Courts' reluctance to impose their own deadlines for agency rulemakings makes sense. Determining how to proceed with a complex and technical rulemaking subject to the APA's notice-and-comment procedures is entrusted to the sound discretion of administrative agencies. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) ("[W]e are mindful that, absent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of its proceedings is entitled to considerable deference." (cleaned up). Courts are "always acutely aware of the limits of our institutional competence in a highly technical area, and loath to interfere with the agency's internal processes." *In re Core Commc'ns, Inc.*, 531 F.3d at 859 (cleaned up); *accord In re Barr Labs.*, 930 F.2d at 74 ("[R]espect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities."). And requiring an agency to adhere to a compressed rulemaking schedule can be counterproductive. No one benefits if the agency rushes to issue a final rule only to have it stayed

or invalidated. *See, e.g.*, *In re United Mine Workers of Am. Int'l Union*, 190 F.3d at 555 ("Although it might still be possible for MSHA to go forward on the current rulemaking record, the agency's plan may well shorten the overall period of delay by resolving issues that would otherwise become the subject of litigation.").

In this case, there is neither a threat to human health nor a record of judicial warnings that went unheeded. That means that the remedies that the Ninth Circuit imposed in *In re A Community Voice* (threat to human health) and *In re PANNA II* (both a threat to human health and prior judicial proceedings) are not particularly instructive here. Nor are Plaintiffs aided, *see* Pls.' Mem. at 15, by cases involving the relief ordered for an agency's failure to follow a prior judicial mandate (*Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1032-36 (D.C. Cir. 1983)), or that did not involve agency rulemaking, but rather an agency's determination of the reasonableness of tariffs proposed by regulated entities (*MCI Telecomms. Corp. v. FCC*, 627 F.2d 322 (D.C. Cir. 1980), and *Nader v. FCC*, 520 F.2d 182 (D.C. Cir. 1975)).

The better guide to an appropriate remedy in this case—assuming that plaintiffs are entitled to any remedy at all—is provided by the D.C. Circuit's decision in *In re United Mine Workers of America International Union*, on which the Ninth Circuit relied in its remedial discussion in *In re A Community Voice*. In the *United Mine Workers* case, the D.C. Circuit declined to set a deadline for rulemaking even though eight years had passed and (unlike here) Congress had set an express statutory deadline that had long since passed. 190 F.3d at 546, 551. Instead, the D.C. Circuit ordered the agency "to issue periodic status reports on its progress toward promulgation of a final rule." *In re A Community Voice*, 878 F.3d at 788. This "alternative device," *see id.*, would be the appropriate remedy here if this Court determines that some relief is required.

In no event would Plaintiffs' request for issuance of a final rule in six months be appropriate. That timeline would require the Bureau to issue a final rule without following its legal obligations under SBREFA and the APA. Before the Bureau can issue a final rule, it must (among other things) resolve outstanding policy issues, draft and release an outline of proposals under consideration, convene a SBREFA panel and obtain feedback from small entity representatives in coordination with two other agencies, review and consider the report produced

by the SBREFA panel, issue a notice of proposed rulemaking, provide an opportunity for notice and comment, review the comments, and prepare a final rule. *See* Pahl Decl. ¶¶ 37-61. Six months would not be enough time to complete this work, let alone to complete these critical tasks in a thoughtful way that produces a workable rule that can benefit Plaintiffs, the Bureau, and all other affected stakeholders. *See id.* ¶ 62.

## CONCLUSION

This Court should deny Plaintiffs motion for summary judgment and grant the Bureau's motion for summary judgment.


DATED: November 8, 2019                    Respectfully submitted,


                                           _ /s/ Christopher J. Deal _____
                                           Christopher J. Deal
                                           (DC Bar No. 990573)
                                           Lawrence DeMille-Wagman
                                           (DC Bar No. 929950)
                                           Consumer Financial Protection Bureau
                                           1700 G Street, N.W.
                                           Washington, D.C. 20552
                                           Telephone: (202) 435-9582
                                           Facsimile: (202) 435-7024
                                           christopher.deal@cfpb.gov
                                           lawrence.wagman@cfpb.gov


                                           *Counsel for Defendants*