1   MARY McLEOD
    General Counsel
2   JOHN R. COLEMAN
    Deputy General Counsel
3   LAURA M. HUSSAIN
    Assistant General Counsel
4   LAWRENCE DeMILLE-WAGMAN
    Senior Litigation Counsel
5   DC Bar No. 929950
    Email:  lawrence.wagman@cfpb.gov
6   CHRISTOPHER J. DEAL
    Senior Litigation Counsel
7   DC Bar No. 990573
    Email:  christopher.deal@cfpb.gov
8   Consumer Financial Protection Bureau
    1700 G Street, N.W.
9   Washington, D.C.  20552
    Telephone: (202) 435-9582
10  Facsimile:  (202) 435-7024

11  Counsel for Defendants

12

13              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
14                       OAKLAND DIVISION

15

16  CALIFORNIA REINVESTMENT          Case No. 4:19-cv-02572-JSW
    COALITION, NATIONAL ASSOCIATION
17  FOR LATINO COMMUNITY ASSET
    BUILDERS, DEBORAH LYNN FIELD, and
18  RESHONDA YOUNG,                  **DECLARATION OF DAVID
                                     SILBERMAN**
19                         Plaintiffs,

         v.
20
    KATHLEEN L. KRANINGER, Director,
21  Consumer Financial Protection Bureau, In Her
    Official Capacity, and CONSUMER
22  FINANCIAL PROTECTION BUREAU,

23                         Defendants.

24

25

26

27

28

I, David Silberman, hereby declare and state the following:

1.  I am the Associate Director for the Division of Research, Markets, and Regulations (RMR) at the Consumer Financial Protection Bureau (CFPB or Bureau), a position I assumed on an acting basis in 2011 and have held on a permanent basis since 2012. For the period covered by this declaration, I had the primary responsibility for overseeing and directing the activities of RMR, including its rulemaking activities.

2.  RMR is composed of economists, market experts, and regulatory attorneys who are responsible, among other things, for developing options and recommendations with respect to policy issues that arise in the context of rulemakings and for leading the rulemaking process in accordance with legal requirements and the Bureau's internal operating procedures. I make the statements in this Declaration based on my personal knowledge and information available to me in my official capacity. This declaration is filed in support of the Bureau's Motion for Summary Judgment and its Opposition to the Motion for Summary Judgment filed by California Reinvestment Coalition, National Association for Latino Community Asset Builders, Deborah Lynn Field, and ReShonda Young (Plaintiffs). The purpose of this declaration is to describe the significant work that the Bureau has already completed on the Section 1071 rulemaking.

3.  On July 21, 2010, Congress enacted the Dodd-Frank Act. Title X of that Act, known as the Consumer Financial Protection Act (CFPA), established the Bureau.

4.  As part of the CFPA, Section 1071 of the Dodd-Frank Act amended the Equal Credit Opportunity Act (ECOA) to require financial institutions to collect, report, and make public certain information concerning credit applications made by women-owned, minority-owned, and small businesses. *See* 15 U.S.C. § 1691c-2.

5.  Section 1071 mandates that the "Bureau shall prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to this section," that the Bureau "may adopt exceptions to any requirement of this section and may, conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section," and that "[t]he Bureau shall issue guidance designed to facilitate

DECLARATION OF DAVID SILBERMAN     1                    Case No.: 4:19-cv-02572-JSW

compliance with the requirements of this section, including assisting financial institutions in working with applicants to determine whether the applicants are women-owned, minority-owned, or small businesses for purposes of this section." *Id.* § 1691c-2(g)(1)-(3). Section 1071 provides that "[t]he Bureau may, at its discretion, delete or modify data collected under this section which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest." *Id.* § 1691c-2(e)(4).

6.    Congress did not provide a specific date by which the Bureau was required to issue rules to implement Section 1071.

