MARY McLEOD
General Counsel
JOHN R. COLEMAN
Deputy General Counsel
LAURA M. HUSSAIN
Assistant General Counsel
LAWRENCE DeMILLE-WAGMAN
Senior Litigation Counsel
DC Bar No. 929950
Email:  lawrence.wagman@cfpb.gov
CHRISTOPHER J. DEAL
Senior Litigation Counsel
DC Bar No. 990573
Email:  christopher.deal@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, N.W.
Washington, D.C.  20552
Telephone: (202) 435-9582
Facsimile:  (202) 435-7024

Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA REINVESTMENT COALITION, NATIONAL ASSOCIATION FOR LATINO COMMUNITY ASSET BUILDERS, DEBORAH LYNN FIELD, and RESHONDA YOUNG,<br><br>Plaintiffs,<br><br>v.<br><br>KATHLEEN L. KRANINGER, Director, Consumer Financial Protection Bureau, In Her Official Capacity, and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Defendants. | Case No. 4:19-cv-02572-JSW<br><br><br>**DECLARATION OF THOMAS PAHL** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I, Thomas Pahl, hereby declare and state the following:

1. I am the Policy Associate Director for the Division of Research, Markets, and Regulations (RMR) at the Consumer Financial Protection Bureau (CFPB or Bureau), a position I have held since April 2018. As Policy Associate Director for RMR, I oversee and direct its activities, including its rulemaking activities. Before joining the Bureau, I served as the Acting Director of the Bureau of Consumer Protection of the Federal Trade Commission (FTC). I have worked for over 26 years at the FTC and CFPB and have extensive experience in rulemakings involving financial regulations.

2. RMR is composed of economists, market experts, and regulatory attorneys who are responsible, among other things, for developing options and recommendations with respect to policy issues that arise in the context of rulemakings, and for leading the rulemaking process in accordance with legal requirements and the Bureau's internal operating procedures. I make the statements in this Declaration based on my personal knowledge and information available to me in my official capacity. This declaration is filed in support of the Bureau's Motion for Summary Judgment and its Opposition to the Motion for Summary Judgment filed by California Reinvestment Coalition, National Association for Latino Community Asset Builders, Deborah Lynn Field, and ReShonda Young (Plaintiffs). The purpose of this declaration is to explain (1) the Bureau's recent work on the Section 1071 rulemaking, (2) the complex policy issues that the Bureau will need to address in connection with the rulemaking, (3) the procedural steps the Bureau must follow to complete the 1071 rulemaking, (4) the Bureau's plan to ensure the responsible and expeditious completion of the 1071 rulemaking, and (5) how the relief requested by Plaintiffs would impact the Bureau's ability to implement Section 1071 effectively.

**The Bureau's Recent Work**

3. In November 2017, the Bureau had its first formal leadership transition. Director Richard Cordray resigned and President Trump selected Mick Mulvaney to serve as the Bureau's Acting Director. *See* The White House, Office of the Press Secretary, *Statement on President Donald J. Trump's Designation of OMB Director Mick Mulvaney as Acting Director of the*

1    *Consumer Financial Protection Bureau* (Nov. 24, 2017), www.whitehouse.gov/the-press-

2    office/2017/11/24/statement-president-donald-j-trumps-designation-omb-director-mick.

3        4.   Under Acting Director Mulvaney's leadership the Bureau initiated a substantial

4    review of the Bureau's activities, including its rulemaking work and regulations. *See, e.g.*, *The*

5    *Semi-Annual Report of the Bureau of Consumer Financial Protection: Hearing Before the H.*

6    *Comm. on Financial Services*, 114th Cong. 85-86 (Apr. 11, 2018) (Serial No. 115-83) (Prepared

7    Statement of Hon. Mick Mulvaney, Acting Director, Bureau of Consumer Financial Protection);

8    83 Fed. Reg. 12286 (Mar. 21, 2018) (requesting public input on regulations issued by the

9    Bureau).

10       5.   In December 2017, the Bureau announced that it intended to commence a rulemaking

11   to revisit certain elements of the Bureau's 2015 regulation implementing the Dodd-Frank Act's

12   amendments to the Home Mortgage Disclosure Act (HMDA), which were scheduled to take

13   effect in 2018. *See* Consumer Financial Protection Bureau, *Statement with respect to HMDA*

14   *implementation* (Dec. 21, 2017), *available at* https://files.consumerfinance.gov/f/documents/

15   cfpb_statement-with-respect-to-hmda-implementation_122017.pdf (attached as Exhibit 1); *see*

16   *also* 84 Fed. Reg. 20972, 20974 & nn.23-24 (May 13, 2019).

17       6.   Additionally, in May 2018, Congress enacted the Economic Growth, Regulatory

18   Relief, and Consumer Protection Act (EGRRCPA), which among other things amended HMDA

19   to add certain partial exemptions from HMDA's requirements. The Bureau determined that while

20   these changes to HMDA took effect immediately, further clarification would be beneficial. The

21   Bureau issued an interpretive and procedural rule in August 2018 to provide further guidance as

22   to the scope and operation of that partial exemption. The Bureau also announced that it was

23   planning to initiate a notice-and-comment rulemaking to incorporate those interpretations and

24   procedures into Regulation C and further implement the EGRRCPA. *See* 83 Fed. Reg. 45325,

25   45325-26 (Sept. 7, 2018).

26       7.   In light of the Bureau's determination that it was appropriate to reconsider certain

27   aspects of its mandated HMDA rulemaking and to pursue a notice-and-comment rulemaking to

28   implement the EGRRCPA's HMDA amendments, Acting Director Mulvaney decided in August

DECLARATION OF THOMAS PAHL        2        Case No.: 4:19-cv-02572-JSW

1    2018 to prioritize work on HMDA and to temporarily pause the Bureau's rulemaking work to

2    implement Section 1071. Bureau staff proceeded to prepare a Notice of Proposed Rulemaking

3    addressing the reporting thresholds under HMDA and incorporating the interpretations and

4    procedures provided for in the Interpretive and Procedural Rule into Regulation C. *See* 84 Fed.

5    Reg. 20972, 20975 (May 13, 2019). Bureau staff also proceeded to prepare an Advance Notice

6    of Proposed Rulemaking to pursue reconsideration of certain of the data points that were added

7    or revised by the 2015 HMDA Rule. 84 Fed. Reg. 20049 (May 9, 2019). The final rule

8    implementing the EGRRCPA amendments was issued five months later. 84 Fed. Reg. 57946

9    (Oct. 29, 2019).

10       8.  Furthermore, pursuant to Acting Director Mulvaney's decision, in its next semi-

11   annual regulatory agenda, the Fall 2018 Agenda, the Bureau reported that it had "adjusted its

12   timeline for implementing" Section 1071. The Bureau noted that it had previously "delayed

13   implementation of [Section 1071] pending implementation of the Dodd-Frank Act amendments

14   to HMDA, which creates a similar regime for mortgages, and then accelerated work on the

15   project after the HMDA rules were issued in 2015." It then explained that "[i]n light of current

16   resource constraints and priority accorded to HMDA implementation, the Bureau has now

17   reclassified the Section 1071 project from pre-rule status to longer-term action status." The

18   Bureau noted that despite this rulemaking pause, it intended "to continue certain market

19   monitoring and research activities to facilitate resumption of the rulemaking." 83 Fed. Reg.

20   58118, 58119 (Nov. 16, 2018).

21       9.  When the Bureau completes its semi-annual regulatory agenda, it does not publish

22   that information right away. Instead, because the Bureau voluntarily participates in the Unified

23   Agenda, it submits the information to the General Services Administration (GSA). A component

24   of GSA, the Regulatory Information Service Center, compiles the Unified Agenda in

25   coordination with the Office of Information and Regulatory Affairs (OIRA) within the Office of

26   Management and Budget (OMB). The Bureau's agenda is then published at the same time as

27   other agencies across the federal government. *See* 83 Fed. Reg. 57804 (Nov. 16, 2018). So, while

28   the Bureau's Fall 2018 Agenda was "current as of August 30, 2018," it was not actually released

1    to the public until October 17, 2018. In keeping with its customary practice, the Bureau

2    highlighted the release with a blog post. *See* Declaration of Jeffrey Dubner, ECF No. 42-2

3    (Dubner Decl.), Ex. 8. The Bureau's Fall 2018 Agenda was later published in the Federal

4    Register. *See* 83 Fed. Reg. 58118 (Nov. 16, 2018).

5        10. In December 2018, the Senate confirmed Kathleen Kraninger to a five-year term as

6    Director of the Bureau. After taking office, Director Kraninger embarked on a listening tour to

7    engage with Bureau stakeholders, employees, and outside experts. As a part of this tour, she met

8    with those who had a particular interest in the Section 1071 rulemaking.

9        11. After evaluating the Bureau's ongoing rulemaking activities, Director Kraninger

10   determined that it would be appropriate for the Bureau to resume pre-rulemaking activities on

11   Section 1071.

12       12. So, as part of the Bureau's next semi-annual regulatory agenda, the Spring 2019

13   Agenda, the Bureau announced that it intended "to recommence work later this year" on the

14   Section 1071 rulemaking. 84 Fed. Reg. 29730, 29731 (June 24, 2019). The Bureau therefore

15   reclassified the Section 1071 project from longer-term action status back into pre-rule status.

16       13. As the Spring 2019 Agenda indicates, the Bureau's statement of its plans to resume

17   pre-rulemaking activities on Section 1071 was current as of March 6, 2019, which preceded the

18   filing of this lawsuit. While these plans had already been submitted to GSA, they were not

19   announced to the public until the entire Spring 2019 Unified Agenda was released on May 22,

20   2019. As usual, the Bureau alerted the public to the release of its semi-annual agenda with a blog

21   post. *See* Dubner Decl. Ex. 9. The Spring 2019 Unified Agenda was later published in the

22   Federal Register. 84 Fed. Reg. 29730 (June 24, 2019).

23       14. On November 6, 2019, the Bureau held a symposium on Section 1071 of the Dodd-

24   Frank Act. The third in the Bureau's symposia series, the 1071 symposium was aimed at

25   stimulating a proactive and transparent dialogue to assist the Bureau in its policy development as

26   it works toward implementation of Section 1071. The symposium consisted of two panels of

27   leading academic, think tank, consumer advocate, industry, and government experts in the small

28   business lending arena. The first panel focused on the current state of, and future outlook for, the

1   small business lending marketplace. The second panel discussed many of the issues surrounding

2   Section 1071 implementation, including concerns that were raised in response to the Bureau's

3   Request for Information. It also explored ways to mitigate potential costs and burdens for

4   reporters. A recording of the event, along with written statements from the panelists, is available

5   on the Bureau's website at https://www.consumerfinance.gov/about-us/events/cfpb-symposium-

6   section-1071-dodd-frank-act/.

7       15. In her opening remarks at the symposium, Director Kraninger emphasized that "small

8   businesses, including those owned by women and minorities, are critical engines for economic

9   growth," that "Section 1071 would increase public data about small business lending," and that

10  the Section 1071 rulemaking "needs to be done with great care and consideration in order that

11  the rule not impede the ability of small businesses—including minority and women owned small

12  businesses—to access the credit they need." *See* Director Kraninger's Speech at CFPB

13  Symposium on Section 1071 of the Dodd-Frank Act (Nov. 6, 2019), *available at* https://www.

14  consumerfinance.gov/about-us/newsroom/director-kraningers-speech-cfpb-symposium-section-

15  1071/ (attached as Exhibit 2).

16  **The Policy Issues to be Addressed in the Section 1071 Rulemaking**

17      16. Section 1071 of the Dodd-Frank Act amended ECOA to require, subject to rules

18  prescribed by the Bureau, financial institutions to collect, report, and make public certain

19  information concerning credit applications made by women-owned, minority-owned, and small

20  businesses. Section 1071 also empowers the Bureau to adopt exceptions to any of the statutory

21  requirements and to conditionally or unconditionally exempt any financial institution or class of

22  institutions from those requirements as the Bureau deems necessary or appropriate to carry out

23  the purposes of the statute. The statutory purpose of Section 1071 is to "facilitate enforcement of

24  fair lending laws and enable communities, governmental entities, and creditors to identify

25  business and community development needs and opportunities of women-owned, minority-

26  owned, and small businesses." 15 U.S.C. § 1691c-2.

27      17. As part of its rulemaking process, the Bureau is exploring potential ways to

28  implement Section 1071 in a balanced manner with a goal of providing small business lending

DECLARATION OF THOMAS PAHL          5          Case No.: 4:19-cv-02572-JSW

data that achieves the statutory objectives without unnecessarily affecting the cost or availability of credit to small businesses.

18. As part of its Section 1071 rulemaking, the Bureau will need to address several significant and complex legal and policy issues including: (1) what is an application for credit; (2) which businesses' credit applications trigger collection and reporting by financial institutions; (3) which financial institutions should be required to collect and report information; (4) what information financial institutions should be required to collect and report; (5) for what financial products financial institutions should be required to collect and report information; and (6) what information should be made public consistent with privacy and confidentiality interests.

"Applications" for Credit

19. Section 1071 of the Dodd-Frank Act amends the ECOA to require financial institutions to collect, record, and report information regarding credit applications made by women-owned, minority-owned, and small businesses. 15 U.S.C. § 1691c-2. Section 1071 applies to "any application to a financial institution for credit for women-owned, minority-owned, or small business," and requires that financial institutions compile, maintain, and report to the Bureau certain information, including "the number of the application and the date on which the application was received." *Id.* § 1691c-2(b), (e)(2)(A).

20. The Bureau has learned through its outreach that there can be uncertainty as to what is, or is not, an application. This may be particularly important in the small business lending context, based on what the Bureau understands to be the market for business credit, which unlike consumer credit, sometimes may not involve the use of standardized credit applications.

21. Comments received in response to the Bureau's Request for Information demonstrate that financial institutions have varying approaches on how to define a business credit application. Thus, one of the major legal and policy issues the Bureau will need to address is the definition of an "application" for purposes of the 1071 rulemaking. In particular, the Bureau will have to decide whether the definition of "application" in Regulation B, 12 C.F.R. § 1002.2(f), which implements ECOA, or some other definition of "application" should be adopted to define the

point at which financial institutions should be obligated to collect and report data under Section 1071.

Definition of "Small Business"

22. Section 1071 defines "small business" as having "the same meaning as the term 'small business concern' in section 3 of the Small Business Act." 15 U.S.C. § 1691c-2(h)(2). This section of the Small Business Act sets forth a multi-part definition of "small business concern" that includes a provision authorizing the Small Business Administration (SBA) to establish detailed size standards that meet certain criteria set forth within the statute. 15 U.S.C. § 632(h)(2). The most commonly used size standards developed by the SBA are industry-specific size standards organized by the six-digit North American Industry Classification System (NAICS-specific size standards). *See* 13 C.F.R. § 121.201 (NAICS-specific size standards promulgated by the SBA). These NAICS-specific size standards are primarily used by the SBA and other Federal agencies to determine eligibility for Federal contract and loan assistance programs. *See id.* § 121.101(a) ("SBA's size standards define whether a business entity is small and, thus, eligible for Government programs and preferences reserved for 'small business' concerns.").

23. Under these NAICS-specific size standards, whether an entity is a small business is determined generally either by its annual receipts or by its number of employees. Thresholds vary significantly across industries. For instance, size thresholds measured by number of employees range from 500 to 1,250 in the food manufacturing (NAICS 311) industries, and 100 to 250 in wholesaling industries (NAICS 423). So too with size thresholds that are measured by annual receipts. As an example, for industries within the personal and laundry services subsector (NAICS 812), the annual receipts threshold for businesses to be considered small ranges from $6 million to $41.5 million. *See id.* § 121.201.

24. Whether a business is a small business depends on which six-digit NAICS code best describes the primary industry the business is engaged in. For instance, there is one size threshold (750 employees) for businesses primarily engaged in "Creamery Butter Manufacturing" (NAICS 311512), and another threshold (1,250 employees) for businesses that

DECLARATION OF THOMAS PAHL      7      Case No.: 4:19-cv-02572-JSW

focus on "Cheese Manufacturing" (NAICS 311513). Still another threshold (1,000 employees) applies to "Ice Cream and Frozen Dessert Manufacturing" (NAICS 311520). *See id.*

25. The Bureau has learned through its 1071 rulemaking outreach that the definition of "small business" is a significant concern to stakeholders. Virtually all commenters on the Bureau's Request for Information expressed concern that applying the NAICS-based size standards definition of "small business" for purposes of 1071 would be complex and difficult to operationalize and therefore these commenters expressed support for a simpler definition of "small business" that can be readily applied.

26. Section 632 of the Small Business Act permits the SBA to approve size standards developed by other Federal agencies that meet certain requirements. 15 U.S.C. § 632(a)(2)(C). As an alternative to the NAICS-specific size standards, and in line with feedback the Bureau has received through its Section 1071 outreach, the Bureau is exploring developing an alternative definition of small business that meets the criteria outlined in section 632 of the Small Business Act and is tailored to the needs of Section 1071. The goal would be to develop a standard that would be easier for applicants and financial institutions to apply while remaining consistent with the SBA's policy and regulatory requirements.

27. The Small Business Act authorizes alternative size standards with notice and comment and the SBA Administrator's approval. Because the Bureau must obtain the SBA Administrator's approval for any definition of "small business" that differs from the current SBA definition, the Bureau does not have exclusive control over the timing to implement any such proposal. The Bureau will seek to work with the SBA in developing a potential alternative definition to "small business" for purposes of the 1071 rulemaking.

"Financial Institutions" to be Covered by the Rulemaking

28. Section 1071 of the Dodd-Frank Act requires financial institutions to report information concerning credit applications made by women-owned, minority-owned, and small businesses. Financial institution is defined in Section 1071 to mean "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity." 15 U.S.C. § 1691c-2(h)(1).

29. Section 1071 of the Dodd-Frank Act allows the Bureau to exempt certain classes of financial institutions from collecting and reporting pursuant to a business lending data collection rule as the Bureau deems necessary or appropriate to carry out the purposes of Section 1071. *Id.* § 1691c-2(g)(2).

30. Through its research and outreach on the 1071 rulemaking, the Bureau has enhanced its understanding of the various financial institutions and other parties engaged in small business lending. One of the major legal and policy issues the Bureau will need to address is which types of entities fall within the definition of financial institutions and whether the Bureau should use its exemption authority to exclude any such categories of institutions. For example, the Bureau will need to determine whether to adopt a reporting threshold as it did in the 2015 HMDA Rule and, if so, where to draw that line; whether to cover some or all sellers of goods and services who extend credit for the purchase of their goods; and whether to cover various types of public or quasi-public entities which extend credit.

The "Information" To Be Collected and Reported

31. Section 1071 of the Dodd-Frank Act specifies particular data points that financial institutions must compile and maintain, submit annually to the Bureau, and make available to members of the public upon request unless the Bureau determines to permit the deletion or modification of certain data to advance a privacy interest. 15 U.S.C. § 1691c-2(e)(2)(A)-(G), (e)(4), (f)(1), (f)(2)(A)-(B). The statute also provides that the data shall annually be made available to the public generally by the Bureau, in such form and in such manner as is determined by the Bureau, by regulation. *Id.* 1691c-2(f)(2)(C). Section 1071 also gives the Bureau authority to require "any additional data that the Bureau determines would aid in fulfilling the purposes of [1071]." *Id.* § 1691c-2(e)(2)(H).

32. One of the major policy issues the Bureau will need to address is how to best implement the data point reporting requirements for the business lending data collection rulemaking to serve the statutory purposes of Section 1071. This was a significant area of disagreement in the comments received in response to the Request for Information (RFI), with some commenters arguing that additional data points, beyond those specified in the statute, were

1    needed to achieve the purposes of Section 1071, while others stated that the Bureau should only

2    require the statutory data points.

3    Financial Products to be Covered by the Rulemaking

4        33. Section 1071 of the Dodd-Frank Act requires financial institutions to report

5    information concerning credit applications made by women-owned, minority-owned, and small

6    businesses. Although Section 1071 does not provide a specific definition for credit, credit is a

7    defined term under ECOA. ECOA defines credit as "the right granted by a creditor to a debtor to

8    defer payment of debt or to incur debts and defer its payment or to purchase property or services

9    and defer payment therefor." 15 U.S.C. § 1691a(d).

10       34. Through its research and outreach on the 1071 rulemaking, the Bureau has enhanced

11   its understanding of the various financial products that are offered to small businesses, including

12   women-owned and minority-owned small businesses. These products include term loans, credit

13   cards, and lines of credit, as well as other financial products like leasing, factoring, and merchant

14   cash advances. One of the major legal and policy issues the Bureau will need to address is which

15   financial products will be covered by the Section 1071 rulemaking.

16   How Privacy Interests Will Be Protected

17       35. Section 1071 of the Dodd-Frank Act specifies particular data points that financial

18   institutions must compile and maintain, submit annually to the Bureau, and make available to

19   members of the public upon request in a form prescribed by the Bureau. 15 U.S.C.

20   § 1691c-2(e)(2)(A)-(G), (f). Section 1071 also provides the Bureau with authority to delete or

21   modify data available to the public to advance a privacy interest. *Id.* § 1691c-2(e)(4).

22       36. Through its research and outreach on the 1071 rulemaking, the Bureau has enhanced

23   its understanding of the privacy concerns related to the potential disclosure of the data points

24   specifically identified for reporting under Section 1071. One of the major legal and policy issues

25   the Bureau will need to address in the rulemaking is striking an appropriate balance between the

26   interests in public disclosure to further the purposes of Section 1071 and the importance of

27   protecting applicant and borrower privacy, as well as the confidentiality interests of financial

28   institutions.

DECLARATION OF THOMAS PAHL          10          Case No.: 4:19-cv-02572-JSW

**The Procedural Steps Needed to Complete the Rulemaking**

37. In promulgating regulations, the Bureau is required to follow the procedures set forth in the Regulatory Flexibility Act (RFA), including the special RFA requirements imposed by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), the Administrative Procedure Act (APA) and section 1022 of the Dodd-Frank Act. Some of these requirements apply to federal agencies generally, while others are unique to the Bureau or apply to only a small number of agencies.

Small business review process required for certain rulemakings

38. In addition to the requirements that the RFA imposes on all federal agencies, section 609 of that Act, as added by SBREFA, contains special requirements applicable to rulemakings by the Bureau and only two other federal agencies (EPA and OSHA). In particular, under the SBREFA provisions of the RFA, the Bureau must form a Small Business Review Panel to take feedback from representative small businesses prior to proposing a rule unless the Director certifies that the proposed rule, if promulgated, will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. §§ 603(a), 605(b) 609(b). The Bureau does not expect that such a certification would be appropriate in connection with the Section 1071 rulemaking. The Bureau's certification must be published along with its factual basis. The Bureau's practice is to consider any readily available data before deciding whether to certify. If the available data are very limited, the Bureau considers whether to collect new data.

39. The Small Business Review Panel as required by SBREFA consists of representatives from OIRA, and the Small Business Administration's (SBA) Office of Advocacy. 5 U.S.C. § 609(b)(3). A Bureau official chairs the Panel.

40. The Bureau works with SBA to select individual representatives of affected small entities with whom the Panel will consult. The SBA has a specific statutory right and obligation to identify such individuals. 5 U.S.C. § 609(b)(2). The Bureau also identifies potential individuals. Trade associations that represent affected small entities typically make suggestions. The Bureau and SBA reach consensus on the final selections. The Bureau's practice is to aim to have roughly 20 representatives in total.

41. The Panel must review any analyses the Bureau has prepared regarding effects of the proposed rules, and alternatives to the proposed rules, on small entities. 5 U.S.C. § 609(b)(4). The Bureau's practice is to share with the Panel a detailed outline of its planned proposed rule and a summary of any quantitative and qualitative analysis of the rule's expected impacts on small businesses that the Bureau has done. The Panel must also get advice and recommendations from the selected representatives of affected small entities. The statute does not say what materials, if any, the Bureau must share with these representatives. The Bureau's practice is to obtain feedback from SBA and OIRA on the materials submitted to the Panel, to make appropriate revisions, and then to share the revised materials with the Panel and the small entity representatives. Doing so enables the Panel to obtain from the small entity representatives their suggestions with respect to the Bureau's planned proposal and their critique of the Bureau's estimate of the impact that the proposal would have on small entities. The Bureau's practice is also to publish these materials on its web site so that all stakeholders in the rulemaking have the same information at the same time. It can take some back and forth with SBA and OIRA to agree on the final materials that are shared with small entity representatives and published on the Bureau's website.

42. A Panel meets with the small entity representatives, typically in-person in a full-day, carefully-structured convening in Washington, D.C. Leading up to that meeting, Bureau staff hold phone calls with representatives to orient them to the process and ensure they understand the outline of the proposed rule, the impact analysis, and the kind of information the Panel would find valuable.

43. The Panel is required to prepare a report of the comments it receives and its findings and make this report part of the rulemaking record. The Bureau's practice is to work with the Panel to develop consensus recommendations to include in the report. As required by SBREFA, the Bureau's notices of proposed rulemakings (NPRMs) state how the Bureau has acted on or otherwise responded to the report's recommendations. Additionally, in these rulemakings, as discussed further below, the RFA also requires additional impact analysis concerning small entities, including consideration of potential alternatives. 5 U.S.C. § 605(b).

DECLARATION OF THOMAS PAHL          12          Case No.: 4:19-cv-02572-JSW

1

2

3

4

5

6

7

8

9

10

11

12

13

    44. Based on the Bureau's use of the SBREFA process during the past five years, once the Bureau's Director or delegees have made the major decisions about the proposal that the agency will submit to the Small Business Review Panel, it has taken at least six months for the Bureau to publicly release an outline of proposals under consideration. During that time, the Bureau drafts the materials and clears them inside the agency; provides SBA and OIRA with an opportunity to do their own review and provide suggestions and comments; makes revisions based upon those comments which are again cleared within the Bureau; and then works through any final revisions with SBA and OIRA. Concurrently, the Bureau and SBA work together to identify potential small entity representatives who will together cover the various types of entities a rule may cover, solicit potential representatives and select final representatives, and schedule and organize the convening and release. The Bureau's practice is to convene the Panel on or about the date the Bureau releases its outline of its proposed rule. The statute requires a Panel to complete its report within 60 days (two months) of convening the Panel.

14

15

16

17

18

19

    45. The outlines of proposals and impact analyses the Bureau provided to the Panel, small entity representatives, and the public for the rulemakings that went through the process required by SBREFA in the last five years ranged from thirty to more than eighty pages long. As an example, the Bureau's outline of proposals that led up to the HMDA rulemaking is attached as Exhibit 3 to this Declaration. The outline is also available at https://files.consumerfinance.gov/f/201402_cfpb_hmda_outline-of-proposals.pdf.

20

The Bureau's Notice-and-Comment Rulemaking Process

21

22

23

24

25

    46. The APA requires a Federal agency to publish an NPRM in the Federal Register whenever it formulates, amends, or repeals rules, unless an exception applies, and to provide the public with an opportunity to submit comments on the proposal.[1] *See* 5 U.S.C. § 553(b). The courts have made clear that an NPRM must provide the public with sufficient information with respect to the regulation the agency is proposing to adopt—including the agency's rationale,

26

27

28

---

[1] The APA includes exceptions for interpretive rules, general statements of policy, rules of agency organization, procedure, or practice, or when the agency for good cause finds that notice and comment are impracticable, unnecessary, or contrary to the public interest.

1   legal authority, and evidence on which the proposal is based—to allow the public to submit

2   meaningful comment.

3   47. The Bureau's NPRMs typically include the following: (1) background sections,

4   which provide information about the relevant market(s) and other applicable laws and

5   regulations; (2) section-by-section analysis of proposed regulatory text and the official

6   interpretations thereto; (3) proposed impact analyses, as described below; and (4) the proposed

7   regulatory text and a set of official interpretations, which elaborate on the regulatory text by

8   offering interpretations and illustrations.

9   48. For major rulemakings, the Bureau typically provides ninety days from the time an

10  NPRM is published in the Federal Register for the public to submit comments. Not infrequently,

11  the Bureau receives a request from stakeholders to extend that time, which the Bureau typically

12  grants. In a major rulemaking, the Bureau typically receives thousands of comments, although in

13  one particularly high-profile rulemaking, the Bureau received over one million comments.

14  49. Once the comment period closes, Bureau staff carefully review all the comments and

15  identify issues raised by commenters that require further analysis and investigation. Staff will

16  prepare a briefing on the substance of the comments received and present options and

17  recommendations. Those options will first be presented to subordinate executives within RMR,

18  then to me, and then to the Director. Once the Director makes decisions on these issues, staff will

19  draft a final rule for the Director's consideration.

