| | |
|---|---|
| Shana E. Scarlett (SBN 217895)<br>Benjamin J. Siegel (SBN 256260)<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>715 Hearst Avenue, Suite 202<br>Berkeley, CA 94710<br>Telephone: (510) 725-3000<br>Facsimile: (510) 725-3001<br>shanas@hbsslaw.com<br>bens@hbsslaw.com<br><br>Steve W. Berman (*pro hac vice*)<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>1301 Second Avenue, Suite 2000<br>Seattle, WA 98101<br>Telephone: (206) 268-9320<br>Facsimile: (206) 623-0594<br>steve@hbsslaw.com<br><br>*Counsel for Plaintiffs* | Nitin Shah (DC Bar No. 156035)<br>(*pro hac vice*)<br>Jeffrey B. Dubner (DC Bar No. 1013399)<br>(*pro hac vice*)<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>Telephone: (202) 448-9090<br>Facsimile: (202) 701-1775<br>nshah@democracyforward.org<br>jdubner@democracyforward.org<br><br>*Counsel for Plaintiffs* |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA REINVESTMENT COALITION, NATIONAL ASSOCIATION FOR LATINO COMMUNITY ASSET BUILDERS, DEBORAH LYNN FIELD, and RESHONDA YOUNG,<br><br>Plaintiffs,<br><br>v.<br><br>KATHLEEN L. KRANINGER, Director, Consumer Financial Protection Bureau, In Her Official Capacity and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Defendants. | No. 4:19-cv-02572-JSW<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date: January 10, 2020<br>Time: 9:00 a.m.<br>Dept: Courtroom 5, 2nd Floor<br>Judge: Hon. Jeffrey S.White |

010829-11 1197876 V1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................................................................1

II. ARGUMENT .........................................................................................................................2

    A. For More Than Eight Years, CFPB Has Stalled and Delayed Implementation of Section 1071 ...................................................................................2

    B. Without Court Intervention, CFPB Will Continue to Delay Its Implementation of Section 1071 ...................................................................................5

    C. The *TRAC* Factors Compel Judicial Relief ................................................................8

        1. The Length of Delay is Unreasonable ............................................................8

        2. The Bureau's Contemplated Delay Will Substantially Harm Plaintiffs and the Public..................................................................................11

        3. The Bureau's Contemplated Delay Will Substantially Harm Plaintiffs and the Public..................................................................................13

    D. The Court Should Hold the Bureau to a Specific and Proximate Timeline for Implementation..................................................................................14

III. CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*In re A Community Voice*,
   878 F.3d 779 (9th Cir. 2017) ................................................................................ 8, 14

*Bennett v. Spear*,
   520 U.S. 154 (1997) .................................................................................................. 2

*Biodiversity Legal Found. v. Badgley*,
   309 F.3d 1166 (9th Cir. 2002) .................................................................................. 9

*Brower v. Evans*,
   257 F.3d 1058 (9th Cir. 2001) .................................................................................. 9

*Grand Canyon Air Tour Coal. v. FAA*,
   154 F.3d 455 (D.C. Cir. 1998) .................................................................................. 9

*MCI Telecomms. Corp. v. FCC*,
   627 F.2d 322 (D.C. Cir. 1980) ........................................................................ 12, 15

*Nader v. FCC*,
   520 F.2d 182 (D.C. Cir. 1975) ........................................................................ 12, 15

*In re Pesticide Action Network of N. Am.*,
   532 F. App'x 649 (9th Cir. 2013) ........................................................................... 10

*In re Pesticide Action Network of N. Am.*,
   798 F.3d 809 (9th Cir. 2015) ........................................................................... 10, 15

*Potomac Elec. Power Co. v. ICC*,
   702 F.2d 1026 (D.C. Cir. 1983) ...................................................................... 12, 15

*Public Citizen Health Research Grp. v. Auchter*,
   702 F.2d 1150 (D.C. Cir. 1983) .............................................................................. 15

*Public Citizen Health Research Grp. v. Brock*,
   823 F.2d 626 (D.C. Cir. 1987) ................................................................................ 14

*South Carolina v. United States*,
   907 F.3d 742 (4th Cir. 2018) .................................................................................. 15

*Telecommunications Research & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) .................................................................................. 14

*In re United Mine Workers of Am. Int'l Union*,
   190 F.3d 545 (D.C. Cir. 1999) ................................................................................ 13

**FEDERAL STATUTES**

15 U.S.C. § 1691c–2 .................................................................................................................. 2, 7

**OTHER AUTHORITIES**

78 Fed. Reg. 10,902 (Feb. 14, 2013) .............................................................................................. 7

78 Fed. Reg. 11,280 (Feb. 15, 2013) .............................................................................................. 7

78 Fed. Reg. 79,730 (Dec. 31, 2013) .............................................................................................. 7

82 Fed. Reg. 32,177 (July 12, 2017) ............................................................................................... 3

## I.  INTRODUCTION

The Consumer Financial Protection Bureau concedes that is has failed to fulfill its nondiscretionary duty to implement a federal statute enacted to combat discrimination in lending to small businesses. The Bureau admits that "small businesses, including those owned by women and minorities, are critical engines for economic growth"; that "[a]ccess to financing is a crucial component of the success of these businesses"; and that implementing Dodd-Frank Act's small business lending transparency requirement serves the "important" interest of "increas[ing] public data about small business lending."[1] It acknowledges that the Dodd-Frank Act requires it to issue regulations implementing Section 1071. And the Bureau concedes that even though it has now had more than eight years to do so, it has failed to issue a rule, and it appears to be no closer to doing so than it was in Fall 2017.