7.    While Congress established the Bureau as of July 21, 2010, Congress recognized that this newly-created agency would not be able to administer the consumer laws immediately. *See, e.g.*, 12 U.S.C. §§ 5586 (providing the Secretary of the Treasury with certain interim authorities), 5587 (establishing reporting and other requirements to "ensure that the Bureau … has an orderly and organized startup"). So, among other things, Congress delayed the transfer of many consumer financial protection authorities from existing regulators to the Bureau until the designated transfer date, July 21, 2011. *See* 12 U.S.C. §§ 5581, 5582; 75 Fed. Reg. 57252 (Sept. 20, 2010); *see also* 12 U.S.C. § 5584 (providing for transfer of personnel from other agencies within 90 days after the designated transfer date).

8.    Consistent with Congress's expectation, the Bureau devoted a substantial portion of its budget and efforts during its early years to building the agency, including hiring staff, developing information technology, and moving into office space.

9.    The Bureau was still working to build its research, markets and related regulations teams at the time of the designated transfer date. At the end of fiscal year 2011, the Bureau had about 660 employees. *See Semi-Annual Report of The Consumer Financial Protection Bureau* 36 (Jan. 30, 2012), https://files.consumerfinance.gov/f/2012/01/Congressional_Report_Jan2012.pdf. By the end of fiscal year 2015, that number had increased to approximately 1500 employees, *see Semi-Annual Report of the Consumer Financial Protection Bureau* 14 (Fall 2015), https://files. consumerfinance.gov/f/201511_cfpb_semi-annual-report-fall-2015.pdf, about the same number as today, *see* 2018 BCFP Annual Employee Survey Results 3 (Dec. 2018), https://files.

consumerfinance.gov/f/documents/2018_AES_results_report-for_posting_to_BCFPgov_vf_122118.pdf.

10. After the designated transfer date, the Bureau principally focused its rulewriting resources on a series of mandatory rulemakings with explicit statutory deadlines. During that time, the Bureau determined that its need to focus its resources on other congressionally-mandated rulemaking projects meant that the Section 1071 effort should be treated as a long-term action item. *See* 78 Fed. Reg. 1652, 1655 (Jan. 8, 2013).

11. For instance, in January 2012, the Bureau issued a final rule regulating remittance transfers, consistent with Congress's direction that the Bureau issue such a rule by January 21, 2012. *See* 77 Fed. Reg. 6194 (Feb. 7, 2012).

12. In 2012 and 2013, the Bureau then clarified and revised the remittance regulations before those regulations went into effect on October 28, 2013. *See, e.g.*, 77 Fed. Reg. 50244 (Aug. 20, 2012); 78 Fed. Reg. 30662 (May 22, 2013).

13. Likewise, in July 2012, the Bureau issued its first rule defining larger non-depository participants in a market for consumer financial products or services, consistent with Congress's direction that the Bureau issue a rule of this kind within a year of the designated transfer date. *See* 77 Fed. Reg. 42874 (July 20, 2012).

14. And, in January 2013, the Bureau issued a series of very significant final rules regulating mortgage lending, consistent with Congress's direction that the Bureau issue such rules by January 21, 2013. *See* 78 Fed. Reg. 4726 (Jan. 22, 2013) (escrows rule); 78 Fed. Reg. 6408 (Jan. 30, 2013) (ability to repay and qualified mortgage rule); 78 Fed. Reg. 6856 (Jan. 31, 2013) (high-cost mortgage loans rule); 78 Fed. Reg. 7216 (Jan. 31, 2013) (ECOA appraisals rule); 78 Fed. Reg. 10368 (Feb. 13, 2013) (interagency appraisals rule); 78 Fed. Reg. 10696 (Feb. 14, 2013) (RESPA mortgage servicing rule); 78 Fed. Reg. 10901 (Feb. 14, 2013) (TILA mortgage servicing rule); 78 Fed. Reg. 11280 (Feb. 15, 2013) (loan originator compensation rule); *see also* 15 U.S.C. § 1601 note. Throughout 2013, the Bureau issued a number of revisions to those rules before they became effective. *See, e.g.*, 78 Fed. Reg. 44686 (July 24, 2013); 78 Fed. Reg. 60382 (Oct. 1, 2013); 78 Fed. Reg. 62993 (Oct. 23, 2013).