20  50. Under the APA, in issuing a final rule an agency must consider and respond to

21  significant comments. Thus, any Bureau final rule includes, in addition to all of the elements

22  contained in the NPRM, a summary of and response to significant comments received on the

23  NPRM (including on its proposed impact analyses), and an explanation of changes from the

24  NPRM.

25  51. In major rulemakings (like the Section 1071 rulemaking), the Bureau has established

26  a set of procedures it routinely follows to assure the quality and legal sufficiency of NPRMs and

27  final rules. Staff in the Office of Regulations draft the regulatory text, the narrative explanation

28  of the proposal, and the explanation of the reasons for the proposal. Staff in the Office of

DECLARATION OF THOMAS PAHL          14          Case No.: 4:19-cv-02572-JSW

Research draft the analyses of benefits, costs, and impacts (described below). Then drafts go through several levels of review within RMR: staff peers, rulemaking team leader, front-line supervisors, Regulations, Markets, and Research Office leaders, Division leaders. All material is reviewed closely by the Legal Division. Material is also reviewed for feedback and input—typically in two separate rounds—by other Bureau divisions. Then the Director reviews them. The drafting and review processes often surface unanticipated issues that require staff to take time from drafting materials to analyze these issues, make recommendations, and obtain guidance from leadership.

52. Notices of proposed rulemaking for major Bureau rulemakings that have gone through the SBREFA process since 2014 have ranged from about 375 pages to about 1,340 pages. As issued, the Bureau's 2014 HMDA proposal was more than 570 pages.

Analysis of impacts of proposed and final rules

53. The Dodd-Frank Act requires the Bureau to consider, in prescribing a rule under the Federal consumer financial laws, the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from the rule. 12 U.S.C. § 5512(b)(2)(A)(i). The Bureau also must consider the impact of proposed rules on depository institutions and credit unions with $10 billion or less in assets and on consumers in rural areas. *Id.* § 5512(b)(2)(A)(ii). The RFA requires federal agencies, at both the proposal and final rule stage, either to certify that the proposed or final rule will not have a significant economic impact on a substantial number of small entities or to prepare and publish an initial regulatory flexibility analysis when issuing a proposal and a final regulatory flexibility analysis when issuing a final rule. Each must analyze the proposed or final rule's impacts on small entities and potential alternatives. The Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, also requires federal agencies to identify the impact of information collection requirements in the rule and to meet certain other procedural requirements in connection with information collections. These impacts analyses are included in an NPRM and reviewed for final rules in light of comments received and further analysis.

Consultation with other Federal agencies

DECLARATION OF THOMAS PAHL         15         Case No.: 4:19-cv-02572-JSW

54. The Dodd-Frank Act requires that the Bureau consult with appropriate prudential regulators or other Federal agencies prior to proposing a rule and before issuing a final rule regarding consistency with prudential, market, or systemic objectives administered by such agencies. 12 U.S.C. § 5512(b)(2)(B). For significant rules, the Bureau typically does this in two steps, at the proposal stage and again at the final rule stage. In the initial step, the Bureau convenes a meeting (either in person or by phone) with representatives of the relevant agencies and provides a summary of the proposal or final rule on which the Bureau is working. If any of the agencies has recommendations or concerns regarding the Bureau's planned proposal or rule, the Bureau will meet with the agencies to discuss and work through their concerns. This occurs while the drafting at the Bureau is underway. Once a draft is complete and is ready for internal review within the Bureau, the draft of the regulatory text and official interpretations are typically shared with the other agencies and they are given an opportunity to submit suggestions for the Bureau's consideration.

55. Under the Dodd-Frank Act, within ten days after the publication of a Bureau regulation, any member of the Financial Stability Oversight Council (FSOC) may petition the FSOC to stay the regulation if the member agency has attempted unsuccessfully to resolve with the Bureau concerns regarding the effect of the rule on the safety and soundness of the banking system or the stability of the financial system. The FSOC, by a two-thirds vote, may stay the rule for up to ninety days to allow consideration of the petition and may set aside the rule during that period if persuaded that the rule would put at risk the safety and soundness of the banking system or the stability of the financial system. *See* 12 U.S.C. § 5513. To date, no petition has been filed to stay a regulation.

**The Bureau's Plan for Completing the Section 1071 Rulemaking**

56. The Bureau believes that any proposed Section 1071 rule would have a significant impact on a substantial number of small entities. Accordingly, the next formal phase in implementing Section 1071 of the Dodd-Frank Act will be the release of materials in advance of convening a SBREFA panel, in conjunction with the Office of Management and Budget and the

Small Business Administration's Chief Counsel for Advocacy, to consult with representatives of small businesses that may be affected by the rulemaking.

57. In preparation for the SBREFA process, the Office of Research within RMR is working on a survey of lenders to obtain estimates of the one-time costs lenders of varying sizes would incur to collect and report application data. The results of this survey will inform the estimates of costs for smaller entities necessary under SBREFA as well as the estimates for the initial regulatory flexibility analysis as required by the Regulatory Flexibility Act. Research staff have drafted a survey instrument which has been pre-tested with stakeholders. Before conducting the survey, RMR must solicit public comment on the information collection under the Paperwork Reduction Act and obtain OMB approval. RMR currently anticipates issuing the public notice by January 2020 and conducting the survey by the summer of 2020.

58. Concurrently with preparing to conduct this research, Bureau staff will brief the Bureau's Director on major policy issues that the rulemaking may cover. These briefings will cover the major legal, policy, and economic issues raised by this complex rulemaking. Based on past Bureau practice, it will take approximately six months to prepare options and recommendations on all of the complex issues implicated by Section 1071 and obtain decisions from the Director.

59. Based on past Bureau practice, the Bureau will take approximately six months from the time the Director makes decisions on the issues the SBREFA outline addresses until the time the Bureau releases the outline. This estimated six-month period of time will give the Bureau sufficient time, in consultation with SBA and OIRA, to prepare, issue, and publish the SBREFA outline, which includes the major proposal topics that may be covered in the rulemaking, alternatives to be considered, and potential impacts on small entities.

60. Once the SBREFA process concludes, the Bureau intends to move expeditiously to issue an NPRM. However, it is not possible to estimate how much time will be needed between the conclusion of the SBREFA process and the issuance of an NPRM because the amount of time required will be a function of the nature of the comments received and the information obtained through the SBREFA process as well as from larger entities not part of that process who

DECLARATION OF THOMAS PAHL          17          Case No.: 4:19-cv-02572-JSW

may provide information to the Bureau once the outline of proposals under consideration is made public. In recent completed rulemakings, the Bureau has issued an NPRM approximately three to eleven months after the conclusion of the SBREFA process.

61. Similarly, the time required after the comment period on the NPRM closes until a final rule issues will be a function in part of the sheer number of comments the Bureau receives but more importantly of the nature and complexity of the issues raised in those comments. For planning purposes, the Bureau generally assumes that it will take at least nine months after the close of the comment period before a final rule will be ready for release. For rules that, like the 1071 rulemaking, go through the SBREFA process, it has taken the Bureau approximately eleven months from the close of the comment period to issue a final rule.

**How the Relief that Plaintiffs Request Would Impact the Rulemaking and the Bureau's Regulatory Agenda**

62. Because of the steps legally required to conduct the Section 1071 rulemaking and the complexity of the legal and policy issues that are implicated, even if all of the Bureau's regulatory resources were dedicated to this rulemaking, I do not believe that it would be feasible to complete this rulemaking in six months without compromising the quality of the Bureau's work on this rulemaking and short-circuiting the Bureau's legal obligations under SBREFA, the RFA, the APA, and the Dodd-Frank Act. In addition, trying to complete this rulemaking in six months would have significant implications for a range of other rulemaking work that the Bureau is required by law to conduct or that the Bureau has determined is necessary to conduct to protect consumers.

63. In addition to the Bureau's pre-rule activities implementing Section 1071, the Bureau reasonably anticipates having multiple regulatory matters under consideration between now and to September 30, 2020. RMR assigns a team of lawyers, market specialists, and economists to work on each of its rulemakings. Many of these individuals have subject matter expertise that is necessary for specific rulemakings. Many of these experts work on multiple rulemakings, so RMR must plan for conflicts and competing demands for the time of these experts to move forward as quickly and effectively as possible on multiple, concurrent rulemakings.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

64. The Bureau is engaged in a number of rulemakings to implement congressional directives mandated in the EGRRCPA, the Dodd-Frank Act, and other statutes. Many of these regulatory matters are in the pre-rule stage, which require Bureau resources. For example, Section 108 of the EGRRCPA directs the Bureau to conduct a rulemaking to exempt from the escrow requirement loans made by certain creditors with assets of $10 billion or less and meeting other criteria. The Bureau continues to conduct pre-rule activities on section 108 of the EGRRCPA.

65. Section 307 of the EGRRCPA amends the Truth in Lending Act (TILA) to mandate that the Bureau prescribe certain regulations relating to "Property Assessed Clean Energy" (PACE) financing. In March 2019, the Bureau published an Advance Notice of Proposed Rulemaking (ANPR) to seek public comment relating to implementation of section 307 of the EGRRCPA. The Bureau is reviewing the comments it received in response to the ANPR, as it considers next steps to facilitate the development of an NPRM.

66. In July 2020 a provision of the Bureau's remittance rule that permits insured institutions (principally banks and credits unions) to provide estimated rather than exact disclosures of certain fees and of foreign exchange rates will expire pursuant to a statutory sunset. After completing an assessment in October 2018 of rules to implement Dodd-Frank Act requirements for international remittance transfers, the Bureau issued in April 2019 a Request for Information to gather information related to the expiration of the temporary exception and information related to the scope of the remittance rule's coverage. Based upon the information received in response to that RFI, the Bureau is concerned that absent mitigating changes to the remittance rule the expiration of that temporary exception could disrupt the ability of consumers to send remittances from their bank accounts to certain destinations. Accordingly, the Bureau expects to issue an NPRM shortly to propose certain revisions to the remittance rule and the Bureau anticipates finalizing those changes before July 2020.

67. In November 2020, the mandatory underwriting provisions of the Bureau's rule with respect to Payday, Vehicle Title and Certain High-Cost Installment Loans are scheduled to take effect. The Bureau issued an NPRM in February 2019 to rescind those provisions as the Bureau

1    has come to question their evidentiary support and legal underpinnings. The Bureau received

2    approximately 190,000 comments in response to that NPRM. The Bureau is currently reviewing

3    those comments and intends to issue a final rule next year.

4        68. In January 2021, a provision of the Bureau's Ability to Repay and Qualified

5    Mortgage Rule will also expire. That provision, known as the "GSE Patch," extends Qualified

6    Mortgage status to all loans eligible for purchase or guarantee by one of the government

7    sponsored entities (Fannie Mae or Freddie Mac), which effectively provides a safe harbor for

8    such loans with respect to the requirement to assess the consumer's ability to repay. Using 2018

9    data, the GSE Patch applies to approximately 52% of all mortgages, which is 3.12 million loans.

10   In July 2019, the Bureau issued an ANPR to request information about issues related to this

11   scheduled expiration of this provision, including ensuring that the expiration of the "GSE Patch"

12   does not unduly or unnecessarily decrease consumer access to mortgages. The Bureau stated that

13   it does not intend to allow this provision to become permanent but sought comments on whether

14   to make adjustments to the other parts of the Qualified Mortgage definition in anticipation of the

15   expiration of this temporary provision and also sought comment on whether a temporary

16   extension of this provision should be provided to allow for an orderly transition. The Bureau

17   expects to engage in rulemaking next year with respect to these issues.

18       69. As discussed above, the Bureau announced in December 2017 that it intended to

19   engage in rulemaking to reconsider various aspects of a 2015 final rule that amended regulations

20   implementing HMDA. The Bureau recently issued a rule that extends for two years a temporary

21   increase in the reporting threshold with respect to open-end lines of credit. The Bureau, however,

22   still has open a rulemaking, in which an NPRM was issued in May, to revise the permanent

23   reporting threshold for both closed-end loans and open-end lines of credit under HMDA. In

24   addition, the Bureau issued an ANPR in May 2019 soliciting comment on certain data points in

25   the 2015 final rule that were added to Regulation C or revised to require additional information,

26   and on coverage of certain business or commercial purpose loans. The Bureau expects to issue a

27   notice of proposed rulemaking to follow up on the ANPR. The Bureau also expects to issue a

28   proposed rule addressing the public disclosure of HMDA data in light of consumer privacy

interests to follow up on the final policy guidance on disclosure of loan-level HMDA data that the Bureau issued in December 2018.

70. In addition to these pre-rule activities across multiple regulatory matters, the Bureau is also in the proposed rule stage of multiple regulatory matters. For example, the Bureau continues its work on a debt collection rulemaking. Following its issuance of an ANPR in 2013 and its convening of a SBREFA Panel in 2016, the Bureau issued a NPRM in May 2019, which would prescribe rules under Regulation F to govern the activities of debt collectors, as that term is defined under the Fair Debt Collection Practices Act. The proposal builds on the Bureau's research and pre-rulemaking activities regarding the debt collection market, which remains a top source of complaints to the Bureau. The Bureau also is engaged in testing of consumer disclosures related to time-barred debt disclosures that were not addressed in the May 2019 proposal. After testing, the Bureau will assess whether to publish a supplemental Notice of Proposed Rulemaking related to time-barred debt disclosures.

71. The Bureau is also actively reviewing existing regulations. For instance, consistent with the requirements of 12 U.S.C. § 5512(d), the Bureau is conducting a retrospective assessment of the regulations that consolidated various mortgage origination disclosures under TILA and RESPA.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 8, 2019, at Washington, D.C.

_Thomas Pahl_

THOMAS PAHL

# EXHIBIT 1



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

December 21, 2017

## Statement with respect to HMDA implementation

Recognizing the impending January 1, 2018 effective date of the Bureau's amendments to Regulation C and the significant systems and operational challenges needed to adjust to the revised regulation, for HMDA data collected in 2018 and reported in 2019 the Bureau does not intend to require data resubmission unless data errors are material. Furthermore, the Bureau does not intend to assess penalties with respect to errors in data collected in 2018 and reported in 2019. Collection and submission of the 2018 HMDA data will provide financial institutions an opportunity to identify any gaps in their implementation of amended Regulation C and make improvements in their HMDA compliance management systems for future years. Any examinations of 2018 HMDA data will be diagnostic to help institutions identify compliance weaknesses and will credit good faith compliance efforts. The Bureau intends to engage in a rulemaking to reconsider various aspects of the 2015 HMDA Rule such as the institutional and transactional coverage tests and the rule's discretionary data points.

For data collected in 2017, financial institutions will submit their reports in 2018 in accordance with the current Regulation C using the Bureau's HMDA Platform.

# EXHIBIT 2

Case 4:19-cv-02572-JSW　Document 44-3　Filed 11/08/19　Page 26 of 111



# Director Kraninger's Speech at CFPB Symposium on Section 1071 of the Dodd-Frank Act

**NOV 06, 2019**

Good morning. I am excited to welcome everyone to today's symposium on Section 1071 of the Dodd-Frank Act. I would like to thank all of our panelists for participating today and our moderators, Grady and Elena. Through our symposia series we have convened experts in a variety of different fields to tackle legal and policy issues facing the Bureau.

Today, we are focused on Section 1071, which requires financial institutions to collect, report, and make public certain information concerning credit applications made by women-owned, minority-owned, and small businesses.

Small businesses, including those owned by women and minorities, are critical engines for economic growth. According to the Census Bureau, there are more than 27.6 million small businesses in the United States. More than 7.9 million of these businesses are minority-owned and over 9.8 million are women-owned.

Access to financing is a crucial component of the success of these businesses. To contribute meaningfully to the U.S. economy, small businesses -- including minority and women owned small businesses -- need access to credit to smooth out business cash flows and to enable entrepreneurial investments that take advantage of, and sustain, opportunities for growth.

The Bureau understands that the market these businesses turn to for credit is vast and complex.  Small businesses have many different options when it comes to financing, including products and providers. Using publicly available data and informed by conversations with market participants, the Bureau estimates the small business financing market is roughly $1.4 trillion in size.

Section 1071 would increase public data about small business lending. Congress wanted the Bureau, and the public generally to better understand the landscape for all small businesses, and specifically those owned and operated by women and minorities. And the law specifically directs the Bureau to develop a rule for the collection, reporting, and publication of certain data.

We know the data collection rule is something that has been on a lot of your minds for some time now.

Early on, in order to help meet our statutory mandate, the Bureau created the Small Business Lending Markets office. This office, in close collaboration with other offices across the Bureau, has focused on outreach and research to enhance our understanding of small business financing.  We have heard feedback from various stakeholders and know that there is concern with the burden to small entities, possible curtailment of credit, and privacy considerations, as well as a general desire for consistency with current business practices. The Bureau fully recognizes the sensitivities here and we know that a rule needs to be done with great care and consideration in order that the rule not impede the ability of small businesses -- including minority and women owned small businesses -- to access the credit they need.

That is why we are seeking your input. Today's symposium explores how to efficiently collect appropriate data without imposing unnecessary or undue costs that could limit access to credit from existing market participants or discourage new entrants into the market for small

11/7/2019 Director Kraninger's Speech at CFPB Symposium on Section 1071 Dodd-Frank Act | Consumer Financial Protection Bureau

Case 4:19-cv-02572-JSW Document 44-3 Filed 11/08/19 Page 27 of 111

business credit. This symposium will provide an opportunity for academics, market participants, and policy makers to discuss the hurdles and goals of an effective rule. Among the myriad issues around Section 1071, the panels will explore the definition of small business, what data points are important to collect, and what information lenders are currently using to evaluate credit to small businesses.

I am looking forward to today's symposium and the opportunity to hear from experts on these issues. Our first panel will focus on the current state of, and future outlook for, the small business lending marketplace. Our second panel will include a discussion surrounding the implementation of Section 1071. We have a great need to understand more about the small business financing market, the products that are offered to small businesses, and the financial institutions offering the credit. So thank you so much for your participation. I am looking forward to the discussion.

###

*The Consumer Financial Protection Bureau is a 21st century agency that helps consumer finance markets work by regularly identifying and addressing outdated, unnecessary, or unduly burdensome regulations, by making rules more effective, by consistently enforcing federal consumer financial law, and by empowering consumers to take more control over their economic lives. For more information, visit* consumerfinance.gov.

Topics: • RULEMAKING

**PRESS INFORMATION**

If you want to republish the article or have questions about the content, please contact the press office.

Go to press resources page

**STAY INFORMED**

Subscribe to our email newsletter. We will update you on new newsroom updates.

**Email address**

mail@example.com

Sign up    See Privacy Act statement

Subscribe to our RSS feed to get the latest content in your reader.

Subscribe to RSS

Contact Us    Newsroom    Careers    Industry Whistleblowers    CFPB Ombudsman

11/7/2019                    Director Kraninger's Speech at CFPB Symposium on Section 1071 of the Dodd-Frank Act | Consumer Financial Protection Bureau

Case 4:19-cv-02572-JSW   Document 44-3   Filed 11/08/19   Page 28 of 111

---

FOIA                                Administrative Adjudication                    USA.gov ⧉

Plain Writing                       Accessibility                                  Office of Inspector General ⧉

Privacy                             Office of Civil Rights

Website Privacy Policy & Legal Notices    No FEAR Act Data

Open Government                     Tribal

Information Quality Guidelines

---

An official website of the United States government

# EXHIBIT 3

# SMALL BUSINESS REVIEW PANEL FOR
# HOME MORTGAGE DISCLOSURE ACT RULEMAKING

## OUTLINE OF PROPOSALS UNDER CONSIDERATION AND ALTERNATIVES CONSIDERED

CONTENTS

I.   Introduction ........................................................................................................... 3

  A.   Why is the Bureau proposing to change HMDA regulations?........................................ 3

  B.   What are the goals of the SBREFA process?................................................................ 4

II.   Current HMDA Requirements and Compliance Process........................................ 5

  A.   What are the current requirements of HMDA?.............................................................. 5

  B.   How do small financial institutions currently comply with HMDA?.............................7

    1.   Data Collection and Reporting/Resubmission Tasks.................................................. 8

    2.   Audits and Exams Tasks ........................................................................................ 9

III.   What Changes to HMDA Is the Bureau Considering? .........................................10

  A.   Who would be required to collect, report, and disclose information? ..........................10

  B.   What types of loans and applications would be covered? ........................................... 11

  C.   What information would be reported and how would it align with existing systems and industry standards?.........................................................................................................12

    1.   Table of Current Data Points and New Data Points Under Consideration ................13

    2.   Summary of Data Point Changes Under Consideration...........................................15

    3.   Aligning HMDA Data with MISMO/ULDD Standards ..............................................19

  D.   How would the HMDA data process be modernized?..................................................21

    1.   Restructured Geocoding .........................................................................................21

    2.   Improved DES........................................................................................................ 22

    3.   Streamlined Submission and Editing ...................................................................... 22

    4.   Integrated Help Sources ......................................................................................... 23

  E.   What other federal rules are closely related to HMDA?.............................................. 23

IV.   Potential Impacts on Small Entities...................................................................... 24

  A.   Overview .................................................................................................................... 24

  B.   Internal Review of HMDA Compliance Processes and Costs....................................... 25

  C.   Types of HMDA Reporters......................................................................................... 26

    1.   Background............................................................................................................. 26

    2.   "Small Entity" HMDA Reporters ............................................................................ 27

  D.   Compliance Tasks and Baseline Compliance Costs..................................................... 28

1.   Compliance Tasks ................................................................................................ 28
2.   Baseline Compliance Costs .................................................................................. 28
E.   Impacts of the Proposals Under Consideration ......................................................... 30
1.   One-time Costs ..................................................................................................... 30
2.   Changes in Ongoing Costs ................................................................................... 31
V.   Cost of Credit Analysis ........................................................................................................ 43
Appendix A:   Additional Background -- Data Points, "Application," and Privacy ................... 44
A.   New and Revised Data Points .................................................................................... 44
1.   Unique Identifiers ................................................................................................ 44
2.   Application Data ................................................................................................... 49
3.   Borrower Data ...................................................................................................... 51
4.   Loan Types ............................................................................................................ 54
5.   Loan Features ........................................................................................................ 56
6.   Loan-to-Value Ratio ............................................................................................. 58
7.   Pricing Data .......................................................................................................... 59
8.   Property Data ........................................................................................................ 64
B.   Clarifying Reportable Applications ........................................................................... 66
C.   Protecting Consumer Privacy .................................................................................... 68
Appendix B:   Legal Authority and Other Relevant Federal Rules ........................................... 70
A.   Bureau's HMDA Rulemaking Authority .................................................................. 70
B.   Community Reinvestment Act .................................................................................... 70
C.   TILA, RESPA (Regulation Z and Regulation X) ..................................................... 71
D.   ECOA/Regulation B .................................................................................................. 72
E.   Regulation AB ............................................................................................................ 73
Appendix C:   Dodd-Frank Amendments ................................................................................... 74
Appendix D:   List of Acronyms ................................................................................................. 79
Appendix E:   Glossary ................................................................................................................ 80

# I.   Introduction

Congress enacted the Home Mortgage Disclosure Act (HMDA) in 1975 as part of an initiative both to counter redlining and the effects of disinvestment in urban neighborhoods, and to encourage reinvestment in the nation's cities.  HMDA requires lenders who meet certain coverage tests to report detailed information to their federal supervisory agencies about mortgage applications and loans at the transaction level.  The information that financial institutions (FIs) report generally does not include personal information that directly identifies individuals, such as name, address, date of birth, or Social Security number.  The HMDA data are made public by both the lenders and the government on a calendar year basis, with some redactions for consumer privacy.

As originally adopted, HMDA states its purposes as providing the public and public officials with information to help determine whether financial institutions are serving the housing needs of the communities in which they are located, and helping public officials target public investment to attract private investment in communities.  Congress significantly revised HMDA in the 1980s.  In particular, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) expanded HMDA to, among other things, require lenders to report race and ethnicity information on applicants and borrowers.  The FIRREA amendments established HMDA data as a means to identify possible discriminatory lending patterns and to enforce antidiscrimination statutes.  The Board of Governors of the Federal Reserve System (Board) implemented HMDA through Regulation C,[1] until the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) transferred that authority to the Consumer Financial Protection Bureau (Bureau).[2]

Today, HMDA data are the preeminent data source for regulators, researchers, economists, industry, and advocates studying and analyzing trends in the mortgage market for a variety of purposes, including general market and economic monitoring, as well as assessing housing needs, public investment, and possible discrimination.  Data users have long called for expansion of HMDA data to keep pace with the mortgage market's evolution.  In response to the subprime market's emergence, the Board amended Regulation C in the mid-2000s to require lenders to report loan pricing information on loans deemed "higher-priced."  Many continued to press for HMDA's improvement, however, particularly during the market's rapid growth into nontraditional lending products, and its subsequent collapse in 2008.  Congress responded by enacting changes to HMDA as well as reforms to the mortgage market and the broader financial system in the Dodd-Frank Act.

## A.  Why is the Bureau proposing to change HMDA regulations?

The Dodd-Frank Act requires the collection and reporting of several new data points, including information about borrowers (age and credit score), information about loan features and pricing, and, as the Bureau determines to be appropriate, unique identifiers for loans, properties, and loan originators.  It also authorizes the Bureau to require FIs to collect and report "such other information as the Bureau may require."

---

[1] 12 CFR part 1003.

[2] See Appendix C.

In addition to the changes to HMDA data, a number of other public and private data standards initiatives have launched in recent years in partial response to the mortgage market and broader financial crises. These include a significant evolution in private market data reporting practices toward a single common standard, and rulemakings and other initiatives by the Bureau and other agencies under the Dodd-Frank Act to improve mortgage market information, ranging from information provided to consumers, to information provided to secondary market investors.

In light of the various Dodd-Frank Act requirements and private market data standards initiatives, the Bureau believes that it is important to begin a broad public dialog about the HMDA rulemaking at this time and to use implementation of the new HMDA requirements as an opportunity to comprehensively review the HMDA reporting regime. In particular, the Bureau seeks to assess whether there are opportunities to improve upon the data collected, reduce unnecessary burden on financial institutions, and, as appropriate, to modernize and streamline the manner in which FIs collect and report data. The Bureau plans to propose revisions to Regulation C to implement the Dodd-Frank Act amendments to HMDA and to clarify current regulatory requirements. The Bureau also plans to use its discretionary authority to propose other new requirements that it believes will ensure that HMDA data continue to serve HMDA's purposes.

Specifically, the Bureau is considering proposals related to:

- Which lenders are required to report HMDA data;
- The types of loans and applications that must be reported;
- The information required about each loan or application; and
- Potential operational improvements in the HMDA compliance system.

## B.  What are the goals of the SBREFA process?

The consultation process developed in the Small Business Regulatory Enforcement Fairness Act (SBREFA)[3] provides a mechanism for the Bureau to hear directly from small financial services providers early in the rulemaking process about new regulatory requirements it is contemplating. SBREFA directs the Bureau to convene a Small Business Review Panel (Panel) when it is considering a proposed rule that would have a significant economic impact on a substantial number of small businesses. The Panel includes representatives from the Bureau, the Chief Counsel for Advocacy of the Small Business Administration (SBA), and the Office of Management and Budget's Office of Information and Regulatory Affairs (OMB). SBREFA requires the Panel to meet with a selected group of small entity representatives (SERs), which include representatives from small businesses, not-for-profits, and local governments (collectively, the small entities) that are likely to be directly affected by the regulation that the Bureau may issue.

During the Panel outreach meeting, SERs provide the Panel with important feedback on the potential economic impacts of complying with proposed regulations. They may also provide feedback on regulatory options under consideration and regulatory alternatives to minimize these impacts. In addition, the Dodd-Frank Act directs the Bureau to collect the advice and recommendations of the SERs concerning whether the proposals under consideration might

---

[3] 5 U.S.C. 609(b), *available at* http://www.sba.gov/content/rfa-overview-0.

increase the cost of credit for small businesses, not-for-profits, or local governments that themselves take out loans and on alternatives to minimize any such increase.[4]

Within 60 days of convening, the Panel is required to complete a report on the input received from the SERs during the panel process.  The Bureau considers the SERs' feedback and the Panel's report as it prepares the proposed rule.  Once the proposed rule is published, the Panel's final report will be placed in the public rulemaking record.

The Bureau is convening a Panel to obtain input from the selected SERs on proposals under consideration to amend Regulation C.  The Bureau has prepared this summary of the proposals under consideration for the SERs in order to provide the necessary background and facilitate the Panel process.  Because the goal of the Panel is to gather feedback and understand how the regulatory options may impact small entities, this summary focuses primarily on the benefits and costs of the proposals under consideration for small entities.  The Panel process is only the first public step in the full rulemaking process, however.  No financial institution will be required to comply with the Dodd-Frank Act amendments to HMDA or new regulatory requirements before a proposed rule is published, public comment is received and reviewed by the Bureau, a final rule is issued, and the implementation period designated in the final rule expires.  One of the specific questions the Bureau will seek input on during the SBREFA process is how long small entities would need to implement the proposals under consideration.

# II.  Current HMDA Requirements and Compliance Process

## A.  What are the current requirements of HMDA?

The Home Mortgage Disclosure Act and Regulation C (collectively HMDA, as appropriate in context) require covered financial institutions (FIs) to compile and disclose on a calendar-year basis data about applications for, originations of, and purchases of certain mortgage loans.

Currently whether a FI is required to compile and report data under HMDA is determined by coverage tests based on assets, loan volume, geographic location, and, in some cases, whether the FI makes loans that are federally related.[5]  These tests differ based on whether the FI is: (1) a bank, savings association, or credit union (depository institution or DI); or (2) a for-profit mortgage-lending institution other than a bank, savings association, or credit union (nondepository institution or non-DI).[6]  The tests are summarized in the following table:

---

[4] Dodd-Frank Act, sec. 1100G, 5 U.S.C. 603(d).