Still, the Bureau urges the Court not to exercise its power to order CFPB to fulfill its mandatory duty to implement the statute. It claims that its delay is not unreasonable because it has "many other pressing obligations," CFPB MSJ at 1, and because it says it is working on a rule, even though it will not commit even to the drawn-out timeline it offers the Court. By the time the Bureau says it *may* issue even a *proposed* rule, in 2021 *or later*, it will be more than a decade overdue.

Eight years is enough. Without this Court's intervention, the Bureau will continue to kick the can down the road on its statutory obligation. Plaintiffs—small business owners and organizations that seek to foster and promote small business development—have waited since 2011 for the Bureau to implement Congress's clear command, and nothing in the Bureau's filing suggests that its recalcitrance to do what Congress has required will change anytime soon. As long as the Bureau continues to delay, the statute remains a dead letter, and Plaintiffs will be deprived of the data they need to ensure that the fair lending laws are complied with and small business credit needs are addressed. The Court should therefore order the Bureau to comply with its long-overdue duty to implement Section 1071 on a prompt and definite timeline.

---

[1] *See* Declaration of Thomas Pahl, filed concurrently with CFPB MSJ ("Pahl Decl."), ¶ 15 & Ex. 2 (remarks of CFPB Director Kathy Kraninger); CFPB MSJ at 18.

PLS.' REPLY ISO PLS.' MOT. FOR SJ &
OPP. TO DEFS.' CROSS-MOT. FOR SJ    - 1
Case No.: 4:19-cv-02572-JSW

## II. ARGUMENT

**A.    For More Than Eight Years, CFPB Has Stalled and Delayed Implementation of Section 1071**

The Bureau wisely does not dispute that it is required to implement Section 1071. *See* CFPB MSJ at 12 n.2. The statute is clear. *See* 15 U.S.C. § 1691c–2(g) (providing that Bureau "shall" prescribe rules and issue guidance as necessary to carry out statute, including compliance guidance; *see also, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 172 (1997) ("shall" ordinarily denotes a mandatory duty). And the agency itself has repeatedly acknowledged its nondiscretionary duty going back to 2011.[2] Yet, even though it promised in April 2011 that it would "act expeditiously" to develop and issue the "necessary implementing regulations,"[3] the Bureau's actions have been anything but expeditious.

To the contrary, the Bureau's path as regards Section 1071 has been one of frequent stops, occasional starts, and repeated delays—a pattern that appears likely to continue for years to come without the Court's intervention. In December 2012, some 20 months after its April 2011 assurance that it would "act expeditiously," CFPB was only able to report that it had "begun the planning process to promulgate rules" implementing Section 1071, and that it was "currently gathering information from stakeholders."[4] There had been little evident progress by two and a half years after that, when, in April 2015, CFPB again reported that it had only just "begun preliminary planning" for implementing the statute.[5] And five years after it promised to "act expeditiously," in Spring 2016, CFPB still had to perform the basic initial steps of "outreach and research."[6] It would take fully

---

[2] *See* Declaration of Jeffrey Dubner, filed concurrently with Pl. MSJ ("Dubner Decl."), Ex. 3, Letter from Leonard Kennedy, General Counsel, CFPB, to Chief Executive Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act (Apr. 11, 2011), https://files.consumerfinance.gov/f/2011/04/GC-letter-re-1071.pdf ("Kennedy Letter") at 1; *see also* Pl. MSJ at 14 (citing other examples of CFPB's acknowledgment of its mandatory duty).

[3] Kennedy Letter at 1.

[4] Dubner Decl., Ex. 4, CFPB, *Fair Lending Report of the Consumer Financial Protection Bureau* (Dec. 2012) at 25-26.

[5] Dubner Decl., Ex. 5, CFPB, *Fair Lending Report of the Consumer Financial Protection Bureau* (Apr. 2015) at 32-33.