15. RMR focused its efforts next on a series of significant rulemakings to implement other provisions of the Dodd-Frank Act and the enumerated consumer laws. For instance, in December 2013, the Bureau published a rule required by sections 1098 and 1100A of the Dodd-Frank Act, integrating mortgage disclosure requirements imposed by the Truth in Lending Act and the Real Estate Settlement Procedures Act. *See* 78 Fed. Reg. 79730 (Dec. 31, 2013). The Bureau likewise issued rules concerning, among other things, arbitration agreements in contracts for consumer financial products and services, 82 Fed. Reg. 33210 (July 19, 2017), prepaid cards, 81 Fed. Reg. 83934 (Nov. 22, 2016), and payday lending, 82 Fed. Reg. 54472 (Nov. 17, 2017)). The Bureau also began work on a debt collection rulemaking. 78 Fed. Reg. 67848 (Nov. 12, 2013).

16. As most relevant to Section 1071, the Bureau also devoted significant rulemaking resources to implement the Dodd-Frank Act's amendments to the Home Mortgage Disclosure Act of 1975 (HMDA).

17. HMDA has long required financial institutions to collect, report, and publicly disclose information about mortgages loans. *See* P.L. 94-200, Title III, codified at 12 U.S.C. § 2801, *et seq*.

18. The Dodd-Frank Act transferred authority to administer HMDA from the Federal Reserve Board to the Bureau. Section 1094 of the Dodd-Frank Act also amended HMDA, adding new data points and authorizing the Bureau to require that additional information be collected. The Act directed the Bureau to engage in a rulemaking to implement the HMDA amendments. *See* 12 U.S.C. § 2803.

19. HMDA and Section 1071 have similar functions and purposes. *Compare* 12 U.S.C. § 2803(a) *with* 15 U.S.C. § 1691c-2(b), and 12 CFR § 1003.1(b) *with* 15 U.S.C. § 1691c-2(a).

20. As the Bureau explained publicly, the Bureau determined that it was appropriate to implement the Dodd-Frank Act's HMDA amendments before implementing Section 1071. The Bureau believed that HMDA data had to be updated in accordance with the Dodd-Frank Act to "address informational shortcomings exposed by the financial crisis and to meet the needs of homeowners, potential homeowners, and neighborhoods throughout the nation." 80 Fed. Reg.

66128, 66130 (Oct. 28, 2015). The Bureau decided to engage in rulemaking to address these gaps before launching an entirely new data collection regime, recognizing that what the Bureau learned in connection with implementing the Dodd-Frank amendments to HMDA would be very instructive when it came to addressing the similar but more complicated Section 1071 rulemaking. Financial institutions and regulators already had years of experience with HMDA reporting, and the Bureau had developed substantial market expertise as the primary federal regulator of consumer mortgage lending. By contrast, the Bureau had only limited authority over and expertise regarding small business lending. Based on its understanding at the time, the Bureau believed that several key distinctions between the small business lending market and the mortgage market added complexity to implementing Section 1071. For example, when compared to the mortgage market, the Bureau believed that the small business lending market was more diverse in terms of products and lenders, the relationship between the lender and the applicant was often a more interactive process, and data was far less standardized in the small business lending marketplace. Because the statutorily required HMDA and Section 1071 data collection and reporting requirements presented parallel operational and regulatory challenges, the Bureau believed that the Section 1071 rulemaking would benefit from following the HMDA rulemaking. In addition, the Bureau planned to leverage the modernized technology it built for the HMDA data collection to support the Section 1071 data collection as well, which would ease reporting by financial institutions. *See, e.g.*, *The Semi-Annual Report of the Bureau of Consumer Financial Protection: Hearing Before the H. Comm. on Financial Services*, 114th Cong. 13 (Sept. 29, 2015) (Serial No. 114-52) (Statement of Hon. Richard Cordray, Director, Consumer Financial Protection Bureau); *The Semi-Annual Report of the Bureau of Consumer Financial Protection: Hearing Before the H. Comm. on Financial Services*, 114th Cong. 22-23 (Mar. 3, 2015) (Serial No. 114-6) (Statement of Hon. Richard Cordray, Director, Consumer Financial Protection Bureau).