[5] Generally, a FI makes federally related mortgage loans if: (1) the FI makes a mortgage loan; *and* (2) either the FI: (a) is federally insured or regulated, or (b) makes a mortgage loan that was insured, guaranteed, or supplemented by a Federal agency, or was intended for sale to Fannie Mae or Freddie Mac.

[6] 12 CFR 1003.2 (definition of financial institution), implementing the HMDA definition of "depository institution."  HMDA defines the term "depository institutions" to include banks, savings associations, credit unions and "other lending institutions" which are engaged for profit in the business of mortgage lending.  12 U.S.C. 2802(3), (5).

**Current HMDA Coverage—Institutions**

| Criterion | DI | Non-DI |
|---|---|---|
| **Location** | • branch or home office in a Metropolitan Statistical Area (MSA) | • branch or home office in an MSA<br>OR<br>• received applications for, originated, or purchased ≥ 5 home purchase loans, home improvement loans, or refinancings on property in an MSA |
| **Size (assets/loan volume)** | • total assets > annually adjusted threshold (currently $43 million)<br>AND<br>• originated 1 or more home purchase or refinance loan secured by a first-lien on a 1- to 4-family dwelling | • total assets > $10 million, or ≥ 100 home purchase/refinance loans<br>AND<br>• ≥ $25 million home purchase/refinance loans or 10% of loan volume in home purchase/refinance loans |
| **Other** | • meets federally related test | • N/A |

Currently, an FI is required to submit data only if the loan would be made for at least one of three purposes:  home purchase, home improvement, or refinancing.  Home purchase and refinancing loans must be reported if they are secured by liens on dwellings, but a loan made for home improvement purposes must be reported whether or not it is secured by a lien on a dwelling.  Regulation C adds an additional layer of coverage complexity by providing that financial institutions may (but are not required to) report home equity lines of credit (HELOCs) that are made in whole or in part for the purposes of home improvement or home purchase.  The categories of transactions that are currently covered by HMDA are summarized in the following table:

**Transactions Currently Covered by HMDA**

| Loan Purpose | Dwelling-Secured | | Not Secured by a Dwelling |
|---|---|---|---|
| | **Closed-end** | **HELOC** | |
| **Home purchase** | Y | Optional | N |
| **Home improvement** | Y | Optional | Y |
| **Refinancing** | Y | Y | N |
| **Other/unknown** | N | N | N |

Information about each application or loan, and about each applicant or borrower, is reported on a transaction basis on a HMDA loan/application register (LAR).  For each transaction reported, the FI generally submits data about:

- The loan, such as type and amount;
- The property, such as type and census-tract location (which requires FIs to obtain accurate geographic information by geocoding loans);
- The action taken by the FI, such as originating or purchasing the loan, or denying the application; and
- The applicant(s) or borrower(s), including information on ethnicity, race, sex, and income.

Regulation C requires FIs to record a transaction on the LAR within 30 calendar days after the end of the quarter in which final action is taken on the transaction.  FIs must send their LARs to the Board, which processes the data on behalf of federal agencies,[7] no later than March 1 following the calendar year for which the loan data are compiled.  During the submission process, the FIs and Board check the data for errors and make sure it is edited as appropriate.

FIs must make a modified LAR that has been altered in specific ways to protect privacy interests of applicants and borrowers (modified LAR) available to the public upon request in electronic or printed form.  Generally, FIs must be prepared to make their modified LARs available no later than March 31 following the calendar year for which the loan data are compiled.

## B.  How do small financial institutions currently comply with HMDA?

The Bureau reviewed the current HMDA compliance processes of FIs of various sizes during the development of the proposals under consideration.  The Bureau identified **four primary tasks** in FIs' HMDA compliance processes:  **data collection**, **reporting and resubmission**, compliance and internal **audits**, and HMDA-related **exams**.[8]

The way that FIs go about HMDA compliance depends in part on the technology that they use to originate mortgage loans generally.  Some FIs use a largely manual process to originate the loans and, in turn, a largely manual process to collect and report the data.  To the extent that they rely on computer systems, they generally rely on free geocoding and reporting software provided by the FFIEC.  Other FIs use some type of general software called a Loan Origination System (LOS) to support the origination of mortgage loans.  They then import certain information from the LOS into a separate HMDA Management Software (HMS) system to facilitate geocoding and review, processing, and reporting of the information.  The following two example scenarios illustrate different HMDA compliance processes for data collection and reporting and resubmission for small FIs, depending on their number of HMDA-reportable

---

[7] The Board processes the data on behalf of the Federal Financial Institutions Examination Council (FFIEC) federal agencies and the U.S. Department of Housing and Urban Development.  The FFIEC federal agencies include the Bureau, Board, Federal Deposit Insurance Corporation (FDIC), National Credit Union Administration (NCUA), and Office of the Comptroller of the Currency (OCC).

[8] Additional discussion of these tasks can be found in Section IV (Potential Impacts on Small Entities) of this Outline of Proposals Under Consideration.

transactions and reliance on technology for reporting (low-volume, low-tech FI or higher-volume, higher-tech FI).[9]

# 1.  Data Collection and Reporting/Resubmission Tasks

### i.   Low-Volume, Low-Tech FI

An example of a FI that does few HMDA-reportable transactions and does not rely on sophisticated technology for reporting is a FI without LOS and HMS systems that collects and reports HMDA data using a manual process.  The loan officer collects the HMDA data from the consumer via application forms and then uses the FFIEC website's geocoding tool to generate census tract information for each loan.  Once all information is gathered, a credit administrator manually checks the data for completeness and enters the data into a spreadsheet.  The FI may check the data once or more before submitting it.  By the March 1 deadline every year, the FI submits the data using the free HMDA data entry software (DES) available for download on the FFIEC's website.  The DES runs edit checks and accepts the final submission.  The Board reviews the submission and replies to the FI with a post-submission report.  In the report, the Board may request data updates or modifications.  The FI then makes changes and sends the revised data back to the Board.  The FI and Board may engage in this process more than once.

The following provides an example of how a low-volume, low-tech FI might collect and submit its HMDA data:



---

[9] For purposes of the descriptions of processes in this and the next sections of the Outline of Proposals Under Consideration (Sections II.B.1.i and ii), a low-volume, low-tech FI is a FI with largely manual processes and approximately 50 HMDA LAR records (reported loans or applications) per year.  A higher-volume, higher-tech FI is a FI with greater reliance on technology and approximately 1,000 HMDA LAR records per year.  The Bureau understands that larger FIs generally have different processes.

## ii.   Higher-Volume, Higher-Tech FI

A higher-volume, higher-tech FI with LOS and HMS systems generally follows a process similar to that outlined above but enters the data into the LOS upon receipt from the consumer.  The data are then transferred to a vendor HMS that automatically does the geocoding.  The HMDA data may be periodically reviewed throughout the year to ensure completeness and to flag and correct errors, and personnel may manually check any outliers highlighted by HMS reports.  A final edit check may be run before the HMS submits the final data to the Board via email.  The Board reviews the submission and replies with a post-submission report.  In the report, the Board may request data updates or modifications.  The FI then makes changes and sends the revised data back to the Board.  The FI and Board may engage in this process more than once. The following provides an example of how a higher-volume, higher-tech FI may collect and submit HMDA data using LOS and HMS systems:



## 2.  Audits and Exams Tasks

FIs may have a variety of internal compliance/audit programs.  These range from informal staff training and edit checks, to well-defined internal compliance programs that follow established business procedures and include internal audits of HMDA data to ensure its accuracy.  More sophisticated programs also include internal and external audits that focus on HMDA reporting accuracy, fair lending audits, and risk assessments.

HMDA-related examinations by regulators are also a factor in FIs' HMDA compliance processes. Typically, HMDA data review is part of a larger exam, such as a compliance management system review or fair lending examination.  HMDA data are also used as part of Community Reinvestment Act (CRA) exams for DIs, and state regulators may also request HMDA data as part of state exams.  Typically, for a federal HMDA-related examination, the FI will receive an exam request, provide any requested information and documents, answer follow-up questions during the exam, address any compliance issues identified and, if needed, resubmit corrected HMDA data.

# III.  What Changes to HMDA Is the Bureau Considering?

As discussed above, in addition to implementing the Dodd-Frank Act changes to HMDA requirements, the Bureau is using this opportunity to review the HMDA reporting regime in its entirety to determine whether and where there are opportunities to improve upon the data collected and, as appropriate, to modernize and streamline the manner in which FIs collect and report data.  The Bureau is considering proposals related to:

- Which FIs are required to report HMDA data;
- The types of loans and applications that must be reported;
- The information required about each loan or application; and
- Potential operational improvements in the HMDA compliance system.

The Bureau is consulting with other federal agencies on the proposals under consideration, which are described below in this Section.  The possible impacts of the proposals under consideration are addressed in Section IV of the Outline, and additional background on specific data points is provided in Appendix A.

## A.  Who would be required to collect, report, and disclose information?

As described above, whether a FI is covered by Regulation C and required to report HMDA data currently is determined by reference to complicated coverage tests based on assets, loan volume, geographic location, and whether the FI makes loans that are federally related.  Many critics have pointed to the coverage tests as an area of complexity in need of clarification and simplification.  In June 2010, the Board announced public hearings on potential revisions to Regulation C.  Three of the purposes of the hearings were to provide information that would assist the Board in its review of Regulation C, to help assess the need for additional data, and to identify emerging issues in the mortgage market that could warrant additional research.  As part of its 2010 public hearings, the Board identified coverage as one of the topics for discussion.  It requested comment on whether it should require reporting from additional types of institutions, whether it should exempt certain types of institutions from reporting, and if any other changes should be made regarding which types of institutions are required to report.[10]  The Bureau has reviewed the comments and testimony presented to the Board during the 2010 hearings as the Bureau developed its proposals under consideration concerning institutional coverage.

The institutional coverage tests differ depending on whether the FI is a DI or non-DI.  The Bureau is concerned that the value of data from relatively small-volume reporters may not outweigh the reporting burden.  In addition, the burden of reporting only a few loans is not shared by all FIs.  Commenters in the Board's 2010 hearings have noted that the existing coverage scheme creates an unlevel playing field for lenders.[11]  In some instances, small

---

[10] Home Mortgage Disclosure Act, Notice of Hearing, 75 FR 35030 (June 21, 2010).  The hearings were conducted on July 15, 2010, in Atlanta (Atlanta Hearing); August 5, 2010, in San Francisco (San Francisco Hearing); September 16, 2010, in Chicago (Chicago Hearing); and September 24, 2010, in Washington, DC (DC Hearing), a*vailable at* http://www.federalreserve.gov/communitydev/hmda_hearings.htm.

[11] See testimony of Faith Anderson, Atlanta Hearing; testimony of Allison Brown (Federal Trade Commission), DC Hearing; testimony of Keith Ernst, San Francisco Hearing.

community banks and credit unions making few—or even one—mortgage loan per year are subject to HMDA reporting requirements, while non-DIs making substantially more loans may not be covered at all because the FI is not a bank, savings association, or credit union and makes less than 100 loans.

To simplify the coverage tests, the Bureau is considering proposing a single, consistent minimum loan volume threshold for HMDA coverage for both DIs and non-DIs. The Bureau is considering a threshold of 25 closed-end mortgage loans, but plans to conduct extensive outreach on whether some other threshold may be more appropriate. Under this approach as currently envisioned, only FIs that originated 25 or more closed-end home purchase or refinance loans in a given year (and meet current location and asset-size tests) would be required to report HMDA data. The Bureau's preliminary view is that a 25-loan test would benefit FIs that are not significantly involved in originating dwelling-secured loans.[12] Such a test could level the playing field between DIs which currently must report if they make only 1 mortgage loan and non-DIs which must report when they make at least 100 loans or have assets of at least $10 million. The Bureau also seeks input on what types of loans should count towards the 25-loan threshold, including closed-end home equity loans (HELs) and HELOCs, which typically are not first-lien products, and reverse mortgages. The Bureau is interested in feedback on how any such changes would affect both FIs and users of the HMDA data.

Using 2012 data, the 25-loan threshold would eliminate approximately 1,775 DIs (of which approximately 1,630 are small entities) from HMDA coverage, and would add approximately 450 non-DIs (of which approximately 350 are small entities) to HMDA coverage, as discussed further in the Impact Analysis in Section IV of this Outline of Proposals Under Consideration. The reduction in HMDA reporters that are DIs would likely remove the reporting of approximately 60,000 loans, which is less than 1 percent of the approximately 6.8 million DI loans reported by DIs that must report HMDA data. Thus, the 25-loan threshold would continue to allow the collection of data that covers most of the mortgage market and would provide a more consistent snapshot of DI and non-DI activity.

The Bureau recognizes that FIs who are either about to go over the loan-volume threshold or about to drop below it would need sufficient time to adjust their business practices, and will seek input on this aspect of adopting a single uniform threshold across the whole market.

## B.  What types of loans and applications would be covered?

Mortgage loans, as defined by HMDA, are loans "secured by residential real property" or "home improvement loan[s]."[13] As described in Section II above, current Regulation C generally requires FIs to report information regarding loans and applications made for one of three purposes:  home purchase, home improvement, or refinancing.[14] Reporting of home equity lines of credit (HELOCs) used for these purposes is generally optional.[15]

---

[12]  The statutory asset threshold and federally related requirements applicable to DIs would be retained. 12 U.S.C. 2808(a), (b).

[13] 12 U.S.C. 2802(2).

[14] 12 CFR 1003.2.

[15] FIs may (but are not required to) report HELOCs made in whole or in part for the purposes of home improvement or home purchase.  12 CFR 1003.4(c)(3).

Under Regulation C's existing transaction reporting regime, certain loans that are secured by residential real property need not be reported (*e.g.*, home equity loans with no stated purpose, HELOCs, certain reverse mortgages).  Yet home improvement loans must be reported even if they are not secured by a dwelling.  Moreover, at times FIs may find it difficult to identify the borrower's purpose for some loans or resolve reporting questions when loans are for multiple purposes.

The Bureau is considering proposing an amendment to Regulation C's transactional coverage provisions to require institutions to report information concerning all dwelling-secured loans,[16] rather than tying coverage primarily to the purpose of the loan.  For FIs that meet the coverage threshold as would be defined by the rule (discussed above), this proposal would, in effect:

- Eliminate reporting of home improvement loans that are not secured by a dwelling;
- Capture all HELs;
- Capture all HELOCs by eliminating optional reporting; and
- Capture all reverse mortgages.

As described in more detail in Appendix A, the proposals under consideration would also require that HELOCs and reverse mortgages be identified by loan type, to distinguish them in the data from other categories of loans with different pricing structures and features.

The proposal under consideration would apply the dwelling-secured test for reporting under HMDA both to applications for loans to be secured by a dwelling and purchases of loans secured by a dwelling.  The Regulation C definition of "application" has been criticized as providing FIs with too much latitude to decide which contacts with consumers to report as applications.  While the Bureau is currently disinclined to revise the definition of application, the Bureau encourages feedback and specific suggestions regarding any aspect of the definition that may benefit from greater clarity (see Appendix A, section B).

The Bureau believes the proposal under consideration to cover dwelling-secured loans could establish a more streamlined, bright-line approach that may be simpler for FIs to apply than the current rules that generally rely on a consumer's stated purpose for the loan.  The Bureau also anticipates this approach would yield more consistent and more useful data.

## C.  What information would be reported and how would it align with existing systems and industry standards?

For each record of an application, originated loan, or purchased loan submitted as part of a FI's LAR, HMDA currently includes reporting of approximately 2 dozen separate pieces of information, or data points.[17]  The Dodd-Frank Act amended HMDA to add new data reporting

---

[16] The definition of "dwelling" in Regulation C includes any residential structure, whether or not attached to real property, including mobile and manufactured homes. 12 CFR 1003.2.  The Bureau expects that the scope of this definition would not be changed if this proposal were adopted, so that loans secured by dwellings would be reported regardless of whether the dwellings are real or personal property (see Appendix A).

[17] This Outline of Proposals Under Consideration uses the term "data point."  In general usage, data points are also commonly called "data elements," "data fields," and "variables."

requirements and enhance certain existing data points.  As part of this rulemaking, the Bureau is comprehensively reviewing all current data points in Regulation C, carefully examining each data point specifically mentioned in the Dodd-Frank Act, and considering proposals to collect other appropriate data points to fill gaps where additional information could be very useful to better understand the HMDA data.  The dataset under consideration is summarized below in chart form and includes: improvements and technical revisions to current Regulation C data requirements; the implementation as required or appropriate of the categories of information specifically identified in the Dodd-Frank Act; and the addition of other data points that target existing gaps in the information currently collected and would further the purposes of HMDA discussed in the Introduction (briefly, to ensure FIs are serving the credit needs of their communities, encourage private investment, and assist in identifying potential fair lending problems).

## 1.  Table of Current Data Points and New Data Points Under Consideration

The first part of the following table lists existing reporting requirements for FIs under HMDA and Regulation C, as well as the new requirements added by the Dodd-Frank Act.  In addition, section 1094 of the Dodd-Frank Act provided the Bureau with the authority to mandate reporting of "such other information as the Bureau may require."  The second part of the table lists additional data points that the Bureau is considering adding to Regulation C under this authority.

| | **Current Regulation C Reporting** | **Dodd-Frank Act Additions** |
|---|---|---|
| **Application/Loan Information** | • Application/loan number <br> • Date of application/loan <br> • Application/loan type <br> • Application/loan purpose <br> • Request for preapproval <br>   o Result of preapproval request <br> • Application/loan amount <br> • Action taken type <br> • Date of action taken <br> • Type of purchaser of loan <br> • Rate spread (higher-priced loans) <br> • HOEPA status <br> • Lien status <br> • Reasons for denial (at FI's option) | • Total points and fees <br> • Rate spread (for all loans) <br> • Prepayment penalty term <br> • Introductory interest rate term <br> • Nonamortizing features <br> • Loan term <br> • Application channel (retail, broker, other) <br> • Universal loan ID* <br> • Loan originator ID* |
| **Property Information** | • Property type <br> • Owner occupancy <br> • Property location, by <br>   o MSA or Metropolitan Division <br>   o State <br>   o County, and <br>   o Census tract | • Property value <br> • Parcel ID* |
| **Applicant/ Borrower Information** | • Race <br> • Ethnicity <br> • Sex <br> • Gross annual income | • Age <br> • Credit score |

**\*** The Dodd-Frank Act provides for the collection and reporting of a universal loan identifier, a unique loan originator identifier, and a parcel identification number "as the Bureau may determine to be appropriate."

| | Additional Data Points Under Consideration** |
|---|---|
| **Application or Loan Information** | • Automated underwriting systems (AUS) results<br>• Making it mandatory, rather than optional, to report the reason an application was denied<br>• Qualified Mortgage (QM) status of loan, as determined by the FI<br>• Combined loan-to-value (CLTV) ratio<br>• Additional points and fees information, including:<br>   o Total origination charges<br>   o Total discount points<br>   o Borrower's risk-adjusted, pre-discounted interest rate<br>   o Interest rate received |
| **Property Information** | • Replacing property type with the number of units financed and the dwelling's construction method<br>• Whether multifamily property has an affordable housing deed restriction<br>• Information concerning manufactured housing:<br>   o Whether the loan is secured by real or personal property<br>   o Whether homeowner rents or owns the property where home is sited |
| **Borrower or Applicant Information** | • Debt-to-income ratio |
| **Other information** | • Unique FI entity identification number (to modify or replace the current Reporter's identification number) |

** In addition to considering these new data points, the Bureau is considering amending certain current data points to improve the integrity of the data reported. For example, the Bureau is considering expanding the existing loan purpose data point (or otherwise revising Regulation C) to provide for separate reporting of cash-out refinance, reverse mortgage, and home equity line of credit (HELOC) transactions.

Appendix A includes additional background on each of the new and revised data points, including some historical perspective for the data points, their potential importance to the HMDA dataset, and how the Bureau is approaching each of the data points under consideration. Section IV of this Outline of Proposals Under Consideration reviews the impacts of these potential changes to the data points that FIs would be required to report.

## 2.  Summary of Data Point Changes Under Consideration

There are also other ways to group the HMDA data points in order to understand and discuss the potential value and interrelatedness of certain information. The new and revised HMDA data points that the Bureau is considering requiring FIs to collect are grouped by subject matter area and briefly described in this section of the Outline of Proposals Under Consideration. Appendix A includes more detailed information about each of the following categories and data points.

**Unique Identifiers.**  The recent housing crisis exposed a number of data gaps, risk management failures, and shortcomings in operational controls throughout the mortgage finance system.  The Dodd-Frank Act calls for the creation or enhancement of certain unique identifiers that could further the purposes of HMDA and address some of these data gaps and control failures through better integration of the fragmented loan data currently available.

Being able to identify, label, and track key characteristics of a mortgage loan across various systems will facilitate efforts to determine whether FIs are meeting the needs of the communities they serve, as well as fair lending analysis.  For instance, unique identifiers could make it easier to identify where there are multiple loans secured by the same property, understand investor risk, track HMDA reporting and compliance by affiliated FIs, and understand how the loans in a community perform through their lifecycles.

The Bureau is considering the following proposals related to unique identifiers (see Appendix A), as it is generally directed to do by the Dodd-Frank Act:

- *Entity Identifier* – replacing the current HMDA Respondent/Reporter ID (HMDA RID) with an entity identifier that would facilitate identification of the corporate entity and its affiliated companies and parent/subsidiary relationships, or expanding and defining new requirements for the current HMDA RID.
- *Loan Identifier* – revising the current loan ID requirement to create a unique loan identifier to facilitate tracking a loan through its lifecycle across multiple platforms (*e.g.*, servicing, foreclosure database).  This proposal would necessitate the establishment of a unique identifier at the time of application for each loan.
- *Loan Originator Identifier* – requiring reporting of the unique identifier number provided under the Nationwide Mortgage Licensing System and Registry (NMLS) for the employee who took the application or originated the loan.
- *Property Identifier* – requiring reporting of a unique identifier for each property (such as the address or geospatial coordinates) to facilitate identification of properties across multiple platforms and, thus, potentially reduce geocoding burden.  Currently, FIs generally report the census tract, county, state and MSA in which the property is located.

**Application Data.**  HMDA data currently includes some data about the consumer's application and how it was resolved (see Appendix A).  To implement certain Dodd-Frank Act requirements, the Bureau is considering proposing to require submission of the following additional data about the mortgage loan application process:

- *Application Channel* – whether the application was submitted through a retail, wholesale, or correspondent channel.
- *Automated Underwriting System Results* – the name of the automated underwriting system (AUS) used to evaluate the application and the AUS recommendation.
- *Denial Reasons* – the reasons an application was denied.  Currently, reporting denial reasons is required only for FIs that are supervised by the Office of the Comptroller of the Currency and the Federal Deposit Insurance Corporation.

**Borrower Data.**  Data about applicant and borrower characteristics are important for HMDA purposes (see Appendix A).  To fulfill these purposes and implement certain Dodd-Frank Act requirements, the Bureau is considering proposing to require submission of the following additional data about applicants and borrowers:

- *Age* – the age of applicant(s) and borrower(s).
- *Credit Score* – numerical credit score for applicants and co-applicants used to make the credit decision.
- *Debt-to-Income Ratio* – the DTI relied on by the institution in processing the application.

**Loan Types.**  Distinguishing different types of loans is important to analyzing HMDA data and in reviewing loans with similar characteristics.  The ability to distinguish loan types may be even more necessary if the Bureau requires FIs to report all dwelling-secured loans.  The Bureau is considering proposing to require submission of data that would build on existing requirements to permit more consistent identification of the following loan types (see Appendix A):

- *Cash-Out Refinancing* – separately identifying refinancing transactions where the borrower takes out equity.
- *HOEPA Status* – revising the existing field to specify whether the loan is covered by the Home Ownership and Equity Protection Act (HOEPA) because of points and fees, rate, or both.
- *Qualified Mortgage Status* – identifying whether the FI classified the mortgage as a Qualified Mortgage.
- *Home-Equity Line of Credit (HELOC)* – requiring an indicator for HELOCs.
- *Reverse Mortgage* – requiring an indicator for reverse mortgages.

**Loan Features.**  A common criticism of HMDA prior to the Dodd-Frank Act was that FIs were not required to report enough detail about loan features to identify risky products.  Additional information about loan features will provide a clearer picture of how FIs are serving their communities and will facilitate analyzing loans with similar terms (see Appendix A).  As required by the Dodd-Frank Act, the Bureau is considering proposing to require submission of the following data related to loan features:

- *Loan Term* – the maturity term of the loan in months.
- *ARM Introductory Term* – the term in months of the initial fixed interest rate period for an adjustable rate mortgage.
- *Prepayment Penalty Term* – the term in months of any prepayment penalty.
- *Balloon Payments, Interest-Only Payments, and Negative Amortization* – indicators for the presence of features related to loan amortization.

**Loan-to-Value.**  The loan-to-value ratio (LTV) is an important underwriting and pricing consideration because it measures the adequacy of the collateral to support the loan (see Appendix A).  The Bureau is considering proposing to require submission of the following data related to LTV:

- *Property Value* – the value of the residential property related to the loan.  Reporting property value is required under the Dodd-Frank Act and will allow calculation of LTV when combined with loan amount (which is currently reported).
- *Combined Loan-to-Value* – the ratio of the combined unpaid principal balance of multiple loans to the property value, using the amounts relied on by the FI in processing the application.

**Pricing.**  Similar to the information on loan features, the pricing information collected under Regulation C prior to the Dodd-Frank Act (rate spread for higher-priced mortgage loans[18] and a HOEPA flag) had been criticized as inadequate to serve HMDA's purposes.  Additional pricing data will address this inadequacy.  The Bureau is considering proposing to require submission of the following data points related to pricing, several of which are required by the Dodd-Frank Act (see Appendix A):

- *Rate Spread* – the rate spread for all loans, not just those that exceed the threshold for higher-priced mortgage loans.
- *Total Points and Fees* – total points and fees as defined by Regulation Z.[19]
- *Total Origination Charges* – total origination charges paid by the borrower to the creditor and loan originators at or before closing, as disclosed under Regulation Z.
- *Total Discount Points* – total points paid by the borrower to reduce the interest rate, as disclosed under Regulation Z.
- *Interest Rate* – the borrower's interest rate after applying discount points.
- *Risk-Adjusted, Pre-Discounted Interest Rate* – the rate that would have been available to the borrower with zero (or the closest-to-zero) discount or premium.

**Property Data**.  Information about the property related to the loan is key for HMDA's purposes.  Regulation C currently requires FIs to record the property type to which a loan or application relates.[20]  Appendix A to Regulation C provides three reporting values, or enumerations, for this information: (1) one- to four-family dwelling (other than manufactured housing); (2) manufactured housing; and (3) multifamily dwelling.  This information, however, has been criticized as inadequate to understand the underwriting and pricing of manufactured and multifamily home loans, as distinct from site-built single-family housing.  Reporting of financed unit count and construction method type could facilitate a more robust analysis of multifamily housing and provide an opportunity to clarify certain aspects of manufactured housing reporting.  In addition, this information is collected by the Fannie Mae and Freddie Mac (collectively, Government-Sponsored Enterprises or GSEs) under established industry standards, so replacing the existing reporting requirement with better targeted data reporting could also streamline reporting by many FIs.  Additional detail about the property would provide greater insight into how FIs are serving the credit needs of their communities and provide better data for targeting public investments and enforcing fair lending laws in the manufactured housing market (see Appendix A).  The Bureau is considering the following proposals related to property:

- *Financed Units Count/Construction Method* – replacing the existing property type data point with a requirement to report data on the number of units financed and construction method (such as manufactured or site-built).
- *Manufactured Housing Details* – requiring reporting whether a manufactured home loan is secured by real property or personal property (a chattel loan), and whether the borrower owns or rents the underlying land.

---

[18] Generally, higher-priced mortgage loans are defined as loans with annual percentage rates (APRs) that exceed the average prime offer rate (APOR) for a comparable transaction by at least 1.5 percentage points for first-lien loans and 3.5 percentage points for subordinate lien loans.  APORs are estimated using data reported by Freddie Mac in its Primary Mortgage Market Survey.

[19] Regulation Z, 12 CFR part 1026, implements the Truth-in-Lending Act.

[20] 12 CFR 1003.4(a)(5).

- *Multifamily Affordable Housing* – requiring reporting whether multifamily properties have affordable housing deed restrictions.

**_Privacy Considerations_**. The new and revised HMDA data points under consideration for proposal by the Bureau are intended to further the three purposes of HMDA discussed in the Introduction.  The Bureau believes the amended set of data points would provide a much more detailed picture of the mortgage market in order to serve these three purposes and fill gaps in information that have been identified as important by Congress, federal agencies, community groups, and others.

However, while there would be significant benefits to having this additional information about the mortgage market, the Bureau is committed to balancing the benefits against the costs of collecting the information that is newly identified or authorized in the Dodd-Frank Act.  While FIs rely on consumer information to underwrite loans and a significant amount of information regarding real estate and mortgage transactions is already available in public records, the Bureau is also sensitive to privacy concerns regarding what information FIs collect, submit to the federal government, and release to the public about their applicants and borrowers, as well as what information the federal government compiles and subsequently releases.  The Bureau's ongoing examination of the potential impacts on privacy is reflected in many of the proposals under consideration outlined in these materials, and the Bureau expects to conduct extensive additional analysis and outreach about privacy considerations in conjunction with the rulemaking process.