[6] Dubner Decl., Ex. 6, CFPB, *Spring 2016 Unified Agenda: Business Lending Data (Regulation B)*.

another year before the very first tangible steps toward implementation occurred. During Spring and Summer 2017, CFPB solicited, and received, comments from various stakeholders, many of whom urged the Bureau to move quickly to implement the statute.[7] The Bureau thereafter targeted a prerule activity date of May 2018. Compl. ¶ 39.[8]

These signs of progress offered some promise to Plaintiffs and stakeholders eager to see the statute finally implemented. Once Mick Mulvaney took over as Acting Director, however, all progress ground to a halt. At Mulvaney's direction (*see* Pahl Decl. ¶¶ 7-8), the CFPB decided to stop its Section 1071 implementation activities altogether (an action the Bureau charitably calls a "temporar[y] pause," Pahl Decl. ¶ 7), reassigning staff to other matters and further delaying its estimated prerule activities by 10 months in Spring 2018, and then removing Section 1071 implementation from its near-term agenda altogether in its Fall 2018 Regulatory Agenda, stating that it instead preferred to focus its resources on entirely discretionary revisions to its Home Mortgage Disclosure Act regulations (for which it had already completed all mandatory rulemakings).[9] Far from expressing any interest in continuing to discuss Section 1071 implementation, Acting Director Mulvaney fired all 25 members of the CFPB's Consumer Advisory Board shortly after Plaintiff CRC's Executive Director, who served on the board, advocated for CFPB to fulfill its statutory duty to implement Section 1071.[10] This is not the record of an agency making good-faith efforts to comply with a statutory mandate.

The Bureau half-heartedly attempts to explain its repeated delays in complying with Congress's command by saying it was busy with other things. But the public record shows that the Bureau did not implement Section 1071 not because it could not, but because *it did not want to*. The Bureau does not try to dispute the fact that its decision to revise its Home Mortgage Disclosure Act

---

[7] *See* Request for Information Regarding the Small Business Lending Market; Extension, 82 Fed. Reg. 32,177 (July 12, 2017).

[8] *See* Office of Information and Regulatory Affairs, Fall 2017 Regulatory Agenda, RIN 3170-AA09, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201710&RIN=3170-AA09.

[9] Dubner Decl., Ex. 8, CFPB, *Fall 2018 Rulemaking Agenda* (Oct. 17, 2018).

[10] Declaration of Paulina Gonzalez Brito, filed concurrently with Pl. MSJ (Gonzalez-Brito Decl.), ¶¶ 18-19.

regulations was entirely discretionary—effectively elevating the Bureau's own preferences above a clear and undisputed congressional mandate to implement Section 1071. To be sure, the Bureau provides a laundry list of other matters it has handled during its existence. *See* Declaration of David Silberman, filed concurrently with CFPB MSJ, ¶¶ 7-21. There is little doubt that every government agency could produce a similar list of matters; government agencies must be, and are, built to be able to do more than one thing at a time.

But the Bureau cannot seriously argue that it lacks the resources it needs to do what Congress has required. Such a claim is irreconcilable with the Bureau's unique, dedicated funding structure through which its resources are not appropriated by Congress, but rather are provided upon request by the Federal Reserve. In each quarter during the relevant time period, the Bureau has received all the funds it has sought from the Federal Reserve.[11] And in the same year that CFPB decided to halt its implementation of Section 1071, its Acting Director requested $0 in funding for an entire quarter, stating in his letter to Chairperson Yellen: "I have been assured that the *funds currently in the Bureau Fund are sufficient for the Bureau to carry out its statutory mandates* for the next fiscal quarter."[12] Section 1071 is such a statutory mandate, and thus Acting Director Mulvaney was implicitly stating that the Bureau had sufficient funds to carry out the Section 1071 rulemaking. Indeed, at the same time that the Bureau decided it had to halt its Section 1071 implementation to focus its limited resources on other projects, the overall level of funding it requested (and received) from the Federal Reserve dropped nearly in half, from $602 million in Fiscal Year 2017 to $381.3 million in Fiscal Year 2018.[13] It is thus impossible to credit the Bureau's new claims of a resource crunch without

---

[11] *See* CFPB, Funds Transfer Requests, https://www.consumerfinance.gov/about-us/budget-strategy/funds-transfer-requests/.

[12] *See* Letter from Mick Mulvaney, Acting Director, CFPB, to Hon. Janet L. Yellen, Chair, Board of Governors of the Federal Reserve System (Jan. 17, 2018) (Mulvaney Letter), https://files.consumerfinance.gov/f/documents/cfpb_fy2018_q2_funding-request-letter-to-frb.pdf; *see also* Compl. ¶ 41 (citing Jim Puzzaghera, Mulvaney Requests Zero Funding for the Consumer Financial Protection Bureau, L.A. Times, Jan. 18, 2019, https://www.latimes.com/business/la-fi-cfpb-mulvaney-funding-20180118-story.html (letter linked in article)).

[13] These calculations are arrived at by totaling the respective funding requests for each fiscal year as provided on CFPB's website, *see supra* note 11.

calling into question the Bureau's prior candor regarding its ability to move forward on Section 1071.

In sum, by 2018, Section 1071 implementation had ground to a complete halt. *See* Pahl Decl. ¶ 7. This was the latest, and most complete, stoppage of work on the rule in an eight-year pattern of repeated stalling and stonewalling, a course the Bureau has willfully chosen over complying with its mandatory duty to implement the rule and protect small businesses.