21. The Bureau accordingly proceeded with the regulatory and operational efforts to implement the HMDA amendments before turning its attention to Section 1071. The Bureau issued a final rule implementing the HMDA amendments in October 2015. *See* 80 Fed. Reg.

DECLARATION OF DAVID SILBERMAN    5                    Case No.: 4:19-cv-02572-JSW

66128. Most of that rule was scheduled to take effect with respect to mortgage transactions in 2018 for which HMDA data must be reported between January 1 and February 28, 2019.

22. After completing the HMDA rulemaking towards the end of 2015, the Bureau turned to the Section 1071 rulemaking. The Bureau created an Office of Small Business Lending Markets within RMR and recruited the subject matter experts needed to help lead the Section 1071 rulemaking.

23. Starting in May 2016, the Office of Small Business Lending Markets, along with colleagues from offices across the Bureau, began intensive stakeholder engagement, holding over 100 meetings with lenders, trade associations, small business organizations, community groups, and other regulators.

24. In May 2017, the Bureau released a white paper summarizing the results of the Bureau's preliminary research on publicly available data on the small business financing market. Among other things, the white paper explored the wide variety of definitions used to identify small businesses, highlighted that nearly all minority-owned and women-owned businesses are small businesses, surveyed the various financing products offered to small businesses by a wide range of institutions, and noted the significant role played by smaller banks in lending to small businesses and the increasing market share of alternative online lenders. *See* Declaration of Jeffrey Dubner, ECF No. 42-2 (Dubner Decl.), Ex. 1.

25. In May 2017, the Bureau also published a request for information (RFI) to inform the 1071 rulemaking project. The RFI sought comment on: the definition of small business; the data points to be collected; the financial institutions that engage in business lending; small businesses' access to credit and the financial products that are offered to small businesses; and the privacy and confidentiality interests of applicants, borrowers, and financial institutions. *See* 82 Fed. Reg. 22318 (May 15, 2017).

26. The Bureau held a field hearing in May 2017 to publicize these efforts and obtain stakeholder input. At the field hearing, then-Director Cordray emphasized that in preparation for the 1071 rulemaking project, the Bureau had "been building an outstanding team of experts in small business lending," and that the Bureau's supervisory examinations of small business

lending had helped the Bureau "learn more about the credit application process, existing data collection processes, and the nature, extent, and management of fair lending risk" in the small business lending market. He also highlighted that the Bureau had "learned much from our work on the reporting of home loans under [HMDA], which has evolved and improved considerably over the past forty years." Dubner Decl. Ex. 11, at 4.

27. The comment period for the RFI closed in September 2017. The Bureau received over 700 unique comments. Bureau staff in RMR carefully reviewed those comments and continued outreach and policy development with respect to the issues raised in the RFI.

28. The Bureau's Division of Supervision, Enforcement, and Fair Lending also began conducting supervisory examinations of small business lending programs at a number of financial institutions to assess their compliance with the ECOA. Those examinations had the ancillary benefit of enhancing the Bureau's understanding of small business lending operations, which in turn has helped inform the Section 1071 rulemaking.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 8, 2019, at Washington, D.C.

DAVID SILBERMAN

DECLARATION OF DAVID SILBERMAN     7          Case No.: 4:19-cv-02572-JSW