# 3. Aligning HMDA Data with MISMO/ULDD Standards

The Bureau is also considering how the HMDA data submission requirements could be revised to improve data quality, while also making compliance easier for FIs.

Currently, HMDA data are submitted in the LAR format, consistent with the instructions in Appendix A to Regulation C.[21]  The data points reported on each LAR entry are defined by Regulation C, its appendices, and the official commentary.[22]  FIs might also seek further information in other materials.[23]  FIs must submit the data in automated, machine-readable format that conforms to the LAR format, except for institutions that report 25 or fewer entries, which may submit their LAR entries in paper format.[24]

FIs maintain electronic records of mortgage loan originations and applications in many forms and many systems other than those used for HMDA reporting.  In many cases, these systems use different data points, use different data methodologies, or define data points differently than under Regulation C, with the result that those systems may not be directly compatible with the HMDA LAR format.  These differences often require institutions to use additional software and modify data in existing systems in order to submit HMDA LAR data in the proper format.

---

[21] 12 CFR part 1003, App. A.

[22] 12 CFR part 1003.

[23] *E.g.,* HMDA Getting It Right Guide, FFIEC Data FAQs, *available at* http://www.ffiec.gov/hmda/.

[24] 12 CFR part 1003, Supp. I, comment 1003.5(a)-2.

The Bureau believes that the burden associated with Regulation C compliance and data submission can be reduced by aligning the requirements of Regulation C to existing industry standards for collecting and transmitting data on mortgage loans and applications.  The Bureau believes that promoting consistent data standards for both industry and regulatory use has benefits for market efficiency, market understanding, and market oversight.[25]  Therefore, the Bureau is considering proposing to use the HMDA rulemaking as an opportunity to align the HMDA data requirements with the widely used Mortgage Industry Standards Maintenance Organization (MISMO)  data standards for residential mortgages, to which there is free and open access.[26]  The HMDA data points and MISMO data standards would be aligned to the greatest extent practicable while fulfilling the purposes of HMDA.

The Federal Housing Finance Agency (FHFA) directed the GSEs to develop a Uniform Mortgage Data Program (UMDP) to enhance the accuracy and quality of mortgage loan data delivered to each GSE.[27]  A key component of the UMDP is the Uniform Loan Delivery Dataset (ULDD), which leverages MISMO to identify the data points and the data delivery format required in connection with the delivery of single-family loans to each GSE.[28]  As of July 23, 2012, all loans delivered to the GSEs have been required to meet ULDD requirements.  Given that currently approximately 70% of all loans are eventually sold to the GSEs – and that a large segment of the market sells at least some of their production to the GSEs directly or indirectly – a significant portion of the market is already operating in the MISMO data standard universe.[29]

In order to develop this proposed alignment with industry standards, the Bureau is analyzing each data point currently included in Regulation C, each new data point specified in the Dodd-Frank Act, and each additional data point under consideration by the Bureau to determine whether analogous data exists in the ULDD data set (first preference) or the larger MISMO data dictionary (second preference).  The Bureau will also need to determine if the MISMO/ULDD definitions would be adequate to meet the objectives of HMDA and Regulation C.

The Bureau believes that the efficiencies achieved by aligning HMDA data with widely used industry data standards will grow over time and that adding new data, if any, to HMDA in the future would be less burdensome.  However, the Bureau understands that some small FIs may not use the ULDD or MISMO data standards because they do not sell loans to the GSEs and

---

[25] The Department of Treasury's Office of Financial Research has identified the lack of consistent data standards as a key source of risk during the recent financial crisis, and has noted the benefits of consistent data standards for both industry and regulators.  Office of Financial Research, 2012 Annual Report, Chapter 5, *available at*
http://www.treasury.gov/initiatives/wsr/ofr/Documents/OFR_Annual_Report_071912_Final.pdf.

[26] MISMO is a nonprofit mortgage technology standards body:  http://www.mismo.org/default.htm.

[27] Federal Housing Finance Agency, Fannie Mae and Freddie Mac Launch Joint Effort to Improve Loan and Appraisal Data Collection (May 24, 2010) , *available at*
http://www.fhfa.gov/webfiles/15748/Uniform_Mortgage_Data_Program.pdf.

[28] *See* Fannie Mae, Uniform Loan Delivery Dataset (ULDD):
https://www.fanniemae.com/singlefamily/uniform-loan-delivery-dataset-uldd ; and
Freddie Mac Uniform Loan Delivery Dataset:
http://www.freddiemac.com/singlefamily/sell/uniform_delivery.html.

[29] *See Inside Mortgage Finance* (February 1, 2013).

conduct only portfolio lending.  The Bureau is interested in learning more about the potential effect on small FIs of alignment of the HMDA data requirements with MISMO/ULDD data standards.

Section IV of this Outline of Proposals Under Consideration reviews the impact of possible alignment of the HMDA data requirements to the MISMO/ULDD data standards.

## D.  How would the HMDA data process be modernized?

As noted above, the Bureau is using this rulemaking as an opportunity to review, streamline, and modernize HMDA operations.  The Bureau understands that many steps in the HMDA data collection, submission, and reporting process are burdensome for FIs, especially small FIs, and believes that the process can be modernized to streamline some of the areas FIs find particularly difficult.[30]  As part of the operations modernization efforts, the Bureau is considering proposals that would reduce the annual, ongoing operational costs FIs currently incur in collecting and reporting HMDA data.  To that end, the Bureau is consulting with other federal agencies about how to facilitate the following improvements to the HMDA process, which are likely to benefit small FIs:

- Restructuring the geocoding process and possibly shifting some of the burden to the government;
- Creating an improved web-based HMDA Data Entry Software (DES);
- Streamlining the submission and editing process to make it more efficient; and
- Expanding and integrating HMDA help sources.

Section IV of this Outline of Proposals Under Consideration reviews the possible impacts of these potential changes.  Some of the changes the Bureau is considering proposing would require amendments to Regulation C, while others would not.  The Bureau considers the process improvements to be part of its overall HMDA/Regulation C modernization effort and, thus, still requests information on potential impacts and recommendations.

## 1.  Restructured Geocoding

Geocoding involves identifying the appropriate census tract, Metropolitan Statistical Area (MSA) or Metropolitan Division (MD), county, and state for the property associated with the reported loan.  Regulation C currently requires this property location data to be reported on the LAR for most properties, using certain numerical codes.[31]  FIs use a variety of methods for obtaining the location codes for the LAR records (geocoding), including proprietary systems and vendor software.

The FFIEC website provides a free geocoding tool for this purpose.[32]  However, this tool only permits the entry of one address at a time and does not allow for "batch" geocoding (entering multiple addresses and receiving applicable codes for each address with one submission), which

---

[30] Recognition of technology improvements may also allow other streamlining changes in other requirements, such as in how FIs' disclosure statements are provided to the public.

[31] 12 CFR 1003.4(a)(9) and App. A.I.C.

[32] http://www.ffiec.gov/Geocode/default.aspx.

has been identified as a significant burden for some FIs.  Further, the tool is not integrated with the free HMDA DES or with commercially available HMS, requiring the employee who uses the geocoding tool to manually input the information retrieved into DES for submission.  In addition, for FIs that use a HMS, there discrepancies sometimes exist between the geocode used by the regulators and the HMS, requiring FIs to spend time reconciling the differences.

Financial institutions have told the Bureau that geocoding is a significant burden.  FIs have also noted problems associated with geocoding difficult addresses, such as those associated with new subdivisions, or where census tracts may have changed.

The Bureau is considering whether it could shift some of the burden of geocoding from FIs to the government.  For example, Regulation C could require FIs to report property addresses or latitude/longitude coordinates associated with the reported loans and applications — information that is not currently reported under HMDA — and geocoding could become an operation shared with or performed by the government.  This effort is related to the Bureau's consideration of a new property identifier data point, which was added to HMDA by the Dodd-Frank Act (see Appendix A).

## 2.  Improved DES

The FFIEC currently provides free downloadable HMDA DES for submitting HMDA data.  However, the current software has some limitations.  A new version of the software is developed each year, and must be downloaded for each year's HMDA submission.  The software is not network-capable, and must be installed locally on individual hard drives.  As a result, DES cannot be accessed by multiple users on different computer terminals, meaning that data must be entered at one location, and cannot be entered at different branch locations or by different departments.  DES also does not currently integrate with vendor HMS.

The Bureau is considering proposing to develop a new DES that accommodates multiple users and network capability by making the tool web-based, so that it would not require updating by FIs.  This would permit entering data from multiple locations and users, which would make the process more efficient for FIs.  This also would also permit multiple users, and would not require new DES software to be downloaded when updates are made.

The Bureau is considering proposing to support integration by releasing an application programming interface (API), which would allow developers to integrate their HMS with government back-end HMDA systems.  This would allow for direct submissions from HMS systems through the API, and provide a shared, coordinated workspace for entering, submitting, and validating HMDA data, while supporting customization and innovation by FIs and vendors.

## 3.  Streamlined Submission and Editing

Currently, the HMDA data submission process involves pre- and post-submission quality, validity, and syntactical edits from the processor which note potential errors or inconsistencies in the data.[33]  The government HMDA processor generates reports that identify possible reporting errors or quality edits.  The HMDA reporting process for each FI with outstanding quality edit issues is not complete until all edits have been verified or resolved.

---

[33] *See, e.g.,* 2014 HMDA Edits, FFIEC, *available at* http://www.ffiec.gov/hmda/pdf/edit2014.pdf.

FIs have identified the edits process as time-consuming and inefficient.  For example, FIs receive many predictable edits on specialized loans to which the edit is not relevant.  The Bureau is considering how to make the edits process more efficient by refining the edits to correspond to the data reported, so that certain edit flags will align more closely with the loan types to which that edit flag is relevant.  This proposal would require that loan types be easily identifiable in HMDA data.  Additional improvements to the edits process that the Bureau is discussing with other federal agencies include preapproval of edits and integrating edits into the web-based DES, as well as having the edit process be part of the API so that vendor HMS can perform edit checks without requiring separate systems.

## 4.  Integrated Help Sources

The Bureau is reviewing how it might facilitate improvements in the existing HMDA guidance and HMDA technical help process.  Currently, in addition to Regulation C, FIs look to multiple sources for written guidance, including the "HMDA Getting it Right Guide," FAQs, a glossary of terms, and newsletters on the FFIEC website.[34]  The Bureau understands that multiple sources of technical and interpretive guidance are difficult for FIs to work with, and may create opportunities for inconsistency.  The Bureau is considering how to provide more centralized HMDA guidance.

## E.  What other federal rules are closely related to HMDA?

The Bureau has identified other federal rules that have potentially overlapping or conflicting requirements in order to avoid duplication or conflict with Regulation C revisions (see Appendix B).  The Bureau has identified the following statutes and regulations as closely related to HMDA:

The **Community Reinvestment Act (CRA)**, implemented by Office of Comptroller of the Currency, Board, and Federal Deposit Insurance Corporation regulations requires some FIs to collect, maintain, and report certain data about small business, farm, and consumer lending to ensure they are serving their communities.  HMDA data are frequently used in CRA exams as part of evaluating home mortgage lending under the CRA lending test, and many CRA definitions and concepts are aligned with HMDA.  The Bureau intends to work with CRA regulatory agencies to ensure HMDA and CRA do not conflict and HMDA data can continue to be used as part of the CRA compliance process.

The **Equal Credit Opportunity Act (ECOA)**, implemented by the Bureau's Regulation B (12 CFR part 1002), prohibits creditors from discriminating in credit transactions and contains other requirements regarding, for example, notices, valuations, and maintaining certain information.  Regulation B requires creditors to collect race, ethnicity, sex, marital status, and age of applicants for some home purchase loans and refinancings and maintain that information for 25 months for purposes of monitoring compliance with antidiscrimination laws. One of HMDA's purposes is to provide data that can be used to assist in enforcing antidiscrimination statutes, which includes ECOA.

---

[34] http://www.ffiec.gov/hmda/.

The **Truth in Lending Act (TILA) and Real Estate Settlement Procedures Act (RESPA)**, implemented by the Bureau's Regulation Z (12 CFR part 1026) and Regulation X (12 CFR part 1024), cover many aspects of mortgage market transactions, including disclosures and restrictions on certain types of transactions.  The Bureau recently issued a final rule on Integrated Mortgage Disclosures Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z) (RESPA-TILA Integrated Disclosures rule).[35]  The Bureau has considered the definitions, requirements, and purposes of TILA and RESPA as it has developed these proposals under consideration for the revision of Regulation C.

Proposed **Regulation AB II** (17 CFR part 229, subpart 229.1100) from the Securities and Exchange Commission (SEC) would require private issuers of asset-backed securities, including mortgage-backed securities, to disclose certain asset-level information.  The proposed standard includes SEC-specific XML standards and data definitions.

# IV.  Potential Impacts on Small Entities

## A.  Overview

The CFPB has identified four categories of small entities that may be subject to the proposed rule for purposes of the Regulatory Flexibility Act (RFA).  These are the categories of entities that may be required to comply with Regulation C's requirements to collect, report, and disclose HMDA data to the public.  The categories and the SBA small entity thresholds for those categories are commercial banks, savings associations and credit unions with up to $500,000,000 in assets; and nondepository institutions engaged in real estate credit and consumer lending with up to $35,500,000 in annual revenue.

Approximately 6,000 banks, savings associations, and credit unions currently report HMDA data.  Of these, about 4,400 have up to $500,000,000 in assets and are therefore small entities.  Approximately 820 non-DIs currently report HMDA data.  The Bureau estimates that approximately 790 of those non-DIs have annual revenue up to $35,500,000 and are therefore small entities.

As discussed above, HMDA data are the preeminent source of mortgage loan origination information for regulators, local governments, industry, researchers, and consumer advocates studying and analyzing trends in mortgage markets.  The data facilitate the statistical analysis of mortgage lending within communities and to borrowers for a wide range of purposes, including the analysis of discriminatory lending practices.  Further, as with other data collected and reported by government, few users of HMDA data could collect comparable information on their own, and the widespread availability of the data ensures that all interested parties can benefit from it.

The Dodd-Frank Act amended HMDA to require the collection and reporting of several new data points.  The Dodd-Frank Act also authorizes the Bureau to mandate that FIs collect and report "such other information as the Bureau may require."  The Bureau is considering requiring reporting of a limited number of additional data points that will ensure that the data continue to serve HMDA's purposes.  In addition, because the Dodd-Frank Act changes to HMDA will

---

[35]  78 FR 79730 (Dec. 31 , 2013).

require that FIs modify their data collection and reporting practices and systems, the Bureau seeks to use this opportunity, as appropriate, to modernize and streamline the manner in which FIs collect and report data and to reduce unnecessary burden on financial institutions.

This section of the Outline of Proposals Under Consideration summarizes both the Bureau's preliminary assessments of the potential impacts of the regulatory and operational proposals under consideration on small entities and the methods used to derive the assessments. The Bureau believes that this information will make it easier for SERs and others to offer the Bureau additional data and information regarding potential impacts.

The information in this section may also help provide context for a discussion on how HMDA compliance and reporting requirements can be improved for small entities, while still achieving the disclosure and other purposes of the statute. The Bureau encourages contributions of data and other factual information that will help it to better understand the potential compliance burdens of small entities and develop a proposed rule that achieves appropriate goals, including those discussed above in this Outline of Proposals Under Consideration.

## B.  Internal Review of HMDA Compliance Processes and Costs

In conjunction with the development of these proposals under consideration, the Bureau reviewed the current HMDA compliance systems and activities of FIs. The review used a cost-accounting case-study methodology.[36] The review was conducted, in part, through interviews with 20 FIs of various sizes, 9 vendors, and 15 governmental agency representatives. This review provided the Bureau with information about current HMDA compliance processes and costs. The review has also provided the Bureau with tools for analyzing the impacts of the proposals under consideration discussed in this outline.[37]

As an initial matter, the Bureau recognizes that FIs differ in the cost per loan application of complying with the current requirements of HMDA. The Bureau sought, as part of its review, to understand the sources of these differences in the current (or "baseline") compliance costs per loan application. This review also improved the Bureau's ability to assess the overall impact of the proposals under consideration and to consider the impact on small FIs. This analysis is summarized below.

Second, based on the interviews with FIs, vendors, and governmental agency representatives, the Bureau classified the operational activities associated with current HMDA data collection and reporting into discrete compliance "tasks." The level of detail of the classification is intended to facilitate the rigorous analysis of impacts of the proposals under consideration across a wide range of FIs. This analysis is summarized below.

---

[36] For a discussion of this methodology in the analysis of the costs of regulatory compliance, see Gregory Elliehausen, *The Cost of Bank Regulation: A Review of the Evidence (*Board of Governors of the Federal Reserve System, Working paper series 171 (1998)).

[37] The FIs interviewed were selected to provide variation in key characteristics like institution type (bank, credit union, independent mortgage bank), regulator, record count, submission mechanism, number of resubmissions, and other designations like multifamily lender or rural. The selection was not random, however, so the Bureau interprets the findings cautiously. The Bureau expects to learn more about the general applicability of these findings through the SBREFA process and additional research.

Third, the Bureau sought to identify efficient elements and areas of difficulty in the current HMDA compliance process.  Some FIs noted that HMDA rules have been mostly stable over time and this has allowed FIs to develop efficient systems and controls to effectively meet regulatory requirements.  However, interviewees also identified certain challenges to compliance.  These difficulties include meeting the FFIEC's accuracy requirements for geocoding; delayed or inconsistent responses from HMDA help support systems; and variations in definitions, interpretations of definitions, and data standards related to HMDA compliance. Some of the Bureau's proposals under consideration specifically address these challenges.

## C.  Types of HMDA Reporters

### 1.  Background

During interviews with FIs, the Bureau identified seven key aspects or dimensions of compliance operations that were significant drivers of ongoing compliance costs (see the first column of Table 1 below).  These seven dimensions are: the reporting system used; the degree of system integration; the degree of system automation; the tools for geocoding, for performing completeness checks, and for performing edits; and the compliance program.

Further, the Bureau found that a given financial institution would tend to have simpler or more complex compliance operations across all seven dimensions.  That is to say, generally, if a given financial institution had less system integration, then it would tend to also use less automation, use simpler tools for geocoding, etc.  It was generally not the case that a financial institution would use less complex approaches on one dimension and more complex approaches on another.  This allowed the Bureau to classify FIs into three broad tiers according to the overall level of complexity of their compliance operations.[38]

Table 1 below summarizes the characteristics of the three tiers of FIs.  Tier 1 FIs have the highest level of complexity in compliance operations, while Tier 2 FIs and Tier 3 FIs have the middle level or lowest level of complexity in compliance operations, respectively:[39]

---

[38] The Bureau found that the cost of HMDA compliance (per loan application) depended on the overall complexity of the compliance operations and LAR size.  However, the Bureau also found that the LAR size was largely correlated with overall complexity, and so the complexity of compliance operations offers a useful framework for understanding the cost of HMDA compliance.

[39] The correlation in complexity across the seven dimensions was not perfect.  For example, if an institution was complex in most areas but manually geocoded 10,000 loans, it might be categorized as Tier 2 rather than Tier 1.

**Table 1:**
**Types of HMDA Reporters**

|  | Tier 3 FIs tend to... | Tier 2 FIs tend to... | Tier 1 FIs tend to... |
|---|---|---|---|
| **Systems** | Store data in EXCEL and use DES | Use LOS and HMS | Use multiple LOS, central SoR, HMS, DES |
| **Integration** | (None) | Have forward integration (LOS to HMS) | Have backward and forward integration |
| **Automation** | Type data into DES | Use manual edit checks | Have high automation (only verifying edits manually) |
| **Geocoding** | Use FFIEC tool (manual) | Use batch processing | Use batch processing with multiple sources |
| **Completeness checks** | Check in DES only | Use LOS, which includes completeness checks | Use multiple stages of checks |
| **Edits** | Use FFIEC edits only | Use FFIEC and customized edits | Use FFIEC and customized edits run multiple times |
| **Compliance program** | Have a joint compliance and audit office | Have basic internal and external accuracy audit | Have in-depth accuracy and fair lending audit |

Notes:  DES is "Data Entry Software"; LOS is "Loan Origination System"; HMS is "HMDA Management Software"; SoR is "System of Record"

## 2. "Small Entity" HMDA Reporters

As discussed above, the Bureau interviewed 20 FIs as part of its review of current HMDA compliance systems and tasks.  Nine of the 20 FIs interviewed are "small" depository institutions under the SBA small business size standards effective since July 22, 2013.  Of these nine, the Bureau characterizes five as Tier 3 FIs and four as Tier 2.[40]

Through the SBREFA process and additional outside research, the Bureau seeks to obtain data on the compliance operations and costs of small entities and on the relative numbers of Tier 3 and Tier 2 (and Tier 1, to the extent applicable) small entities.  Further, as discussed above, the Bureau expects that SERs who review their own systems and operations as part of the SBREFA

---

[40] Two of the 20 FIs were non-DIs, but the Bureau did not obtain the revenue information that would determine whether they were small non-DIs under the SBA small business size standards.

process would find Table 1 generally useful for organizing this review and identifying the Tier to which each of their institutions belong.

## D.  Compliance Tasks and Baseline Compliance Costs

### 1.  Compliance Tasks

Using information obtained from the review of current HMDA compliance systems and processes, the Bureau classified the operational activities associated with ongoing HMDA data collection and reporting into discrete compliance "tasks."  The classification of compliance activities consists of 18 "component tasks" which can be grouped into 4 "primary tasks:"

1. *Data Collection*
   - Transcribing data, resolving reportability questions, and transferring data to HMS
2. *Reporting and Resubmission*
   - Geocoding, standard annual edit and internal checks, researching questions, resolving question responses, checking post-submission edits, filing post-submission documents, creating public LAR, distributing public LAR, distributing disclosure report, FI uses vendor HMS software[41]
3. *Compliance and Internal Audits*
   - Training, internal audits, and external audits
4. *HMDA-related Exams*
   - Exam preparation and Exam assistance

These 4 primary tasks and their 18 component tasks are also listed in subsequent tables in this Section of the Outline of Proposals Under Consideration.

### 2.  Baseline Compliance Costs

Table 2 lists the primary tasks and component tasks.  The table also provides a formula that indicates how to go about potentially calculating the cost of each component task for a representative FI in Tier 3 (the calculation for FIs in other Tiers would be similar).  This information can then be used to calculate, for a representative FI in Tier 3, the baseline compliance costs for each task (or for all tasks)  per loan application (or for all loan applications).[42]

In subsequent sections and tables, the Bureau indicates how it expects these baseline compliance costs would be affected by the various changes in Regulation C that are discussed in the Outline of Proposals Under Consideration.

---

[41] Whether or not an FI uses vendor HMS software is not a task per se.  This item is included separately in order to distinguish the DES system from other HMS systems that FIs may purchase from vendors.

[42] "Applications" should be understood to refer to items covered by Regulation C, which includes loans and non-originated applications plus loans purchased without an application.   Certain table headings below refer to "applications and loans" for clarity.

**Table 2:**
**Compliance Tasks and Baseline Compliance Costs**

| Primary Task | Component Tasks | Baseline Compliance Costs at a Tier 3 FI | Fixed or Variable Cost |
|---|---|---|---|
| **Data Collection** | Transcribing data | (hourly wage) x (hours spent transcribing data per application) x (number of applications) | Variable |
| | Resolving reportability questions | (hourly wage) x (hours spent resolving reportability questions per application) x (number of applications with reportability questions) | Variable |
| | Transfer data to HMS | (hourly wage) x (hours spent transferring data to HMS per application) x (number of applications) | Variable |
| **Reporting and Resubmission** | Complete geocoding data | (hourly wage) x (hours spent geocoding per application) x (number of applications) | Variable |
| | Standard annual edit and internal check | (hourly wage) x (hours spent on edits and checks) | Fixed |
| | Researching questions | (hourly wage) x (hours spent researching questions per application) x (number of applications with questions) | Variable |
| | Resolving question responses | (hourly wage) x (hours resolving question responses per application) x (number of applications with contrary answers to questions) | Variable |
| | Checking post-submission edits | (hourly wage) x (hours spent checking post-submission edits per application) | Variable |
| | Filing post-submission documents | (hourly wage) x (hours spent filing post-submission documents) | Fixed |
| | Creating public LAR | (hourly wage) x (hours spent creating public LAR) | Fixed |
| | Distributing public LAR | (hourly wage) x (hours spent distributing public LAR) x (number of public LAR requests) | Fixed |
| | Distributing disclosure report | (hourly wage) x (hours spent distributing disclosure report) x (number of disclosure report requests) | Fixed |
| | FI uses vendor HMS software | Interviews indicated Tier 3 FIs use free DES instead of vendor HMS | Fixed |
| **Audits** | Training | (hourly wage) x (number of loan officers and processors) x (hours of training received by each) | Fixed |
| | Internal audit | Interviews indicated Tier 3 FIs have no internal audit department | Fixed |
| | External audit | Cost based on representative average of information gathered during interviews | Fixed |
| **Exams** | Exam prep | (hourly wage) x (hours spent preparing for exam) | Fixed |
| | Exam assistance | (hourly wage) x (hours spent assisting during exams) | Fixed |

Table 2 shows that for many component tasks, an hourly wage is one factor in computing the baseline compliance cost.  The analysis below uses the national, average hourly wage for compliance officers from the Bureau of Labor Statistics.  The other factor in computing baseline compliance costs is time.  For example, for resolving reportability questions, the Bureau's interviews with FIs indicated that approximately 10 percent of applications have reportability questions and it takes approximately 1 hour to resolve each question.  The number of hours spent resolving reportability questions is then constructed based on the number of applications received.  As a second example, for geocoding, the Bureau's interviews indicated that problems arise for 5 percent of applications and that geocoding takes approximately 0.50 hours for problem applications and approximately 0.05 hours when no problems arise.  Hours spent geocoding is then constructed based on the number of applications received.  As a final example, for training, the Bureau's interviews indicated that each loan officer receives approximately 2 hours of training per year and that each Tier 3 FI has approximately 5 loan officers on staff.

To further clarify the nature of the component tasks, Table 2 further identifies each component task as imposing either a variable cost or a fixed cost type of ongoing cost.  Following standard terminology, variable costs are defined as costs that increase directly with the number of

applications reported.[43]  The variable cost component tasks are:  transcribing data, resolving reportability questions, transferring data to HMS, geocoding, researching questions, resolving question responses, and checking post-submission edits.  In contrast, fixed costs are any costs that are independent of the number of applications reported; they are costs "per financial institution."  These costs are typically lump-sum payments, often made to outside parties, that are paid regardless of the number of applications received.  The eleven component tasks that are not variable cost tasks are fixed cost tasks.

# E.  Impacts of the Proposals Under Consideration

## 1.  One-time Costs

All of the proposals under consideration would impose some one-time costs on small entity HMDA reporters.  Management, legal, and compliance personnel will likely take time to learn new reporting requirements and assess legal and compliance risks.  FIs that use vendors for HMDA compliance will incur one-time costs associated with software installation, troubleshooting, and testing.  The Bureau is aware that these activities will take time and that the costs may be sensitive to the time available for them.  FIs that maintain their own reporting systems will incur one-time costs to develop, prepare, and implement necessary modifications to those systems.  In all cases, FIs will need to update training materials to reflect new requirements and activities and may have certain one-time costs for providing initial training to current employees.  However, these one-time costs are likely to be relatively small for Tier 2 and especially Tier 3 small entities.  These entities use less complex reporting processes, so tasks are more manual and new requirements may involve greater use of established processes.  As a result, compliance would likely require straightforward changes in systems and workplace practices and therefore impose relatively low one-time costs.  The Bureau expects to obtain more information about these one-time costs through this SBREFA process.[44]

Changes in HMDA coverage would result in certain FIs no longer reporting or being newly obligated to report.  For example, the Bureau is considering proposing to set a minimum reporting threshold of 25 home purchase and refinance loans.  The minimum reporting threshold requirement would no longer require reporting by depository institutions (DIs) that meet the asset threshold and currently report 25 or fewer loans; but it would obligate reporting by certain non-DIs that currently do not report despite making more than 25 (but fewer than 100) loans.

Approximately 4,400 DIs are small entities and are currently required to report HMDA data.  Of these, 1,630 would no longer report HMDA data under this proposal under consideration.  The

---

[43] Note that variable cost (per loan application) can depend on other factors, including the number of data points that must be reported.

[44] The changes to HMDA being considered may also induce some financial institutions to incur one-time expenses that go beyond direct impacts.  For example, some HMDA reporters may decide to incur one-time expenses in order to move from Tier 3 to Tier 2, as described in Table 1 above, in order to achieve lower ongoing costs (fixed or variable).  These one-time expenses might be incurred for introducing LOS and HMS that are forward integrated and include batch geocoding, introducing automated and customized data edits and checks, or adopting some of the other systems and processes of financial institutions in a higher Tier.

results are more tentative for non-DIs that would begin reporting.  The Bureau estimates that approximately 790 non-DIs are small entities and currently report HMDA data, and that 350 small entity non-DIs would begin reporting HMDA data under this proposal under consideration.[45]

For small entities that would no longer be required to report as a result of a proposal under consideration, the Bureau does not expect any significant one-time cost.  Ongoing costs would cease.  Institutions that would be obligated to report for the first time, in contrast, would incur both the one-time costs of beginning HMDA reporting and the ongoing costs associated with all 18 tasks.  The Bureau is currently engaged in outreach regarding the costs of initiating HMDA reporting and will be studying the issue further.