**B.     Without Court Intervention, CFPB Will Continue to Delay Its Implementation of Section 1071**

After this lawsuit was filed, CFPB vaguely announced that it would "recommence work later this year" on prerule activities.[14] Now, for the first time in its summary judgment brief, the Bureau sketches out a broad view of what an implementation timeline *could* look like. By the Bureau's rough timeline, Plaintiffs could be left with no relief for another three years or more. But even this timeline is ephemeral: despite its protests that it is working on implementing Section 1071, the Bureau refuses to commit to a concrete timeline for implementation, pointedly avoiding any assurances that it will meet the schedule it outlines. The vagueness and drawn-out nature of the Bureau's timeline only underscores its lack of seriousness with regard to promptly implementing Section 1071. To wit:

- Even though the Bureau claims it has been planning to continue its work on Section 1071 since at least March 6, 2019, *see* Pahl Decl. ¶ 13, the Bureau indicates it plans to wait another six months from November 2019 before so much as briefing the CFPB Director on "the major legal, policy, and economic issues" to be addressed in the rulemaking. This is a total of 14 months from when the Bureau first claims to have re-initiated its preparation for implementation simply to brief the Director on the issues presented by the rulemaking. CFPB MSJ at 10. It is hard to understand why this briefing process has not already occurred. (May 2020)

---

[14] Dubner Decl., Ex. 9, CFPB, *Spring 2019 Rulemaking Agenda* (May 22, 2019).

PLS.' REPLY ISO PLS.' MOT. FOR SJ &
OPP. TO DEFS.' CROSS-MOT. FOR SJ     - 5
Case No.: 4:19-cv-02572-JSW

- Then, the CFPB says it will need *six months more* to prepare the Small Business Regulatory Enforcement Fairness Act (SBREFA) outline of the rulemaking. CFPB MSJ at 10. Again, given the Bureau's insistence that it has been hard at work on preparing for implementation these last eight years, it defies reason why an additional six months would be needed after briefing the Director simply to prepare an outline. (November 2020)

- Next, the Bureau will have to wait two months for the report of the SBREFA panel that is required to review rules affecting small businesses. CFPB MSJ at 10. (January 2021)

- Only then, according to the Bureau, will it even *share* an expected date for issuing a *proposed* rule—and even then it will not suggest a timeline for a final rule. It says that the timeline for a proposed rule from this point could be anywhere from *three months to a year*. CFPB MSJ at 10 (April 2021-January 2022)

- After that, issuance of a final rule will take "*at least nine months*," but possibly "longer." CFPB MSJ at 11. (January 2022-October 2022 or later)

This drawn-out timeline—which the Bureau offers but to which it pointedly does not commit—only underscores its reluctance to comply with Congress's mandate. For instance, the Bureau proposes to take an additional year from November 2019 simply to brief the Director on the issues involved and to write the SBREFA outline. The declarations submitted by Bureau employees provide no plausible justification for why these tasks would take so long, particularly in light of the amount of work the Bureau claims to have already put into implementation: the Bureau insists that it has "already completed" "substantial research and outreach" on implementation. CFPB MSJ at 13. Why, then, it needs a total of 20 months since it first determined it would restart the rulemaking process to prepare an outline is difficult to comprehend. Nor does the Bureau explain how many staff it has dedicated to Section 1071 implementation, either in the past, present, or future, information without which it is impossible to assess the credibility of its claims that it genuinely needs two to three years or more to implement the statute.

PLS.' REPLY ISO PLS.' MOT. FOR SJ &
OPP. TO DEFS.' CROSS-MOT. FOR SJ     - 6
Case No.: 4:19-cv-02572-JSW

The Bureau also ignores the fact that when a rulemaking has been a genuine agency priority, it has been able to move with much greater speed. Take, for example, the Bureau's mortgage servicing, origination, and disclosure rulemakings, a highly complex, technical, and interconnected set of 2013 rules. The Bureau issued these rules on a very rapid timeframe despite not having had the benefit of years of research and outreach as here, reaching finalization within two years of their very first appearance on the regulatory agenda.[15] In those cases, the Bureau was able to publish a SBREFA outline about six months from the first appearance in the regulatory agenda, and proposed rules about three months after SBREFA approval.