## 2.  Changes in Ongoing Costs

This section discusses and illustrates the changes in HMDA compliance activities that are conducted on an ongoing basis as loans are made by the creditor.  The analysis also presents a preliminary assessment of the associated changes in ongoing costs.  The changes in ongoing costs to small entities from the proposals under consideration are the costs that result from the changes in the ongoing activities of small entities.[46]

In general, the impact of a proposed change on a variable cost task depends on how the proposed change affects the time to conduct the task, the type of employees who will conduct the task, and the hourly wage for those employees.  The impact of a proposed change on a fixed cost task depends on whether the task must be performed more intensively (or less intensively) as a result of the proposal and whether these changes use (or add to) unused capacity or require additional capacity.

The proposals under consideration that affect ongoing tasks can be assigned to one of five groups:  changes in coverage; changes in data standards or data points; changes in data collection and submission; changes in help sources; and changes in data disclosures by FIs.  It is useful to note at the outset that most proposals affect only a few of the 18 tasks.  Where a proposal affects multiple tasks, the overall impact of the proposal depends on the net impact of all affected tasks.

---

[45] The Bureau estimates that 1,630 small DIs report fewer than 25 first-lien residential mortgage loans for owner-occupied, 1- to 4-family homes.  This is currently the most reliable estimate of the number of small DIs that would no longer report HMDA data under the change in coverage that is under consideration.  Similarly, the Bureau estimates that 350 small non-DIs make 25 or more, but fewer than 100, first-lien residential mortgage loans for owner-occupied, 1- to 4-family homes.  This is currently the most reliable estimate of the number of small non-DIs that would begin reporting HMDA data under the change in coverage that is under consideration.  These estimates are approximations and do not take into account all of the factors that may produce changes in the number of FIs reporting HMDA data.  For example, certain non-DIs with assets above $10 million that make fewer than 25 loans and currently report HMDA data would no longer be required to report HMDA data.  The Bureau is continuing to refine its estimates of the effects on HMDA reporting of any such change in coverage.

[46] It is important to note that the information presented here comes from a limited number of FIs that currently report to HMDA.  Thus, this information is not necessarily representative for FIs or small entity FIs overall.  Through the SBREFA process and other research, the Bureau hopes to use this information to elicit information from SERs and others on the quantity and cost of the resources used in HMDA compliance.

The discussion of each group of proposals under consideration includes a table that summarizes the Bureau's current understanding of the size and direction of the impact of each proposal. Specifically, the tables indicate the size and direction of the impact of each proposal on each task for small entities in Tier 3 and Tier 2.  The last row indicates the size and direction of the overall net impact of a proposal on entities in each tier.  The discussion also presents an example of how to compute the impact of a particular proposal on a particular task and offers general guidance on how to compute the impact on ongoing costs.  The example provided highlights one of the largest impacts for the specific proposal being discussed.

The discussion focuses on small entities in Tier 3.  There are only a few qualitative differences in impacts across Tier 3 and Tier 2 entities.  No proposal would increase the cost of a particular task for entities in one tier and decrease the cost of the same task for entities in the other tier.  If a proposal affects the way entities in both tiers perform a task, the proposal could result in different levels of increase or decrease in costs depending on the tier, but there would be no instances in which the proposal would have the opposite impact on the cost of the task. However, where a given proposal would produce cost increases and cost decreases for different tasks, the overall impact may be different for Tier 3 and Tier 2 entities.  The Bureau's preliminary assessment of impacts indicates that the tiers show the opposite net impact for just one of the proposals under consideration (*see* Table 4 below).[47]

The summary tables all have the same format.  Each row presents one of the 18 specific tasks that FIs perform in gathering and reporting HMDA data.  Each main column presents a particular proposal under consideration; the two sub-columns under each column separately present the Bureau's current assessment of the likely impact on Tier 3 and Tier 2 entities.[48]  The color of each cell and symbols indicate the likely size and direction of the impact of a particular proposal under consideration on the cost of a particular task, per loan application.  Cells are colored or filled as follows:

- Red indicates that the proposal would likely increase the ongoing cost of the task. Further:
    - "+" indicates the increase would likely be less than 50 cents per application.

    - "++" indicates the increase would likely be at least 50 cents but less than $5 per application.

    - "+++" indicates the increase would likely be at least $5 per application.

- Green indicates that the proposal would likely decrease the ongoing cost of the task. Further:
    - "-" indicates the decrease would likely be less than 50 cents per application.

---

[47] The most common difference across tiers occurs when a proposal would affect the way entities in only one of the tiers performs a task.  For example, a proposal may implicate a particular technology used by the entities in one of the tiers but not the other.  In this case, the proposal may have an impact on certain tasks for entities in one tier but zero impact on the same tasks for entities in the other tier.  Even this difference is relatively uncommon.

[48] The impact of a proposal is the Bureau's current understanding of what would likely occur as a result of the proposal.  Potential impacts are projections based on the limited information described above and should be interpreted cautiously.

- o "--" indicates the decrease would likely be at least 50 cents but less than $5 per application.

- o "---" indicates the decrease would likely be at least $5 per application.

- White indicates that the proposal may change the ongoing cost of other tasks, but the proposal does not implicate the particular task and therefore cannot change the cost of the task.

Finally, the red/green shading and symbols in the last row of each table indicate the likely overall size and direction of the impact of a proposal under consideration on the ongoing cost for a reporting institution in the indicated Tier, per application.

Based on the information gathered from approximately 20 FIs of various sizes as described in Section IV.B above, the Bureau has been able to develop very rough estimates of average costs per application of HMDA compliance under the existing requirements and for the proposals under consideration for those institutions as a group.  In part because these institutions were not drawn from a random sample, these estimates cannot be easily generalized to FIs as a whole, and additional investigation may cause these estimates to increase or decrease.  Nevertheless, these estimates provide some sense of scale particularly when compared to the overall costs of mortgage origination.  Based on the information gathered to date, the Bureau has estimated that the combined impact of the proposals under consideration would increase the cost of compliance with HMDA by roughly $25 per application for the Tier 3 institutions and roughly $5 per application for the Tier 2 institutions.  This is compared with an estimated baseline cost per application under existing HMDA of roughly $45 per application for the Tier 3 institutions interviewed, and roughly $30 per application for the Tier 2 institutions.  Note that these figures are small compared to the overall cost of originating a mortgage loan.  These costs are approximately $7,000 for smaller independent mortgage banks and $4,400 for smaller DIs.[49]

---

[49] Mortgage Bankers Association, *Mortgage Company Financial and Operational Performance*, November 2013, at 21.

*Changes Under Consideration in Coverage*

**Table 3:**
**Projected Impact on Ongoing Costs from**
**Changes Under Consideration in Coverage**

| | | Report all dwelling-secured applications and loans (adds HELOCs, closed-end HELs, reverse mortgages) | | Report all dwelling-secured applications and loans (excludes unsecured home improvement loans) | |
|---|---|---|---|---|---|
| | | Tier 3 | Tier 2 | Tier 3 | Tier 2 |
| **Data Collection** | Transcribing data | ++ | + | – | – |
| | Resolving reportability questions | + | + | – | – |
| | Transfer data to HMS | ++ | | – | |
| **Reporting and Resubmission** | Complete geocoding data | + | + | – | – |
| | Standard annual edit and internal check | | | | |
| | Researching questions | + | + | – | – |
| | Resolving question responses | | | | |
| | Checking post-submission edits | | | | |
| | Filing post-submission documents | | | | |
| | Creating public LAR | | | | |
| | Distributing public LAR | | | | |
| | Distributing disclosure report | | | | |
| | FI uses vendor HMS software | | | | |
| **Audits** | Training | | | | |
| | Internal audit | | | | |
| | External audit | | | | |
| **Exams** | Exam prep | | | | |
| | Exam assistance | | | | |
| **Overall** | Estimated Quantitative Net Impact | ++ | + | – – | – |

Table 3 presents the projected impacts on ongoing costs of the proposals under consideration for changes in coverage.[50]

---

[50] Proposals that would only exempt or newly obligate reporting by certain financial institutions would impose only one-time costs and are not presented.  Further, the options to maintain certain existing requirements within each category of proposals are not presented.

The columns "Report all dwelling-secured applications..." present the projected impacts of a particular proposal.  One proposal under consideration would change reporting on applications (and loans, as explained above) to make reporting of HELOCs mandatory, rather than optional; require reporting of all HELs, not just those to be used for home purchase, refinancing, or home improvement; and require reporting of all reverse mortgages.  This change would have no impact on many operational tasks, such as standard annual edits/checks, resolving question responses and creating the public LAR.  That result would occur because the proposed change would not involve those tasks.

Under this proposal under consideration, FIs would incur the additional transcription costs associated with having to start reporting applications and loans for additional HELOCs, HELs and reverse mortgages.[51]  The red shading indicates that there would likely be an increase in the ongoing cost of transcribing data and transferring additional data to HMS.  All other implicated tasks would be likely to produce much smaller cost increases.[52]

To assess the impact of this proposal on the transcription task, one would need the expected number of additional HELOC, HEL, and reverse mortgage applications; the number of minutes it takes to transcribe data for one application; and the hourly wage of the staff member transcribing the data.  For each product, one would multiply these three values together, divide by 60, and then sum up the results.

Overall, this proposal on reporting of HELOCs, HELs and reverse mortgages would likely increase costs for five operational tasks and would not mitigate costs for any operational task. Therefore, the overall impact would likely increase costs as indicated on the last row of the table.

---

[51] Note that, in this calculation and others below, both the task-level calculations and the calculation of overall net impact assume some stability in the task structure and the costs of factors that determine impact.  If a proposal causes a major change in the processes that underlie HMDA compliance, tasks may be combined or become less relevant and the overall impact from proposals that affect multiple tasks may change.

[52] For Tier 2 institutions, there is no impact on the "Transfer data to HMS" task because of existing integration of HMS.

*Changes Under Consideration in Data Standards or Data Points*

**Table 4:**
**Projected Impact on Ongoing Costs from Changes Under Consideration**
**in Data Standards or Data Points**

| | | Align current HMDA data points with MISMO or MISMO-ULDD | | Add DFA-identified data points and align with MISMO, MISMO-ULDD, definition from other regulation, or new definition | | Add additional data points beyond DFA - identified data points and align with MISMO, MISMO-ULDD, definition from other regulation, or new definition | |
|---|---|---|---|---|---|---|---|
| | | Tier 3 | Tier 2 | Tier 3 | Tier 2 | Tier 3 | Tier 2 |
| **Data Collection** | Transcribing data | ++ | | +++ | | ++ | |
| | Resolving reportability questions | | | | | | |
| | Transfer data to HMS | ++ | | +++ | | ++ | |
| **Reporting and Resubmission** | Complete geocoding data | | | | | | |
| | Standard annual edit and internal check | ++ | ++ | +++ | +++ | ++ | ++ |
| | Researching questions | – – | – | ++ | + | + | + |
| | Resolving question responses | | | | | | |
| | Checking post-submission edits | | | + | + | + | + |
| | Filing post-submission documents | | | | | | |
| | Creating public LAR | | | | | | |
| | Distributing public LAR | | | | | | |
| | Distributing disclosure report | | | | | | |
| | FI uses vendor HMS software | | | | | | |
| **Audits** | Training | – – | – – | + | + | + | + |
| | Internal audit | | + | | + | | + |
| | External audit | ++ | | +++ | | ++ | |
| **Exams** | Exam prep | | | | | | |
| | Exam assistance | + | + | ++ | + | + | + |
| **Overall** | Estimated Quantitative Net Impact | ++ | – | +++ | +++ | +++ | ++ |

Table 4 presents the potential impacts 0f revising the current HMDA data points or data standards (or both).  These impacts come from proposals under consideration to: align current HMDA data points with MISMO or MISMO-ULDD; collect the 13 data points specified in the Dodd-Frank Act according to a particular standard; and collect 7 other data points (to ensure that the data continue to serve the purposes of HMDA) according to a particular standard.

As one example of the projected impacts, consider the proposed change to align current HMDA data points with MISMO or MISMO-ULDD.  Notice that this proposed change would have no

36

projected impact on many operational tasks, such as geocoding data, resolving question responses and creating the public LAR.  The proposed change would not involve those tasks so there would be no impact.  The costs of researching questions and the costs of training would likely be reduced.  This is indicated by the green shading.  However, the proposal may create additional costs for transcribing data, transferring data to HMS, edit checks, external audit and exam assistance.  These likely additional costs are due entirely to the fact that aligning current HMDA data points with MISMO may add three additional data points to HMDA.  Multiple MISMO data points may be required to convey the same information as one current HMDA data point in some instances.

Since the proposal would likely increase the costs of certain tasks and decrease the costs of other tasks, the overall impact would likely depend on the relative magnitudes of these effects.  The Bureau's preliminary assessment of the overall impact is that, for Tier 3 small entities, costs would likely increase by a small amount.  This impact is indicated in red on the last row of the table.  If not for the three additional data points that arise in aligning current HMDA data points with MISMO, the proposal would likely reduce the costs of all tasks implicated.[53]

In contrast, the Bureau finds that for Tier 2 small entities, costs would be likely to decrease.  The reason is that, while the proposal is projected to increase the cost of annual edit and internal checks as well as exam assistance for both types of small entities, it would increase this cost for Tier 2 small entities by a lesser amount.  As a result, the cost mitigating factors would likely more than offset the cost increasing factors for Tier 2 small entities.  The overall result is indicated in green on the last row of the table.

The other two proposals would increase the costs of all the tasks they implicate.  They also implicate checking post-submission edits.  They therefore would be likely to produce an overall increase in ongoing compliance costs.

To assess the impact on training costs of the proposed change to align current HMDA data with MISMO, one would need to know the current, annual HMDA-related training costs and an estimate of how these training costs would change with a switch to a MISMO reporting standard.  One would expect this proposed change to reduce costs, because more standardized data point definitions would reduce training costs.  Multiplying current training costs by an estimate of the percentage reduction in costs would yield the impact of the proposal on this task.  As noted above, switching to a MISMO reporting standard would increase the current number of data points collected by three.  The mitigation in training costs would therefore be tempered slightly by a small increase in training costs associated with the three additional data points that would need to be added.

As a further illustration, consider the proposed change under consideration to require FIs to report data for all DFA-identified data points.  Notice that this change would have no projected impact on many operational tasks, such as resolving reportability questions, geocoding, and creating the public LAR.  That result would occur because the proposed change would not

---

[53] The analysis presents the impact of aligning current HMDA data points with MISMO in order to clarify the cost mitigating effects that this change would have.  These effects are present, but are not as transparent, in proposals that would also add DFA-identified data points or additional data points.  The finding that costs overall may increase depends on the assumptions made to quantify the impacts of all of the implicated tasks.  Further, this finding assumes that all other HMDA reporting requirements remain unchanged.  This might not be true if aligning current HMDA data points with MISMO were the only proposal under consideration.

involve those tasks.  External audit costs for Tier 3 entities, on the other hand, would likely increase as indicated by the red shading.

To assess the impact of this proposed change on external audit costs, one might first estimate the percentage increase in total external audit costs from adding an additional data point.  One would then multiply this number by the number of additional data points to determine the percentage increase in external audit costs.  One might then multiply this product by current external audit costs to determine the dollar amount by which external audit costs would increase.  The expected change in audit costs may differ across the four possible types of new data points being considered (MISMO, MISMO-ULDD, a current regulation, and a completely new variable), and across the specific data points being added.[54]

Overall, for Tier 3 FIs, this proposal would likely increase costs for eight operational tasks and would not mitigate costs for any operational task.  Therefore, the overall impact would likely be an increase in costs as indicated on the last row of the table.

---

[54] Alternatively, one might first estimate the percentage increase in external audit costs per data point from adding an additional data point and modify the calculations accordingly.

*Changes Under Consideration in Data Collection and Submission*

**Table 5:**
**Projected Impact on Ongoing Costs from Changes Under Consideration**
**to Data Collection and Submission**

| | | Processor conducts or facilitates geocoding | | Web-based DES | | Edits tailored to loan type | | Pre-approval of most edits | | Post-submission report part of web-based program/API | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Tier 3 | Tier 2 | Tier 3 | Tier 2 | Tier 3 | Tier 2 | Tier 3 | Tier 2 | Tier 3 | Tier 2 |
| **Data Collection** | Transcribing data | | | | | | | | | | |
| | Resolving reportability questions | | | | | | | | | | |
| | Transfer data to HMS | | | | | | | | | | |
| **Reporting and Resubmission** | Complete geocoding data | – – | – – | | | | | | | | |
| | Standard annual edit and internal check | | | – | | – – | – – | – – | – – | | |
| | Researching questions | | | | | | | | | | |
| | Resolving question responses | | | | | | | | | | |
| | Checking post-submission edits | | | | | – | – | – – | – | – | – |
| | Filing post-submission documents | | | | | | | | | + | |
| | Creating public LAR | | | | | | | | | | |
| | Distributing public LAR | | | | | | | | | | |
| | Distributing disclosure report | | | | | | | | | | |
| | FI uses vendor HMS software | | | | | | | | | | |
| **Audits** | Training | | | | | | | | | | |
| | Internal audit | | | | | | | | | | |
| | External audit | | | | | | | | | | |
| **Exams** | Exam prep | | | | | | | | | | |
| | Exam assistance | | | | | | | | | | |
| **Overall** | Estimated Quantitative Net Impact | – – | – – | – | | – – | – – | – – | – – | – | – |

Table 5 presents the projected impacts 0f proposed changes under consideration in data collection and submission.

As one example of projected impacts, consider the proposal under consideration to allow pre-approval of most edits.  Notice that this proposed change would have no projected impact on many operational tasks, such as transcribing data, transferring data to HMS and geocoding.  The proposed change would not involve those tasks so there would be no impact.  Standard annual checking and editing costs, on the other hand, likely would be reduced as indicated by the green shading.

To assess the projected impact of this proposed change on the costs of standard annual checking and editing, one would need hours spent checking data annually, an estimate of the change in

checking time due to the proposed change, and the hourly wage of the staff member conducting the checks.  One could calculate the impact of this proposed change on checking and editing costs by multiplying together these three values.  One would expect this to reduce costs, because FIs would have to spend less time checking data edits that have been pre-approved.

Overall, this proposal would likely mitigate costs for two operational tasks and would not be likely to increase costs for any operational task.  Therefore, the overall impact would be to mitigate costs as indicated on the last row of the table.

*Changes Under Consideration in Help Sources*

**Table 6:**
**Projected Impact on Ongoing Costs from**
**Changes Under Consideration in Help Sources**

| | | Single POC for all three sources (processor, rule-maker, regulator) | | Periodic integrated written guidance | | Multiple access points (email, phone, web-chat) | |
|---|---|---|---|---|---|---|---|
| | | Tier 3 | Tier 2 | Tier 3 | Tier 2 | Tier 3 | Tier 2 |
| **Data Collection** | Transcribing data | | | | | | |
| | Resolving reportability questions | | | – | – | – | – |
| | Transfer data to HMS | | | | | | |
| **Reporting and Resubmission** | Complete geocoding data | | | | | | |
| | Standard  annual edit and internal check | | | | | | |
| | Researching questions | | | – | – | – | – |
| | Resolving question responses | – – | – | | | | |
| | Checking post-submission edits | | | | | | |
| | Filing post-submission documents | | | | | | |
| | Creating public LAR | | | | | | |
| | Distributing public LAR | | | | | | |
| | Distributing disclosure  report | | | | | | |
| | FI uses vendor HMS software | | | | | | |
| **Audits** | Training | | | | | | |
| | Internal audit | | | | | | |
| | External audit | | | | | | |
| **Exams** | Exam prep | | | | | | |
| | Exam assistance | | | | | | |
| **Overall** | Estimated Quantitative Net Impact | – – | – | – | – | – | – |

Table 6 presents the projected impacts 0f changes under consideration in help sources.

As one example of the projected impacts, consider the proposal under consideration to create a single POC for all three help sources (processor, rule-maker and regulators).  Notice that this change would have no projected impact on many operational tasks, such as transcribing data, transferring data to HMS and geocoding.  That result would occur because the proposed change would not involve those tasks.  Resolving question responses, on the other hand, would be reduced as indicated by the green shading.

To assess the impact of this proposed change on the costs of resolving question responses, one would need hours spent aligning information from different help sources and the hourly wage of the staff member involved.  One could calculate the impact of this proposed change on costs of resolving question responses by multiplying together these two values.  One would expect this proposed change to reduce costs, because FIs would be less likely to receive responses that required alignment.

Overall, this proposal would likely mitigate costs for one operational task and would not increase costs for any operational task.  Therefore, the overall impact would likely be to mitigate costs as indicated on the last row of the table.

*Changes Under Consideration in Data Disclosure by FIs*

**Table 7:**
**Projected Impact on Ongoing Costs from**
**Changes Under Consideration in Data Disclosures by FIs**

| | | Disclosure report provided by website link | |
|---|---|---|---|
| | | Tier 3 | Tier 2 |
| **Data Collection** | Transcribing data | | |
| | Resolving reportability questions | | |
| | Transfer data to HMS | | |
| **Reporting and Resubmission** | Complete geocoding data | | |
| | Standard annual edit and internal check | | |
| | Researching questions | | |
| | Resolving question responses | | |
| | Checking post-submission edits | | |
| | Filing post-submission documents | | |
| | Creating public LAR | | |
| | Distributing public LAR | | |
| | Distributing disclosure report | | – |
| | FI uses vendor HMS software | | |
| **Audits** | Training | | |
| | Internal audit | | |
| | External audit | | |
| **Exams** | Exam prep | | |
| | Exam assistance | | |
| **Overall** | Estimated Quantitative Net Impact | | – |

Table 7 presents the projected impacts 0f proposals under consideration to change data disclosures by FIs.  The Bureau's current understanding is that Tier 3 entities normally do not receive requests for disclosure reports from the public.  Thus, this proposal is not expected to have any impact on these FIs and all of the cells in the Tier 3 column are white.  In contrast, Tier 2 entities do receive some such requests.  The proposal under consideration is expected to mitigate costs associated with those tasks for Tier 2 entities as indicated on the last row of the table.

# V.  Cost of Credit Analysis

The Bureau recognizes that HMDA reporters may incur one-time costs and increases in ongoing costs due to the proposals under consideration.  However, the Bureau currently does not believe that these proposals will increase the cost of credit to small entities.  The reasons are two-fold: the impact on the cost of a mortgage loan in general is likely to be small, and the Bureau does not currently believe that many small entities rely on consumer mortgage loans as a source of credit.

Regarding one-time costs (and also ongoing costs that do not increase with the number of loans), these are not likely to be passed through to borrowers as long as lenders are pricing their loans to maximize profits prior to incurring these one-time costs.  One-time costs do not change the incremental profitability of any loan, so raising prices could only deter the origination of profitable loans.  This is a standard principle of microeconomics.

- The Bureau is aware of anecdotal evidence that lenders may not be maximizing profits prior to incurring these one-time costs, in which case some portion of these costs may be passed through to borrowers.  The Bureau expects to learn more about this through the SBREFA process.
- Further, it is theoretically possible that some lenders may exit the mortgage market solely due to these proposals and the remaining lenders may acquire some market power.  The Bureau is not aware of evidence supporting this and currently does not believe it will occur.

Regarding variable costs, while these may be passed through to borrowers, the Bureau's preliminary assessment of potential impacts suggests that these are likely to be small.  As discussed above, the combined impact of the proposals under consideration would likely increase the cost of compliance with HMDA by $25 per application for a Tier 3 FI and $5 per application for a Tier 2 FI.  This expense will be amortized over the life of the loan and represents a negligible increase in the cost of a mortgage loan.

Finally, while the Bureau is aware that some small entities may rely on consumer mortgage loans as source of credit, the Bureau does not believe that this is common.  According to the 2010 Survey of Consumer Finance, 15-20 percent of respondents used credit (such as credit cards, personal loans or business loans) to fund start-up or operational costs of a small business.  However, the survey does not provide information on to what extent these loans involve HELOCs or closed-end HELs.  Therefore, the Bureau estimates that no more than 15-20 percent of small entities would experience the estimated costs noted above.

# <u>Appendix A</u>:   Additional Background -- Data Points, "Application," and Privacy

This appendix provides a more in-depth description of the data point proposals the Bureau is considering, discussed briefly above in Sections III and IV, as well as information on some of the alternatives considered, the definition of "application," and privacy considerations.  The Bureau invites information and feedback on all of these topics.

## A.  New and Revised Data Points

As part of the HMDA rulemaking, the Bureau is comprehensively reviewing all current data points in Regulation C, carefully examining each Dodd-Frank Act required data point, and proposing additional data points, as necessary, to fulfill HMDA's purposes.  A table of the data points is included in Section III of this Outline of Proposals Under Consideration.

### 1.  Unique Identifiers

The Dodd-Frank Act specified several new data points (as the Bureau may determine to be appropriate) related to unique identifiers for persons, properties, and transactions.  The Bureau is considering the Dodd-Frank Act data points and other requirements relating to unique identifiers for entities and certain individuals involved in a mortgage transaction.

The recent housing crisis exposed a number of data gaps, risk management failures, and shortcomings in operational controls throughout the mortgage finance system.  Identifiers (or IDs) are key infrastructure in the creation and collection of any data, and are critical to correctly identifying, combining, integrating, and validating records and data fields across various collections and systems.  Certain identifiers would facilitate life-of-loan tracking of an application or loan origination.

At the same time, privacy considerations are likely to be a factor in the adoption of any requirement to provide unique identifiers that data users might be able to associate with a particular applicant or borrower.  The Bureau believes it is important to solicit information that will help it determine how to appropriately address privacy considerations.

The Bureau analyzed potential unique identifiers using an industry standard framework for what defines a robust ID, including:  persistence, uniqueness, extensibility, reliability and coverage.  With this framework, the Bureau has assessed a number of options for each category of unique identifier.  The Bureau plans to consider these qualities when determining which, if any, proposal for each unique identifier to implement in Regulation C.  The Bureau is seeking input from SERs on how the proposals under consideration mentioned below meet these qualities or others that the SERs believe are relevant.  The Bureau is also seeking input from SERs on privacy implications of FIs' collection, reporting, and disclosure of unique identifiers and, where applicable, how the Bureau might mitigate such risks.

#### i.  Entity Identifier

The lack of a sufficiently comprehensive identification system for FIs that are parties in mortgage transactions can result in the same FI being identified by different names or codes. As a result, FIs, regulators, and data users may find data aggregation, validation, and analysis

difficult.  Unique entity identifiers may facilitate information sharing within FIs, among regulators, and across geographical locations.[55]

Currently under Regulation C, each FI submits its HMDA LAR using a HMDA Respondent/ Reporter ID (HMDA RID), consisting of a combination of the entity ID specified by the FI's prudential regulator — with zeros added to become 10 digits — and the code of the regulating agency.  The HMDA RID is listed on all the FI's HMDA data files and is searchable on the FFIEC and Bureau websites.

The Bureau is considering proposing changes to Regulation C's entity identifier requirement that it believes would improve the ability to identify a legal entity that is a party to a transaction and link it to its corporate organization, including affiliates, subsidiaries, and parent companies. These changes may help data users in achieving HMDA's objectives of identifying whether FIs are serving the housing needs of their communities, as well as identifying possible discriminatory lending patterns.  These changes may also enable regulators to more easily identify each party to a transaction quickly and accurately, and may assist in identifying market activity and risks by related companies.

Under the current system, many subsidiaries of large FIs use independent HMDA RIDs, and there is no mechanism to link the related companies.  The Bureau is considering the following two proposals to require a universal entity identifier that would more easily allow identification of affiliated companies and parent-subsidiary relationships.

- The Bureau is considering proposing requiring FIs to obtain and report a Legal Entity Identifier (LEI), which is an identifier that would comply with a global standard mandated by the G-20[56] that is currently under development by the Department of the Treasury's Office of Financial Research.  This identifier would be a unique code assigned to a financial institution that would be linked to reference data about the company, including its name, address, corporate structure and affiliations.  Support for the LEI is widespread,[57] and, although work is still progressing on the standard, some companies participating in the effort have been issued identifiers.  There also is likely to be a cost for participation, although the cost is expected to decrease as the LEI program gains traction.

- The Bureau is also considering proposing requiring all FIs to obtain and report RSSD ID numbers, which are assigned and managed by the Board and already used by a significant portion of FIs as their HMDA RID.  However, the RSSD system currently does not cover all FIs that are not depository institutions or holding companies and, thus, would require operational coordination with the Board in order to extend assignment of

---

[55] *See* Financial Stability Board, "A Global Legal Entity Identifier for Financial Markets," June 8, 2012, *available at* https://www.financialstabilityboard.org/publications/r_120608.pdf.

[56] *See* G-20 Cannes Summit Final Declaration, November 4, 2011, *available at* http://iipdigital.usembassy.gov/st/english/texttrans/2011/11/20111104151513su0.8040212.html#axzz2s HIAswBH.