The complexity and degree of difficult decisionmaking involved in the mortgage rules—one of which occupies 636 pages of the Federal Register—bears no comparison to Section 1071, which is relatively specific and nondiscretionary.[16] To be sure, as is the case for any rulemaking, there are decisions to be made, which the Bureau describe in painstaking detail as if it is providing schematics for reinvention of the wheel. But in reality, the decisions are fairly cabined and discrete, given the relatively specific and mandatory nature of the language of Section 1071. *See, e.g.*, 15 U.S.C. § 1691c-2(e) (describing specific items of information to be collected and prescribing manner of itemization); *see also id.* § 1691c-2(h) (defining various terms including "financial institution," "small business," and "minority"). Moreover, the Bureau claims it is able to "leverage[] the substantial research and outreach that the Bureau has already completed in support of the Section

---

[15] *See* CFPB, Integrated Mortgage Disclosures Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 79,730 (Dec. 31, 2013), https://www.federalregister.gov/documents/2013/12/31/2013-28210/integrated-mortgage-disclosures-under-the-real-estate-settlement-procedures-act-regulation-x-and-the; CFPB, Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 11,280 (Feb. 15, 2013), https://www.federalregister.gov/documents/2013/02/15/2013-01503/loan-originator-compensation-requirements-under-the-truth-in-lending-act-regulation-z; CFPB, Mortgage Servicing Rules Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 10,902 (Feb. 14, 2013), https://www.federalregister.gov/documents/2013/02/14/2013-01248/mortgage-servicing-rules-under-the-real-estate-settlement-procedures-act-regulation-x. The timelines can be ascertained by viewing the associated dockets and RIN pages for each rule, which are accessible from the rules' Federal Register web pages, provided above.

[16] In November 2019, the Bureau announced a decision to revisit one of these 2013 mortgage rules, another example of it elevating its discretionary priorities over its mandatory duty to implement Section 1071. *See* CFPB, Consumer Financial Protection Bureau to Assess Integrated Mortgage Disclosure Rule (Nov. 20, 2019), https://www.consumerfinance.gov/about-us/newsroom/bureau-to-assess-integrated-mortgage-disclosure-rule/.

PLS.' REPLY ISO PLS.' MOT. FOR SJ &
OPP. TO DEFS.' CROSS-MOT. FOR SJ      - 7
Case No.: 4:19-cv-02572-JSW

1071 rulemaking." CFPB MSJ at 13. If that it so, then it is unclear why an additional year is needed before the Bureau can even provide an outline of how it plans to proceed.

The Bureau expects to issue this mandatory rule—but still will not commit to doing so—sometime in 2022 or later. In other words, Defendants ask this Court to countenance a virtually unprecedented delay of 11 years to fulfill what the Bureau itself admits is an important statutory obligation. And as long as the Bureau delays, the statute has no effect whatsoever, stymying Congress's express command to collect critical data for deterring and identifying fair lending violations and ameliorating credit deserts. In the interim, small business owners and would-be female and minority entrepreneurs will continue to face the barriers that Congress sought to overcome, as exemplified by Ms. Young and Ms. Field. The Court should exercise its authority to prevent such a result.

C. The *TRAC* Factors Compel Judicial Relief

The equitable *TRAC* factors strongly support judicial relief. For the reasons discussed above, the Bureau's delay has been unreasonable and unjustified, and its loose outline of a potential implementation timeline inspires no confidence that the Bureau's dilatoriness will change without judicial intervention. Defendants find no support for their claim that the Court should refrain from exercising its equitable power to fashion appropriate relief despite the Bureau's delay to date of eight years—much less the eleven years Defendants anticipate will have elapsed before the Bureau may finally comply with its statutory obligations. And just as Defendants do not challenge Plaintiffs' standing to bring this suit, there is no disputing the very real impact the Bureau's failure has had on Plaintiffs and other small business owners and prospective owners who have been denied credit, or offered less than they need or only on disadvantageous terms. In these circumstances, the Court should not stay its hand.

1. **The Length of Delay is Unreasonable**

The Ninth Circuit has held that the first TRAC factor—the reasonableness of the delay—is the most important. *See In re A Community Voice*; 878 F.3d 779, 786 (9th Cir. 2017). For the reasons discussed above, the Bureau has little to say in its favor on that point. In arguing that the first two *TRAC* factors do not support relief, CFPB identifies no cases in which a court has sustained a

1  complete failure to implement a statutory command for as long as the Bureau has failed to implement
2  Section 1071 to date—much less the eleven-plus years it anticipates. Indeed, as discussed in
3  plaintiffs' motion for summary judgment, the Ninth Circuit has twice found a delay of the exact
4  same length at issue so far here—eight years—to be excessive. *See* Pl. MSJ at 15 (citing *In re A*
5  *Community Voice*; 878 F.3d 779, 787 (9th Cir. 2017); *In re Pesticide Action Network of N. Am.*, 798
6  F.3d 809, 814 (9th Cir. 2015) ("*PANNA II*")). And the D.C. Circuit has consistently found delays of
7  a similar length or even shorter to be unreasonable. *See id.* at 15-16 (citing *Potomac Elec. Power Co.*
8  *v. ICC*, 702 F.2d 1026, 1035 (D.C. Cir. 1983) (eight-year delay was unreasonable); *MCI Telecomms.*
9  *Corp. v. FCC*, 627 F.2d 322, 324 (D.C. Cir. 1980) (four-year delay was unreasonable); *Nader v.*
10 *FCC*, 520 F.2d 182, 206 (D.C. Cir. 1975) (ten-year delay was unreasonable)).