[57] Many trade associations, including the Americans Bankers Association, expressed support for creation of the LEI in a letter to the Secretary of the Treasury and all G-20 finance ministers, *available at* http://www.gfma.org/correspondence/item.aspx?id=159.

numbers to additional nondepository institutions.  Moreover, because of the manner in which IDs are assigned to bank branches, there may be rare cases where the identifier changes over time, compromising the reliability of the RSSD number created.  Further, use of the HMDA RID will not comport with the global LEI standards currently under development.

The Bureau is interested in hearing from the SERs regarding which, if either, of these proposals it should propose to modify or replace the current HMDA RID requirement, including the benefits, burdens, and costs of each option, and whether either option is preferred to the current HMDA RID requirement.

## ii.  Loan Identifier

The size, complexity, and fragmented nature of the mortgage finance system and its regulation make it difficult to accurately identify lending patterns or connect various stages of the loan lifecycle.  Currently, different identifiers may be assigned to the same mortgage loan for different purposes, such as for origination, sale of the loan, and reporting the HMDA data, and there is no system or process to synchronize those numbers with respect to each loan.  The weaknesses in the current loan ID requirement make it difficult to track a loan over its life.  The flexibility of the current requirement may also create privacy risks to the extent that FIs may include sensitive borrower information in their loan IDs, such as the borrower's last name.  The Dodd-Frank Act made the requirement to report "as the Bureau may determine to be appropriate, a universal loan identifier."[58]  Implementing this requirement may address many of the deficiencies associated with the current Regulation C loan ID.  The Bureau also hopes that the universal loan ID would be used in other contexts by the industry, and therefore would be useful for purposes other than HMDA reporting.

Under Regulation C, FIs are required to report an identifying loan or application number that can be used to retrieve each file.[59]  The loan ID can be any number of the institution's choosing, up to 25 characters.  The official commentary to Regulation C strongly encourages FIs not to use Social Security numbers or applicants' names in the loan ID for privacy purposes, but does not prohibit use of that information in creating identifiers.[60]

Because Regulation C gives individual FIs substantial latitude in creating and assigning loan IDs, there is no uniformity in how the IDs are structured.  There is no requirement that numbers be unique in the nationwide dataset, that they match any other regulatory ID requirements, or that they not be repeated from year to year.

To address these issues and other weaknesses in the ability to connect information related to individual loans, the Bureau is considering two proposals for revising the Regulation C loan ID and implementing a universal loan ID requirement:

- The Bureau is considering proposing adopting a universal loan ID requirement based on a national centralized registry for all mortgage loans and applications, either created and

---

[58] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(6)(G).

[59] 12 CFR 1003.4(a)(1).

[60] 12 CFR part 1003, Supp. I, comment 4(a)(4).

operated by the Bureau, or based on a viable industry standard, should one emerge.  For instance, the Bureau could work with other financial regulators or industry groups such as MISMO to create a new platform for the creation of loan IDs.  MISMO has a working group focused on developing a universal loan ID.  While it has not produced recommendations, the group has considered a number of options such as the creation of a registry system based on the Digital Object Identifier (DOI) model, in which there is a centralized operating entity that allows for the creation or "minting" of IDs by others.  This would allow for large lenders or LOS providers, for example, to become minters of IDs and help reduce assignment time and cost for industry.  This development of a universal loan ID would require significant investment of time and money and substantial coordination among all relevant stakeholders.  Another option would be to work with industry to implement a loan identifier program utilizing a bar code system or other open standard.  Any option considered would focus on creating transparency in the marketplace for the life of the loan by using open standards.

- The Bureau is also considering proposing a hybrid identifier system.  Adoption of a hybrid identifier system would allow individual institutions to assign a self-created unique identifier based on specific rules implemented in Regulation C and applied across the industry.  The self-created loan ID would be appended to the unique entity identifier to create a combined ID that would be unique for each loan.  The Bureau believes this proposal would be relatively simple to implement and comply with, but is concerned that entities may not use the ID for purposes other than HMDA, which would limit the full usefulness of the ID.  The cost of implementing a hybrid system should be relatively low for industry since HMDA reporters are already creating their own loan IDs.  While there would be a cost for updating current systems to ensure that the numbers created are unique and persistent, this cost also should be relatively low.

The Bureau is seeking information from the SERs to support their preference of these or any other alternatives to the existing loan ID requirement.

### iii.  Loan Originator Identifier

The Dodd-Frank Act authorized reporting of, "as the Bureau may determine to be appropriate, a unique identifier that identifies the loan originator as set forth in section 1503 of the [Secure and Fair Enforcement for] Mortgage Licensing Act of 2008" (S.A.F.E. Act).[61]  The S.A.F.E. Act provides for a unique identifier under the Nationwide Mortgage Licensing System and Registry (NMLS) for individuals who originate residential mortgage loans.  The S.A.F.E. Act requirements are implemented by the Bureau in Regulations G and H.[62]

The Bureau believes that implementing this requirement will improve HMDA data and assist in identifying and addressing potential issues, such as training deficiencies, with specific loan originators, as well as strengthen the transparency of the residential mortgage market.  Being able to identify an individual who has responsibility in the transaction will enable new dimensions of analysis, including being able to link individual loan originators or groups of loan originators to a mortgage lending institution.  The NMLS ID also provides a vehicle for industry

---

[61] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(6)(F).

[62] 12 CFR parts 1007 (Regulation G) and 1008 (Regulation H).

to self-test and determine appropriate corrective measures when they identify individual misconduct through self-analysis of HMDA data.

The Bureau is considering proposing requiring FIs to report the NMLS unique identifier for the employee who originated each loan or took and handled each application.  The Bureau expects that this requirement would add, at most, marginal one-time implementation costs to small businesses as this information will be reported on the RESPA-TILA integrated disclosure form starting on August 1, 2015.[63]  As a result, the NMLS unique identifier will be readily available to HMDA reporters at little to no ongoing cost.

### iv.   Property Identifier

Currently, for most loans, Regulation C requires FIs to report "[t]he location of the property to which the loan or application relates, by MSA or by Metropolitan Division, by state, by county, and by census tract . . . ."[64]  Providing census tract information can be a significant burden for FIs because of the difficulties involved in matching addresses, such as those associated with new subdivisions, to their census tract (a process known as geocoding).  In addition, the geocoding tool currently provided by the FFIEC and relied upon by many smaller entities lacks certain efficiencies, such as batch geocoding and integration with the free HMDA DES (*see* section III.D of this Outline).

The Dodd-Frank Act authorized reporting of, "as the Bureau may determine to be appropriate, the parcel number that corresponds to the real property pledged or proposed to be pledged as collateral."[65]  As amended by the Dodd-Frank Act, HMDA also directs the Bureau (in place of the Board), in consultation with other agencies, to "develop or assist in the improvement of, methods of matching addresses and census tracts to facilitate compliance by depository institutions in as economical a manner as possible with the requirements of [HMDA]."[66]

There is no universal standard for identifying the location of a property so that it can be linked to related mortgage data.  Instead, parcel data are collected and maintained by local governments with limited state or federal involvement.  Local jurisdictions use their own standards and mechanisms for identifying property, which may include a combination of postal addresses, legal descriptions, tax parcel numbers, and geospatial coordinates.

Despite the various methods available for property identification, there remains a high incidence of misidentification of property that creates greater risks for mistakes and fraud.  In addition, the lack of a common standard and database for property records leads to problems and inefficiencies in collecting and sharing data that impacts the entire mortgage process, from title searches to foreclosure proceedings.  The Bureau believes that the addition of a property identifier requirement and the directive to facilitate economical compliance with matching

---

[63] The RESPA-TILA Integrated Disclosure rule provides standards for identifying the appropriate loan originator where more than one individual is listed in the disclosure documents. *See* 12 CFR 1026.37(k) and comment 37(k)-3 in the official commentary for 12 CFR part 1026 (Supplement I).

[64] 12 CFR 1003.4(a)(9).

[65] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(6)(H).

[66] Dodd-Frank Act sec. 1094(6), 12 U.S.C. 2806(a)(1).

addresses and census tracts provides a unique opportunity to improve Regulation C property location data and the reporting process.  The Bureau believes it is important to solicit information that will help it determine how to appropriately address privacy considerations.

The Bureau is considering two proposals related to a property identifier: reporting geographic coordinates or postal address.

- A geographic coordinate system using latitude and longitude to identify parcels allows for precise location of properties.  A benefit of such a system is that the coordinates are easy to maintain and universally recognized.  However, there could be difficulties for multiunit properties (*e.g.*, condominiums, high-rise apartments) and maintaining accuracy.  The Bureau understands that such a system is currently under development within the industry.

- Postal address is currently collected during the mortgage origination process and would be a low cost option to implement.  Reporting of a postal address could potentially obviate the need for reporting the current property location fields, as geocoding could be done from the reported address by the processor.  However, postal addresses sometimes do not correspond to the physical location of a property.  Further, there are some inaccuracies associated with postal addresses.  Reporting postal addresses also raises privacy concerns, which are discussed below in section C of Appendix A.

The Bureau is seeking input from the SERs on these proposals under consideration and others that might reduce burden and improve the quality of HMDA data.

## 2. Application Data

Regulation C currently contains several data points relating to the application itself, including: the date the application was received; the action taken on the application; the date the action was taken; and optional reporting for denial reasons.  The Bureau is reviewing current data points and is also considering proposals related to Dodd-Frank Act amendments and other data points to improve the utility of the application information.

### i.   Reasons for Denial

Regulation C currently permits optional reporting of reasons for denial of a loan application.[67] In general, the statistical value of such data obtained through optional reporting is compromised because of the lack of standardization across all reporters.  Further, certain FIs supervised by the OCC and FDIC are required by those agencies to report denial reasons on their HMDA LARs.[68]  The Bureau is considering proposing requiring all FIs to report reasons for denial.  The Bureau believes this proposal could provide more consistent and meaningful data to serve HMDA's purposes.  The Bureau is also considering whether the current codes relating to reasons for denial (debt-to-income ratio, employment history, credit history, collateral, insufficient cash, unverifiable information, credit application incomplete, mortgage insurance denied, other) should be amended.

---

[67] 12 CFR part 1003.4(c)(1), App. A, sec. I.F.

[68] 12 CFR 27.3(a)(1)(i), 128.6, 390.147.

## ii.   Automated Underwriting System (AUS) Results

An automated underwriting system (AUS) is a computer application that FIs use to evaluate loan applications.  FIs input certain information about an application into the AUS and the AUS generates messages, including a recommendation indicating both whether the application is eligible to be approved or should be referred for further underwriting and specific conditions on that recommendation.  There are several AUSs, including Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector, the Federal Housing Administration's (FHA's) TOTAL Scorecard, and others.[69]  Larger lenders may have their own proprietary AUSs.  AUS systems are frequently used by FIs that intend to sell loans to the GSEs or to insure loans with FHA, because the AUS recommendation may indicate whether the loan is eligible for purchase or insurance.  The Bureau and other regulators review AUS return codes during examinations because the AUS recommendation may play an important role in the credit decision.

The Bureau is considering requiring FIs to report information about AUS results if an AUS was used to evaluate an application.  This new reporting requirement would provide valuable information on credit underwriting.  During the 2010 Board hearings on HMDA[70] and the Bureau's review of current HMDA operations, commentators have recommended requiring reporting of AUS results.

The Bureau understands that there are different ways to collect information about AUS results.  For example, FIs could report the name of the AUS system used and the actual return code generated by that system.  Alternatively, FIs could report only the return code in categories defined by the Bureau, such as, recommended approval or recommended referral for further underwriting.

The Bureau understands that FIs may process a single application through an AUS multiple times or through multiple AUS systems.  The Bureau is considering collecting only the AUS return code relied on by the FI in the credit decision.  The Bureau solicits feedback regarding the potential costs and benefits associated with this proposal for consideration, including the burden associated with such a reporting requirement.

## iii.   Application Channel

The Dodd-Frank Act amended HMDA to add the requirement for FIs to report, for originations and applications, "the channel through which application was made, including retail, broker, and other relevant categories."[71]

The Bureau understands that primary application channels include: (1) retail, where the applicant submits the application directly to the lender; and (2) wholesale, where the applicant submits the application to a mortgage broker that sends the application to the lender, with or

---

[69] *See* Fannie Mae's Desktop Underwriter, *available at* https://www.fanniemae.com/singlefamily/desktop-underwriter# ; Freddie Mac's Loan Prospector, *available at* http://www.loanprospector.com/; and FHA's TOTAL Scorecard, *available at* http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/total/total_scorecard .

[70] Testimony of Allison Brown (Federal Trade Commission), DC Hearing.

[71] Dodd-Frank Act sec. 1094(3); 12 U.S.C. 2803(b)(6)(E).

without a table-funding arrangement. A third application channel includes correspondent arrangements between two lenders. The Bureau understands that a purchasing lender may have different arrangements with correspondents and may or may not delegate underwriting authority to a correspondent. A correspondent with delegated underwriting authority processes an application much like the retail channel described above. The correspondent receives the application directly from the applicant, makes the credit decision, finances the transaction initially, and immediately sells the loan to an acquiring creditor. Correspondents with nondelegated authority operate more like a mortgage broker in the wholesale channel. These correspondents receive the application from the applicant, but prior to closing involve a third party lender that funds the transaction and in whose name the transaction closes. The correspondent with nondelegated authority does not make the credit decision without lender involvement.

To determine how to implement the statutory requirement, the Bureau seeks information on how FIs characterize and define different application channels. The Bureau is also interested in information about the type of data that FIs typically collect and maintain about different application channels.

### iv.   Other Information Concerning Applications

The Bureau is considering proposing to retain existing Regulation C data points concerning the type of action taken, the date of action taken,[72] the date the application was received,[73] and requests for preapproval.[74] The Bureau plans to review the instructions and official commentary regarding action taken to determine if it can improve clarity regarding these data points.

## 3.  Borrower Data

Currently, Regulation C requires reporting of income and demographic information about applicants and borrowers, including the ethnicity, race, and sex of an applicant/co-applicant and borrower/co-borrower.[75] Information about applicants and borrowers generally fulfills the purpose of helping to identify potential discriminatory lending patterns. The Bureau is also considering proposals related to Dodd-Frank Act amendments and information gaps regarding applicant and borrower information.

### i.   Age

The Dodd-Frank Act amended HMDA to require the collection and reporting of an applicant's or borrower's age for loan originations and applications.[76] The Bureau believes that implementing this requirement will help fulfill HMDA's purposes of identifying whether FIs are serving the

---

[72] 12 CFR 1003.4(a)(8).

[73] 12 CFR 1003.4(a)(1).

[74] 12 CFR 1003.4(a)(4).

[75] 12 U.S.C. 2803(b)(4), 12 CFR 1003.4(a)(10).

[76] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(4).

housing needs of their communities, targeting public investment, and identifying possible discriminatory lending patterns.

Age is a protected category under ECOA and Regulation B.[77]  For monitoring purposes, Regulation B requires a creditor to request and maintain applicant information, including age, for certain transactions secured by the applicant's dwelling.[78]  Unlike HMDA data, ECOA monitoring data are not reported or disclosed to the public.  Under Regulation B, "age" refers "only to the age of natural persons and means the number of fully elapsed years from the date of an applicant's birth."[79]  Given that one of the purposes of HMDA is to enforce antidiscrimination statutes, the Bureau seeks to ensure that any changes to Regulation C align well and do not conflict with Regulation B.

FIs that use the Uniform Residential Loan Application (URLA) form[80] currently collect the date of birth of the borrower and co-borrower, if applicable.  Existing MISMO/ULDD data standards for age information include both the date of birth (YYYY-MM-DD format) and the age of the borrower at the time of application (numeric data point).

In light of consumer privacy concerns related to date of birth, the Bureau is considering proposing that FIs report the age of the applicant(s) or borrower(s) at the time of application. (Section C of Appendix A, below, discusses this and other privacy concerns and potential mitigants.)  Reporting age, rather than birth date, would be consistent with both Regulation B and MISMO definitions.  The Bureau solicits comment on such a reporting requirement.

## ii.  Credit Score

The Dodd-Frank Act added the requirement to report "the credit score of mortgage applicants and mortgagors, in such form as the Bureau may prescribe."[81]

The Bureau is considering proposing that FIs report the credit score used to make the credit decision, applying the Fair Credit Reporting Act's (FCRA) definition of credit score.[82]  The Bureau requests feedback regarding the benefits and costs associated with adopting this definition, as well as on whether the Bureau should adopt an alternative definition.  For a discussion of privacy concerns, see section C of Appendix A below.

---

[77] 15 U.S.C. 1691(a)(1), 12 CFR 1002.1(b) , 1002.4(a)(b), *available at* http://www.ecfr.gov/cgi-bin/retrieveECFR?gp=&SID=0b62bb2c7ea45fbd7f64a441d202433a&r=PART&n=12y8.0.2.9.1.

[78] 12 CFR 1002.5(a)(2), 1002.12(b)(1)(i), and 1002.13(a)(1)(iv).

[79] 12 CFR 1002.2(d).

[80] Freddie Mac Form 65 or Fannie Mae Form 1003.

[81] Dodd-Frank Act sec. 1094(6), 12 U.S.C. 2803(b)(6)(I).

[82] The FCRA defines credit score as "a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors....and [] does not include [1] any mortgage score or rating of an automated underwriting system that considers one or more factors in addition to credit information, including the loan to value ratio, the amount of down payment, or the financial assets or a consumer; or [2] any other elements of the underwriting process or underwriting decision."  15 U.S.C. 1681g(f)(2)(A).

The Bureau understands that FIs may collect multiple credit scores for applicants.  The Bureau is considering proposing that FIs report only the credit score the institution used to make the credit decision for the loan.  For example, Regulation C could require that a FI that collected three scores, but used only the lowest to make the credit decision, report solely the lowest score.  Where there are multiple applicants, the Bureau is considering proposing that FIs report the single credit score used to make the credit decision for the loan.  The Bureau solicits feedback regarding such reporting requirements.

The Bureau also understands that some FIs rely on multiple credit scores when making credit decisions.  For example, an institution might collect three scores and use the average of the scores to make the credit decision.  The Bureau solicits feedback regarding reporting one or all of the scores used to make the credit decision or, alternatively, the average of such scores.

In addition to credit score, the Bureau is considering proposing that FIs report related contextual information, such as the date on which the score was created, the name of the scoring model used, and the range of possible scores under the model used.  The Bureau solicits feedback regarding the costs and benefits associated with reporting this information, as well as whether additional information would be necessary to put the credit score reported into context.

### iii.   Debt-to-Income Ratio

The Bureau is considering using its authority under HMDA to add a new reporting requirement regarding the applicant's or borrower's debt-to-income ratio (DTI).  The Bureau believes that most FIs use DTI ratio as an underwriting consideration.  The Bureau has been informed that, in many cases, DTI ratio is the primary reason for a denial of an application.  Thus, adding a DTI ratio reporting requirement may improve targeting of government supervision and enforcement resources.[83]

The Bureau is primarily interested in "back-end" DTI ratio, which generally includes the total amount of debt owed by a consumer and is not limited to housing-related debt.  The Bureau is also considering a reporting requirement for "front-end" DTI ratio, which generally refers to a consumer's housing-related debt, such as the mortgage payment and ongoing property taxes.  The Bureau solicits feedback regarding whether unique burdens would exist with respect to reporting front-end or back-end DTI ratios, and what are any particular benefits of reporting one or the other type of DTI ratio.

The Bureau recognizes that there is not a single, uniform definition of DTI ratio.  Thus, the Bureau also seeks feedback on how the burden to report DTI ratio would differ for different calculation methods, such as: (1) the value calculated by FIs' loan origination systems; (2) the value calculated according to investor guidelines; (3) the value calculated according to the information provided on the URLA; or (4) other methods of calculation.  The Bureau also seeks feedback on whether the same benefits of DTI ratio reporting would be achieved by requiring FIs to report the ratio relied on by the FI in processing the application, rather than requiring a particular calculation method.

---

[83] See *Fair Lending: Data Limitations and the Fragmented U.S. Financial Regulatory Structure Challenge Federal Oversight and Enforcement Efforts*, GAO-09-704, 20 (July 2009), *available at* http://www.gao.gov/new.items/d09704.pdf .

### iv.   Other Data Concerning Applicants and Borrowers

The Bureau is considering proposing to retain existing Regulation C data points regarding ethnicity, race, and sex.[84]

The Bureau is also considering proposing to retain the existing Regulation C data point regarding gross annual income relied on in processing the application.[85]   The Bureau plans to review the instructions and official commentary regarding this data point to identify opportunities to improve clarity in this area.

The Bureau is soliciting information about any current compliance issues with these data points.

## 4.  Loan Types

Currently, Regulation C requires reporting of information about loans that helps to distinguish categories and types of loans.  The Bureau is also considering proposals related to Dodd-Frank Act amendments and information gaps regarding loan category information.

### i.   Loan Purpose and Categories

Regulation C requires the reporting of "the purpose of the loan or application."[86]   FIs currently must identify a reported loan's purpose as for "home purchase," "home improvement," or "refinancing."[87]

The Bureau has been informed that FIs often experience difficulty when determining a loan's purpose for HMDA reporting.  For example, the proceeds of a loan may be for multiple purposes, such as for refinancing and home improvement.  Also, FIs may have difficulty determining a loan's purpose at application.

The Bureau is interested in learning about ways to facilitate compliance by reducing the burden associated with reporting loan purpose.  The Bureau solicits information regarding the costs and benefits associated with the three current enumerated loan purposes, and specifically solicits input regarding the costs and benefits of eliminating the home improvement enumeration.  The Bureau also solicits input regarding whether any other loan purpose should be added to fulfill HMDA's purpose of helping to determine whether FIs are serving the housing needs of their communities, and, if so, the costs and benefits associated with adding such a new loan purpose.

Similarly, the Bureau is aware that information on certain categories of loans is missing from the information currently reported under HMDA.  The Bureau believes that HMDA's utility may be improved if FIs were required to report whether a loan or application is for a reverse

---

[84] 12 CFR 1003.4(a)(10).

[85] 12 CFR 1003.4(a)(10).

[86] 12 CFR 1003.4(a)(3).

[87] 12 CFR 1003, App. A sec. I.A.5.

mortgage, HELOC, or cash-out refinancing.  The Bureau is also aware that some FIs experience unique challenges when determining HMDA compliance on business-purpose loans.  The Bureau also solicits feedback on the costs and benefits associated with reporting business-purpose loans under HMDA, and whether the potential modifications under consideration present additional costs or benefits.  The Bureau solicits data and information on the costs and benefits of requiring the reporting of these additional loan designations.  The Bureau also solicits input on the potential reporting methods by which these loans can be identified, for example, on the costs and benefits of requiring FIs to use only a yes/no flag to identify loans that are reverse mortgages, HELOCs, or cash-out refinancings, or of identifying these loans through new data points.

## ii.   Other Data Points Concerning Loan Categories

The Bureau is considering using its authority under HMDA to propose a new requirement to report for each loan whether the FI determined the loan to be a Qualified Mortgage under Regulation Z at the time the loan was originated.[88]  The Bureau believes this information may be valuable in furthering HMDA's purposes, including helping to determine how FIs are serving the housing needs of their communities.  In addition, the Bureau expects that this information will be collected and reported within and between market participants as a common business practice, so it will be available through commercial sources.  Therefore, requiring the information under Regulation C should impose little additional burden.

Regulation C currently requires FIs to report  "[w]hether the loan is subject to the Home Ownership and Equity Protection Act of 1994, as implemented in Regulation Z (12 CFR 1026.32)."[89]  Loans must be reported as High-Cost Mortgages if their APRs or points and fees exceed the thresholds set forth in Regulation Z.[90]  To improve the usefulness of this data point, which the Board added to Regulation C in 2002 to better understand and focus fair lending resources on the subprime market,[91] the Bureau is considering requiring FIs that originate or purchase High-Cost Mortgages to specify which HOEPA thresholds (rate, points and fees, and certain prepayment penalties) are met.  Any additional burden associated with reporting this information would be limited to the small fraction of FIs that originate or purchase High-Cost Mortgages.[92]

---

[88] See the Bureau's 2013 Mortgage Rule Implementation Page for information about the Ability to Repay/Qualified Mortgage rule:  http://www.consumerfinance.gov/regulatory-implementation/.

[89] 12 CFR 1003.4(a)(13).

[90] 12 CFR 1026.32.

[91] See 67 FR 7222, 7223, 7229 (Feb. 15, 2002), available at http://www.gpo.gov/fdsys/pkg/FR-2002-02-15/pdf/02-3323.pdf.

[92] For 2012, only 524 of 7,400 HMDA reporters (approximately 7 percent) extended HOEPA loans, and only 5 of 2,185 HOEPA loans that were reported (less than 0.25 percent) were sold to secondary market participants.  Neil Bhutta and Glenn B. Canner, Mortgage Market Conditions and Borrower Outcomes: Evidence from the 2012 HMDA Data and Matched HMDA–Credit Record Data, Federal Reserve Bulletin (Sept. 18, 2013), available at http://www.federalreserve.gov/pubs/bulletin/2013/pdf/2012_HMDA.pdf.  The fraction of lenders originating High-Cost Mortgages may increase under the Bureau's 2013 Final HOEPA Rule, which took effect in January of 2014; however, the Bureau does not expect any increase to be significant.  See 78 FR 6856, 6953-57 (Jan. 31, 2013).

The Bureau would retain the current, statutory data point regarding the type of entity purchasing a loan.[93]

# 5.  Loan Features

Currently, Regulation C requires information regarding certain loan features.  The Bureau is considering additional data points related to Dodd-Frank Act amendments and information gaps regarding loan features.

## i.  Nonamortizing Features

The Dodd-Frank Act added the requirement to report "the presence of contractual terms or proposed contractual terms that would allow the mortgagor or applicant to make payments other than fully amortizing payments during any portion of the loan term."[94]  The Bureau is considering proposing to implement this requirement by requiring FIs to report whether the loan includes, or would have included, a balloon payment, interest-only payments, or negative amortization features.  The Bureau is considering defining these three features to be consistent with the Loan Estimate disclosure form finalized as part of the Bureau's Integrated Mortgage Disclosures under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z).[95]

Under this proposal:

- For balloon payments, FIs would report this feature if the loan included a payment that is more than two times a regular periodic payment and is not itself a regular periodic payment, consistent with the integrated mortgage disclosures rule.[96]

- For interest-only payments, FIs would report this feature if the loan permits one or more regular periodic payments to be applied only to interest accrued and not to the loan principal, consistent with the integrated mortgage disclosures rule.[97]
- For negative amortization, FIs would report this feature if the principal balance of the loan may increase due to the addition of accrued interest to the principal balance, consistent with the integrated mortgage disclosures rule.[98]

---

[93] 12 CFR 1003.4(a)(11), 12 U.S.C. 2803(h)(1)(C).  The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) added this requirement. Pub. L. No. 101-73, 103 Stat. 183 (1989), sec. 1211(b), available at http://www.gpo.gov/fdsys/search/searchresults.action?st=.+Pub.+L.+No.+101-73.

[94] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(6)(C).

[95] Integrated Mortgage Disclosures Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z) 78 FR 79730 (Dec. 31, 2013), *available at* https://www.federalregister.gov/articles/2013/12/31/2013-28210/integrated-mortgage-disclosures-under-the-real-estate-settlement-procedures-act-regulation-x-and-the.

[96] *Id.  See* 12 CFR 1026.37(a)(10)(ii)(D).

[97] *Id. See* 12 CFR 1026.37(a)(10)(ii)(B).

[98] *Id.  See* 12 CFR 1026.37(a)(10)(ii)(A).

The Bureau is also seeking input on whether any other features may meet the definition of "contractual terms or proposed contractual terms" that include "payments other than fully amortizing payments."

## ii.  Introductory Period of Adjustable Rate Mortgage

The Dodd-Frank Act added the requirement to report, for loans and applications, "the actual or proposed term in months of any introductory period after which the rate of interest may change."[99]  Currently, the HMDA data does not show whether an application or loan relates to a fixed-rate or adjustable rate loan, even though pricing decisions vary by product type. Moreover, the introductory term is an important factor in the borrower's real cost and the anticipated future interest rate risk of the loan.

Lenders that charge high initial loan fees may do so in order to offer low initial rates.  An indication that the loan has an adjustable interest rate may permit users of HMDA data to understand more fully new data on total points and fees payable at origination that the Bureau is also considering collecting as a result of the Dodd-Frank Act amendments.[100]  In addition, this information can be combined with new information on payments that are not fully amortizing,[101] discussed above, to understand whether a particular loan may have other features that affect how the loan should be viewed for HMDA purposes.  The value of adding information about adjustable rate mortgages (ARMs) to better understand the impact of various underwriting characteristics was referenced by a number of commenters in the 2010 Board hearings.[102]

Therefore, the Bureau is considering proposing a requirement that FIs report the number of months of the initial fixed period of an ARM for which a consumer applied or that was originated.

## iii.  Other Information Concerning Loan Features

The Dodd-Frank Act added the requirement to report the "actual or proposed term in months of the mortgage loan."[103]  The Bureau is considering proposing to implement this provision by requiring FIs to report the maturity term of the loan in months.