11        The Bureau's reliance on the absence of a specific statutory deadline here is a red herring.
12 None of the cases relied on above involved a specific deadline, and in this Circuit, the *TRAC* factors
13 only apply when there is no such deadline. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166,
14 1177 n.11 (9th Cir. 2002). The second *TRAC* factor, whether Congress has itself provided a deadline,
15 primarily informs the application of the first and primary factor, the reasonableness of delay—in
16 other words, a statutory deadline "may supply content for this rule of reason." *Brower v. Evans*, 257
17 F.3d 1058, 1068 (9th Cir. 2001) (quoting *Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 n.7
18 (9th Cir. 1997)). In the absence of such a deadline, the Court simply determines the reasonableness
19 of delay under the first factor, and there the Bureau's argument fails.

20        In response, the Bureau cites two D.C. Circuit cases, neither of which is on point. One case
21 concerned a delay of five years to respond to a particular petition for tribal recognition under a
22 program that handled those petitions on a first-in, first-out basis. *See* CFPB MSJ at 13 (citing
23 *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003)). The
24 delay there was substantially shorter than that in issue here. Moreover, there was no claim that the
25 agency had failed to implement the statute. Rather, it was working through a backlog of petitions
26 under the statutory program—a different situation than the Bureau's complete inaction here. The
27 other case involved a challenge to a consummated rule that was alleged to *inadequately* implement a
28 statute. *See id.* (citing *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477-78 (D.C. Cir. 1998).

PLS.' REPLY ISO PLS.' MOT. FOR SJ &
OPP. TO DEFS.' CROSS-MOT. FOR SJ     - 9
Case No.: 4:19-cv-02572-JSW

There, the agency first issued one rule implementing restrictions on Grand Canyon overflights and then, based on the effects of that first rule, began work on follow-up measures. *See* 154 F.3d at 477 (noting that statute "contemplated that the agencies' first plan might not succeed and might have to be revised—as the agencies have done in the regulatory plan at issue here"). Again, it would be one thing if the Bureau had issued a rule implementing Section 1071 that had proven inadequate over time. Rather, the Bureau has failed entirely to give any effect to the law for more than eight years. That is the problem here, and the Bureau can point to no cases in which courts have countenanced such prolonged disregard for a clear legislative command.

The Bureau further states that the Court should not act because it has a plan for implementation. As discussed in greater detail above, the Bureau's plan falls far short of what is required, both because it refuses to commit to any concrete timeline, and because even its *potential* timeframe for completion of a rule would likely leave Plaintiffs with no relief for another three years or more. The Bureau's unwillingness to commit to an expeditious and concrete timeframe is especially surprising given its insistence that it has already completed "substantial research and outreach" toward implementation. CFPB MSJ at 13.

The Bureau next relies on *In re Pesticide Action Network of N. Am.*, 532 F. App'x 649, 651 (9th Cir. 2013) ("*PANNA I*"), for the proposition that an agency's concrete timeline for action militates against relief. In fact, that case provides a useful contrast and cautionary lesson. There, the court initially denied a mandamus petition despite six years of inaction because the agency provided a "concrete timeline" in which it committed to completion of final action within seven months. *Id.* That stands in stark contrast to this case, where the Bureau has been anything but concrete as to its plans, and has suggested it will take nearly three years to complete its rulemaking at a minimum. That difference alone plainly distinguishes the cases. But back to *PANNA*: two years after the initial denial, the petitioner came back to court because the government had not fulfilled its promise even though the petitioner had, by that point, waited eight years. *PANNA II*, 798 F.3d at 812 ("As an astute reader might have guessed, EPA's timeline proved not to be 'concrete.'"). In *PANNA II*, as here, the agency "has spent nearly a decade reviewing" the materials underpinning its action. *Id.* at 813. And just as the Bureau has broken its 2011 promise that it would "act expeditiously" to

PLS.' REPLY ISO PLS.' MOT. FOR SJ &
OPP. TO DEFS.' CROSS-MOT. FOR SJ    - 10
Case No.: 4:19-cv-02572-JSW

implement Section 1071, the EPA had failed to meet its own assurances as to when it would meet its mandatory duty. And here, as there, "the agency has still not stated with certainty when it intends" to complete its required action. So, just as in *PANNA II*, relief "is necessary to end this cycle." *Id.*

2. **The Bureau's Contemplated Delay Will Substantially Harm Plaintiffs and the Public**

The third and fifth TRAC factors—which involve the nature of the interests harmed by delay—favor relief because, as Plaintiffs explained in their motion for summary judgment, every day that the Bureau fails to enact Section 1071 harms the organizational plaintiffs in their efforts to ensure that the fair lending laws are properly enforced and that needs and opportunities for increasing credit access for small businesses, especially those that serve communities of color, are identified and addressed. Plaintiff CRC faces major challenges to identify which communities are most in need and what a given financial institution's existing practices are, which it needs to convince financial institutions to agree to provide additional investment in communities that face barriers to accessing credit. Gonzalez-Brito Decl. ¶ 8. Plaintiff NALCAB has spent many tens of thousands of dollars so far to develop research into lending practices and barriers to credit. *See* Declaration of Noel Poyo, filed concurrently with Pl. MSJ, ¶¶ 9-10. But even these enormous efforts cannot come close to filling the information gap left by the Bureau's failure to implement the statute. *Id.* ¶ 10. Indeed, Defendants do not even try to dispute that Plaintiffs are injured by their ongoing delay, conceding standing and leaving Plaintiffs' declarations unopposed.