The Dodd-Frank Act also added the requirement to report "the term in months of any prepayment penalty or other fee or charge payable on repayment of some portion of principal or the entire principal in advance of scheduled payments."[104]  The Bureau is considering proposing

---

[99] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(6)(B).

[100] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(5)(A).

[101] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(6)(C).

[102] Testimony of Lisa Rice, National Fair Housing Alliance; testimony of Donald Clark, Federal Trade Commission; testimony of Kevin Stein, California Reinvestment Coalition, DC Hearing.

[103] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(6)(D).

[104] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(5)(C).

to implement this requirement by requiring FIs to report any prepayment penalty period in months.

The Bureau is considering proposing to retain the current Regulation C requirement for reporting loan or application type, which relates to whether the loan is or would be a conventional loan, or is insured by the Federal Housing Administration, or is guaranteed by the Veterans Administration or Department of Agriculture.

## 6.  Loan-to-Value Ratio

Currently, Regulation C requires reporting information regarding the loan amount.  However, it is not possible to use this data to analyze the loan-to-value (LTV) ratio using HMDA data.  LTV ratio is a key pricing and underwriting factor used by FIs and would assist data users in interpreting the underwriting and loan pricing information reported in the HMDA data.  Therefore, the Bureau is considering additional data requirements to facilitate analysis of LTV ratio.

### i.   Property Value

The Dodd-Frank Act added the requirement to report, for loans and applications, "the value of the real property pledged or proposed to be pledged as collateral."[105]  When combined with the existing Regulation C requirement to report loan amount, this new requirement will allow users to calculate LTV ratio from HMDA data.  The general benefit of adding LTV ratio for regulatory screening efforts was noted in the 2009 GAO report on fair lending[106] and many commenters at the 2010 Board hearings supported adding LTV ratio.[107]

Because LTV ratio generally is calculated using the lower of the purchase price or the appraised price for a purchase loan, the Bureau is proposing to implement the property value requirement by requiring a FI to report whatever value it relied on in underwriting or pricing the loan.

The Bureau is soliciting input on how this requirement should be fulfilled for applications that do not result in originations where a property valuation has not been performed.

The Bureau has also considered requiring the reporting of both appraised value (defined broadly to include broker price opinions and other valuations) and purchase price.  This additional reporting would increase the amount of data available in HMDA and allow users to see both values for reported transactions.  However, the Bureau believes this may be burdensome as one or the other value would not have been relied on by the FI in making the credit decision, and purchase price is generally not relevant in refinancing transactions.

---

[105] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(6)(A).

[106] GAO-09-704, 21 (July 2009).

[107] Testimony of Jeffrey Dillman, Adam Rust, James Elliott, Stella Adams, Atlanta Hearing; Testimony of Preston DuFouchard, Keith Ernst, San Francisco Hearing; Testimony of Bill Howard, Chicago Hearing; Testimony of Janneke Ratcliffe, Eric Halperin, DC Hearing.

The Bureau has also considered requiring reporting of the valuation method used to determine the property value (such as purchase price, automated valuation, appraisal, or broker price opinion).  However, the Bureau believes this also may be burdensome on FIs.

## ii.   Other Information Concerning Loan-to-Value Ratio

The Bureau is considering using its authority under HMDA to propose requiring FIs to report the Combined Loan-to-Value Ratio (CLTV) they relied on in processing applications.  These data are important for understanding underwriting and pricing decisions for properties subject to multiple liens.

As indicated above, the Bureau is considering proposing retaining the existing Regulation C data point regarding loan amount or amount applied for,[108] which, combined with the new requirement for property value, will allow the calculation of LTV ratio using HMDA data.

# 7.  Pricing Data

Currently, the only pricing data FIs report under HMDA are the rate spread for higher-priced loans and an indicator of HOEPA loan status.  The lack of pricing data in HMDA has often been cited as a primary weakness of the HMDA data set.  Recognizing this, the Dodd-Frank Act amended HMDA to require the collection and reporting of the number and dollar amount of mortgage loans grouped according to measurements of, among other things, "the total points and fees payable at origination in connection with the mortgage as determined by the Bureau, taking into account 15 U.S.C. 1602(aa)(4)."[109]

## i.   Total Points and Fees

The Dodd-Frank Act language directing the Bureau to require reporting of points and fees also directs it to consider how points and fees are defined in TILA for purposes of determining whether a transaction is a High-Cost Mortgage or a Qualified Mortgage.[110]  Regulation Z implements this definition of points and fees.[111]  Effective January 10, 2014, Regulation Z will provide that total points and fees generally include the following types of charges, if the amount of the charge is known at or before consummation of the loan:

- Items included in the finance charge under Regulation Z[112] except: (1) interest; (2) government mortgage insurance premiums and funding fees; (3) annual private mortgage insurance (PMI) premiums and some upfront PMI premiums; (4) bona fide

---

[108] 12 CFR 1003.4(a)(7).

[109] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(5)(A).  The Dodd-Frank Act elsewhere renumbered 15 U.S.C. 1602(aa) as 15 U.S.C. 1602(bb).

[110] TILA sec. 103(bb)(4), 15 U.S.C. 1602(bb)(4).  TILA section 129C(b)(2)(C)(i) defines points and fees for Qualified Mortgages to have the same meaning as in TILA section 103(bb)(4).

[111] 12 CFR 1026.32(b)(1).

[112] 12 CFR 1026.4(a) and (b).

third-party charges not retained by the creditor, loan originator, or an affiliate; and (5) up to two bona fide discount points, under certain conditions;

- Loan originator compensation paid by a consumer or creditor to a loan originator, but not separately including a creditor or loan originator's (*e.g.*, a mortgage broker's) subsequent payment to its own employee;

- Real estate-related charges (*e.g.*, property appraisal fees, title exam, title insurance fees) if paid to an affiliate of the creditor, or for which the creditor receives direct or indirect compensation;

- Credit insurance premiums and charges for debt cancellation or debt suspension agreements;

- The maximum penalty that could be charged if a consumer prepays the loan; and

- The fee charged to a consumer in a refinance transaction as a penalty for prepaying the prior loan.

As amended by the Dodd-Frank Act, TILA provides that points and fees for open-end credit plans include total points and fees that are known at or before closing, as well as the minimum additional fees the consumer would be required to pay to draw down an amount that is equal to the total credit line.[113] Section 1026.32(b)(2) of Regulation Z implements this provision by providing that total points and fees for HELOCs generally include all of the charges included in points and fees under Regulation Z § 1026.32(b)(1), plus any participation fees payable at or before account opening, and, if there is a charge to draw on the credit line, the amount that would be charged for one draw.

The Bureau is considering proposing to implement the Dodd-Frank Act requirement that FIs report total points and fees for originated loans by specifying that FIs report: the total dollar amount calculated pursuant to Regulation Z, 12 CFR 1026.32(b)(1) (closed-end) or 1026.32(b)(2) (open-end). The Bureau believes that this approach is consistent with the Dodd-Frank Act requirement that FIs report total points and fees "taking into account" the definition used for Qualified Mortgages and High-Cost Mortgages, and that it should be minimally burdensome because most FIs will have calculated these amounts for Qualified Mortgage and High-Cost Mortgage testing. In addition, this approach should align with new Qualified Mortgage data fields that will be incorporated into accepted industry reporting standards.

The Bureau solicits information on the benefits and burden of requiring total points and fees to be reported for loans that are not subject to the Regulation Z § 1026.32 definition. Such loans would include business-purpose loans that are not subject to Regulation Z, and HELOCs secured by a consumer's secondary residence, which are subject to neither Qualified Mortgage nor High-Cost Mortgage rules.

The Bureau's proposal under consideration would require the reporting of a total dollar amount of points and fees as defined in Regulation Z.[114] At this time, the Bureau is not planning to

---

[113] TILA sec. 103(bb)(5), 15 U.S.C. 1602(bb)(5).

[114] 12 CFR 1026.32(b)(4).

propose to collect points and fees as a percentage of the total loan amount; however, the Bureau solicits comment on the merits of collecting this total as a percentage, given that FIs will likely maintain this data for Qualified Mortgage and High-Cost Mortgage regulatory compliance.

## ii.   Other Pricing-related Data

**Total origination charges.**  Requiring reporting of total points and fees as calculated for Qualified Mortgage and High-Cost Mortgage purposes will not permit visibility into component items of points and fees, such as how much of the total is comprised of origination charges paid by the consumer to the FI or loan originator for originating and extending the credit.  In addition, because the Regulation Z § 1026.32 total excludes certain charges, such as up to two bona fide discount points, it may not always provide a complete picture of loan pricing.  As a result, the Bureau is considering using its authority under HMDA to propose requiring FIs to separately report total origination charges, in addition to total points and fees.

Total origination charges is a value that will be reported for real property-secured, closed-end mortgage loans on the Closing Disclosure under the Bureau's RESPA-TILA Integrated Disclosures rule and the Bureau is considering adopting for HMDA the same definition used for the Closing Disclosure.  Specifically, total origination charges would include any charge, however denominated, paid by the consumer to the creditor and to each loan originator at or before closing for originating and extending the credit.[115]  The total thus would include charges such as application fees, origination fees, underwriting fees, processing fees, verification fees, and rate-lock fees.  It would not include charges paid by the borrower for required services provided by persons other than the creditor or loan originator, nor would it include taxes or other government fees.[116]  The Bureau believes that knowing total origination charges would provide further clarity concerning loan pricing and may be useful for flagging potentially discriminatory lending practices for further investigation.

The Bureau anticipates that reporting of total origination charges for closed-end mortgage loans would be minimally burdensome because most FIs will have calculated this amount for the Closing Disclosure.  In addition, the amount should align with a new data point that MISMO has been developing to be consistent with the Bureau's new Closing Disclosure and which MISMO had released for public comment before adoption into its residential mortgage standards.

The Bureau notes that the Closing Disclosure will not be required for HELOCs, for loans secured by personal property (such as many manufactured housing loans), or for business-purpose loans not subject to Regulation Z.  The Bureau believes that total origination charges, as defined for disclosure purposes, can be calculated for these types of transactions but invites input on the burden of reporting this information and on whether preferable alternatives exist.

---

[115] *See* amended Regulation Z, 12 CFR 1026.38(f)(1), as published at 78 FR 79730, 80008-10 (Dec. 31, 2013).

[116] Examples of charges that might not be included in total origination charges include appraisal fees, credit report fees, flood determination fees, lender's attorney fee, tax status research fee, and title fees. *See id.*

The Bureau also notes that, during the Board's 2010 HMDA hearings, several commenters recommended that loan originator compensation be reported with points and fees.[117]  While some amounts of loan origination compensation will be included in totals for both Regulation Z § 1026.32 points and fees and total origination charges, the Bureau is not currently considering proposing to require separate HMDA reporting of loan originator compensation.  The Bureau invites feedback, however, on the benefits and burdens of requiring separate reporting of this data, particularly in light of the fact that The Dodd-Frank Act requires reporting of application channel.  The Bureau notes that, if it were to propose separate reporting of loan originator compensation, the amount reported would likely be the amount required to be included in Regulation Z points and fees, which is the same amount that would be reported on the Closing Disclosure (*i.e.*, compensation paid by a consumer or creditor to a loan originator, but not separately including a creditor or loan originator's subsequent payment to its own employee).

**Total discount points.**  Knowing the total discount points paid by the consumer to the creditor to reduce the interest rate—particularly when combined with other pricing and underwriting information—may assist data users in better understanding loan pricing and in identifying potentially discriminatory lending patterns for further investigation.  The Bureau therefore is considering using its authority under HMDA to propose requiring FIs to separately report total discount points paid by the consumer to reduce the interest rate.[118]  For closed-end, real property-secured loans, the amount under consideration would correspond to the amount required to be shown on the new Closing Disclosure and would align with new data reporting fields that currently are being incorporated into accepted industry reporting standards.[119]

**Risk-adjusted, pre-discounted interest rate.**  The Bureau is considering using its authority under HMDA to propose requiring FIs to report the base interest rate calculated in connection with the Qualified Mortgage and High-Cost Mortgage bona fide discount point calculations.[120]  Knowing the interest rate that the consumer would have received in the absence of any discount points or rebates, along with the rate that the consumer actually received and any discount points paid, may assist in understanding the value that the consumer received, relative to otherwise similarly situated borrowers, in exchange for total discount points paid.  This analysis, in turn, may be useful for flagging potentially discriminatory lending practices for further investigation.

**Interest rate.**  The Bureau is considering using its authority under HMDA to propose requiring FIs to report the interest rate.  Knowing the interest rate that the consumer actually

---

[117] Testimony of Phil Greer, Will Jordan, Atlanta Hearing; NCRC, comment letter (Sept. 24, 2010); Advocates for Basic Legal Equality, comment letter (Aug. 20, 2010); NEDAP, comment letter (Aug. 20, 2010).

[118] During the Board's 2010 HMDA hearings, HUD's Assistant Secretary of Policy Development and Research recommended that total discount points be reported separately from other points and fees data, to provide a complete picture of loan pricing.  Testimony of Raphael Bostic, DC Hearing.

[119] *See* amended Regulation Z, 12 CFR 1026.38(f)(1), as published at 78 FR 79730 (Dec. 31, 2013) (requiring disclosure of the points that the consumer will pay to the creditor to reduce the interest rate, as both a percentage of the amount of credit extended and a dollar amount).

[120] *See, e.g.*, 12 CFR 1026.32(b)(1)(i)(E) (permitting the exclusion of up to two bona fide discount points from total points and fees, provided that the consumer's interest rate *before excluding the would-be bona fide points* did not exceed the average prime offer rate by more than one percentage point).

received, along with discount points paid and the rate that the consumer would have received in the absence of any discount points or rebates, may assist in understanding the value that the consumer received, relative to otherwise similarly situated borrowers, in exchange for total discount points paid.  Again, this analysis may be useful for flagging potentially discriminatory lending practices for further investigation.

The Dodd-Frank Act added the requirement to report for all loans "the difference between the annual percentage rate [APR] associated with the loan and a benchmark rate or rates for all loans" (*i.e.*, rate spread).[121]  Currently, Regulation C requires FIs to report this spread for "higher-priced" loans the FIs originated, *i.e.*, loans for which the difference between the APR and APOR equals or exceeds 150 basis points (for subordinate liens the spread must equal or exceed 350 basis points).[122]  Loans identified as "higher priced" are subject to certain additional protections in Regulation Z.  Informal FFIEC guidance indicates that rate spread need not be reported for HELOCs.[123]

The Bureau is considering two alternatives to implement the Dodd-Frank requirement.  First, the Bureau is considering requiring FIs to report the spread between a loan's disclosed APR and the APOR for a comparable transaction.  Existing guidance in Regulation C would be used to determine the correct APOR for closed-end transactions and guidance developed in connection with the Bureau's 2013 HOEPA Final Rule would be used to determine the correct APOR for HELOCs.[124]

Second, the Bureau is considering requiring reporting of a loan's APR in addition to rate spread.  If rate spread were reported, it would be possible to estimate a loan's APR, but the actual APR would be unknown because the APOR used to generate the spread would be unknown.  Similarly, if APR were reported, it would be possible to calculate a loan's rate spread, but again the result would be only an estimate.  The Bureau seeks information on the relative benefits and burdens of reporting of rate spread, APR, or both.

For any alternative, the Bureau also invites feedback on the burden of requiring reporting for loans not subject to Regulation Z (*i.e.*, business-purpose loans).

---

[121] Dodd-Frank Act sec. 1094(3), 12 U.S.C. 2803(b)(5)(B).

[122] 12 CFR 1003.4(a)(12).  The Board added this requirement to Regulation C in 2002, using its authority to prescribe such regulations as may be necessary to effectuate the purposes of HMDA.  *See* 67 FR 7222, 7228 (Feb. 15, 2002).

[123] *See* FFIEC, Regulatory and Interpretive (FAQs), *available at* http://www.ffiec.gov/hmda/faqreg.htm#heloc.

[124] *See* 78 FR 6856, 6873-75 (discussing new 12 CFR 1026.32(a)(1)(i) and comments 32(a)(1)(i)-1 and -2).

## 8.  Property Data

Currently, Regulation C requires certain information about the property that secures or will secure the loan, including location, property type, and owner-occupancy status.  The Bureau is considering using its authority under HMDA to propose requiring FIs to collect and report additional data points that provide property information.

### i.  Expanded and Modified Property Type Information

Regulation C currently requires FIs to record the property type to which a loan or application relates.[125]  Appendix A to Regulation C provides three reporting values, or enumerations, for this information: (1) one- to four-family dwelling (other than manufactured housing); (2) manufactured housing; and (3) multifamily dwelling.  The Bureau is considering replacing the existing reporting requirement with the following requirements:

**Financed Unit Count.**  The Bureau is considering proposing to replace the current property type reporting framework with a streamlined requirement to report the number of units financed by the reported loan or application.  The Bureau anticipates that this proposal would simplify reporting by aligning with information collected by the GSEs under established industry standards.  In addition, this change would facilitate more robust analysis of access to credit for multifamily housing, which would be valuable for those communities where multifamily housing is an important component of housing stock.  Community advocates suggested this change during the 2010 hearings on HMDA.[126]

**Affordable Housing Programs.**  For loans secured by dwellings with more than one financed unit, the Bureau is considering proposing to require FIs to report whether the property is deed restricted for affordable housing.  Consumer advocates urged the Board to collect this information during the 2010 Board hearings.[127]  This proposal might enable more robust analysis of access to credit in certain communities and better targeting of public resources, consistent with HMDA's purposes.

**Construction Method Type.**  The Board added identification of manufactured homes as a property type under Regulation C in 2002, finding that HMDA data was enhanced by identifying these types of loans, which tend to be underwritten differently from and have higher denial rates than other loans.[128]  However, the current Regulation C property types do not correspond to other industry standards for data collection and reporting, such as information collected by the

---

[125] 12 CFR 1003.4(a)(5).

[126] *See, e.g.*, Testimony of John Lind, San Francisco Hearing.

[127] Testimony of Kevin Stein, California Reinvestment Coalition; Paul Ainger, Affordable Development Housing Consultant; Clarence L. Johnson, Mills Grove Christian Church Disciples of Christ in the East Oakland Community of Maxwell Park, San Francisco Hearing.

[128] 67 FR 7222, 7227 (Feb. 15, 2002).  An analysis of 2012 HMDA data shows that one-third of all manufactured home loan applications were originated, compared to almost two-thirds for 1- to 4-family dwellings.  Similarly, almost 44 percent of all manufactured home loan applications were considered higher-priced (*i.e.*, had rate spreads reported in HMDA), compared to less than 3 percent for 1- to 4-family dwellings.

GSEs, which treat construction method and financed unit count as distinct concepts.  The Bureau therefore is considering proposing to require reporting of the construction process for the dwelling that would secure, or secures, the application or loan.  This would replace the current reporting method for property type, including manufactured housing, with a requirement to report a dwelling's construction method, such as site-built or manufactured housing.[129]

**Financing Type.**  For loans secured, or to be secured, by manufactured housing, the Bureau is considering proposing to require the reporting of whether the loan is or would be secured by real property or personal property (*i.e.*, chattel).  During the 2010 Board Hearings, commenters noted that a key issue in understanding manufactured housing, which predominantly serves lower- and middle-income populations, is to know how the home is financed.  Manufactured homes loans are often secured by personal property and generally carry higher interest rates, shorter loan terms, and fewer consumer protections than conventional mortgages secured by real property.[130]  The Bureau believes that being able to identify personal property-secured loans included in HMDA data would assist in determining whether manufactured home lenders are meeting the housing needs of their communities and in identifying possible discriminatory lending within the manufactured housing market.

**Property Estate Type.**  In addition, for loans secured by manufactured housing, the Bureau is considering proposing to require the reporting of the borrower's ownership interest in the underlying land, *i.e.*, whether the manufactured home will be sited on owned or leased land.  Based on 2012 Census data, 77 percent of newly sited manufactured homes were financed by loans secured by personal property (often with higher interest rates and fewer protections), even though almost 60 percent of those newly sited homes were placed on land owned by the consumer, rather than in land-lease communities.[131]  The Bureau believes that knowing whether a manufactured home is placed on owned or leased land, together with the financing type and pricing data for the home loan, could help in understanding the manufactured housing market and serve HMDA's purposes in that market, but invites feedback on the burdens associated with this proposal under consideration.

## ii.   Property Location

Regulation C currently requires FIs to report information about the location of the property related to certain applications and loans originated or purchased, including: (1) the Metropolitan Statistical Area (MSA) or Metropolitan Division (MD); (2) state; (3) county; and (4) census tract.[132]

---

[129] Commenters at the 2010 Board hearings requested clarification on the reporting of manufactured housing and modular housing.  *See, e.g.,* Testimony of Bill Loving, Atlanta Hearing.

[130] Testimony of Lance George, Housing Assistance Council, DC Hearing; Housing Assistance Council, comment letter (Sept. 20, 2010); Community Reinvestment Association of North Carolina, comment letter (Dec. 22, 2010).

[131] *See* Selected Characteristics of New Manufactured Homes Placed: by Region – 2012, *available at* http://www.census.gov/construction/mhs/pdf/char12.pdf .

[132] 12 CFR 1003.4(a)(9).

Regulation C only requires FI to report the property location information if the loans relate to property located in the MSA or MD in which the FI has a home or branch office or if the FI is subject to certain reporting requirements under the Community Reinvestment Act (CRA).[133]  If the property related to the loan is located in a county with a population of 30,000 or less, reporting of the census tract is optional.[134]  The Bureau is considering requiring reporting of the property location information described above for all loans.

The Bureau anticipates that this proposal would streamline reporting by eliminating an optional element, which the Bureau understands creates confusion and uncertainty for reporters.  The Bureau believes that the burden of this change would be minimal, in part because many FIs already voluntarily report this information.  In addition, as discussed elsewhere, the Bureau is considering operational modifications, including centralizing geocoding, which would significantly reduce the burden of reporting property location information.

This proposal also would strengthen HMDA data by connecting all reported loans to other loans related to property in the same communities, which would enhance the community-level data available for fair lending analysis, analyzing access to credit, and targeting public investment.  Moreover, the Bureau is considering this proposal in light of current trends in the market, such as branch consolidation and national lenders operating from a single branch office, which might lead to significant gaps in property location information in the future.

### iii.   Other Property Information

The Bureau is considering proposing retaining the current Regulation C data point regarding owner occupancy status.[135]  The Bureau invites feedback on whether the information required should be changed to include reporting of either investment, principal residence, or second home to align with industry standards.

## B.  Clarifying Reportable Applications

Regulation C requires FIs to collect and report certain information about loan applications.[136]  Currently, Regulation C defines application generally as "an oral or written request for a home purchase loan, a home improvement loan, or a refinancing that is made in accordance with procedures used by a [FI] for the type of credit requested."  The definition expressly covers certain preapproval programs.[137]

---

[133] *See* 12 CFR 1003.4(e) (stating that "banks and savings associations that are required to report data on small business, small farm, and community development lending under the [CRA]... shall also collect the location of property located outside MSAs and Metropolitan Divisions in which the institution has a home or branch office, or outside any MSA").

[134] 12 CFR 1003, App. A.I.C.3.

[135] 12 CFR 1003.4(a)(6).

[136] 12 CFR 1003.4.

[137] 12 CFR 1003.2.

The Regulation C definition of application has been criticized as providing FIs too much latitude to decide which contacts with consumers to report as applications, resulting in inconsistent reporting across institutions.  Others assert that flexibility in the definition of application may be necessary to accommodate varied business practices.  As discussed below, the Bureau has considered amending Regulation C to further clarify the circumstances in which contact with a potential borrower constitutes an application.  At this time, the Bureau is disinclined to change the current requirements but is seeking feedback on the issue.

Specifically, the Bureau has considered more closely aligning the Regulation C definition of "application" with the Regulation B definition used for purposes of ECOA.[138]  Currently, the principal difference between the definitions is that Regulation B's definition (unlike Regulation C's) encompasses certain prequalification requests.[139]  Were the Bureau to amend the Regulation C definition of application to cover prequalification requests, the compliance burden for FIs may increase in that institutions would be required to report more "applications."  The Bureau also notes that, at the prequalification stage, FIs may not yet have collected some of the information that HMDA and Regulation C require that FIs report.

The Bureau also has considered aligning the Regulation C definition of "application" with the new Regulation Z definition.[140]  Effective August 1, 2015, receipt of an application as newly defined by Regulation Z will trigger a creditor's obligation under the Truth in Lending Act (TILA) and Real Estate Settlement Procedures Act (RESPA) to provide the borrower a summary of key loan terms and estimated loan and closing costs.[141]  Weighing against alignment of the Regulation C and Regulation Z definitions are the different purposes of the statutes that each regulation implements.

While the Bureau is disinclined to fully align the Regulation C definition of application with either the Regulation B or the Regulation Z definition, the Bureau seeks feedback on the issue and on whether there are aspects of the Regulation C definition of application that may benefit from greater clarification.

Finally, during the 2010 Board hearings, some commenters questioned the utility of reporting preapprovals and urged the Bureau to redefine application so as to not include preapprovals.

---

[138] 12 CFR part 1002, Supp. I.

[139] "A prequalification request is a request by a prospective loan applicant (other than a request for preapproval) for a preliminary determination on whether the prospective applicant would likely qualify for credit under an institution's standards, or for a determination on the amount of credit for which the prospective applicant would likely qualify."  12 CFR part 1003, Supp. I, comment 1003.2 (Application)-2.

[140] Effective August 1, 2015, Regulation Z defines an "application" as "the submission of a consumer's financial information for the purposes of obtaining an extension of credit."  Regulation Z, 12 CFR 1026.2(a)(3)(i), as amended by Integrated Mortgage Disclosures Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z), (Integrated Mortgage Disclosures Final Rule), 78 FR 79730 (Dec. 31, 2013).  For certain transactions, under Regulation Z "an application consists of the submissions of the consumer's name, the consumer's income, the consumer's Social Security number to obtain a credit report, the property address, an estimate of the value of the property, and the mortgage loan amount sought."  Regulation Z, 12 CFR 1026.2(a)(3)(ii), as amended by Integrated Mortgage Disclosures Final Rule.

[141] 12 CFR 1026.19(e), as published at 78 FR 79730 (Dec. 31, 2013).

The Bureau is not currently considering proposing to redefine application to exclude preapprovals, given the importance of capturing information on making credit decisions at the preapproval stage.

## C.  Protecting Consumer Privacy

HMDA is a disclosure statute.  Its purposes are to provide the public and public officials with information to enable them to determine whether FIs are serving the housing needs of the communities and neighborhoods in which they are located, to assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes, and to assist public officials in distributing public sector investments in a manner designed to improve the private investment environment.  In implementing HMDA to effectuate these purposes, the Bureau is directed by the statute to protect the privacy interests of applicants and borrowers as appropriate.

The information that FIs report and disclose pursuant to HMDA and Regulation C generally does not include personal information that directly identifies individuals, such as name, address, date of birth, or Social Security number.[142]  Even so, if all information reported on the LAR were publicly disclosed in an unedited format, some information could potentially be used to identify individual applicants and borrowers and possibly harm their privacy interests.  Accordingly, the Bureau is examining the privacy implications of both the FIs' collection, reporting, and disclosure of information pursuant to HMDA and Regulation C and the regulators' releases of HMDA data and reports.

Consistent with the disclosure goals of the statute, HMDA requires that FIs make their LARs available to the public upon request, in a form required under regulations prescribed by the Bureau.  Congress has provided that "[t]he Bureau shall require, by regulation, such deletions as the Bureau may determine to be appropriate" to protect any privacy interest of any applicant, and to protect FIs from liability under any federal or state privacy law.[143]  The Dodd-Frank Act further directs the Bureau to "modify or require modification of itemized information, for the purpose of protecting the privacy interests of mortgage applicants or mortgagors, that is or will be available to the public."[144]  Where necessary to protect privacy, the Bureau must "provide for the disclosure of information . . . in aggregate or other reasonably modified form, in order to effectuate the purposes of [HMDA]."[145]  The Bureau recognizes that mitigating privacy risks in the HMDA data disclosed to the public may decrease the utility of the data to users and is investigating strategies and techniques to protect consumer privacy while maximizing the utility of the data for the purposes of the statute.

---

[142]  As described above, the official commentary to Regulation C strongly encourages that FIs not use Social Security numbers or applicants' names in the loan ID for privacy reasons, but does not prohibit use of that information in creating the loan ID.  The loan ID field is redacted from the HMDA data disclosed to the public, however.

[143] 12 U.S.C. 2803(j)(2)(B).

[144]  12 U.S.C. 2803(h)(1)(E).

[145] 12 U.S.C. 2803(h)(3)(B).

Currently, in order to protect applicant and borrower privacy, Regulation C requires a FI to report loan amount and income rounded to the nearest thousand[146] and to delete three fields from its LAR before making it available to the public: the application or loan number; the date the application was received; and the date action was taken.[147]  The Dodd-Frank Act amendments and the Bureau's proposals will require that institutions include additional data points on the LAR.  Public disclosure of some of these new data points could potentially harm the privacy interests of applicants and borrowers.  These new data points include credit score and age, which Congress identified as data points that may raise privacy concerns.[148]  The Bureau is evaluating whether it is necessary to modify these data points or other data points before disclosure for the purpose of protecting privacy interests.