Nor is the desire for swift implementation limited to Plaintiffs; rather, the desire for the Bureau to comply with its duty and promptly implement Section 1071 was further underscored by the Bureau's symposium on November 6, 2019, which reflected a broad consensus among affected stakeholders, including from the regulated community, that it is well past time for the law to be implemented.[17] For example, a Vice President of American Express, a financial institution subject to the law's data collection requirements, began his testimony by stating, "When the Dodd-Frank Act

---

[17] *See* CFPB, Symposium: Section 1071 of the Dodd-Frank Act (Nov. 6, 2019), https://www.consumerfinance.gov/about-us/events/archive-past-events/cfpb-symposium-section-1071-dodd-frank-act/.

PLS.' REPLY ISO PLS.' MOT. FOR SJ &
OPP. TO DEFS.' CROSS-MOT. FOR SJ      - 11
Case No.: 4:19-cv-02572-JSW

was signed into law on July 21, 2010 probably no one envisioned that one of its provisions related to the collection of small business data would still be unimplemented more than nine years later."[18] He continued: "Getting a rule in place expeditiously that may not be perfect, but accomplishes the primary purpose of the provision, should be a priority."[19]

A professor from Brigham Young University the Bureau invited to speak on Section 1071 implementation explained the research underpinning his conclusion that "[t]he availability of data and information along the consumer's journey to access capital is of paramount importance if markets are to improve for all consumers."[20] Accordingly, he and his co-authors concluded that "the potential costs of reporting the data called for in Section 1071 are far outweighed by the illumination and marketplace transparency those data have power to provide."[21]

The Bureau responds that human health is not at risk. CFPB MSJ at 18. True; rather, what is at issue is, in the Bureau's own words, the need to support the "vital role" of small businesses "in driving economic activity and supporting job creation."[22] As Plaintiffs and stakeholders in the financial community have stated, data transparency is critical to ensuring that the small business sector can continue to be a significant engine for American economic growth. The Bureau appears to concede that the rule serves important economic and antidiscriminatory purposes. That it is economic in nature rather than related to human health serves as no bar to relief. Indeed, the D.C. Circuit cases upon which Plaintiffs rely all involved failures to enact *economic* regulations for a similarly lengthy period of time. *See Potomac Elec. Power Co.*, 702 F.2d at 1035 (failure to adjudicate coal transportation rate protest); *MCI Telecomms. Corp.*, 627 F.2d at 324 (failure to revise

---

[18] Statement of Brad Blower, Vice President, Consumer Practices, American Express (Nov. 6, 2019) at 1 ("Blower Statement"), https://files.consumerfinance.gov/f/documents/cfpb_blower-written-statement_symposium-section-1071.pdf.

[19] *Id.*

[20] Statement of Glenn L. Christensen, Associate Professor of Marketing, Brigham Young University (Nov. 6, 2019) at 7, https://files.consumerfinance.gov/f/documents/cfpb_christensen-written-statement_symposium-section-1071.pdf.

[21] *Id.*

[22] See Dubner Decl., Ex. 1, CFPB, *Key Dimensions of the Small Business Lending* Landscape, at 39 (May 2017).

telecommunications rates); *Nader v. FCC*, 520 F.2d at 206 (failure to respond to complaints regarding telecommunications rate increases). And the Bureau's claim that the rule may hurt small businesses is inconsistent with the testimony of industry stakeholders indicating that implementation of the statute in a manner that benefits small business owners and the public at large should in fact be a fairly straightforward endeavor—by and large, the Bureau need only stick to the law's own mandatory terms.[23]

### 3. The Bureau's Contemplated Delay Will Substantially Harm Plaintiffs and the Public

The fourth and sixth factors—which focus on the reasons for delay—also favor judicial relief. The Bureau describes various projects across the agency, most of which have nothing whatsoever to do with Section 1071, without explaining how its staffing of those projects would overlap with its staffing for Section 1071 implementation or how those projects might otherwise suffer from expeditious progress on Section 1071. Nor does the Bureau explain how it has staffed its Section 1071 implementation team to this point (or if such a team even exists), or any other details about the resources it is bringing to bear—or declining to tap—to increasing the size and skill of that team. *See* Pahl Decl. ¶¶ 62-70. Without this information, it is impossible to assess the Bureau's claims that its drawn-own timetable is the fastest it could reasonably be expected to comply with its statutory mandate. And, as discussed above, the Bureau is in a unique position relative to other federal agencies to determine its resource and staffing levels, and it has stated clearly that its funding levels are "sufficient for the Bureau to carry out its statutory mandates."[24] Accordingly, its complaints that its resources would be overtaxed by implementing Section 1071 any faster are not well founded. And in any event, such arguments only go so far. They do not justify a decade of delay. "However many priorities the agency may have, and however modest its personnel and budgetary resources may be,

---

[23] *See* Blower Statement, *supra* note 18, at 1 ("The Bureau can meet the purpose of Section 1071 by issuing a simple, workable definition of small business that both lenders and small business applicants can follow, and by closely adhering to the language of Section 1071 related to the categories of information collected.").