The Bureau is considering proposing that FIs continue to report loan amount and income rounded to the nearest thousand and to delete the three fields that Regulation C currently requires to be deleted from the modified LAR.  It is also considering proposing that FIs delete or otherwise modify additional data points on the modified LAR that may raise privacy concerns, including, but not limited to, credit score and age.  The Bureau is also considering whether, as an alternative to deletion, there are other methods that would appropriately protect applicant and borrower privacy while still providing users with data useful to fulfilling HMDA's purposes.  For example, the Bureau is considering whether requiring FIs to bin the age data point into categories such as "62 or over" or "under 62"[149] would appropriately protect applicant and borrower privacy while still providing users with useful data.

The Bureau is also considering strategies to protect applicant and borrower privacy in connection with the regulators' release of HMDA data, including, but not limited to, the use of various statistical disclosure limitation techniques, such as techniques aimed at masking the precise value of data points,[150] use restrictions, and a restricted access program.

---

[146] 12 CFR part 1003, App. A, sec. I(A)(7), (D)(6).

[147] 12 CFR 1003.5(c).  These three fields are identified in the statute as fields that are appropriate for deletion before institutions make their LARs public.  12 U.S.C. § 2803(j)(2)(B).

[148] 12 U.S.C. 2803(h)(3)(A).

[149] Data binning is a technique wherein the original data value (in this case, age as reported to regulators on the LAR) is placed in an interval, or bin, and is then represented by the value of that bin.  Applied to the age data point, for example, institutions would replace each age data point on the LAR with the appropriate bin value before making the modified LAR available to the public.

[150]  Examples of these techniques include binning, coarsening, perturbing, and top and bottom coding.

# <u>Appendix B</u>:   Legal Authority and Other Relevant Federal Rules

This appendix describes the statutory authority for Regulation C, the Dodd-Frank Act amendments to HMDA, and the Bureau's authority to implement those changes and make other amendments to Regulation C.  It also describes other federal rules which may potentially overlap or conflict with Regulation C.

## A.  Bureau's HMDA Rulemaking Authority

The Bureau has broad rulemaking authority to implement HMDA, including the authority to prescribe such regulations as may be necessary to carry out the purposes of HMDA.  These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary and proper to effectuate the purposes of HMDA, and prevent circumvention or evasion thereof, or facilitate compliance therewith.[151]  The Bureau also has authority to, among other things, issue regulations concerning the submission and disclosure of data and determining the timing of submissions.[152]

The Dodd-Frank Act made several amendments to HMDA, including adding new data elements to be compiled and reported; directing the Bureau to make determinations about whether certain data elements are appropriate for addition; and granting the Bureau authority to require additional data elements and information.[153]  The Dodd-Frank Act also amended HMDA to authorize the Bureau to develop regulations for the purpose of protecting the privacy interests of applicants and borrowers.[154]

## B.  Community Reinvestment Act

Similar to HMDA, the Community Reinvestment Act of 1977 (CRA) was enacted out of concerns that depository institutions were not meeting the credit needs of the communities they served, particularly in low- and moderate-income areas.[155]  CRA is implemented through regulations issued by the OCC, the Board, and the FDIC.[156]

The CRA regulations require the OCC, the Board, and the FDIC to examine and rate their regulated institutions on how well they are meeting the credit needs of their communities,

---

[151] Dodd-Frank Act, sec. 1094, 12 U.S.C. 2803, 2804.

[152] *See, e.g.*, Dodd-Frank Act, sec. 1094(3), 12 U.S.C 2803(h)(1), (j)(1)-(3), (k)(1).

[153] *See, e.g.*, Dodd-Frank Act, sec. 1094(3), 12 U.S.C. 2803(b)(5)(D) and (J).

[154] Dodd-Frank Act, sec. 1094(3)(B); 12 U.S.C. 2803(h)(1)(E), adding to the protections for applicants' privacy that are in HMDA sec. 304(j)(2)(B); 12 U.S.C. 2803(j)(2)(B).

[155] 12 U.S.C. 2901-2908.

[156] 12 CFR parts 25 and 195 (OCC), 228 (Board), and 345 (FDIC).

including low- and moderate-income neighborhoods.[157]  To facilitate CRA examinations, the agencies' CRA regulations impose certain data collection and reporting obligations on DIs subject to the CRA.  The data collected and reported concern lending to small businesses and small farms and community development loans.[158]

HMDA and Regulation C play an important role in CRA examinations.  Most prominently, CRA rules require the agencies to consider the geographic distribution and borrower income levels of large DIs' home mortgage lending.  Specifically, the CRA rules require a comparison of a large DI's home mortgage lending inside and outside its CRA assessment area and its home mortgage lending to low-, moderate-, middle-, and upper-income individuals.[159]  "Home mortgage loan" for CRA purposes is defined with reference to Regulation C's definitions of home improvement loan, home purchase loan, and refinancing.[160]  To facilitate CRA examinations, other regulators require large DIs to report property location data for all applications and loans under HMDA, even if they relate to property located outside an MSA or Metropolitan Division in which the DIs have a home or branch office, or outside any MSA.[161]

Because HMDA data are relied on in evaluating CRA-covered institutions' performance under the CRA, the Bureau is planning to coordinate any changes to Regulation C with the CRA agencies to ensure that CRA regulations and Regulation C do not conflict.  The Bureau is seeking information on how any of the changes the Bureau is considering proposing as noted in this document might impact CRA compliance.

## C.  TILA, RESPA (Regulation Z and Regulation X)

The Bureau has authority to issue regulations implementing other consumer protection laws that apply to home mortgage lending.  These include the Truth in Lending Act[162] (implemented by Regulation Z[163]) and the Real Estate Settlement Procedures Act[164] (Regulation X[165]).  The Bureau is attempting, where possible, to align definitions and terms in Regulation C with those in Regulation Z and Regulation X.  However, where terms and requirements must be different in

---

[157] *See* 12 CFR 228.21-29, 42.

[158] 12 CFR 228.12, 42-43.

[159] 12 CFR 228.22(b)(2)(i), (3)(i).  *See also* 60 FR 22172 ("The data are also necessary for the lending test assessment criterion that evaluates the degree to which an institution's lending is inside its assessment area.").

[160] 12 CFR 228.12(l).

[161] 12 CFR 1003.4(e).

[162] 15 U.S.C. 1601 *et seq.*

[163] 12 CFR part 1026.

[164] 12 U.S.C. 2601-2617.

[165] 12 CFR part 1024.

order to facilitate the different purposes of the statutes, the Bureau is planning to retain those differences and is not considering proposing to align the definitions and terms.[166]

Notably, the Bureau recently issued a final rule implementing the Dodd-Frank Act requirement to integrate the disclosures under TILA and RESPA.[167]  Some of the information collected as part of HMDA is also included on the disclosures, and the GSEs are currently implementing loan delivery data standards to collect this information.  The Bureau is seeking comment on how the proposals in this document might impact Regulation X and Regulation Z compliance.

## D.  ECOA/Regulation B

ECOA makes it illegal for a creditor to discriminate in any aspect of a credit transaction, including home financing, against any applicant because of race, color, religion, national origin, sex, marital status, age (if the applicant is old enough to enter into a contract), receipt of income from any public assistance program, or the exercise in good faith of a right under the Consumer Credit Protection Act.[168]  The Bureau has certain oversight, enforcement, and supervisory authority over ECOA requirements and has rulemaking authority under the statute.

ECOA's implementing regulation, Regulation B, generally prohibits creditors from inquiring about an applicant's race, color, religion, national origin, or sex, with limited exceptions, including when it is required by regulation such as by Regulation C.[169]  Regulation B requires creditors to request information about the race, ethnicity, sex, marital status, and age of applicants for certain dwelling-secured loans and to retain that information for certain periods.[170]  Regulation B requires this data collection for credit primarily for the purchase or refinancing of a dwelling occupied or to be occupied by the applicant as a principal residence, where the extension of credit will be secured by the dwelling, and requires the data to be maintained by the creditor for 25 months for monitoring purposes.[171]  Unlike HMDA data, ECOA monitoring data are not reported or disclosed to the public.  Persons such as mortgage brokers and loan correspondents who are otherwise prohibited from collecting demographic data of an applicant are permitted to do so if the purpose of the collection of such information is to provide it to a creditor that is covered by HMDA.[172]

HMDA data are relied on in evaluating a creditor's fair lending compliance under ECOA and the Bureau is planning to ensure that any changes to Regulation C do not conflict with Regulation B.

---

[166] See Appendix A regarding the proposals under consideration regarding nonamortizing features and points and fees, and a discussion of the definition of "application."

[167] 78 FR 79730 (Dec. 31 , 2013).

[168] 15 U.S.C. 1691(a)(1).

[169] 12 CFR 1002.5(a), (b), 12 CFR part 1002, Supp. I, comment 5(a)-2.

[170] 12 CFR 1002.5(a)(2), 1002.12(b)(1)(i), 1003.13(a).

[171] 12 CFR 1002.12(b)(1)(i), 1002.13(a)(1).

[172] 12 CFR pt. 1002, Supp. I, comment 5(a)(2)-3.

The Bureau is seeking information on how any of the changes the Bureau is considering proposing as noted in this document might impact ECOA compliance.

## E.  Regulation AB

The SEC's Regulation AB[173] addresses the registration, disclosure, and reporting requirements for asset-backed securities under the Securities Act of 1933 and the Securities Exchange Act of 1934.  In April 2010, the SEC released a notice of proposed rulemaking announcing a plan to reform its Regulation AB by collecting and publishing loan-level data for private mortgage-backed security (MBS) issuances, including loan, borrower, originator, and performance characteristics.[174]  The proposed standard is based on an XML format and uses data definitions developed by the SEC.  The SEC re-released proposed revisions (Regulation AB II) in July 2011, but has not yet released final revisions.[175]

At this time, the Bureau is not considering proposing to align HMDA data standards with Regulation AB standards for MBS issuances.  Regulation AB data standards have not been finalized, so the Bureau is unable to determine to what extent those standards may differ from the Bureau's proposals regarding HMDA.

---

[173] 17 CFR part 229, subpart 1100.

[174] Asset-Back Securities Proposed Rule, 75 FR 23328 (May 3, 2010), *available at* http://www.sec.gov/rules/proposed/2010/33-9117fr.pdf).

[175] Re-Proposal of Shelf Eligibility Conditions for Asset-Backed Securities, 76 FR 47948 (Aug. 5, 2011) *available at* http://www.sec.gov/rules/proposed/2011/33-9244fr.pdf.

# Appendix C:   Dodd-Frank Amendments

**Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. 111-2013, 124 Stat. 1376 (approved July 21, 2010)**

**SEC. 1094. AMENDMENTS TO THE HOME MORTGAGE DISCLOSURE ACT
OF 1975.**

The Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2801 et seq.) is amended—
    (1) by striking "Board" each place that term appears, other than in sections 303, 304(h), 305(b) (as amended by this section), and 307(a) (as amended by this section) and inserting "Bureau".
    (2) in section 303 (12 U.S.C. 2802)—
        (A) by redesignating paragraphs (1) through (6) as paragraphs (2) through (7), respectively; and
        (B) by inserting before paragraph (2) the following:
    "(1) the term 'Bureau' means the Bureau of Consumer Financial Protection;";
    (3) in section 304 (12 U.S.C. 2803)—
        (A) in subsection (b)—
                (i) in paragraph (4), by inserting "age," before "and gender";
                (ii) in paragraph (3), by striking "and" at the end;
                (iii) in paragraph (4), by striking the period at the end and inserting a semicolon; and
                (iv) by adding at the end the following:
    "(5) the number and dollar amount of mortgage loans grouped according to measurements of—
        "(A) the total points and fees payable at origination in connection with the mortgage as determined by the Bureau, taking into account 15 U.S.C. 1602(aa)(4);
        "(B) the difference between the annual percentage rate associated with the loan and a benchmark rate or rates for all loans;
        "(C) the term in months of any prepayment penalty or other fee or charge payable on repayment of some portion of principal or the entire principal in advance of scheduled payments; and
        "(D) such other information as the Bureau may require; and
    "(6) the number and dollar amount of mortgage loans and completed applications grouped according to measurements of—
        "(A) the value of the real property pledged or proposed to be pledged as collateral;
        "(B) the actual or proposed term in months of any introductory period after which the rate of interest may change;
        "(C) the presence of contractual terms or proposed contractual terms that would allow the mortgagor or applicant to make payments other than fully amortizing payments during any portion of the loan term;
        "(D) the actual or proposed term in months of the mortgage loan;
        "(E) the channel through which application was made, including retail, broker, and other relevant categories;
        "(F) as the Bureau may determine to be appropriate, a unique identifier that identifies the loan originator as set forth in section 1503 of the S.A.F.E. Mortgage Licensing Act of 2008;

"(G) as the Bureau may determine to be appropriate, a universal loan identifier;

"(H) as the Bureau may determine to be appropriate, the parcel number that corresponds to the real property pledged or proposed to be pledged as collateral;

"(I) the credit score of mortgage applicants and mortgagors, in such form as the Bureau may prescribe; and

"(J) such other information as the Bureau may require.";

 (B) by striking subsection (h) and inserting the following:

"(h) SUBMISSION TO AGENCIES.—

"(1) IN GENERAL.—The data required to be disclosed under subsection (b) shall be submitted to the Bureau or to the appropriate agency for the institution reporting under this title, in accordance with rules prescribed by the Bureau. Notwithstanding the requirement of subsection (a)(2)(A) for disclosure by census tract, the Bureau, in consultation with other appropriate agencies described in paragraph (2) and, after notice and comment, shall develop regulations that—

"(A) prescribe the format for such disclosures, the method for submission of the data to the appropriate agency, and the procedures for disclosing the information to the public;

"(B) require the collection of data required to be disclosed under subsection (b) with respect to loans sold by each institution reporting under this title;

"(C) require disclosure of the class of the purchaser of such loans;

"(D) permit any reporting institution to submit in writing to the Bureau or to the appropriate agency such additional data or explanations as it deems relevant to the decision to originate or purchase mortgage loans; and

"(E) modify or require modification of itemized information, for the purpose of protecting the privacy interests of the mortgage applicants or mortgagors, that is or will be available to the public.

"(2) OTHER APPROPRIATE AGENCIES.—The appropriate agencies described in this paragraph are—

"(A) the appropriate Federal banking agencies, as defined in section 3(q) of the Federal Deposit Insurance Act (12 U.S.C. 1813(q)), with respect to the entities that are subject to the jurisdiction of each such agency, respectively;

"(B) the Federal Deposit Insurance Corporation for banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), mutual savings banks, insured State branches of foreign banks, and any other depository institution described in section 303(2)(A) which is not otherwise referred to in this paragraph;

"(C) the National Credit Union Administration Board with respect to credit unions; and

"(D) the Secretary of Housing and Urban Development with respect to other lending institutions not regulated by the agencies referred to in subparagraph (A) or (B).

"(3) RULES FOR MODIFICATIONS UNDER PARAGRAPH (1).—

"(A) APPLICATION.—A modification under paragraph (1)(E) shall apply to information concerning—

"(i) credit score data described in subsection (b)(6)(I), in a manner that is consistent with the purpose described in paragraph (1)(E); and

"(ii) age or any other category of data described in paragraph (5) or (6) of subsection (b), as the Bureau determines to be necessary to satisfy the purpose described in paragraph (1)(E), and in a manner consistent with that purpose.

"(B) STANDARDS.—The Bureau shall prescribe standards for any modification under paragraph (1)(E) to effectuate the purposes of this title, in light of the privacy interests of mortgage applicants or mortgagors. Where necessary to protect the privacy interests of mortgage applicants or mortgagors, the Bureau shall provide for the disclosure of information described in subparagraph (A) in aggregate or other reasonably modified form, in order to effectuate the purposes of this title.";

(C) in subsection (i), by striking "subsection (b)(4)" and inserting "subsections (b)(4), (b)(5), and (b)(6)";

(D) in subsection (j)—

(i) by striking paragraph (3) and inserting the following:

"(3) CHANGE OF FORM NOT REQUIRED.—A depository institution meets the disclosure requirement of paragraph (1) if the institution provides the information required under such paragraph in such formats as the Bureau may require"; and

(ii) in paragraph (2)(A), by striking "in the format in which such information is maintained by the institution" and inserting "in such formats as the Bureau may require";

(E) in subsection (m), by striking paragraph (2) and inserting the following:

"(2) FORM OF INFORMATION.—In complying with paragraph (1), a depository institution shall provide the person requesting the information with a copy of the information requested in such formats as the Bureau may require."; and

(F) by adding at the end the following:

"(n) TIMING OF CERTAIN DISCLOSURES.—The data required to be disclosed under subsection (b) shall be submitted to the Bureau or to the appropriate agency for any institution reporting under this title, in accordance with regulations prescribed by the Bureau. Institutions shall not be required to report new data under paragraph (5) or (6) of subsection (b) before the first January 1 that occurs after the end of the 9–month period beginning on the date on which regulations are issued by the Bureau in final form with respect to such disclosures.";

(4) In section 305 (12 U.S.C. 2804)—

(A) by striking subsection (b) and inserting the following:

"(b) POWERS OF CERTAIN OTHER AGENCIES.—

"(1) IN GENERAL.—Subject to subtitle B of the Consumer Financial Protection Act of 2010, compliance with the requirements of this title shall be enforced—

"(A) under section 8 of the Federal Deposit Insurance Act, The appropriate Federal banking agency, as defined in section 3(q) of the Federal Deposit Insurance Act (12 U.S.C. 1813(q)), with respect to—

"(i) any national bank or Federal savings association, and any Federal branch or Federal agency of a foreign bank;

"(ii) any member bank of the Federal Reserve System (other than a national bank), branch or agency of a foreign bank (other than a Federal branch, Federal agency, and insured State branch of a foreign bank), commercial lending company owned or controlled by a foreign bank, and any organization operating under section 25 or 25A of the Federal Reserve Act; and

"(iii) any bank or State savings association insured by the Federal Deposit Insurance Corporation (other than a member of the Federal Reserve System), any mutual savings bank as, defined in section 3(f) of the Federal Deposit Insurance Act (12 U.S.C. 1813(f)), any insured State branch of a foreign bank, and any other depository institution not referred to in this paragraph or subparagraph (B) or (C);

"(B) under subtitle E of the Consumer Financial Protection Act of 2010, by the Bureau, with respect to any person subject to this subtitle;

"(C) under the Federal Credit Union Act, by the Administrator of the National Credit Union Administration with respect to any insured credit union; and

"(D) with respect to other lending institutions, by the Secretary of Housing and Urban Development.

"(2) INCORPORATED DEFINITIONS.—The terms used in paragraph (1) that are not defined in this title or otherwise defined in section 3(s) of the Federal Deposit Insurance Act (12 U.S.C. 1813(s)) shall have the same meanings as in section 1(b) of the International Banking Act of 1978 (12 U.S.C. 3101)."; and

(B) by adding at the end the following:

"(d) OVERALL ENFORCEMENT AUTHORITY OF THE BUREAU OF CONSUMER FINANCIAL PROTECTION.—Subject to subtitle B of the Consumer Financial Protection Act of 2010, enforcement of the requirements imposed under this title is committed to each of the agencies under subsection (b). To facilitate research, examinations, and enforcement, all data collected pursuant to section 304 shall be available to the entities listed under subsection (b). The Bureau may exercise its authorities under the Consumer Financial Protection Act of 2010 to exercise principal authority to examine and enforce compliance by any person with the requirements of this title.";

(5) in section 306 (12 U.S.C. 2805(b)), by striking subsection (b) and inserting the following:

"(b) EXEMPTION AUTHORITY.—The Bureau may, by regulation, exempt from the requirements of this title any State–chartered depository institution within any State or subdivision thereof, if the agency determines that, under the law of such State or subdivision, that institution is subject to requirements that are substantially similar to those imposed under this title, and that such law contains adequate provisions for enforcement. Notwithstanding any other provision of this subsection, compliance with the requirements imposed under this subsection shall be enforced by the Office of the Comptroller of the Currency

77

under section 8 of the Federal Deposit Insurance Act, in the case of national banks and Federal savings associations, the deposits of which are insured by the Federal Deposit Insurance Corporation."; and

(6) by striking section 307 (12 U.S.C. 2806) and inserting the following: "SEC. 307. COMPLIANCE IMPROVEMENT METHODS.

"(a) IN GENERAL.—

"(1) CONSULTATION REQUIRED.—The Director of the Bureau of Consumer Financial Protection, with the assistance of the Secretary, the Director of the Bureau of the Census, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and such other persons as the Bureau deems appropriate, shall develop or assist in the improvement of, methods of matching addresses and census tracts to facilitate compliance by depository institutions in as economical a manner as possible with the requirements of this title.

"(2) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated, such sums as may be necessary to carry out this subsection.

"(3) CONTRACTING AUTHORITY.—The Director of the Bureau of Consumer Financial Protection is authorized to utilize, contract with, act through, or compensate any person or agency in order to carry out this subsection.

"(b) RECOMMENDATIONS TO CONGRESS.—The Director of the Bureau of Consumer Financial Protection shall recommend to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives, such additional legislation as the Director of the Bureau of Consumer Financial Protection deems appropriate to carry out the purpose of this title.".

# Appendix D:   List of Acronyms

| | |
|---|---|
| **API** | Application Programming Interface |
| **APOR** | Average Prime Offer Rate |
| **APR** | Annual Percentage Rate |
| **ARM** | Adjustable Rate Mortgage |
| **AUS** | Automated Underwriting System |
| **CLTV** | Combined Loan-to-Value Ratio |
| **CRA** | Community Reinvestment Act |
| **DES** | Data Entry Software |
| **DI** | Depository Institution |
| **DTI** | Debt-to-Income Ratio |
| **ECOA** | Equal Credit Opportunity Act |
| **FCRA** | Fair Credit Reporting Act |
| **FDIC** | Federal Deposit Insurance Corporation |
| **FFIEC** | Federal Financial Institutions Examination Council |
| **FHFA** | Federal Housing Finance Agency |
| **FI** | Financial Institution |
| **FIRREA** | Financial Institutions Reform, Recovery, and Enforcement Act of 1989 |
| **GSEs** | Government-Sponsored Enterprises (Fannie Mae and Freddie Mac) |
| **HEL** | Home Equity Loan |
| **HELOC** | Home Equity Line of Credit |
| **HMDA** | Home Mortgage Disclosure Act |
| **HMDA RID** | HMDA Respondent/Reporter ID |
| **HMS** | HMDA Management Software |
| **HOEPA** | Home Ownership and Equity Protection Act |
| **HUD** | Department of Housing and Urban Development |
| **IDs** | Identifiers |
| **LAR** | Loan/Application Register |
| **LEI** | Legal Entity Identifier |
| **LOS** | Loan Origination System |
| **LTV** | Loan-to-Value |
| **MD** | Metropolitan Division |
| **MISMO** | Mortgage Industry Standards Maintenance Organization |
| **MSA** | Metropolitan Statistical Area |
| **NCUA** | National Credit Union Administration |
| **NMLS** | Nationwide Mortgage Licensing System |
| **Non-DI** | Nondepository Institution |
| **OCC** | Office of the Comptroller of the Currency |
| **PMI** | Private Mortgage Insurance |
| **QM** | Qualified Mortgage |
| **RESPA** | Real Estate Settlement Procedures Act |
| **SBA** | Small Business Administration |
| **SBREFA** | Small Business Regulatory Enforcement Fairness Act |
| **SEC** | Securities and Exchange Commission |
| **SER** | Small Entity Representative |
| **TILA** | Truth in Lending Act |
| **ULDD** | Uniform Loan Delivery Dataset |
| **URLA** | Uniform Residential Loan Application |

# Appendix E:   Glossary

**Annual, ongoing operational costs** means the estimated yearly costs for complying with the requirements of HMDA and Regulation C.

**Application** is defined by Regulation C, and means an oral or written request for a home purchase loan, a home improvement loan, or a refinancing that is made in accordance with procedures used by a FI for the type of credit requested.  The term includes certain requests for preapproval.  12 CFR 1003.2.  Generally, this outline uses the term application to refer to a HMDA-reportable transaction that did not result in an origination (loan), but would require reporting on a HMDA Loan/Application Register.

**Cost of Credit** refers to the cost of a small entity obtaining credit.

**Data Entry Software** or **DES** means the free software provided on the FFIEC website that FIs may use to submit their annual HMDA data.  HMDA DES includes editing features to help verify and analyze the accuracy of the data and creates a file that can be submitted in soft or hard copy.

**Data Point** means a single item of data collected and reported under HMDA/Regulation C for a LAR record, such as action taken or loan amount.  Often referred to as a variable or data element in other contexts, data point is the terminology used by the Bureau in its HMDA rulemaking process.  Data points discussed in this Outline of Proposals Under Consideration either relate to current Regulation C requirements, implementation of Dodd-Frank Act requirements, or data needed to address information gaps.

**Depository institution** or **DI** means, generally, a financial institution that is a bank, savings association, or credit union that is covered by Regulation C.  *See* 12 CFR 1003.2.

**Dodd-Frank Act** or **DFA** means the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 (July 21, 2010), section 1094 of which significantly amended HMDA.

**Financial institution** or **FI** means an institution (either a DI or a non-DI) that is covered by Regulation C and required to report HMDA data.  *See* 12 CFR 1003.2.

**Fixed costs** means the estimated annual, ongoing operational costs to maintain a system and process for HMDA compliance.

**GSE** means government-sponsored enterprise, and, in these materials, specifically refers to Fannie Mae and Freddie Mac.  The requirements of the GSEs are a significant influence on the mortgage industry, including their data standards for loan delivery (*see* ULDD).

**HMDA** means the Home Mortgage Disclosure Act of 1975 (as amended), 12 U.S.C. 2801–2810.  HMDA was amended by the Dodd-Frank Act, which transferred broad rulemaking authority for HMDA to the Bureau and added additional requirements discussed in this outline.  HMDA is implemented by Regulation C.

**HMDA Management Software** or **HMS** means privately developed software that FIs may use to collect, organize, manage, and submit their annual HMDA data.

**LAR** means the HMDA Loan/Application Register.  The LAR is a financial institution's electronic or paper register of the individual records for each application or loan and contains the required data for each in the appropriate format.  Instructions for completing the LAR are provided in Appendix A to Regulation C.

**Loan** generally means a HMDA-reportable origination, which would include the Regulation C definitions of "home purchase loan," "home improvement loan," and "refinancing."

**Loan Origination System** or **LOS** means a private software application or system that an FI uses to create new loans by defining and tracking the steps throughout the process, from application to booking the loan onto the system of record.

**MISMO** means the Mortgage Industry Standards Maintenance Organization residential mortgage data standards.  These standards provide an XML architecture encompassing data origination, secondary market, and servicing data for residential mortgages, and a data dictionary to provide business definitions and corresponding architecture data element tag names.  One of the primary goals of the Bureau's proposals under consideration is to align HMDA data points with MISMO to the extent practicable (*see* ULDD).

**Nondepository Institution** or **Non-DI** means a financial institution that is a for-profit mortgage lending institution other than a bank, savings association, or credit union that is covered by Regulation C.  *See* 12 CFR 1003.2.

**One-time costs** means the estimated costs to transition to revised HMDA requirements, including the one-time costs of potentially upgrading processing systems; transition preparation (planning meetings and research) by legal and compliance teams; and development of software systems, training, and compliance procedures.

**Record** refers to an individual LAR entry regarding an application or loan.  It is generally used in this outline in discussions of cost or reporting processes.

**Regulation C** is the implementing regulation for HMDA and is codified in the Code of Federal Regulations at title 12, part 1003 (12 CFR part 1003).  The Bureau may include the proposals under consideration discussed in this outline in a proposed rule through which the Bureau would seek public comment on proposed amendments to Regulation C.

**Small Business Regulatory Enforcement Fairness Act of 1996** or **SBREFA**, Pub. L. No. 104-121 (Mar. 29, 1996), refers to the statute that establishes the Small Business Review Panel process for certain Bureau, Environmental Protection Agency, and Occupational Health and Safety Administration rulemakings.

**Small Business Review Panel** or **Panel** means a panel formed of representatives from the Bureau, the Chief Counsel for Advocacy of the Small Business Administration, and the Office of Management and Budget's Office of Information and Regulatory Affairs.  A Panel is convened in accordance with SBREFA when a rule under development may have a significant economic impact on a substantial number of small entities.  The Panel for the Bureau's HMDA rulemaking will prepare a report of its recommendations after discussing with Small Entity Representatives the Outline of Proposals Under Consideration.

**Small Entity** means a small business, small organization, or a small government as defined by the Regulatory Flexibility Act.  The size standards for determining a business as small vary by

industry and are established by the Small Business Administration.  Small entities affected by this rulemaking within the meaning of SBREFA include DIs with annual assets of $500 million or less and non-DIs with annual revenues of $35.5 million or less.

**Small Entity Representative** or **SER** means a representatives of a small business who participates in the SBREFA process to provide input on costs and benefits of the proposals under consideration in a rulemaking.

**System of Record** or **SoR** means the location of the definitive data values and information pertinent to processing and resolution of applications for mortgage products.

**ULDD** means the Uniform Loan Delivery Dataset, which is the common set of data elements required by the GSEs for 1- to 4-family mortgage loans to be purchased by the GSEs.  ULDD standards are included in the MISMO data standards.