[24] Mulvaney Letter, *supra* note 12.

there is a limit to how long it may use these justifications to excuse inaction." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 554 (D.C. Cir. 1999).

Finally, the Bureau suggests that because Plaintiffs do not directly accuse the Bureau of bad faith, the sixth factor does not favor relief. CFPB MSJ at 21-22. But the Bureau misses the whole point of *TRAC* factor six, which is to make clear that bad faith is not required: "the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.'" *Telecomms. Res. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (quoting *Public Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 34 (D.C. Cir. 1984)). In any event, and as discussed above, CFPB's record of inaction with respect to Section 1071 is difficult to reconcile with the image the Bureau attempts to paint of an agency working in good faith to comply with a mandatory statutory obligation. *See supra* at 2-5. The Bureau admits that it completely shut down its Section 1071 implementation program last year in favor of discretionary actions, despite being well aware of its mandatory duty to implement it and having promised all the way back in 2011 that it would "act expeditiously" to do so. And even now, the Bureau will not commit to a specific and proximate timeline for implementation. These are not the actions of an agency that should be relied upon to fulfill its duty without the Court's intervention. "At some point, we must lean forward from the bench to let an agency know, in no uncertain terms, that enough is enough." *Public Citizen Health Research Grp. v. Brock*, 823 F.2d 626, 627 (D.C. Cir. 1987).

D.  **The Court Should Hold the Bureau to a Specific and Proximate Timeline for Implementation**

After more than eight years of delays and halts, the Bureau assures the Court that it actually intends to implement the statute this time—but then refuses to commit to any concrete timeline for implementation, much less one that will afford Plaintiffs the relief they seek anytime soon. Given the Bureau's lengthy history of failing to act on its mandatory duty, the Court should exercise its equitable discretion to direct the Bureau to adhere to a definite timeline that will ensure Plaintiffs—and the entire affected community—the certainty they seek as to implementation of this long-overdue statutory duty.

In similar circumstances, the Ninth Circuit and D.C. Circuit have agreed that a specific, binding timeline is needed to ensure that the agency carries out its duty. In *In re A Community Voice*, the agency would not provide a concrete timeline, but instead only a "vague intention" as to when it would proceed. 878 F.3d at 788. Accordingly, the court required a proposed rule within 90 days and a final rule within a year thereafter. *Id.* Courts have imposed similar timelines in other cases. *See, e.g.*, *Brock*, 823 F.3d at 629 (requiring final action within six months and progress reports every 90 days); *Public Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1159 (D.C. Cir. 1983) (requiring issuance of proposed rule within 30 days and a final rule thereafter "on a priority, expedited basis . . . within a year's time"); *PANNA II*, 798 F.3d at 815 (requiring action within three months). Nor, contrary to the Bureau's suggestion, have such orders been limited to matters involving health and human safety or where court orders have been defied. *See, e.g.*, *Potomac Elec. Power Co.*, 702 F.2d at 1035-36 (requiring agency action within sixty days); *MCI Telecomms. Corp.*, 627 F.2d at 345-46 (setting binding schedule with input from parties); *Nader v. FCC*, 520 F.2d at 207 (same). And as is routinely done in these matters, the Court should also maintain jurisdiction over the case and require the Bureau to submit regular status reports updating the Court and Plaintiffs on its progress toward implementation. *See, e.g.*, *South Carolina v. United States*, 907 F.3d 742, 752-53 (4th Cir. 2018) (upholding district court decision setting concrete timeline for action and requiring periodic status reports).

### III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment and deny the Bureau's cross-motion for summary judgment.

| | | |
|---|---|---|
| 1 | DATED: November 26, 2019 | Respectfully submitted, |
| 2 | | DEMOCRACY FORWARD FOUNDATION |
| 3 | | By: ___/s/ Nitin Shah_____ |
| 4 | | Nitin Shah (DC Bar No. 156035) (*pro hac vice*) |

Jeffrey B. Dubner (DC Bar No. 1013399)
(*pro hac vice*)
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
Facsimile: (202) 701-1775
nshah@democracyforward.org
jdubner@democracyforward.org

Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 256260)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com

Steve W. Berman (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP

*Counsel for Plaintiffs*

PLS.' REPLY ISO PLS.' MOT. FOR SJ &
OPP. TO DEFS.' CROSS-MOT. FOR SJ    - 16
Case No.: 4:19-cv-02572-JSW